# EXHIBIT A

CALLAGY LAW, P.C.
A Limited Liability Company
Lori B. Shlionsky (Bar Id. 205322017)
Mack-Cali Centre II
650 From Road, Suite 240
Paramus, New Jersey 07652
Phone: (201) 261-1700
Fax: (201) 549-6236
E-mail: lshlionsky@callagylaw.com
Attorneys for Plaintiff, Oasis Medical and Surgical Wellness

| | |
|---|---|
| **OASIS MEDICAL AND SURGICAL WELLNESS on assignment of FRANCESCO S.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITEDHEALTHCARE, INC.,**<br><br>**Defendants.** | : **SUPERIOR COURT OF NEW JERSEY**<br>: **LAW DIVISION: CIVIL PART**<br>: **BERGEN COUNTY**<br>:<br>: **DOCKET NO.:**<br>:<br>: **CIVIL ACTION**<br>:<br>: **COMPLAINT**<br>:<br>:<br>:<br>: |

OASIS MEDICAL AND SURGICAL WELLNESS on assignment of FRANCESCO S. by way of Complaint against UNITEDHEALTHCARE, INC. ("Defendant(s)"), asserts:

## THE PARTIES

1.     For all relevant times herein, Plaintiff is and was a healthcare provider in the State of New Jersey whose principal place of business is 85 Harristown Road, Glen Rock, NJ 07452.

2.     Upon information and belief, Defendants were present and engaged in significant activities in the State of New Jersey to sustain this Court's exercise of in personam jurisdiction.

3.     Venue and Jurisdiction is proper in the Bergen County Superior Court because the Plaintiff resides in Bergen County.

1

## ANATOMY OF THE CLAIM

1.      Upon information and belief, at all material times Principal had health insurance through his spouse's employer, Vitamin Shoppe Industries which provided health insurance benefits via a group insurance contract administered by third-party UnitedHealthcare, Inc.

2.      At the time of the subject surgery Principal's selected medical benefit option was the Choice Plus Medical Plan.  See **Exhibit A**.

3.      Patient presented to the Hudson Regional Hospital on March 6, 2020, with severe posttraumatic facet syndrome at L5-S1. See **Exhibit B**.

4.      On March 6, 2020, Drs. Suja Patel and Gregory Lawler, medical providers with Oasis Medical and Surgical Wellness, provided medically necessary and reasonable services to Patient. Id.

5.      The patient was involved in a motor vehicle accident in October 2018. After failing conservative treatment, the patient elected to undergo spine surgery. Id.

6.      Patient underwent a dorsal ramus rhizotomy with mechanical destruction of nerves at the right L4 and L5 on March 6, 2020.  Id.

7.      On February 19, 2020, at 3:29pm, Plaintiff spoke to a representative of Defendant named "Theo E." and received prior authorization for CPT 64653 (Authorization #A09057429), the representative also indicated the no prior authorization was required for CPT 64636, the authorization was provided for the time period of March 6, 2020, 1through June 4, 2020; the reference number for the call was #1404.

8.      CPT 64653 as maintained by the American Medical Association, is a medical procedure code that denotes destruction of a sympathetic nerve by a neurolytic agent.

7.      Initially, Dr. Patel sought to perform rhizotomy with a less invasive approach, and CPT 64635 would have been applicable, which is why Dr. Patel obtained pre-certification for that CPT. See **Exhibit C**

8.      However, while performing the procedure, Dr. Patel found that the initial, non-invasive approach was not applicable for the subject patient and same required a more complex approach than applicable for the use of CPT 64653.

9. Because of the use of a more complex approach for the Rhizotomy, Dr. Patel billed the same procedure under CPT 64999.  See **Exhibit F**.

10.      Although the Rhizotomy was pre-approved by UnitedHealthcare, the procedure was denied because of the discrepancy in CPT code, not a lack of pre-approval for the procedure. Id.

11.      These services met the definition of a covered expense as addressed in the Summary Plan Description ("SPD") as the Patient received services from an out-of-network provider.

If you go to an out-of-network provider, you must pay a certain deductible amount. Insured benefits are generally paid at 50% of R&C charges, and you must file claim forms to be reimbursed. After you have met your deductible, you are responsible to pay any excess and above the R&C limits.

See **Exhibit D** at page 18.

12.      At the time of the subject surgical procedure, Oasis Medical and Surgical Wellness was not participating in the network of providers associated with the benefits provided by the plan. See **Exhibit E**.

13.      The bill for this service, submitted to Defendant by way of health insurance claim forms ("HICFs"), was $26,481.34. See **Exhibit F**.

13.     On September 10, 2020, UnitedHealthcare denied the claim in its entirety. See

**Exhibit E**.

12.     This represents an underpayment of approximately $26,481.34, considering

applicable pay rates and reductions.

13.     The Plan's SPD defines the "Reasonable and Customary" charge —for out-of-

network providers providing spine surgery services such as Drs. Suja Patel and Gregory Lawler,

—as follows:

Reasonable and Customary (R&C) charge generally means the prevailing charge made for providers of similar expertise for a similar procedure in a particular geographic area, as determined by the relevant Claims Administrator. A specific certificate may use a variation on this term, e.g. UCR in an United Healthcare Certificate or a variation on this definition; the specific definition used in a certificate will govern as to benefits provided under that certificate.

 See **Exhibit D** (page 136).

15.     Plaintiff disputes the denial of the procedure. Dr. Patel is an expert in his field and

therefore performed a surgery he believed was medically necessary.

16.     As previously mentioned, the initial procedure was authorized, therefore, Plaintiff

finds the denial improper. See **Exhibit C**

17.     According to the documents submitted to UnitedHealthcare, the Plaintiff billed

the claim as an unlisted procedure as the complexity of the procedure changed and the code

originally authorized no longer applied. Id.

16.     Oasis Medical and Surgical Wellness appealed Defendant's determination on

multiple occasions. See**, Exhibit G**.

18.     Upon information and belief, Plaintiff has exhausted all administrative remedies.

19.     Oasis Medical and Surgical Wellness, proceeding on an Assignment of Benefits

from Patient, brought suit.  See **Exhibit H**.

4

20.     Accordingly, Plaintiff brings this action for the recovery of the balance of benefits due to Principal under the Plan for the treatment rendered to him by the providers within Oasis Medical and Surgical Wellness.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

1.     Plaintiff repeats and restates the allegations in the preceding paragraphs of the Complaint as if fully set forth at length herein.

2.     As a result of the foregoing, Defendants provide health insurance benefits to the insured Patient and through their actions breached the contract with the Patient.

3.     As a result of Defendants actions, Plaintiff has been damaged in an amount of $26,481.34 for date of service March 6, 2020, cost of suit, attorneys' fees, plus interest, thereon and any other relief as the Court deems just and equitable under the circumstances.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

4.     Plaintiff repeats and restates the allegations in the preceding paragraphs of the Complaint as if fully set forth at length herein.

5.     Defendant was unjustly enriched at the expense of the Plaintiff.

6.     Plaintiff provided services to Patient, the Defendants insured, and the Plaintiff was underpaid pursuant to the health benefit plan.

7.      As a direct and proximate result of the Defendant's actions and unjust enrichment, Plaintiff has suffered, and will continue to suffer, substantial monetary damages.

8.      As a result of Defendants actions, Plaintiff has been damaged in an amount of $26,481.34 for date of service March 6, 2020, cost of suit, attorneys' fees, plus interest, thereon and any other relief as the Court deems just and equitable under the circumstances.

**THIRD CAUSE OF ACTION**

**(Promissory Estoppel)**

9.      Plaintiff repeats and restates the allegations in the preceding paragraphs of the Complaint as if fully set forth at length herein.

10.      Defendant made representations to Plaintiff concerning payment in accordance with the health benefit plan or Summary Plan Description ("SPD").

11.      Defendant failed to comply with the terms of the Summary Plan Description.

12.      Plaintiff reasonably relied upon the representations made by the SPD.

13.      As a result of Defendants actions, Plaintiff has been damaged in an amount of $26,481.34 for date of service March 6, 2020, cost of suit, attorneys' fees, plus interest, thereon and any other relief as the Court deems just and equitable under the circumstances.

**FOURTH CAUSE OF ACTION**

**(Breach of Duty of Good Faith and Fair Dealing)**

14.      Plaintiff repeats and restates the allegations in the preceding paragraphs of the Complaint as if fully set forth at length herein.

6

15.     Defendants owed Plaintiff an obligation to act in good faith and deal fairly with him regarding the terms of the SPD.

16.     By engaging in the misconduct alleged herein, Defendants breached their duty of good faith and fair dealing, which has damaged and continues to damage Plaintiff.

17.     As a result of Defendants actions, Plaintiff has been damaged in an amount of $26,481.34 for date of service March 6, 2020, cost of suit, attorneys' fees, plus interest, thereon and any other relief as the Court deems just and equitable under the circumstances.

**WHEREFORE**, Plaintiff demands judgment against Defendants, as follows:

a.     For an Order directing Defendant to pay to Plaintiff $26,481.34 for date of service March 6, 2020;

b.     For compensatory damages and interest;

c.     For attorney's fees and costs of suit, if allowed by the Agreement; and

d.     For such other and further relief as the court may deem just and equitable.

**Dated:** November 17, 2022

Respectfully,
**CALLAGY LAW, PC**

**Lori B. Shlionsky (Bar Id. 205322017)**
**650 From Road, Suite 240**
**Paramus, New Jersey 07652**
**Telephone: (201) 261-1700**
**Facsimile: (201) 549-6237**
**E-mail: lshlionsky@callagylaw.com**
**Attorney for Plaintiff**

## TRIAL COUNSEL DESIGNATION

Lori Shlionsky, Esq., is hereby designated as Trial Counsel in the above matter.

## R. 4:5-1(b)(2) CERTIFICATION

Pursuant to R. 4:5-1(b)(2), I hereby certify that the matter in controversy is not the subject of any other action pending in any court, is not the subject of a pending arbitration proceeding and is not the subject of any other contemplated action or arbitration proceeding, except as may be set forth below:

**None.**

I further certify that I know of no non-parties who should be joined in the action pursuant to R. 4:28, or who may be subject to joinder pursuant to R. 4:29-1(b) because of potential liability to any party on the basis of the same transactional facts, except as may be set forth below:

**None.**

**Respectfully,**
**CALLAGY LAW, PC**

**Lori B. Shlionsky (Bar Id. 205322017)**
**650 From Road, Suite 240**
**Paramus, New Jersey 07652**
**Telephone: (201) 261-1700**
**Facsimile: (201) 549-6237**
**E-mail: lshlionsky@callagylaw.com**
**Attorney for Plaintiff**

# EXHIBIT "A"



**This message, and any documents attached hereto, may contain confidential or proprietary information intended only for the use of the addressee(s) named above or may contain information that is legally privileged. If you are not the intended addressee, or the person responsible for delivering it to the intended addressee, you are hereby notified that reading, disseminating, distributing or copying this message is strictly prohibited. If you have received this message by mistake, please immediately notify us by replying to the message and delete the original message and any copies immediately thereafter. Thank you for your cooperation.**



eligibilityLink     Frank ████████

## POLICIES / KEY DATES

### POLICIES

ACTIVE COVERAGE: 01/01/2019 - 11/30/2019
UNITEDHEALTHCARE CHOICE PLUS

### SEARCHED DATE RANGE

11/12/2019 -

### EFFECTIVE - TERM DATES

01/01/2019 - 11/30/2019

## PATIENT / PROVIDER INFORMATION

### PATIENT DETAILS

View ID Card

NAME

FRANK ████████

*To view other members on this plan, click the drop-down box arrow.*

MEMBER ID     BIRTHDATE     GENDER
916077154     ████████      M

ADDRESS (SUBSCRIBER'S ADDRESS)
████████

SEARCH THIS PATIENT:
claimsLink

FIND A PROVIDER FOR THIS PATIENT:
Provider Search

PLAN REQUIREMENTS:

Referrals: No

Prior Authorizations & Notifications: Yes

Check Prior Authorization by Code

CODE LOOKUP TOOL
Find a Diagnosis or Procedure Code

NON-PAR LABORATORY REFERRAL:

Search for Preferred Labs

CARE OPPORTUNITIES:

### PRIMARY CARE PHYSICIAN

No Primary Care Physician on file for this plan.

### SELECTED CARE PROVIDER

Change Provider

YOUR PROVIDER/ORGANIZATION
OASIS MEDICAL AND SURGICAL WELLNESS GRP

This message, and any documents attached hereto, may contain confidential or proprietary information intended only for the use of the addressee(s) named above or may contain information that is legally privileged. If you are not the intended addressee, or the person responsible for delivering it to the intended addressee, you are hereby notified that reading, disseminating, distributing or copying this message is strictly prohibited. If you have received this message by mistake, please immediately notify us by replying to the message and delete the original message and any copies immediately thereafter. Thank you for your cooperation.

## INSURANCE INFORMATION

### POLICY STATUS                    ACTIVE POLICY

EFFECTIVE - TERM DATES

01/01/2019 - 11/30/2019

### SELECTED INSURANCE DETAILS

| MEMBER ID | GROUP NUMBER | PAYER | PAYER ID |
|---|---|---|---|
| 916077154 | 908882 | UNITEDHEALTHCARE | 87726 |

| PLAN DESCRIPTION | PAYER STATUS | INSURANCE TYPE | FUNDING TYPE |
|---|---|---|---|
| UNITEDHEALTHCARE CHOICE PLUS | Primary | Commercial | Self-Funded |

| COORDINATION OF BENEFITS | CONSUMER DRIVEN HEALTH PLAN | HSA | HRA |
|---|---|---|---|
| Member COB us date overdue. Last update: 02/20/2018 | NO | NO | |

CLAIMS ADDRESS

P.O. BOX 740800
ATLANTA, GA 30374
0800

### ADDITIONAL COVERAGE                    NONE

### PLAN DEDUCTIBLES & MAXIMUMS

Out-of-Network

**This message, and any documents attached hereto, may contain confidential or proprietary information intended only for the use of the addressee(s) named above or may contain information that is legally privileged. If you are not the intended addressee, or the person responsible for delivering it to the intended addressee, you are hereby notified that reading, disseminating, distributing or copying this message is strictly prohibited. If you have received this message by mistake, please immediately notify us by replying to the message and delete the original message and any copies immediately thereafter. Thank you for your cooperation.**

Name: Salvemini, Francesco                    DOB: 09/30/1960                    Date:

# EXHIBIT "B"

```
------------------------------------------------------------------------
MEDICAL RECORD                                         Progress Notes
STATUS: COMPLETED
------------------------------------------------------------------------
NOTE DATED: 03/06/2020 12:34
LOCAL TITLE: OR:OPERATIVE REPORT
VISIT: 03/06/2020 07:46 SAMEDAY SURGERY M

ACCOUNT#: N00000718023
DATE:      03/06/2020
```

OPERATIVE REPORT

PREOPERATIVE DIAGNOSIS:  Right L5-S1 posttraumatic facet syndrome.

POSTOPERATIVE DIAGNOSIS:  Right L5-S1 posttraumatic facet syndrome.

PROCEDURE:  Right L4 and L5 dorsal ramus rhizotomy with mechanical destruction
of nerves.

SURGEON:  Sujal Patel, M.D.

ASSISTANT:  Gregory Lawler, M.D.

ANESTHESIA:  General endotracheal.

ESTIMATED BLOOD LOSS:  Minimal, approximately 10 cc.

SPECIMENS:  None.

DRAINS:  None.

COMPLICATIONS:  None.

DISPOSITION:  The patient was transferred to the recovery room in stable
condition.

INDICATIONS:  The patient is a 59-year-old male complaining of continuing low
back pain greater on the right-hand side after injuring himself in an accident
on November?9,?2018.  Pain is most severe over the right-hand side in the
right paraspinal muscles and exacerbates with extension of the lumbar spine.
The patient failed conservative treatment including physical therapy,
antiinflammatory medications and lumbar medial branch blocks with short-term
pain relief.  The patient was candidate for a right L4 and L5 dorsal?ramus
rhizotomy.  The?risks, benefits, alternatives and the nature of the procedure
were discussed with the patient.  Risks included risk of anesthesia, risk of
infection, risk?of?blood loss, risk of neurovascular injury, risk of
continuing low back pain and leg pain, risk of future surgeries, risk of DVT
and PE, risk?of myocardial infarction and stroke, and the risk of death.  The
patient accepted the risks and informed consent was obtained.

DESCRIPTION OF THE PROCEDURE:  The patient was identified in the holding area
and the lumbar spine was marked.  The patient was then brought into the
operating?room.  After general anesthesia was administered, the patient was
placed prone on a Jackson table with a Kambin frame.  All bony prominences
were well padded.  There was no compression on the eyes.  2 gm of Ancef was
administered prior to incision.  Next, the lumbar spine was prepped and draped
                ** THIS NOTE CONTINUED ON NEXT PAGE **

```
------------------------------------------------------------------------
        , FRANCESCO         HUDSON REGIONAL HOSPITAL    Printed:08/20/2020 11:22
1100124746 DOB:09/30/1960     Pt Loc: OUTPATIENT               Vice SF 509
------------------------------------------------------------------------
```

This message, and any documents attached hereto, may contain confidential or proprietary information intended only for the use of the addressee(s) named above or may contain information that is legally privileged. If you are not the intended addressee, or the person responsible for delivering it to the intended addressee, you are hereby notified that reading, disseminating, distributing or copying this message is strictly prohibited. If you have received this message by mistake, please immediately notify us by replying to the message and delete the original message and any copies immediately thereafter. Thank you for your cooperation.

Name        , Francesco                    DOB                                    Date:

```
--------------------------------------------------------------------------
MEDICAL RECORD                                              Progress Notes
STATUS: COMPLETED
--------------------------------------------------------------------------
03/06/2020 12:34     ** CONTINUED FROM PREVIOUS PAGE **
```

in usual sterile fashion.  Timeout was performed.  Next, fluoroscopy was
brought in and the right?transverse?process-facet junction was identified.
The needle was localized to the region.  Next,?0.25% Marcaine with epinephrine
approximately 5 mL was injected into the incision site.  An incision was made
and sharp and blunt dissection was carried down to the fascia which was
incised in line with the skin incision.  Next, sequential dilation was carried
down to the right?L5?transverse?processfacet junction.  Soft tissues were
visualized and removed.  The medial branch of the L4 dorsal ramus was
visualized and mechanically destroyed using a biofrequency device.  All
bleeders were then?coagulated with bipolar cautery.  Next, the needle was then
localized to the sacral?ala-facet junction using the same incision.
Sequential dilation was carried down to the junction.  Soft?tissues were
visualized and removed.  The medial branch of the L5?dorsal ramus was
visualized and mechanically destroyed using a biofrequency device.  All?
bladders were again coagulated with bipolar cautery.  The incision was
copiously irrigated with normal saline.  Throughout the procedure, an
endoscope was used to aid in visualization.  The?incision was then closed in a
layered fashion.  The?incision was dressed with Mastisol, Steri-Strips, 4x4
and Tegaderm.  The patient was awoken from anesthesia and transferred to the
recovery room in stable condition.

```
_____

Sujal Patel, M.D.

PTC/84
JOB: 0306-054
DDT: 03/06/2020 12:34
TDT: 03/07/2020 05:37
```

```
               Signed by: /es/ SUJAL PATEL
                          03/18/2020 13:45
```

```
--------------------------------------------------------------------
█████████, FRANCESCO        HUDSON REGIONAL HOSPITAL     Printed:08/20/2020 11:22
1100124746 DOB:09/30/1960       Pt Loc: OUTPATIENT               Vice SF 509
--------------------------------------------------------------------
```

This message, and any documents attached hereto, may contain confidential or proprietary information intended only for the use of the addressee(s) named above or
may contain information that is legally privileged. If you are not the intended addressee, or the person responsible for delivering it to the intended addressee, you are
hereby notified that reading, disseminating, distributing or copying this message is strictly prohibited. If you have received this message by mistake, please immediately
notify us by replying to the message and delete the original message and any copies immediately thereafter. Thank you for your cooperation.

Name █████ Francesco                              ████████████                    Date:

# EXHIBIT "C"



**OASIS**

MEDICAL AND WELLNESS GROUP

**85 Harristown Rd, Suite 103 Glen Rock, NJ 07452**
**Telephone: 844-366-8800**
**Facsimile:   844-366-8900**

*Keith P. Johnson, M.D., Sujal Patel, MD, Rajnik Raab, MD,*
*Ralph Wheeler, MD,  Anissa Hashemi, DPM, Ralph Daniel, PA-C, Umara Suri, PA-C*

May 5, 2021

To: UHC

RE: Francesco █████████
ID# 916077154
DOB: ██████████

To Whom It May Concern,

This letter is to appeal processing claim for your subscriber and our patient Francesco ████████ for date of service 3/06/2020.

On this day patient underwent on L4 and L5 dorsal ramus Rhizotomy with mechanical destruction of nerves. The 60 years old male was complaining of neck and low back pain. He was involved in a motor vehicle accident on 10/09/2018, injuring his neck and low back. The patient has failed conservative treatment including physical therapy, anti-inflammatory medication, and two lumber epidural injections with short-term pain relief.

The best option for Mr. ████████ to relive his back pain and help with daily activities was Rhizotomy procedure. Rhizontomy is a surgical procedure to sever nerve roots in the spinal cord. The procedure effectively relives chronic back pain and muscle spasms, and provide lasting low back pain relief by disabling the sensory nerve at the facet joint.

We obtained authorization from UHC for CPT code 64635 (authorization #A090574291) that is usually billed for Rhizontomy. The procedure that Dr. Patel perform to MR. ████████ on 3/06/2020 was more complex than CPT codes 64635. The CPT code 64999 was billed for each level because there is no other code which best describes work performed (open procedures). Dr. Patel did open procedure that is documented on the operative report. CPT code 64635 is only for close procedures. There are sometimes

situation that surgeon has to use different techniques that were not planned for better results on each patient condition, pain and/or injury.

Consider Rhizotomy to be medically necessary for Mr ███████ we expect that your coverage of this procedure would be consistent with coverage of other medically necessary procedures.

We respectfully request that claim for date of service 3/06/2020, be promptly processed for the service rendered to your subscriber as allowed by the State prompt payment regulations. Your attention on this matter will be greatly appreciated.

Sincerely,

Margaret Tyszko
Director of Revenue Cycle
Oasis Medical and Surgical Wellness Group, LLC
85 Harristown Road
Glen Rock, NJ 07452

# EXHIBIT "D"



Health & Welfare Benefits Program

# WRAP SUMMARY PLAN DESCRIPTION

January 1, 2019

# SUMMARY PLAN DESCRIPTION

This booklet (this "Guide"), as supplemented by the brochures and/or certificates issued by the Insurers and Claims Administrators and referenced below, is the summary plan description intended to describe the Vitamin Shoppe Industries Inc. Health & Welfare Benefits Program (the "Program"), sponsored by Vitamin Shoppe Industries Inc. (the "Company"). This Guide highlights the main features of the Program as intended to be effective as of January 1, 2019.

If you are an employee of the Company or one of its affiliates participating in the Program, you should generally consider the term "employer" or the Company in that portion of this Guide to mean your own employer. However, when used in connection with the administration of the Program, the term "employer" or the Company means Vitamin Shoppe Industries Inc.

The benefits described in this Guide generally are available to employees regularly scheduled to work at least 30 hours per week who also meet the applicable eligibility requirements for a particular benefit as described in this Guide.

IMPORTANT NOTE:  This Guide is based on legal documents that include insurance policies, contracts and other Program documents.  While steps have been taken to make the summary descriptions presented in this Guide as accurate as possible, the official documents contain all the specific provisions of the Program.  If there are any differences or ambiguities between this Guide and the legal documents, the legal documents will control.

This Guide is supplemented by brochures and/or certificates issued by the Insurers and Claims Administrators.  This Guide may be incomplete without reference to such a brochure or certificate.

The information in this Guide, or participation in a Plan, are not guarantees of continued employment with the Company or its affiliates.  Also, there is no guarantee that the Program will continue to exist or will remain unchanged in the future.  The Company reserves the right to amend, modify, suspend or terminate all or any portion of the Program at any time.

The Guide tries to explain Program provisions in everyday language, but you may come across capitalized words, which indicate they have specific meanings within the context of the Program.  You'll find definitions of the capitalized terms in the "Key Terms & Definitions" section, and the Index will assist in locating where those terms appear.

Please also be sure to read the "Administrative Facts" section of this Guide for important administrative guidelines and facts about your rights under applicable law and the Program.  It also contains other information about the Program required by law to be furnished to you.

**Spanish**:  This Guide contains a summary in English of your rights and benefits under the Vitamin Shoppe Industries Inc. Health & Welfare Benefits Program.  If you have difficulty understanding any part of this Guide, contact Total Rewards, The Vitamin Shoppe, 300 Harmon Meadow Blvd, Secaucus, NJ  07094.  Office hours are from 8:30 A.M. to 5:00 P.M. Eastern time Monday through Friday.  You also may call them at (201) 552-6000 during office hours or email them at VStotalrewards@vitaminshoppe.com for assistance.

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................... A-1

How Your Benefits Work .................................................................................... A-2

General Information About Your Benefits ......................................................... B-1
    Who's Eligible? ................................................................................................ B-1
    Cost of Coverage ............................................................................................. B-4
    Pre-Tax Premium Plan .................................................................................... B-4
    Leaves of Absence and Other Rights Under Federal Law ........................... B-4
    When Coverage Stops ..................................................................................... B-7
    To Find Network Providers, PCPs, Pharmacies, Vision, Dental and Employee
    Assistance Program, and for Questions Regarding the FSA ........................ B-8

Medical Plan ........................................................................................................ C-1
    Who's Eligible? ................................................................................................ C-1
    The UnitedHealthCare PPO Plans ................................................................. C-1
    Prescription Drug Benefits ............................................................................. C-1
    Non-Tobacco User Discount .......................................................................... C-2
    Other Wellness Programs ............................................................................... C-2
    PPO 600 .......................................................................................................... C-3
    PPO 600 Prescription Drug Plan ................................................................... C-12
    PPO 2000 ........................................................................................................ C-14
    PPO 2000 Prescription Drug Plan ................................................................. C-23
    Health Savings Account ("HSA") ................................................................. C-24
    Puerto Rico Medical ....................................................................................... C-26
    Puerto Rico Prescription Drug Plan .............................................................. C-31
    Hawaii Medical ............................................................................................... C-33
    Exclusions and Limitations ............................................................................ C-35
    Additional Information on Hawaii Coverage ................................................ C-41

Virtual Visits Program ........................................................................................ D-1
    Eligibility ......................................................................................................... D-1
    Cost of Coverage ............................................................................................. D-1
    Overview Of Virtual Visits ............................................................................ D-1
    How To Use Virtual Visits ............................................................................ D-1

Dental Plan .......................................................................................................... E-1
    Who's Eligible? ................................................................................................ E-1
    United Healthcare Dental Benefits Summary ............................................... E-1
    Hawaii Dental Service .................................................................................... E-17

Vision Plan .......................................................................................................... F-1
    Who's Eligible? ................................................................................................ F-1
    The Vision Service Plan Option .................................................................... F-1

Employee Assistance Program ........................................................................... G-1
    Who's Eligible? ................................................................................................ G-1

## TABLE OF CONTENTS (continued)

**Page**

Cost of Coverage ................................................................................................. G-1
Overview of the Employee Assistance Program ............................................... G-1

The Health Care Flexible Spending Account (FSA) .......................................... H-1
Who's Eligible? .................................................................................................. H-1
Why Enroll? ....................................................................................................... H-1
When You Can Enroll or Change Your Coverage ............................................. H-1
How to Enroll ..................................................................................................... H-1
Your Annual Election ........................................................................................ H-1
Examples of Eligible Expenses ......................................................................... H-2
Reimbursement .................................................................................................. H-2
Termination of Employment ............................................................................. H-2
How Do I Claim Reimbursement? ..................................................................... H-3
A.    Traditional Paper Claims: ........................................................................ H-3
B.    Electronic Payment Card: ........................................................................ H-3

Short Term Disability (STD) ............................................................................... I-1
Who's Eligible? .................................................................................................... I-1
Cost of Coverage .................................................................................................. I-1
What is Covered .................................................................................................... I-1
Filing Claims ........................................................................................................ I-1
When Coverage Stops ........................................................................................... I-1
Elimination Period ................................................................................................ I-2
Weekly Income Benefit: ....................................................................................... I-2
Maximum Benefit Period ..................................................................................... I-2
Eligible Employees Working in California, Hawaii, New Jersey, New York,
Puerto Rico or Rhode Island ................................................................................ I-2

Long Term Disability (LTD) .............................................................................. J-1
Who's Eligible? ...........................................................................**Error! Bookmark not defined.**
Cost of Coverage ................................................................................................ J-1
What Qualifies as a Long Term Disability? ....................................................... J-1
Elimination Period ............................................................................................. J-1
Monthly Benefit: ................................................................................................ J-1
Other Income Benefits ....................................................................................... J-2
Maximum Duration of Benefits ......................................................................... J-2
When Coverage Stops ........................................................................................ J-2
When LTD Benefits Are Not Paid ..................................................................... J-2
How to File a Claim ........................................................................................... J-3

Basic Life Insurance .......................................................................................... K-1
Who's Eligible? .................................................................................................. K-1
Amount of Coverage .......................................................................................... K-1
Cost of Coverage ............................................................................................... K-1
Your Beneficiary ............................................................................................... K-1
Payment of Benefits .......................................................................................... K-2
Reduction in the Principal Amount ................................................................... K-2

## TABLE OF CONTENTS (continued)

**Page**

When Coverage Stops ............................................................................................... K-2
Conversion Privilege ............................................................................................... K-2
Portability .................................................................................................................. K-3

Accidental Death And Dismemberment (AD&D) Insurance .................................... L-1
Who's Eligible? .......................................................................................................... L-1
Amount of Coverage .................................................................................................. L-1
Cost of Coverage ....................................................................................................... L-1
Benefits ....................................................................................................................... L-1
Benefits Amount Payable ......................................................................................... L-1
Limitation per Accident ............................................................................................ L-2
When Coverage Stops ............................................................................................... L-2

Optional Life Insurance ............................................................................................ M-1
Optional Group Term Life Coverage ....................................................................... M-1
Who's Eligible? .......................................................................................................... M-1
Cost of Coverage ....................................................................................................... M-1
Amount of Coverage You Can Choose ..................................................................... M-1
Guaranteed Issue ...................................................................................................... M-1
Reduction in the Principal Amount ......................................................................... M-1
When Coverage Stops ............................................................................................... M-1
Conversion Privilege ............................................................................................... M-2
Portability .................................................................................................................. M-2

Spousal Optional Life Insurance ............................................................................. N-1
Spousal Optional Group Term Life Coverage ......................................................... N-1
Who's Eligible? .......................................................................................................... N-1
Amount of Coverage You Can Choose ..................................................................... N-1
Cost of Coverage ....................................................................................................... N-1
Guaranteed Issue ...................................................................................................... N-1
When Coverage Stops ............................................................................................... N-1
Conversion Privilege ............................................................................................... N-2
Portability .................................................................................................................. N-2

Dependent Child Optional Life Insurance .............................................................. O-1
Dependent Child Optional Group Term Life Coverage .......................................... O-1
Who's Eligible? .......................................................................................................... O-1
Amount of Coverage .................................................................................................. O-1
Cost of Coverage ....................................................................................................... O-1
Guaranteed Issue ...................................................................................................... O-1
When Coverage Stops ............................................................................................... O-1
Conversion Privilege ............................................................................................... O-2
Portability .................................................................................................................. O-2

Critical Illness Coverage .......................................................................................... P-1
Who's Eligible? .......................................................................................................... P-1
Optional Critical Illness Coverage .......................................................................... P-1

# TABLE OF CONTENTS (continued)

**Page**

Cost of Coverage ......................................................................................................P-1
Amount of Coverage You Can Choose ....................................................................P-1
When Coverage Stops................................................................................................P-1
Portability ................................................................................................................P-2

Accident Coverage ......................................................................................................Q-1
Who's Eligible? ........................................................................................................Q-1
Optional Accident Coverage ....................................................................................Q-1
Cost of Coverage ......................................................................................................Q-1
Amount of Coverage You Can Choose ....................................................................Q-1
When Coverage Stops................................................................................................Q-1
Portability ................................................................................................................Q-2

Business Travel Accident Insurance ..........................................................................R-1
Who's Eligible? ........................................................................................................R-1
Cost of Coverage ......................................................................................................R-1
Coverage ..................................................................................................................R-1
Amount of Coverage ................................................................................................R-1
Limitation Per Accident ..........................................................................................R-2
Aggregate Limitation Per Accident ........................................................................R-2
When Benefits Are Not Paid ....................................................................................R-2
How To File A Claim ................................................................................................R-2
When Coverage Stops................................................................................................R-2

Business Travel Accident Insurance ..........................................................................S-1
Who's Eligible? ........................................................................................................S-1
Cost of Coverage ......................................................................................................S-1
Coverage ..................................................................................................................S-1
How to fila a claim ..................................................................................................S-2
Exclusions: Medical Illness and Injury....................................................................S-3
Exclusions: Accidental Death And Dismemberment ..............................................S-4

COBRA Continuation of Your Coverage ....................................................................T-1
Cobra Continuation Generally ................................................................................T-1
How is COBRA Continuation Coverage Provided ..................................................T-1
How COBRA Continuation Coverage Could End ..................................................T-4
COBRA Coverage for the Health Care FSA ............................................................T-4

Other Important Information........................................................................................U-1

Claims and Appeals Procedures..................................................................................U-1
Claims and Appeals – Eligibility or Salary Deferrals Only ..................................U-1
Claims and Appeals – Medical, Dental and Vision Plans ......................................U-1
Claims and Appeals -- Health Care FSA ................................................................U-1
Release of Information ..............................................................................................U-3
Claims and Appeals – Short Term Disability Insurance; Long Term Disability
Insurance; Life and Accident Insurance and Employee Assistance Program ....................U-3

## TABLE OF CONTENTS (continued)

**Page**

Limitations Periods and Jurisdiction ............................................................................... U-3

Coordinating Benefits with Other Plans, Subrogation and Right of Recovery .......................... V-1
Facility of Payment .................................................................................................. V-1
Recovery of Overpayment ......................................................................................... V-1
Subrogation ............................................................................................................ V-2
Reimbursement ....................................................................................................... V-2
Constructive Trust ................................................................................................... V-2
Lien Rights ............................................................................................................. V-2
First-Priority Claim .................................................................................................. V-2
Workers Compensation ............................................................................................. V-3
Applicability to all Settlements and Judgments ............................................................. V-3
Offset Rights .......................................................................................................... V-3
Cooperation ............................................................................................................ V-3
Interpretation .......................................................................................................... V-4
Release of Information .............................................................................................. V-4
Early Termination of Coverage .................................................................................. V-4

Limitations on Access to Protected Health Information ..................................................... W-1
Privacy Rule ........................................................................................................... W-1
Security Rule .......................................................................................................... W-2

Additional Information ................................................................................................. X-1
How Benefits May Be Forfeited or Delayed ................................................................. X-1
Claim Fraud ........................................................................................................... X-1
Compliance With Federal Law .................................................................................. X-1
Collective Bargaining Agreements ............................................................................. X-1
Ownership of Benefits .............................................................................................. X-1
Program Administration ............................................................................................ X-2
Amendment of Program ............................................................................................ X-2
Information About the Program .................................................................................. X-2

Program Facts ............................................................................................................ Y-1
Your ERISA Rights Under the Vitamin Shoppe Industries Inc. Health and Welfare
Benefits Program ..................................................................................................... Y-2

Key Terms & Definitions ............................................................................................... Z-1

Index ........................................................................................................................... 1

# INTRODUCTION

The Vitamin Shoppe Industries Inc. Health & Welfare Benefits Program (the "Program") is a flexible benefits arrangement that lets you make certain benefit decisions and choices to meet your needs.  At the same time, flexible benefits may give you valuable tax-saving features.  This Guide highlights the main features of the Program as intended to be in effect as of January 1, 2019.

If you are an eligible employee (as described in this Guide), the Program provides you a flexible benefits arrangement.  In other words, rather than having only a pre-packaged set of benefits, you have certain choices relating to Medical, Dental, Vision, Life, Accident and Disability insurance coverages, as well as to your participation in a Health Care Flexible Spending Account (FSA).  The Program can help you tailor your benefits to meet your individual needs and priorities.  (For example, you have the flexibility to decide whether or not you want the Medical or Dental insurance coverage, and whether or not to cover your eligible dependents.)

Many of the component benefits within the Program are referred to in this Guide as separate "Plans" or "Accounts" although they are only parts of a single large plan, namely the Program itself.

Some benefits under the Program are automatically provided to you at no cost if you are eligible for those benefits.  Other benefits require a payment by you in order to participate in those benefits.  Sometimes you also can gain a tax advantage by paying your share of the cost with pre-tax dollars.  Thus, besides choice, the Program offers what can be valuable tax-saving features.

This Introduction presents a general description of the benefits available under the Program and of the implications of making pre-tax contributions to pay your share of the cost of those benefits.  More information regarding pre-tax contributions is found in the portion of this Guide describing the FSA.  Also, check with your own tax advisor regarding pre-tax contributions.

> **This Guide is provided to you for general information only.  The description of the Program in this document is necessarily a summary and does not describe all of the details and provisions relating to the Program.  In case of any inconsistency between this Guide and the Program, the terms of the official Program documents will control in all instances.**

National

## HOW YOUR BENEFITS WORK

The benefits enrollment process generally occurs once each year, during the Annual Enrollment Period. Before the Annual Enrollment Period begins, you will be provided enrollment materials showing the coverage choices available to you.  Also, as discussed below, certain changes in your family status may allow you to change existing elections, or make new elections, during the year.

Overall, the Company pays a substantial portion of the total cost of your Program coverage.  If you are eligible, the costs of Basic Life Insurance, Accidental Death and Dismemberment (AD&D) Insurance, Business Travel Accident Insurance, and Basic Long Term Disability (LTD) coverages are paid entirely by the Company.  You contribute, generally on a pre-tax basis, toward the cost of coverage under the Medical, Vision and Dental coverage options.  In addition, you can elect to make pre-tax contributions to fund your Health Care FSA, or to establish a Health Savings Account. The voluntary Critical Illness and Accident coverages are available on an after tax basis.

National

## GENERAL INFORMATION ABOUT YOUR BENEFITS

The following rules apply unless provided otherwise in a Certificate or one of the sections below.

### WHO'S ELIGIBLE?

All full-time hourly and salaried Employees in the categories listed below who are regularly scheduled to work at least 30 hours per week are eligible to participate in the Program.

> **Note:** Even if you are not regularly scheduled to work 30 hours per week, you could still become eligible for medical, dental, and vision benefits if your actual working hours average more than 30 hours per week over the 12 consecutive month period (11 consecutive month period for new-hires) set by the Plan Administrator. If you meet the hours of service requirement, the Plan Administrator will provide enrollment information and inform you of when your benefits will commence. If you have questions, please contact the Plan Administrator.

> **Note:** Individuals employed on a temporary or seasonal basis are not eligible for benefits under the Program.

> **Note:** If you work in Hawaii, you are eligible for Medical benefits if you work at least 20 hours per week for four consecutive weeks, as required by Hawaii state law.

> **Note:** In order to be eligible to contribute to a Health Savings Account, you must be enrolled in a medical plan option that is considered a high deductible health plan ("HDHP"). The PPO 2000 Medical Plan is an HDHP. Further, if you contribute to the Health Savings Account, you are not eligible to participate in the Health Care FSA.

### And When? (Your benefit commencement date)

- If you are a Distribution Center or Retail Employee, you must complete a 90-day waiting period before your benefits commence. If you are eligible upon hire and you enroll within 90 days of your first day of employment, your benefits start on your 91st day of employment. "Retail Employee" means an Assistant Store Manager, a Key Holder, or a Sales Associate.

> **Note:** If you are a Retail Employee in Hawaii and you enroll within 31 days of meeting the eligibility criteria above, your Medical benefits start on the day of the month after you complete four consecutive weeks of employment working at least 20 hours each of these four consecutive weeks.

- If you are a Store Manager, Nutritionist, Field Training Manager, Customer Support Center Employee, Director or an Executive, you must complete a 30-day waiting period before your benefits commence. If you are eligible upon hire and you enroll within 30 days of your first day of employment, your benefits start on the 31st day following 30 days of service.

- If you are not eligible upon hire but you transfer to one of the positions listed in this section on a full-time basis, you have 30 days from the date of your transfer to enroll, and your benefits will start retroactively to the date of your transfer, provided you have satisfied the required 30-day or 90-day waiting period, as applicable.

- All service performed for the Company before you are an eligible employee counts toward the waiting periods above.

National

> **Note:** If you are eligible, you also may be able to enroll if you experience one of the status change event listed below; for example, if you lose coverage under your parent's health plan upon your attainment of age 26.

**Who You Can Cover —** If you participate, you can also cover your eligible dependents:

- Your Spouse or your Domestic Partner named on an Affidavit of Domestic Partnership
- Your Child up to age 26
- Your unmarried Child who is solely dependent on you for support due to mental or physical handicap also may be eligible for certain coverages.

**When You Can Enroll or Change Your Coverage —**

You can enroll or change your coverage elections only:

1. During the Annual Enrollment Period;

2. Within 30 or 90 days of your first day of employment, as applicable (see above), if you are eligible upon hire; or

3. Provided you have completed your waiting period, within 31 days of a qualified Change in Status event:

    - Change in your legal marital status (marriage, divorce or legal separation) or Domestic Partner status (i.e., filing of an Affidavit of Domestic Partnership or a dissolution form with the Company);
    - Change in the number of your dependents (for example, through birth or adoption, or if a Child is no longer an eligible dependent, death of eligible dependent);
    - Change in your Spouse's or Domestic Partner's employment status (resulting in a loss or gain of coverage);
    - Change in your employment status from full-time to part-time, part-time to full-time, or commencing or returning from an approved leave of absence resulting in a gain or loss of coverage; or
    - Change in your address or location that affects the plans for which you are eligible.

    NOTE: Changes affecting a Domestic Partner affect only coverages paid for on an after-tax basis.

4. Within 31 days of a change in your entitlement to Medicare or Medicaid benefits;

5. Within 60 days of becoming eligible for premium assistance under Medicaid or the Children's Health Insurance Program ("CHIP").

6. Within 31 days of a significant change in cost or coverage, as determined in the Plan Administrator's discretion. However, this does not permit a change in your Health Care FSA election.

7. Within 31 days of your reduction in hours to below 30 hours per week, provided that your revocation of medical coverage is accompanied by promptly enrolling in another medical coverage that provides minimum essential coverage (as defined under the Affordable Care Act). However, this permits a change only in your medical coverage and does not permit a change in your Health Care FSA election.

8. Within 31 days before a special enrollment period for a "health care marketplace" (as defined under the Affordable Care Act), provided that your revocation of medical coverage is accompanied by promptly enrolling in such "marketplace." However, this permits a change only in your medical coverage and does not permit a change in your Health Care FSA election.

National

9.      Within 31 days of a "Special Enrollment Period" (applicable to medical coverage only), which occurs if you declined medical coverage under the Program when it was first available because of other health coverage, and:

- that coverage is later lost on account of (i) exhaustion of COBRA continuation coverage, (ii) loss of eligibility for the other coverage, or (iii) termination of employer contributions towards the other coverage; or

- you have a new eligible dependent because of marriage, birth, adoption, or placement for adoption;

> **NOTE:  Your change in coverage must be consistent with the applicable event (#3-#9) above.**

**Your new coverage becomes effective** on the date specified for the Annual Enrollment Period, on your benefit commencement date or on the date of the event entitling you to change your election (referred to as your "event date"), provided you timely notify the Plan Administrator.

> **IMPORTANT**: Be sure to make your benefits decisions carefully!  The benefit coverages you choose must remain in effect until one of the above events occurs.

**How To Enroll** in Medical, Dental, Vision, Optional Life Insurance, Short Term Disability, Accident, Critical Illness and/or the FSA:

- Go to the online health enthusiast center – portal.adp.com and log in.  [First time users – you need access to personal e-mail to complete registration; go to portal.adp.com to register.  Please see the "how to enroll" instructions in the benefit enrollment guide on the intranet under the benefits tab.]

- Select the benefits tab and click health & welfare on the menu and dashboard opens.  Explore your benefit options and enroll in those coverages you select.  Follow instructions to explore your choices.  Be prepared beforehand with dates of birth and Social Security Numbers when adding eligible dependents.  If applicable, once dependents are added, you then may enroll your eligible dependents for each of the available coverages.  Reminder:  benefit summaries are located in the document library for review.

- Verify all of your selections and then click the "confirm elections" button at the bottom of the page.  The certification statement opens.  Click the "I agree" button.  The e-mail address page opens.  If you want an e-mail sent to notify you when updates are complete, select the applicable button and then click the "submit" button.

- If you have any additional questions after reviewing enrollment materials, please contact Direct Path at 1-866-253-2273, Monday through Friday 7 am – 8 pm CST and on Saturday from 8 am – 1 pm CST, or visit them online at www.directpathhealth.com

- Once you enroll, your re-enrollment will be automatic for succeeding years and you will not need to fill out a new form during the Annual Enrollment Period, *except* with respect to the Health Care FSA.  However, you may change your election during the Annual Enrollment Period or if an applicable event (#2-#7) above occurs.

**After You Enroll** you'll receive:

- A Confirmation Statement from the ADP portal with complete coverage details.

- ID cards (within 3 weeks after you enroll).  Your Medical ID card will identify the medical plan and your dental card will identify the dental plan.  There are no ID cards for the vision plan.

National

## COST OF COVERAGE

During the Annual Enrollment Period or at other times when you can make an election, you will be provided a chart listing the current costs of the various coverages and stating the option(s) available in your area. However, in Hawaii and Puerto Rico only one option may be available.

## PRE-TAX PREMIUM PLAN

**Puerto Rico Employees:** The Hacienda currently does not permit Pre-Tax Premium Plans to be offered in Puerto Rico; all employee premiums must be after-tax. You will be notified if the situation changes.

The Pre-Tax Premium Payment Plan under the Program allows you to reduce your salary and use the amount of your salary reduction to pay your portion of the cost for Medical, Dental and Vision coverages (and other coverages, such as the FSA, that may be paid for on a pre-tax basis) for you, your Spouse and your eligible dependents. The cost of the coverage you choose is deducted from your base pay before federal income and employment taxes and, in most cases, state and local income taxes are withheld. The result is that the payment of these premiums will be on a pre-tax basis, thus reducing your net after-tax cost of the health insurance coverage premiums. <u>NOTE</u>: If you are employed in Hawaii, the pre-tax cost for Medical, Dental and Vision coverages can be paid from all of your compensation including, but not limited to, wages, commissions and bonuses.

The cost of the coverage of a same-sex Spouse will be deducted on a pre-federal-tax basis. However, for state and local tax purposes there may be differences in the treatment of same-sex and opposite-sex Spouses. Contact Total Rewards for more information about such possible differences. Also, consult your own tax advisor for more information. The cost of coverage for a Domestic Partner (or his or her dependent) will be deducted on an after-tax basis, as will the costs for short term disability and optional group term life insurance coverage (if you elect either or both of them).

To enroll in the Pre-Tax Premium Payment Plan, you must elect to contribute a portion of your salary to the Program by entering into a salary reduction agreement with the Company. Prior to the beginning of each Plan Year (or the date your participation begins if you commence employment or otherwise first become eligible for the Program coverage during a Plan Year) you must decide what benefit coverage(s), if any, you want and, if you desire to pay such premiums on a pre-tax basis, you must designate all or part of your salary reduction amount to pay your share of the premiums for those coverage(s). The salary reduction amount under the Pre-Tax Premium Payment Plan depends upon the cost of the coverage(s) you elect. The election you make with regard to the Pre-Tax Premium Payment Plan automatically applies for each Plan Year thereafter until it is revoked or changed in accordance with the terms of the Program other than with respect to your Health Care FSA. Similarly, deduction on an after-tax basis of the cost of coverage for a Domestic Partner (or his or her dependent), as well as the costs for short term disability and optional group term life insurance coverage (if you elect either or both of them), automatically continues for each Plan Year thereafter until it is revoked or changed in accordance with the terms of the Program.

## LEAVES OF ABSENCE AND OTHER RIGHTS UNDER FEDERAL LAW

### Your rights under the Newborns' and Mothers' Health Protection Act.

Group health plans and health insurance issuers generally may not, under federal law, restrict benefits for any hospital stay in connection with childbirth for the mother or newborn child to less than:

• 48 hours following a normal vaginal delivery; or

• 96 hours following a cesarean section.

However, federal law generally does not prohibit the mother's or newborn's attending provider, after consulting with the mother, from discharging the mother or her newborn earlier than 48 hours (or 96 hours as

applicable).  In any case, plans and issuers may not, under federal law, require that a provider obtain authorization from the Program or the insurance issuer for prescribing a length of stay not in excess of 48 (or 96) hours.

The laws of your state related to hospital stays in connection with childbirth may differ from these federal requirements.  For more information and coverage details, refer to the applicable medical Certificate.

**Your rights under the Women's Health and Cancer Rights Act of 1998.**

The Program, as required by the Women's Health and Cancer Rights Act of 1998, provides benefits for mastectomy-related services, and the complications resulting from a mastectomy (including lymphedema). These benefits include reconstruction and surgery to achieve breast symmetry, and prostheses.  For more information and coverage details, refer to the applicable medical Certificate.

**Children's Health Insurance Program (CHIP) Notice**

If you or your children are eligible for Medicaid or the Children's Health Insurance Program ("CHIP") but are unable to afford the premiums, your state may have a premium assistance program that can help pay for coverage.  These states use funds from their Medicaid or CHIP programs to help people who are eligible for these programs but who also have access to health insurance through their employer.  If you or your children are NOT eligible for Medicaid or CHIP, you will not be eligible for these premium assistance programs.

If you or your dependents are already enrolled in Medicaid or CHIP, or if you think you might be eligible for Medicaid or CHIP, you can contact your state Medicaid or CHIP office or dial 1-877-KIDS-NOW (543-7669), or go to www.insurekidsnow.gov to find out if premium assistance is available. If you qualify, you can ask the state if it has a program that might help you pay the premiums for an employer-sponsored plan.  Once it is determined that you or your dependents are eligible for premium assistance under Medicaid or CHIP, your employer's health plan is required to permit you and your dependents to enroll in the plan — as long as you and your dependents are eligible, but not already enrolled in the employer's plan. This is called a "special enrollment" opportunity, and you must request coverage within 60 days of being determined eligible for premium assistance.

**Mental Health Parity**

The Plan may not, under federal law, impose any limits or restrictions on mental health coverage that are less favorable than the other hospital/medical/surgical coverages.

**Leaves of Absence.**  If you go on an approved paid leave of absence, whether under the Family Medical Leave Act ("FMLA") or otherwise, you generally will continue to participate in the Plans in which you had previously elected to participate.  If you go on an approved unpaid leave of absence, whether under FMLA or otherwise, you generally can elect to continue to participate in the Plans in which you had previously elected to participate.

If your coverage continues during an approved leave, you will be charged the same Employee premium for group health plan coverage as in effect before that leave (unless you have made a permitted change in election). If you fail to timely make any required payments during an approved leave, your group health plan coverage will end unless you make alternative arrangements with the Plan Administrator under which you will be required to contribute the amounts (Employee's share) paid on your behalf by the Company upon your return from the leave in the time and manner prescribed by the Plan Administrator or, if you do not return to active employment, to pay those amounts (both Employee's and Company's share) within 30 days of your termination date.

If you do not return to work after an approved leave during which group health plan coverage did not end, your coverage under the Pre-tax Premium Payment Plan and the corresponding group health plans will terminate.

National

You may be eligible to continue your group health coverages under the provisions of COBRA at that time. Your COBRA premiums will be on an after-tax basis. See the discussion of COBRA beginning on page S-1.

Contact Total Rewards for more information about benefit coverage during an approved leave of absence.

**How a Leave of Absence Impacts Your Health Care FSA.**

**Continuing Coverage During Leave**

If you go on an approved <u>paid</u> leave of absence, whether under FMLA or otherwise, and you have enrolled in the Health Care FSA, you generally will continue to receive benefits under the Health Care FSA during your period of leave because your salary deductions will continue unless you have made a permitted change in election.

If you go on an approved <u>unpaid</u> leave of absence, whether under FMLA or otherwise, and you have enrolled in the Health Care FSA, you can continue to receive benefits under the Health Care FSA during your period of leave if you continue your Health Care FSA coverage. If you decide to continue coverage under the Health Care FSA during an unpaid approved leave, you will be required to continue to make your required employee contributions under the Health Care FSA. You may make the required payments before your approved leave begins (by way of a pre-tax salary reduction from your final payment(s) of salary prior to your leave), or you may make the required payments (on an after-tax basis) at the same time(s) as you would have made them if you had not taken an approved leave, or you may use another payment schedule as determined by the Plan Administrator in accordance with applicable law. Contact Total Rewards for more information about the treatment of the Health Care FSA in connection with an approved leave of absence.

If you fail to timely make any required payments during an unpaid approved leave, your Health Care FSA coverage will end for the remainder of your leave unless you make alternative arrangements with the Plan Administrator to make up your contributions at the time and in the manner prescribed by the Plan Administrator or, if you do not return to active employment, to pay those amounts within 30 days of your termination date.

If you do not return to work after an approved leave during which Health Care FSA coverage did not end, your coverage under the Health Care FSA will terminate unless you are eligible to, and elect to, continue your coverage under the provisions of COBRA. See the discussion of COBRA on page S-1.

**Revoking Coverage During Leave**

Alternatively, you may choose to revoke your existing election for coverage under the Health Care FSA during the period of unpaid approved leave. Upon returning from such leave within the same Plan Year as the leave began, you may reinstate your Health Care FSA coverage and choose to:

▪ reinstate your per-pay-period deduction under the Health Care FSA, in which case your elected annual contribution to the Health Care FSA will be prorated (decreased) to account for the period during which no salary deferrals were made and will be reduced by prior reimbursements; or

▪ resume your salary deferrals at the same annual contribution level, by: (A) repaying the missed salary deferral contributions attributable to your unpaid leave in a lump sum upon return from leave; (B) adjusting your per-pay-period deduction under the Health Care FSA to an amount equal to the elected annual salary deferral contributions less the actual salary deferral contributions, divided by the number of pay periods remaining in the Plan Year; or (C) another manner permitted by the Plan Administrator. However, if the Health Care FSA already has made disbursements on your behalf that exceed the elected salary deferral contributions that will be paid for the Plan Year, the Company may not require you to pay any more than the remaining elected salary deferral contributions due.

For example, if you elected to contribute $2,400 to the Health Care FSA and took an unpaid approved leave during which you missed making $200 in pre-tax contributions, under the first alternative you would not make up the missed amount and your Health Care FSA would operate much as if you had elected to contribute $2,200 for the year. Under the second alternative, your scheduled contributions would increase over the rest

National

of the year from the prior $200 per month to make up for the shortfall; the amount of that increase would differ if your leave was in February (so the shortfall would be made up over 10 months) or in August (so the shortfall would be made up over only 4 months).

You will be reinstated at the same annual coverage levels, with per-pay-period contributions increased to make up for the missed contributions during your leave of absence, unless you notify the Company otherwise within 30 days of your return to work.  However, reinstatement will not apply if you return from an approved leave in the subsequent Plan Year from the year the leave began.  In that situation, you must make your Health Care FSA election for the later Plan Year either during the Annual Enrollment Period or promptly following your return from such leave.  Before the approved leave begins, or as soon as possible after it begins, contact Total Rewards for information about how to continue Health Care FSA coverage during the remainder of the Plan Year in which the leave begins.

> **Puerto Rico Employees:**  The Hacienda currently does not permit pre-tax Flexible Spending Accounts (FSAs) to be offered in Puerto Rico.  You will be notified if the situation changes.

## WHEN COVERAGE STOPS

Coverage will cease immediately upon the earliest of the following events:

- The Program terminates;
- The component benefit under the Program in which you are enrolled (e.g., Medical, Dental, Vision, Life, Accident or Disability insurance coverages) terminates;
- You are no longer in an eligible class of employees or dependents;
- You fail to pay the required premiums;
- You enter military service (other than Reserve or National Guard), subject to your rights under USERRA; or
- You retire or your employment terminates for any other reason.

Notwithstanding the above, if you work in Hawaii, your Kaiser Permanente Medical, Hawaii Dental Service and Kaiser Permanente Vision benefits will end on the last day of the month in which the earliest of the above events occurs.

National

**TO FIND NETWORK PROVIDERS, PCPS, PHARMACIES, VISION, DENTAL AND EMPLOYEE
ASSISTANCE PROGRAM, AND FOR QUESTIONS REGARDING THE FSA**

| To Find | If You Enroll In | Call | Or Use The Web |
|---|---|---|---|
| Doctors, Specialists, Hospitals, Retail Pharmacies | Medical benefits | UnitedHealthcare PPO 600 and Puerto Rico plans:   1-866-633-2482<br><br>UnitedHealthcare PPO 2000 plan:   1-866-734-7678<br><br>Hawaii only:  Kaiser Permanente:   1-808-432-5955 | www.myuhc.com<br><br>Hawaii only:  www.kp.org/plandocuments |
| Dentists | Dental benefits | UnitedHealthcare:   1-877-816-3596<br><br>Hawaii only:  Hawaii Dental Service:   Oahu 1-808-529-9248   Neighbor Islands 1-800-232-2533, ext. 248 | www.myuhc.com<br><br>Hawaii only:  www.HawaiiDentalService.com |
| Vision Providers | Vision benefits | VSP at 1-800-877-7195 | www.vsp.com |
| Employee Assistance Program and Tobacco Cessation Assistance | N/A | ComPsych:   1-844-491-1740 | www.guidanceresources.com;; password:  VitaminEAP |
| Examples of expenses that can be reimbursed from a Health FSA and questions about FSA reimbursements | Flexible Spending Account (FSA) | Discovery Benefits for FSA: 1-866-451-3399 | www.discoverybenefits.com |

National

# MEDICAL PLAN

## WHO'S ELIGIBLE?

Please see "Who's Eligible" under "General Information About Your Benefits" on page B-1.

## THE UNITEDHEALTHCARE PPO PLANS

The UnitedHealthcare medical plans are Preferred Provider Organization (PPO) Plans; you can use the PPO preferred providers (in-network) and pay less for health care.  Or, you can go out-of-network and use any doctor or facility you choose, but you will pay a larger share of the cost.  Special rules apply if you live in Hawaii or Puerto Rico.  See page C-27 for more information about coverage in Puerto Rico, and page C-34 for more information about coverage in Hawaii.

▪ If you use a preferred provider, just show your ID card and pay a co-payment (and deductible for some services) to receive in-network benefits.  There are no claim forms to file and you won't have to pay any excess cost above the reasonable and customary ("R&C") limits.

If you go to an out-of-network provider, you must pay an annual deductible amount.  Covered benefits are generally paid at 50% of R&C charges, and you must file claim forms to be reimbursed.  Also, you will have to pay any excess cost above the R&C limits.

**NETWORK PROVIDERS:**  Toll free numbers and websites for you to obtain listings of network providers in your area may be found on page B-8 of this Summary.

**MEDICAL COVERAGE OVERVIEW:**  The following pages provide an overview of the medical coverage provided under the Program.  Complete coverage details may be found in the Certificate sent to you by your Claims Administrator.  Copies of the Certificate are available at no cost from Total Rewards.

The charts below presents a brief comparison of the medical coverage options under the Program.  More specific information may be found on the following pages, and complete details may be found in the applicable Certificates.

The information presented in these charts is an overview only.  They highlight general features and are not intended to be a substitute for the terms, provisions, limitations and conditions imposed by the controlling Certificate.  Since benefits are reviewed annually and are often modified, if there is a condition that you are treated for on a regular basis, be sure to inquire about your specific coverage needs.  For a complete understanding of benefits, please read a chart in conjunction with the applicable Certificate.  The Certificate contains a detailed explanation of benefits, exclusions, and limitations.  In addition, there may be endnotes or information statements that accompany the charts; again please read the chart in conjunction with any applicable endnotes or information statements.

Please note:  Providers/Specialists may be listed in a directory or on a provider finder website (www.myuhc.com) or (www.kp.org), but not covered as benefits by this group health plan (e.g., durable medical equipment, ambulance, allergists).  Some of these benefits may be covered under Other Covered Services or not at all.  Please check your Certificate to determine coverage.

## PRESCRIPTION DRUG BENEFITS

Your medical plan also includes prescription drug benefits.  Retail prescription drugs may be covered only if you fill prescriptions at a participating local or mail-order pharmacy.  Mail-order service also is included in order to provide lower cost access to medication for treatment of chronic illnesses.  More information about prescription drug coverage is available in the descriptions below of your medical plan options.

## NON-TOBACCO USER DISCOUNT

The Company provides a discount to participants (and Spouses and Domestic Partners) for non-tobacco use. Each year that you enroll in a UnitedHealthcare medical plan or Kaiser Medical plan, you must indicate whether you have used products containing tobacco in the past 12 months prior to enrollment and whether you plan to use tobacco in the next plan year.  If you indicate that you have not used tobacco products during this time and do not plan to use products containing tobacco, you will receive a discount of $150 per month toward your medical plan costs.  This applies to all UnitedHealthcare coverage tiers and to Kaiser (Hawaii) spouse and family tiers.[1]

Alternatively, you might be able to qualify for the non-tobacco user credit by different means.  For example, you may still qualify for the credit by following a program prescribed by your personal physician designed to cease tobacco use or by enrolling in the tobacco cessation program offered by ComPsych through the Employee Assistance Program.  Contact Total Rewards at 1-800-670-8747 during office hours or by email at VStotalrewards@vitaminshoppe.com with any questions or for assistance with enrollment in the tobacco cessation program.

## OTHER WELLNESS PROGRAMS

The Company has established a Wellness Program to provide Health Enthusiasts, Spouses and Domestic Partners who are benefits eligible with a variety of opportunities to maintain and/or improve health. You may participate in the Wellness Program if you are enrolled in any of the Company's medical plans (including the Kaiser Permanente plan for Hawaii residents).  However dependent children are not eligible to participate in the Wellness Program.  All participation in the Wellness Program is voluntary and confidential.

The Company has engaged the services of Virgin Pulse as its Wellness Program administrator, who will provide a web-based platform to track wellness activities, wellness points, administer compliance of outcomes and maintain confidentiality.  The Wellness Program generally will include the following:

- Non-tobacco user discounts (as described above)
- Tobacco cessation program – administered by ComPsych, the Employee Assistance Program administrator
- Annual biometric screening
- Annual health risk assessment
- Access to educational tools and tips about healthy living, exercise and nutrition

More information about the Wellness Program will be provided during open enrollment or as otherwise appropriate.

The Company partners with Johns Hopkins to provide the Workstride and Balance programs.  The Workstride program is a telephonic and web-based resource providing cancer education and support to employees, dependents, and caretakers.  The Balance program provides employees with a voluntary comprehensive behavioral health assessment to help identify common health and well-being concerns and connects health enthusiasts with the care they need from behavioral health professionals.

---

[1]   The employee-only premium in Hawaii is calculated on the assumption that all employees qualify for the non-tobacco user credit.

## PPO 600

The table below provides an overview of the Annual Deductible and Out-of-Pocket Maximum for the PPO 600.

| Plan Features | Network Amounts | Non-Network Amounts |
|---|---|---|
| **Copays** | | |
| In addition to these Copays, you may be responsible for meeting the Annual Deductible for the Covered Health Services described in the chart on the following pages. | | |
| Acupuncture. | $15 for Primary Care $40 for Specialist | 50% after you meet the Annual Deductible |
| Emergency Health Services. | $300*waived if admitted | $300 |
| Physician's Office Services - Primary Physician. | $15 | 50% after you meet the Annual Deductible |
| Physician's Office Services - Specialist. | $40 | 50% after you meet the Annual Deductible |
| Rehabilitation Services. | $40 | 50% after you meet the Annual Deductible |
| Urgent Care Center Services. | $25 | $25 |
| Virtual Visits. | $10 | Not Available |
| Copays do not apply toward the Annual Deductible. | | |
| Copays apply toward the Out-of-Pocket Maximum. | | |
| **Annual Deductible** | | |
| Individual. | $600 | $1,350 |
| Family (not to exceed the applicable Individual amount per Covered Person). | $1,500 | $4,050 |
| **Annual Out-of-Pocket Maximum** | | |
| Individual. | $3,500 | $6,000 |

| Plan Features | Network Amounts | Non-Network Amounts |
|---|---|---|
| Family (not to exceed the applicable Individual amount per Covered Person). | $7,000 | $12,000 |
| The Annual Deductible applies toward the Out-of-Pocket Maximum for all Covered Health Services. | | |
| The Annual Out-of-Pocket Maximum applies to all Covered Health Services under the Plan, including Covered Health Services provided in  the United Healthcare Certificate. | | |
| **Lifetime Maximum Benefit**<br><br>There is no dollar limit to the amount the Plan will pay for essential Benefits during the entire period you are enrolled in this Plan.<br><br>Generally the following are considered to be essential benefits under the *Patient Protection and Affordable Care Act:*<br><br>Ambulatory patient services; emergency services, hospitalization; maternity and newborn care, mental health and Substance-Related and Addictive Disorders Services (including behavioral health treatment); prescription drug products; rehabilitative and habilitative services and devices; laboratory services; preventive and wellness services and chronic disease management; and pediatric services, including oral and vision care. | Unlimited | |

This table provides an overview of the Plan's coverage levels.

| Covered Health Services[1] | Benefit *(The Amount Payable by the Plan based on Eligible Expenses)* | |
|---|---|---|
| | Network | Non-Network |
| **Acupuncture Services** | 100% after you pay a Copayment of $15 Primary Care or $40 Specialist per visit | 50% after you meet the Annual Deductible |

| Covered Health Services[1] | Benefit (The Amount Payable by the Plan based on Eligible Expenses) | |
|---|---|---|
| | Network | Non-Network |
| **Allergy Testing/Injections**<br><br>Testing and Follow-Up Office Visits<br><br><br><br>Injections without Office Visit Follow-Up | 100% after you pay a Copayment of $15 Primary Care or $40 Specialist per visit<br><br><br>100% | 50% after you meet the Annual Deductible<br><br>50% after you meet the Annual Deductible |
| **Ambulance Services**<br><br>Emergency Ambulance.<br><br><br>Non-Emergency Ambulance.<br><br>Ground or air ambulance, as the Claims Administrator determines appropriate. | *Ground and/or Air Ambulance*<br><br>80% after you meet the Annual Deductible<br><br>80% after you meet the Annual Deductible | *Ground and/or Air Ambulance*<br><br>Same as Network<br><br><br>Same as Network |
| **Cancer Services**<br><br><br><br><br>See  the United Healthcare Certificate. | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. |
| **Clinical Trials** | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. |

National (including Hawaii and Puerto Rico)

| Covered Health Services[1] | Benefit (The Amount Payable by the Plan based on Eligible Expenses) | |
| --- | --- | --- |
| | Network | Non-Network |
| **Congenital Heart Disease (CHD) Surgeries** | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Dental Services - Accident Only** See the United Healthcare Certificate for limits. | 80% after you meet the Annual Deductible | Same as Network |
| **Diabetes Services** Diabetes Self-Management and Training/ Diabetic Eye Examinations/Foot Care | Depending upon where the Covered Health Service is provided, Benefits for diabetes self-management and training/diabetic eye examinations/foot care will be paid the same as those stated under each Covered Health Service category in this section. | Depending upon where the Covered Health Service is provided, Benefits for diabetes self-management and training/diabetic eye examinations/foot care will be paid the same as those stated under each Covered Health Service category in this section. |
| Diabetes Self-Management Items | Depending upon where the Covered Health Service is provided, Benefits for diabetes self-management items will be the same as those stated under *Durable Medical Equipment* in this section and in the United Healthcare Certificate. | Depending upon where the Covered Health Service is provided, Benefits for diabetes self-management items will be the same as those stated under *Durable Medical Equipment* in this section and in S the United Healthcare Certificate. |
| **Durable Medical Equipment (DME)** | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |

National (including Hawaii and Puerto Rico)

| Covered Health Services[1] | Benefit (The Amount Payable by the Plan based on Eligible Expenses) | |
| --- | --- | --- |
| | Network | Non-Network |
| **Emergency Health Services - Outpatient** <br><br> If you are admitted as an inpatient to a Hospital directly from the Emergency room, you will not have to pay this Copay. The Benefits for an Inpatient Stay in a Hospital will apply instead. | 100% after you pay a Copayment of $300 per visit, deductible waived | Same as Network |
| **Gender Dysphoria** | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in the *Schedule of Benefits* available from Total Rewards and in the United Healthcare Certificate. | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in the *Schedule of Benefits* available from Total Rewards and in  the United Healthcare Certificate. |
| **Hearing Aids** <br> See the United Healthcare Certificate for limits. | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Home Health Care** <br> See the United Healthcare Certificate for limits. | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Hospice Care** | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Hospital - Inpatient Stay** | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Infertility** (underlying medical condition) | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under |

| Covered Health Services[1] | Benefit *(The Amount Payable by the Plan based on Eligible Expenses)* | |
| --- | --- | --- |
| | Network | Non-Network |
| | each Covered Health Service category in this section. | each Covered Health Service category in this section. |
| **Kidney Services**<br><br><br>*See* the United Healthcare Certificate. | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. |
| **Lab, X-Ray and Diagnostics - Outpatient**<br>Lab Testing - Outpatient.<br><br>X-Ray and Other Diagnostic Testing - Outpatient. | 80% after you meet the Annual Deductible<br><br>80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible<br><br>50% after you meet the Annual Deductible |
| **Lab, X-Ray and Major Diagnostics – CT, PET, MRI, MRA and Nuclear Medicine - Outpatient** | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Mental Health Services**<br><br>Inpatient.<br><br><br>Outpatient. | 80% after you meet the Annual Deductible<br><br>100% after you pay a Copayment of $15 per visit | 50% after you meet the Annual Deductible<br><br>50% after you meet the Annual Deductible |
| **Neurobiological Disorders - Autism Spectrum Disorder Services**<br><br>Inpatient.<br><br><br>Outpatient. | 80% after you meet the Annual Deductible<br><br>100% after you pay a Copayment of $15 per visit | 50% after you meet the Annual Deductible<br><br>50% after you meet the Annual Deductible |

| Covered Health Services[1] | Benefit (The Amount Payable by the Plan based on Eligible Expenses) | |
|---|---|---|
| | Network | Non-Network |
| **Nutritional Counseling** | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Ostomy Supplies** See the United Healthcare Certificate for limits. | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Pharmaceutical Products - Outpatient** | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Physician Fees for Surgical and Medical Services** | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Physician's Office Services - Sickness and Injury** Primary Physician. | 100% after you pay a Copayment of $15 per visit | 50% after you meet the Annual Deductible |
| Specialist Physician. | 100% after you pay a Copayment of $40 per visit | 50% after you meet the Annual Deductible |
| **Pregnancy – Maternity Services** Initial Visit | 100% after you pay a Copayment of $15 | 50% after you meet the Annual Deductible |
| Routine Prenatal Care and Postpartum Care | 100% | 50% after you meet the Annual Deductible |
| Delivery/All Inpatient Services | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Preventive Care Services** Physician Office Services. | 100% | 50% after you meet the Annual Deductible |
| Lab, X-ray or Other Preventive Tests. | 100% | 50% after you meet the Annual Deductible |

| Covered Health Services[1] | Benefit (The Amount Payable by the Plan based on Eligible Expenses) | |
| --- | --- | --- |
| | Network | Non-Network |
| Breast Pumps. | 100% | 50% after you meet the Annual Deductible |
| Sterilization for Women | 100% | 50% after you meet the Annual Deductible |
| Sterilization for Men | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| Routine Hearing Exams (once every two years) | 100% | 50% after you meet the Annual Deductible |
| **Prosthetic Devices** | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Reconstructive Procedures** | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. |
| **Rehabilitation Services - Outpatient Therapy and Manipulative Treatment** See the United Healthcare Certificate for visit limits. | 100% after you pay a Copayment of $40 per visit | 50% after you meet the Annual Deductible |
| **Scopic Procedures - Outpatient Diagnostic and Therapeutic** | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Skilled Nursing Facility/Inpatient Rehabilitation Facility Services** See the United Healthcare Certificate for limits. | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |

| Covered Health Services[1] | Benefit *(The Amount Payable by the Plan based on Eligible Expenses)* | |
|---|---|---|
| | Network | Non-Network |
| **Substance-Related and Addictive Disorders Services** Inpatient. | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| Outpatient. | 100% after you pay a Copayment of $15 per visit | 50% after you meet the Annual Deductible |
| **Surgery - Outpatient** | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Therapeutic Treatments - Outpatient** | 80% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Transplantation Services** For Network Benefits, transplantation services must be received at a Designated Facility. The Claims Administrator does not require that cornea transplants be performed at a Designated Facility in order for you to receive Network Benefits. | 80% after you meet the Annual Deductible | Non-Network Benefits are not available. |
| **Travel and Lodging** Covered Health Services must be received at a Designated Facility. | For patient and companion(s) of patient undergoing cancer treatment, Congenital Heart Disease treatment or transplant procedures | |
| **Urgent Care Center Services** | 100% after you pay a Copayment of $25 per visit | Same as Network |

| Covered Health Services[1] | Benefit *(The Amount Payable by the Plan based on Eligible Expenses)* | |
| --- | --- | --- |
| | **Network** | **Non-Network** |
| **Virtual Visits** Network Benefits are available only when services are delivered through a Designated Virtual Network Provider. You can find a Designated Virtual Network Provider by going to **www.myuhc.com** or by calling the telephone number on your ID card. The Virtual Visit Copayment counts toward your Annual Out-of-Pocket Maximum | 100% after you pay a Copayment of $10 per visit | Non-Network Benefits are not available. |
| **Vision Examinations** – one routine exam every other year for members through age 16 years. See the United Healthcare Certificate for limits. | 100% | 50% after you meet the Annual Deductible |

[1] In general, your Network provider must obtain prior authorization from the Claims Administrator or Personal Health Support, as described the UnitedHealthcare Certificate, before you receive certain Covered Health Services. There are some Network Benefits, however, for which you are responsible for obtaining prior authorization from the Claims Administrator or Personal Health Support. See Section 6, *Additional Coverage Details*, of the UnitedHealthcare Certificate for further information.

Please see the applicable Certificate issued by UnitedHealthcare to obtain more information about the particular medical coverage. The Certificate describes exclusions that may apply to you. Copies of the Certificates are available at no cost from Total Rewards.

## PPO 600 PRESCRIPTION DRUG PLAN

Your Copayment and/or Coinsurance is determined by the tier to which the Prescription Drug List Management Committee has assigned the Prescription Drug. All Prescription Drugs on the Prescription Drug List are assigned to Tier-1, Tier-2, Tier-3 or Specialty. Find individualized information on your benefit coverage, determine tier status, check the status of claims and search for network pharmacies by logging on to **www.myuhc.com**® or calling Customer Care at the telephone number on the back of your ID card.

| **Annual Drug Deductible** | **Network and Non-Network** |
| --- | --- |
| Individual Deductible | $50 Tier 2, Tier 3 and Specialty Only |
| Family Deductible | $100 Tier 2, Tier 3 and Specialty Only |
| **Out-of-Pocket Maximum** | **Network and Non-Network** |
| Individual Out-of-Pocket Maximum | See Medical Benefit Summary |
| Family Out-of-Pocket Maximum | See Medical Benefit Summary |

| Tier Level | Retail<br>Up to 31-day supply | | *Mail Order<br>Up to 90-day supply |
|---|---|---|---|
| | Network | Non-Network | Network |
| Tier 1 | $10 | Not Covered | $20 |
| Tier 2 | $25 | Not Covered | $50 |
| Tier 3 | $50 | Not Covered | $100 |
| Specialty | $100 | | |

\* Only certain Prescription Drugs are available through mail order; please visit www.myuhc.com® or call Customer Care at the telephone number on the back of your ID card for more information.

Note: If you purchase a Prescription Drug from a Non-Network Pharmacy, you are responsible for any difference between what the Non-Network Pharmacy charges and the amount we would have paid for the same Prescription Drug dispensed by a Network Pharmacy.

**Other Important Information about your Outpatient Prescription Drug Benefits**

You are responsible for paying the lower of the applicable Copayment and/or Coinsurance or the retail Network Pharmacy's Usual and Customary Charge, or the lower of the applicable Copayment and/or Coinsurance or the mail order Network Pharmacy's Prescription Drug Cost.

For a single Copayment and/or Coinsurance, you may receive a Prescription Drug up to the stated supply limit. Some Prescription Drugs are subject to additional supply limits

Some Prescription Drug or Pharmaceutical Products for which Benefits are described under the Prescription Drug section of the Summary Plan Description (SPD) are subject to step therapy requirements. This means that in order to receive Benefits for such Prescription Drug or Pharmaceutical Products you are required to use a different Prescription Drug(s) or Pharmaceutical Product(s) first.

You may be required to fill an initial Prescription Drug Product order and obtain one refill through a retail pharmacy prior to using a mail order Network Pharmacy.

Benefits are available for refills of Prescription Drug Products only when dispensed as ordered by a duly licensed health care provider and only after 3/4 of the original Prescription Drug Product has been used.

If you require certain Maintenance Medications, we may direct you to the Mail Order Network Pharmacy to obtain those Maintenance Medications. If you choose not to obtain your Maintenance Medications from the Mail Order Network Pharmacy, you may opt-out of the Maintenance Medication Program each year through the Internet at myuhc.com or by calling Customer Care at the telephone number on your ID card.

National (including Hawaii and Puerto Rico)

## PPO 2000

The table below provides an overview of the Annual Deductible and Out-of-Pocket Maximum for the PPO 2000.

| Plan Features | Network Amounts | Non-Network Amounts |
|---|---|---|
| **Annual Deductible** | | |
| Individual. | $2,000 | $4,000 |
| Family (cumulative Annual Deductible). | $6,000 | $12,000 |
| The Plan does not require that you or a covered Dependent meet the individual Deductible in order to satisfy the family Deductible. If more than one person in a family is covered under the Plan, the individual coverage Deductible stated in this table above does not apply. Instead, the family Deductible applies and no one in the family is eligible to receive Benefits until the family Deductible is satisfied. | | |
| The Annual Deductible applies to all Covered Health Services under the Plan, including Covered Health Services provided in the United Healthcare Certificate. | | |
| **Annual Out-of-Pocket Maximum** | | |
| Individual. | $4,000 | $8,000 |
| Family (not to exceed the applicable Individual amount per Covered Person). | $7,150 | $16,000 |
| The Annual Deductible applies toward the Out-of-Pocket Maximum for all Covered Health Services. | | |
| The Annual Out-of-Pocket Maximum applies to all Covered Health Services under the Plan, including Covered Health Services provided in the United Healthcare Certificate. | | |
| **Lifetime Maximum Benefit** | | |
| There is no dollar limit to the amount the Plan will pay for essential Benefits during the entire period you are enrolled in this Plan. | Unlimited | |

| Plan Features | Network Amounts | Non-Network Amounts |
|---|---|---|
| Generally the following are considered to be essential benefits under the *Patient Protection and Affordable Care Act:*<br><br>Ambulatory patient services; emergency services, hospitalization; maternity and newborn care, mental health and Substance-Related and Addictive Disorders Services (including behavioral health treatment); prescription drug products; rehabilitative and habilitative services and devices; laboratory services; preventive and wellness services and chronic disease management; and pediatric services, including oral and vision care. | | |

This table provides an overview of the Plan's coverage levels.

| Covered Health Services[1] | Benefit<br>*(The Amount Payable by the Plan based on Eligible Expenses)* | |
|---|---|---|
| | Network | Non-Network |
| **Acupuncture Services** | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Allergy Testing/Injections**<br><br>Testing and Follow-Up Office Visits<br><br><br>Injections without Office Visit Follow-Up | 70% after you meet the Annual Deductible<br><br><br>100% | 50% after you meet the Annual Deductible<br><br>50% after you meet the Annual Deductible |
| **Ambulance Services**<br><br>Emergency Ambulance.<br><br><br>Non-Emergency Ambulance.<br><br>Ground or air ambulance, as the Claims Administrator determines appropriate. | *Ground and/or Air Ambulance*<br>70% after you meet the Annual Deductible<br><br>70% after you meet the Annual Deductible | *Ground and/or Air Ambulance*<br><br>Same as Network<br><br><br>Same as Network |

National (including Hawaii and Puerto Rico)

| Covered Health Services[1] | Benefit *(The Amount Payable by the Plan based on Eligible Expenses)* | |
|---|---|---|
| | Network | Non-Network |
| **Cancer Services**<br><br><br><br>See the United Healthcare Certificate. | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. |
| **Clinical Trials** | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. |
| **Congenital Heart Disease (CHD) Surgeries** | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Dental Services - Accident Only**<br>See  the United Healthcare Certificate for limits. | 70% after you meet the Annual Deductible | Same as Network |
| **Diabetes Services**<br><br>Diabetes Self-Management and Training/ Diabetic Eye Examinations/Foot Care | Depending upon where the Covered Health Service is provided, Benefits for diabetes self-management and training/diabetic eye examinations/foot care will be paid the same as those stated under each Covered | Depending upon where the Covered Health Service is provided, Benefits for diabetes self-management and training/diabetic eye examinations/foot care will be paid the same as those stated |

National (including Hawaii and Puerto Rico)

| Covered Health Services[1] | Benefit (The Amount Payable by the Plan based on Eligible Expenses) | |
|---|---|---|
| | Network | Non-Network |
| Diabetes Self-Management Items | Health Service category in this section.<br><br>Depending upon where the Covered Health Service is provided, Benefits for diabetes self-management items will be the same as those stated under *Durable Medical Equipment* in this section and in the United Healthcare Certificate. | under each Covered Health Service category in this section.<br><br>Depending upon where the Covered Health Service is provided, Benefits for diabetes self-management items will be the same as those stated under *Durable Medical Equipment* in this section and in the United Healthcare Certificate. |
| **Durable Medical Equipment (DME)** | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Emergency Health Services - Outpatient** | 70% after you meet the Annual Deductible | Same as Network |
| **Gender Dysphoria** | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in the *Schedule of Benefits* available from Total Rewards and in the United Healthcare Certificate. | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in the *Schedule of Benefits* available from Total Rewards and in the United Healthcare Certificate. |
| **Hearing Aids**<br>See the United Healthcare Certificate for limits. | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |

National (including Hawaii and Puerto Rico)

| Covered Health Services[1] | Benefit (The Amount Payable by the Plan based on Eligible Expenses) | |
|---|---|---|
| | Network | Non-Network |
| **Home Health Care** <br><br> See  the United Healthcare Certificate for limits. | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Hospice Care** <br><br> See the United Healthcare Certificate for limits. | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Hospital - Inpatient Stay** | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Infertility** (underlying medical condition) | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. |
| **Kidney Services** <br><br><br> *See* the United Healthcare Certificate. | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. | Non-Network Benefits are not available |
| **Lab, X-Ray and Diagnostics - Outpatient** <br> Lab Testing - Outpatient. | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| X-Ray and Other Diagnostic Testing - Outpatient. | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |

National (including Hawaii and Puerto Rico)

| Covered Health Services[1] | Benefit (The Amount Payable by the Plan based on Eligible Expenses) | |
|---|---|---|
| | Network | Non-Network |
| **Lab, X-Ray and Major Diagnostics – CT, PET, MRI, MRA and Nuclear Medicine - Outpatient** | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Mental Health Services** | | |
| Inpatient. | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| Outpatient. | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Neurobiological Disorders - Autism Spectrum Disorder Services** | | |
| Inpatient. | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| Outpatient. | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Nutritional Counseling** | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Ostomy Supplies** See the United Healthcare Certificate for limits. | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Pharmaceutical Products - Outpatient** | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Physician Fees for Surgical and Medical Services** | | |
| Primary Physician | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| Specialist Physician. | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Physician's Office Services - Sickness and Injury** | | |

| Covered Health Services[1] | Benefit (The Amount Payable by the Plan based on Eligible Expenses) | |
|---|---|---|
| | Network | Non-Network |
| Primary Physician. | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| Specialist Physician. | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Pregnancy – Maternity Services** | | |
| Initial Visit | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| Routine Prenatal Care | 100% | 50% after you meet the Annual Deductible |
| Delivery/Postpartum Care | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Preventive Care Services** | | |
| Physician Office Services. | 100% | 50% after you meet the Annual Deductible |
| Lab, X-ray or Other Preventive Tests. | 100% | 50% after you meet the Annual Deductible |
| Breast Pumps. | 100% | 50% after you meet the Annual Deductible |
| Sterilization for Women | 100% | 50% after you meet the Annual Deductible |
| Sterilization for Men | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| Routine Hearing Exams (Frequency: once every two (2) years) | 100% | 50% after you meet the Annual Deductible |
| **Prosthetic Devices** | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |

National (including Hawaii and Puerto Rico)

| Covered Health Services[1] | Benefit (The Amount Payable by the Plan based on Eligible Expenses) | |
|---|---|---|
| | Network | Non-Network |
| **Reconstructive Procedures** | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. |
| **Rehabilitation Services - Outpatient Therapy and Manipulative Treatment** See the United Healthcare Certificate for visit limits. | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Scopic Procedures - Outpatient Diagnostic and Therapeutic** | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Skilled Nursing Facility/Inpatient Rehabilitation Facility Services** See the United Healthcare Certificate for limits. | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Substance-Related and Addictive Disorders Services** Inpatient. Outpatient. | 70% after you meet the Annual Deductible 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible 50% after you meet the Annual Deductible |
| **Surgery - Outpatient** | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Therapeutic Treatments - Outpatient** | 70% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Transplantation Services** | | |

| Covered Health Services[1] | Benefit (The Amount Payable by the Plan based on Eligible Expenses) | |
| --- | --- | --- |
| | Network | Non-Network |
| For Network Benefits, transplantation services must be received at a Designated Facility. The Claims Administrator does not require that cornea transplants be performed at a Designated Facility in order for you to receive Network Benefits. | 70% after you meet the Annual Deductible | Non-Network Benefits are not available. |
| **Travel and Lodging** Covered Health Services must be received at a Designated Facility. | For patient and companion(s) of patient undergoing cancer treatment, Congenital Heart Disease treatment or transplant procedures | |
| **Urgent Care Center Services** | 70% after you meet the Annual Deductible | 70% after you meet the Annual Deductible |
| **Virtual Visits** Network Benefits are available only when services are delivered through a Designated Virtual Network Provider. You can find a Designated Virtual Network Provider by going to **www.myuhc.com** or by calling the telephone number on your ID card.  Member will pay $49 Virtual Visit Fee until the annual deductible is met.  Once the annual deductible is met, the member will pay the 30% co-insurance of the Virtual Visit Fee.  Virtual Visit Copayments will count toward the Out-of-Pocket Maximum. | 70% after you meet the Annual Deductible | Non-Network Benefits are not available. |
| **Vision Examinations** (one routine exam every other year for members through age 16) See the United Healthcare Certificate for limits. | 100% | 50% after you meet the Annual Deductible |

[1]  In general, your Network provider must obtain prior authorization from the Claims Administrator or Personal Health Support, as described in Section 4, *Personal Health Support*, of the UnitedHealthcare Certificate before you receive certain Covered Health Services. There are some Network Benefits, however, for which you are responsible for obtaining prior authorization from the Claims Administrator or Personal Health Support. See Section 6, *Additional Coverage Details*, of the UnitedHealthcare Certificate for further information.

Please see the applicable Certificate issued by UnitedHealthcare to obtain more information about the particular medical coverage.  The Certificate describes exclusions that may apply to you.  Copies of the Certificates are available at no cost from Total Rewards.

## PPO 2000 PRESCRIPTION DRUG PLAN

Your Copayment and/or Coinsurance is determined by the tier to which the Prescription Drug List Management Committee has assigned the Prescription Drug. All Prescription Drugs on the Prescription Drug List are assigned to Tier-1, Tier-2, Tier-3 or Specialty. Find individualized information on your benefit coverage, determine tier status, check the status of claims and search for network pharmacies by logging on to **www.myuhc.com®** or calling Customer Care at the telephone number on the back of your ID card.

A deductible and out-of-pocket maximum may apply. Please refer to the medical plan documents for the annual deductible and out-of-pocket maximum amounts, which include both medical and pharmacy expenses. This means that you will pay the full amount we have contracted with the pharmacy to charge for your prescriptions (not just your copayment), until you have satisfied the deductible. Once the deductible is satisfied, your prescriptions will be subject to the copayments outlined below. If you reach the Out-of-Pocket maximum, you will not be required to pay a copayment.

| Annual Drug Deductible | Network and Non-Network |
|---|---|
| Individual Deductible | See Medical Benefit Summary |
| Family Deductible | See Medical Benefit Summary |
| **Out-of-Pocket Maximum** | **Network and Non-Network** |
| Individual Out-of-Pocket Maximum | See Medical Benefit Summary |
| Family Out-of-Pocket Maximum | See Medical Benefit Summary |

| Tier Level | Retail Up to 31-day supply | | *Mail Order Up to 90-day supply |
|---|---|---|---|
| | Network | Non-Network | Network |
| **Tier 1** | $10 | Not Covered | $20 |
| **Tier 2** | $25 | Not Covered | $50 |
| **Tier 3** | $50 | Not Covered | $100 |
| **Specialty** | $100 | | |

* Only certain Prescription Drugs are available through mail order; please visit www.myuhc.com® or call Customer Care at the telephone number on the back of your ID card for more information.
Note: If you purchase a Prescription Drug from a Non-Network Pharmacy, you are responsible for any difference between what the Non-Network Pharmacy charges and the amount we would have paid for the same Prescription Drug dispensed by a Network Pharmacy.

**Other Important Information about your Outpatient Prescription Drug Benefits**
You are responsible for paying the lower of the applicable Copayment and/or Coinsurance or the retail Network Pharmacy's Usual and Customary Charge, or the lower of the applicable Copayment and/or Coinsurance or the mail order Network Pharmacy's Prescription Drug Cost.

For a single Copayment and/or Coinsurance, you may receive a Prescription Drug up to the stated supply limit. Some Prescription Drugs are subject to additional supply limits

Some Prescription Drug or Pharmaceutical Products for which Benefits are described under the Prescription Drug section of the Summary Plan Description (SPD) are subject to step therapy requirements. This means that in order to receive Benefits for such Prescription Drug or Pharmaceutical Products you are required to use a different Prescription Drug(s) or Pharmaceutical Product(s) first.

You may be required to fill an initial Prescription Drug Product order and obtain one refill through a retail pharmacy prior to using a mail order Network Pharmacy.

Benefits are available for refills of Prescription Drug Products only when dispensed as ordered by a duly licensed health care provider and only after 3/4 of the original Prescription Drug Product has been used.

If you require certain Maintenance Medications, we may direct you to the Mail Order Network Pharmacy to obtain those Maintenance Medications. If you choose not to obtain your Maintenance Medications from the Mail Order Network Pharmacy, you may opt-out of the Maintenance Medication Program each year through the Internet at myuhc.com or by calling Customer Care at the telephone number on your ID card.

## HEALTH SAVINGS ACCOUNT ("HSA")

The PPO 2000 Medical Plan option is considered an HDHP that may permit you to make pre-tax or tax-deductible contributions to a Health Savings Account ("HSA").  Note that if you contribute to the HSA, you are not eligible to participate in the Health Care FSA.  The following is a brief summary of the HSA offered by Discovery in connection with the PPO 2000 Medical Plan.  You may obtain further information about the HSA from Discovery or from Total Rewards.

### What does an HSA do for you?

| | |
|---|---|
| **It comes with tax advantages** | **Contribute anytime** |
| **Tax savings**.  Money you put into your HSA can reduce your taxable income — helping you save on taxes you pay.<br>**Tax-free earnings**.  Money you keep in your HSA earns interest tax-free.  Let it grow from year to year.<br>**Tax-free spending**.  Money you take from your HSA to pay for IRS-qualified health care costs is never taxed. | You and your spouse and Family members can contribute anytime, up to a yearly maximum.  The 2019 limits are $3,500 for single coverage and $7,000 for family coverage; these limits are increased by $1,000 if you are age 55 or over.  These maximums are adjusted yearly by the IRS for future years.  The maximum amount you can contribute may change based on your plan eligibility during the year.  Talk with your tax advisor.<br>The more you contribute, the bigger your account can grow. |
| **There are other benefits, too** | **Know how much you have** |
| **You own your HSA**.  You decide how to spend — or save — your health savings account.  If you change jobs or health plans, you keep the account.  You can even name a beneficiary to inherit your account.<br>**There's no use-it-or-lose it**.  Any money not used at the end of the plan year rolls over to the next year ... every year.<br>**It's an investment**.  That's right.  Your HSA is a savings account that earns interest.  It's a way to put away money for health care costs down the road, even in retirement.  After you build up a certain amount, you might have investment options. | You can only use the money that's in your HSA at the time you want to make a payment.<br>Make sure to keep track of how much is available in your HSA.<br>Log in to Discovery at www.discoverybenefits.com and check your account balances. |
| **How do you make the most of these financial opportunities?** | **Avoid surprises** |
| The Discovery online HSA Savings Calculator can help.  Find it on your secure Discovery website at https://www.discoverybenefits.com<br><br>**Enroll and get a welcome kit**<br><br>When you sign up for the Discovery HSA, Discovery will send you a card and information to help you use your account. | Know what your health plan covers. For example:<br>• Do you need a primary care physician, also known as a PCP?<br>• How much is your copay or coinsurance?<br>• Do you have in-network and out-of-network costs?<br>• Is a referral needed?<br>• What about approval For some services?†<br>**Know before you go.  Visit www.myuhc.com to:**<br>• Find doctors in the UnitedHealthcare network through UnitedHealthcare's online Find A Doctor® directory.<br>See what doctors and hospitals will charge you for some common services — before you walk out the front door. |
| | |
| **Using your HSA** | |
| **How your PPO 2000 plan works** | **Make the most of your HSA** |

**Step 1:**  Visit participating doctors, hospitals and other health care professionals.

**Step 2:**  Pay for covered health care services and prescriptions until you meet your yearly deductible. Use your HSA if you like.

**Step 3:**  Then, pay a copay or coinsurance at each visit.  Again, you can use your HSA.

**Step 4:**  Pay until you reach the out-of-pocket maximum.  Now your health plan pays for covered services when you visit doctors, hospitals and pharmacies. You pay nothing.

It's smart to research costs and quality, no matter what health plan you have. But it's even more important with an HSA. After all, it's your money!

Visit **https://www.discoverybenefits.com**.  If you are a new user, get started and "create your profile" online.  If you are already a registered member, you're a step ahead.  Just log in and check "My Dashboard." They're at your service 24/7, throughout the plan year, to:

• Check your account balance under the Financial Center
• Review HSA claims under the Financial Center

.

**3 easy ways to pay**

Flexibility is built in, with three easy ways to pay:

1. **The Discovery Benefits Debit Card, your account debit card, is included in your "welcome kit."**  Pay directly with a debit card linked to your HSA.
2. **Pay yourself back**.  Pay for eligible expenses with cash, check or your personal credit card.  Then withdraw funds from your HSA to pay yourself back.  You can also have your payment deposited directly into your checking or savings account.
3. **Online bill payment**.  Pay for health care expenses on your computer, directly from your HSA.

**Check for qualified costs**

Here are some expenses the IRS lets you use your HSA to pay for:

• Deductible payments
• Copays and coinsurance
• Wheelchairs
• Dental care and braces
• Hearing aids
• Contact lenses and LASIK surgery
• Prescription drugs are also included — even if you don't have an United HealthCare drug plan

Check Discovery for more information.  There's even a tool to help you organize medical expenses and HSA withdrawals online.

• And visit the IRS website at **www.irs.gov** for a list of qualified health care costs.  NOTE:  These are generally the same expenses that can be paid for by a health care flexible spending account.

Maybe you or your spouse has a flexible spending account (FSA).  And you think an HSA works the same way.  (According to IRS rules, you are not eligible to participate in an HSA if you are covered by another health plan, including an FSA.  In addition, according to IRS rules, you will not be eligible to contribute to your HSA if your spouse is enrolled in a general purpose FSA that will reimburse eligible expenses that you incur.)

It's true that both let you put away money, tax free, to pay for qualified health care expenses.  But there are some differences you should know about.

|  | HSA | FSA |
|---|---|---|
| Is a health plan required? | Yes | No |
| Use it or lose it? | No | Yes |
| Take it with you? | Yes | No |
| Are contributions taxed? | No.  Also, contributions can be made with after-tax funds; please consult your tax advisor for more information. | No |
| Is earned interest taxed? | No | An FSA doesn't earn interest |
| Are withdrawals for qualified costs/expenses taxed? | No | No |
| Who can contribute? | You, your family and your employer | You and your employer |

**Puerto Rico Employees:**  The Hacienda currently does not permit employees to contribute to HSAs on a pre-tax basis in Puerto Rico.  You will be notified if the situation changes.

## PUERTO RICO MEDICAL

The following is the only Medical Plan option available in Puerto Rico.

| Plan Features | Network Amounts |
|---|---|
| **Copays** | |
| Acupuncture. | $10 |
| Emergency Health Services. | $50 |
| Hospital Inpatient Stay | $100 |
| Physician's Office Services | $10 |
| Rehabilitation Services. | $10 |
| Copays apply toward the Out-of-Pocket Maximum. | |
| **Annual Out-of-Pocket Maximum** | |
| Individual. | $1,200 |
| Family (cumulative Out-of-Pocket Maximum). | $2,400 |
| The Plan does not require that you or a covered Dependent meet the individual Out-of-Pocket Maximum in order to satisfy the family Out-of Pocket Maximum. If more than one person in a family is covered under the Plan, the individual coverage Out-of-Pocket Maximum stated in this table above does not apply. Instead, for family coverage the family Out-of-Pocket Maximum applies. | |
| The Annual Out-of-Pocket Maximum applies to all Covered Health Services under the Plan, including Covered Health Services provided in the United Healthcare Certificate. | |
| **Lifetime Maximum Benefit** | |
| There is no dollar limit to the amount the Plan will pay for essential Benefits during the entire period you are enrolled in this Plan. | Unlimited |
| Generally the following are considered to be essential benefits under the *Patient Protection and Affordable Care Act:* | |
| Ambulatory patient services; emergency services, hospitalization; maternity and | |

| Plan Features | Network Amounts |
|---|---|
| newborn care, mental health and Substance-Related and Addictive Disorders Services (including behavioral health treatment); prescription drug products; rehabilitative and habilitative services and devices; laboratory services; preventive and wellness services and chronic disease management; and pediatric services, including oral and vision care. | |

This table provides an overview of the Puerto Rico Plan's coverage levels.

| Covered Health Services[1] | Benefit *(The Amount Payable by the Plan based on Eligible Expenses)* |
|---|---|
| | Network |
| **Acupuncture Services** | 100% after you pay a Copayment of $10 per visit |
| **Allergy Testing/Injections** | |
| ■  Testing and Follow-Up Office Visits | 100% after you pay a Copayment of $10 per visit |
| ■  Injections without Office Visit Follow-Up | 100% |
| **Ambulance Services** <br> ■  Emergency Ambulance. <br><br> ■  Non-Emergency Ambulance. <br> Ground or air ambulance, as the Claims Administrator determines appropriate. | *Ground and/or Air Ambulance* <br> 90% <br><br> 90% |
| **Cancer Services** <br><br> See  the United Healthcare Certificate. | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. |
| **Clinical Trials** | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. |
| **Congenital Heart Disease (CHD) Surgeries** | 90% |

| Covered Health Services[1] | Benefit *(The Amount Payable by the Plan based on Eligible Expenses)* |
|---|---|
| | Network |
| **Dental Services - Accident Only**<br>See the United Healthcare Certificate for limits. | 90% |
| **Diabetes Services**<br><br>Diabetes Self-Management and Training/ Diabetic Eye Examinations/Foot Care<br><br><br><br>Diabetes Self-Management Items | Depending upon where the Covered Health Service is provided, Benefits for diabetes self-management and training/diabetic eye examinations/foot care will be paid the same as those stated under each Covered Health Service category in this section.<br><br>Depending upon where the Covered Health Service is provided, Benefits for diabetes self-management items will be the same as those stated under *Durable Medical Equipment* in this section and in the United Healthcare Certificate. |
| **Durable Medical Equipment (DME)** | 90% |
| **Emergency Health Services - Outpatient**<br>Emergency services received at a non-Network Hospital are covered at the Network level.<br><br>If you are admitted as an inpatient to a Hospital directly from the Emergency room, you will not have to pay this Copay. The Benefits for an Inpatient Stay in a Hospital will apply instead. | 100% after you pay a Copayment of $50 per visit |
| **Gender Dysphoria** | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in the *Schedule of Benefits* available from Total Rewards and in the United Healthcare Certificate. |
| **Hearing Aids**<br>See the United Healthcare Certificate for limits. | 90% |
| **Home Health Care**<br>See the United Healthcare Certificate for limits. | 90% |
| **Hospice Care** | 90% |

| Covered Health Services[1] | Benefit (The Amount Payable by the Plan based on Eligible Expenses) |
|---|---|
| | Network |
| **Hospital - Inpatient Stay** | 90% |
| **Infertility**(underlying medical condition) | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. |
| **Kidney Services** See the United Healthcare Certificate. | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. |
| **Lab, X-Ray and Diagnostics - Outpatient** ■ Lab Testing - Outpatient. ■ X-Ray and Other Diagnostic Testing - Outpatient. | 90% 90% |
| **Lab, X-Ray and Major Diagnostics – CT, PET, MRI, MRA and Nuclear Medicine - Outpatient** | 90% |
| **Mental Health Services** ■ Inpatient. ■ Outpatient. | 90% 100% after you pay a Copayment of $10 per visit |
| **Neurobiological Disorders - Autism Spectrum Disorder Services** ■ Inpatient. ■ Outpatient. | 90% 100% after you pay a Copayment of $10 per visit |
| **Nutritional Counseling** | 90% |
| **Ostomy Supplies** See the United Healthcare Certificate for limits. | 90% |
| **Pharmaceutical Products - Outpatient** | 90% |
| **Physician Fees for Surgical and Medical Services** | 90% |

| Covered Health Services[1] | Benefit *(The Amount Payable by the Plan based on Eligible Expenses)* |
|---|---|
| | **Network** |
| **Physician's Office Services - Sickness and Injury** | 100% after you pay a Copayment of $10 per visit |
| **Pregnancy - Maternity Services**<br>■ Initial Visit<br><br>■ Routine Prenatal Care<br>■ Delivery/Postpartum Care | 100% after you pay a Copayment of $10 per visit<br>100%<br>90% |
| **Preventive Care Services**<br>■ Physician Office Services.<br>■ Lab, X-ray or Other Preventive Tests.<br>■ Breast Pumps.<br>■ Sterilization for Women<br>■ Sterilization for Men<br>■ Routine Hearing Exam (once every two (2) years | 100%<br>100%<br>100%<br>100%<br>90%<br>100% |
| **Prosthetic Devices** | 90% |
| **Reconstructive Procedures** | Depending upon where the Covered Health Service is provided, Benefits will be the same as those stated under each Covered Health Service category in this section. |
| **Rehabilitation Services - Outpatient Therapy and Manipulative Treatment**<br>See the United Healthcare Certificate for visit limits. | 100% after you pay a Copayment of $10 per visit |
| **Scopic Procedures - Outpatient Diagnostic and Therapeutic** | 90% |
| **Skilled Nursing Facility/Inpatient Rehabilitation Facility Services**<br>See the United Healthcare Certificate for limits. | 90% |
| **Substance-Related and Addictive Disorders Services**<br>■ Inpatient. | 90% |

| Covered Health Services[1] | Benefit<br>*(The Amount Payable by the Plan based on Eligible Expenses)* |
|---|---|
| | **Network** |
| ■   Outpatient. | 100% after you pay a Copayment of $10 per visit |
| **Surgery - Outpatient** | 90% |
| **Therapeutic Treatments - Outpatient** | 90% |
| **Transplantation Services**<br><br>Transplantation services must be received at a Designated Facility. The Claims Administrator does not require that cornea transplants be performed at a Designated Facility. | 90% |
| **Travel and Lodging**<br><br>Covered Health Services must be received at a Designated Facility. | For patient and companion(s) of patient undergoing cancer treatment, Congenital Heart Disease treatment or transplant procedures |
| **Urgent Care Center Services** | 100% after you pay a Copayment of $50 per visit |
| **Vision Examinations** (one routine exam every other year for members through age 16 years)<br>See the United Healthcare Certificate for limits. | 100% |

[1]  In general, your Network provider must obtain prior authorization from the Claims Administrator or Personal Health Support, as described in Section 4, Personal Health Support, of the United Healthcare Certificate before you receive certain Covered Health Services. There are some Network Benefits, however, for which you are responsible for obtaining prior authorization from the Claims Administrator or Personal Health Support. See Section 6, Additional Coverage Details, of the United Healthcare Certificate for further information.

> Please see the applicable Certificate issued by UnitedHealthcare to obtain more information about the particular medical coverage.  The Certificate describes exclusions that may apply to you.  Copies of the Certificates are available at no cost from Total Rewards.

## PUERTO RICO PRESCRIPTION DRUG PLAN

Your Copayment and/or Coinsurance is determined by the tier to which the Prescription Drug List Management Committee has assigned the Prescription Drug. All Prescription Drugs on the Prescription Drug List are assigned to Tier-1, Tier-2, Tier-3 or Specialty. Find individualized information on your benefit coverage, determine tier status, check the status of claims and search for network pharmacies by logging on to **www.myuhc.com**® or calling Customer Care at the telephone number on the back of your ID card.

| Annual Drug Deductible | Network and Non-Network |
|---|---|
|   Individual Deductible | $50 Tier 2, Tier 3 and Specialty Only |
|   Family Deductible | $100 Tier 2, Tier 3 and Specialty Only |
| **Out-of-Pocket Maximum** | **Network and Non-Network** |
|   Individual Out-of-Pocket Maximum | See Medical Benefit Summary |
|   Family Out-of-Pocket Maximum | See Medical Benefit Summary |

| Tier Level | Retail Up to 31-day supply | | *Mail Order Up to 90-day supply |
|---|---|---|---|
| | **Network** | **Non-Network** | **Network** |
| **Tier 1** | $0 | Not Covered | $0 |
| **Tier 2** | 20% | Not Covered | 20% |
| **Tier 3** | 20% | Not Covered | 20% |
| **Specialty** | 20% | | |

\* Only certain Prescription Drugs are available through mail order; please visit www.myuhc.com® or call Customer Care at the telephone number on the back of your ID card for more information.

Note: If you purchase a Prescription Drug from a Non-Network Pharmacy, you are responsible for any difference between what the Non-Network Pharmacy charges and the amount we would have paid for the same Prescription Drug dispensed by a Network Pharmacy.

**Other Important Information about your Outpatient Prescription Drug Benefits**
You are responsible for paying the lower of the applicable Copayment and/or Coinsurance or the retail Network Pharmacy's Usual and Customary Charge, or the lower of the applicable Copayment and/or Coinsurance or the mail order Network Pharmacy's Prescription Drug Cost.

For a single Copayment and/or Coinsurance, you may receive a Prescription Drug up to the stated supply limit. Some Prescription Drugs are subject to additional supply limits

Some Prescription Drug or Pharmaceutical Products for which Benefits are described under the Prescription Drug section of the Summary Plan Description (SPD) are subject to step therapy requirements. This means that in order to receive Benefits for such Prescription Drug or Pharmaceutical Products you are required to use a different Prescription Drug(s) or Pharmaceutical Product(s) first.

You may be required to fill an initial Prescription Drug Product order and obtain one refill through a retail pharmacy prior to using a mail order Network Pharmacy.

Benefits are available for refills of Prescription Drug Products only when dispensed as ordered by a duly licensed health care provider and only after 3/4 of the original Prescription Drug Product has been used.

If you require certain Maintenance Medications, we may direct you to the Mail Order Network Pharmacy to obtain those Maintenance Medications. If you choose not to obtain your Maintenance Medications from the Mail Order Network Pharmacy, you may opt-out of the Maintenance Medication Program each year through the Internet at myuhc.com or by calling Customer Care at the telephone number on your ID card.

## HAWAII MEDICAL

The following is the **only** Medical Plan option available in Hawaii.  For more information about benefit coverages and exclusions, please see the Kaiser Permanente booklet.

### 2019 Features of your Kaiser Permanente plan

This is only a summary.  It does not fully describe your benefit coverage.  For details on your benefit coverage, exclusions, and plan terms, please refer to the Company's applicable Face Sheet, Group Medical and Hospital Service Agreement, benefit schedule, and riders (collectively known as "Service Agreement")

| Section | Benefits | You Pay |
|---|---|---|
| Supplemental charges maximum** | Your copays and coinsurance for covered Basic Health Services are capped by a **supplemental charges maximum** | $2,200 / $4,400 |
| Deductible | Deductible** | $200 single / $400 family |
| Outpatient services | **Office visits** | |
| | • For primary care | $15 per visit |
| | • With a Specialist | $15 per visit |
| | **Outpatient surgery and procedures** | |
| | • Provided in medical office during a primary care visit | $15 per visit |
| | • Provided in medical office with a Specialist | $15 per visit |
| | • Provided in an ambulatory surgery center (ASC) or hospital-based setting | 10% of applicable charges after deductible |
| | • Routine pre- and post-surgical office visits in connection with a covered surgery | No charge |
| Outpatient laboratory, imaging, and testing services | **Laboratory services** | $20 copay per department per day |
| | **Imaging services** | |
| | • General radiology | $20 copay per department per day |
| | • Specialty imaging services | 20% of applicable charges after deductible |
| | **Testing services** | 20% of applicable charges |
| Preventive care services | **Preventive care office visits for:** | |
| | • Well child office visits (at birth, ages 2 months, 4 months, 6 months, 9 months, 12 months, 15 months, 18 months, 2 years, 3 years, 4 years, and 5 years) | |
| | • One preventive care office visit per accumulation period for members 6 years of age and over | No charge |
| | • One gynecological office visit per accumulation period for female members | |

| Section | Benefits | You Pay |
|---|---|---|
| **Prescribed Drugs** | Self-administered | **4-Tier Prescription drug 3/10/45/200**<br>Generic Maintenance Drugs: $3 per prescription<br>Other Generic Drugs: $10 per prescription<br>Brand-Name Drugs: $45 per prescription<br>Specialty drugs: $200<br>(Applies towards the annual supplemental charges maximum per calendar year) |
| | **Prescribed drugs that require skilled administration by medical personnel,** such as injections and infusions (e.g. cannot be self-administered)\*\*<br>• Provided in a medical office▼<br>• Provided during other settings, such as hospital stay, outpatient surgery, skilled nursing care | $20 per dose<br>Applicable cost shares apply. See applicable benefit sections† |
| | **Diabetes supplies**\*\* | 50% of applicable charges (a minimum price as determined by Pharmacy Administration may apply) |
| | **Tobacco cessation drugs and products**\*\* | No charge |
| | **Other drug therapy services**<br>• Home IV/Infusion therapy | No charge |
| | • Medically necessary growth hormone therapy<br>• Prescribed inhalation therapy | Applicable cost shares apply. See applicable benefit sections† |
| | **Routine immunizations** | No charge |
| **Obstetrical Care** | Routine prenatal visits<br>Routine postpartum visit<br>Delivery/hospital stay (uncomplicated) | No charge<br>No charge<br>10% of applicable charges after deductible |
| **Hospital Inpatient care** | Hospital inpatient care | 10% of applicable charges after deductible |
| **Home health care and hospice care** | **Home health care**, nurse and home health care visits to homebound members, when prescribed by a Kaiser Permanente physician | No charge (office visit copays apply to physician visits) |
| | **Hospice care**\*\* | No charge (office visit copays apply to physician visits) |
| **Emergency services** | **Emergency services**\*\*<br>within and outside the Hawaii service area<br>*Note: The copayment for emergency services is waived if you are directly admitted as a hospital patient from the emergency department (the hospital copay will apply)* | 20% of applicable charges / 20% of applicable charges |
| **Urgent care services** | **Urgent care services**\*\*<br>• At a Kaiser Permanente (or Kaiser Permanente-designated) urgent care center within the Hawaii service area, for primary care services<br>• At a non-Kaiser Permanente facility outside the Hawaii service area | $15 per visit<br><br><br><br>20% of applicable charges |
| **Ambulance services** | Ambulance services\*\* | 20% of applicable charges |
| **Durable medical equipment**\*\* | **Diabetes equipment** | 50% of applicable charges |
| | **Home phototherapy equipment** for newborns | No charge |

| Section | Benefits | You Pay |
|---|---|---|
| | **Breast feeding pump,** including any equipment that is required for pump functionality | No charge |
| | All other **durable medical equipment** | 10% of applicable charges |
| **External prosthetic devices and braces**** | **External prosthetic devices and braces** | 10% of applicable charges |
| **Additional services** | | |
| **Prescription drug mail-order incentive** | | Two drug copayments for a 90-consecutive-day supply |
| **Optical 150** | Allowance for glasses or contacts | $150 allowance for glasses or contact lenses per calendar year |
| **Active & Fit** | per calendar year | $200 gym membership or $10 home fitness program |

## ENDNOTES FOR HAWAII MEDICAL COVERAGE

▼  Members must pay their office visit copay for the office visit.

†  For example, office visits are subject to office visit copay, inpatient care are subject to hospital inpatient care cost share, lab, imaging and testing are subject to lab, imaging and testing cost share, etc.

*  See **Coverage Exclusions** Section

** See **Coverage Limitations** Section

## EXCLUSIONS AND LIMITATIONS

A.    Exclusions.  The exclusions set forth in this section apply generally to medical services and benefits otherwise covered under the Kaiser Permanente Certificate (referred to below as the "Service Agreement").  Exclusions specific to a particular benefit are located in the relevant section of the benefit schedule(s).  As used in all exclusions in this section, "Member" means the employee or his or her dependent enrolled in Kaiser Permanente coverage, and "Service" means any treatment, diagnosis, care, procedure, test, drug, injectable, facility, equipment, item, device, or supply.  When a Service is excluded or non-covered, all Services that are necessary or related to the excluded or non-covered Service are also excluded.  The following Services are excluded:

**Acupuncture.**

**Alternative Medical Services.**  Alternative medical services not accepted by standard allopathic medical practices such as:  hypnotherapy, behavior testing, sleep therapy, massage therapy, naturopathy, rest cure and aroma therapy.  This exclusion does not apply to alternative medical services that are accepted by standard allopathic medical practices and meet the requirements of medical necessity, as described in the introductory section of the applicable benefit schedule.

**Artificial Aids and Corrective Appliances.**  Artificial aids and corrective appliances, such as orthopedic aids and corrective lenses and eyeglasses, except that:  (i) Physicians provide the professional services necessary to determine the need therefore and attempt to make arrangements whereby they may be obtained, (ii) Senior Advantage Members are entitled to receive these items in accord with section T of the Senior Advantage benefit schedule, (iii)external prosthetic devices and braces are provided in accord with section CC of the applicable benefit schedule, and (iv) hearing aids are provided in accord with section FF of the applicable benefit schedule.

**Blood and Blood Processing.**  All blood, blood products, blood derivatives, and blood components whether of human or manufactured origin and regardless of the means of administration, except as provided in section B of the Senior Advantage benefit schedule for Senior Advantage members, or section U of the applicable benefit schedule for all other members.

**Chiropractic.**  Services of chiropractors or chiropractic Services, except that Senior Advantage and Medicare Members are entitled to manual manipulation of the spine to correct subluxation in accord with Medicare guidelines when prescribed by a Physician and performed by a Health Plan-designated practitioner.

**Clinical Trials.**  A Service that at the time the Service is or will be provided to the Member, is the subject of a Phase I or Phase II clinical trial, or is the experimental or research arm of a Phase III clinical trial.  If two or more Services

are part of the same plan of treatment or diagnosis, all of the Services are excluded if one of the Services is a Clinical Trial.  This exclusion does not apply to covered services the Member receives that are not related to a clinical trial.

**Cosmetic Services.**  Plastic surgery or other Services that are indicated primarily to change or maintain the Member's appearance and are not likely to result in significant improvement in physical function, including treatment for complications resulting from cosmetic services.  This exclusion does not apply to procedures that (a) will correct significant disfigurement resulting from an injury or medically necessary surgery; (b) are incident to a covered mastectomy; or (c) treatment for complications resulting from cosmetic services provided by a Physician in a Health Plan facility.

**Custodial Care Services or Care and Services in an Intermediate Level Care Facility.**

(a)  Custodial care.  Custodial care is (i) assistance with activities of daily living which include, but are not limited to, activities such as walking, getting in and out of bed, bathing, dressing, feeding, toileting, and taking medication; or (ii) care that can be performed safely and effectively by persons who, in order to provide the care, do not require licensure or certification or the presence of a supervising licensed nurse.

(b)  Care in an intermediate care facility or care for which, in the judgment of the Physician, the facilities and Services of an acute general hospital or the extended care Services of a Skilled Nursing Facility are not medically necessary.

**Dental Care Services.**  Dental Services such as dental implants, dental appliances, orthodontia, dental X-rays, care for Temporomandibular Joint Dysfunction (TMJ) or Craniomandibular Pain Syndrome (CPS).  This exclusion does not apply to medically necessary dental Services covered by Medicare, prescribed by a Physician, and which are provided to Senior Advantage Members.

**Employer or Government Responsibility.**

(a)  Financial responsibility for Services otherwise covered under the Service Agreement for any illness, injury or condition to the extent a payment or any other benefit, including any amount received as a settlement (collectively referred to as a "Financial Benefit"), is provided under any workers' compensation or employer's liability law. Health Plan will provide Services even if it is unclear whether a Member is entitled to a Financial Benefit.  However, Health Plan may recover the value, calculated at full charges, of any such Services provided under the Kaiser Permanente Certificate from any source providing a Financial Benefit or from whom a Financial Benefit is due.

Health Plan reserves the right to bill the Employer or any appropriate compensation insurance carrier for Services provided under the Kaiser Permanente Certificate.

If the Member receives payment from the proceeds of a settlement, judgment or other payment received from or on behalf of the Employer or Employer's workers' compensation insurance carrier, the Member shall repay Health Plan first from any payments received, for the value of Services provided calculated at full charges.  Members are responsible for notifying Health Plan of any "work injury", as defined by Chapter 386, Hawaii Revised Statutes, Section 1-3.  If a Member receives any payment under any workers' compensation or employer's liability law on account of the injury or illness, and remits all amounts received to Health Plan or its nominees (up to the value of Services received, computed at full charges), charges for Services provided under the Kaiser Permanente Certificate will be canceled to the extent they exceed the amount recovered, and if no recovery is effected, all charges provided under the Kaiser Permanente Certificate will be canceled.

(b)  Financial responsibility for Services that an employer is required by law to provide.

(c)  Services for any military service-connected illness, injury or condition when such Services are reasonably available to the Member at a Department of Veterans Affairs facility.  (This exclusion does not apply to Senior Advantage Members.)

(d)  Financial responsibility for Services for any illness, injury, or condition when the law requires such Services to be provided only by or received only from a government agency.

**Certain Examinations and Services.**  Certain services and related reports/paperwork, in connection with third party requests or requirements, such as those for:  employment, participation in employee programs, sports, camp,

insurance, disability, licensing, or on court order or for parole or probation.  Physical examinations that are authorized and deemed medically necessary by a Physician and are coincidentally needed by a third party are covered.

**Eye surgery** solely for the purpose of correcting refractive error of the eye, such as Photo-refractive Keratectomy (PRK), lasek eye surgery, and lasik eye surgery.

**No FDA Approval.**  A Service that at the time the Service is or will be provided to the Member, cannot be legally marketed in the United States without the approval of the Food and Drug Administration (FDA) and such approval has not been granted, or is the subject of a current new drug or new device application on file with the FDA and such approval has not been granted.  If two or more Services are part of the same plan of treatment or diagnosis, all of the Services are excluded if one of the Services has not received FDA approval.  This is not intended to exclude off-label uses of drugs which have received FDA approval for another use.

**Informed Consent Protocols.**  A Service that at the time the Service is or will be provided to the Member, is provided pursuant to informed consent documents, written disclosure form, or other written protocols that indicate that the Service is being evaluated for its safety, toxicity, or efficacy..  If two or more Services are part of the same plan of treatment or diagnosis, all of the Services are excluded if one of the Services is provided pursuant to such informed consent documents.

**Services Subject to Institutional Review Board or Other Body.**  A Service that at the time the Service is or will be provided to the Member, is subject to the approval or review of an Institutional Review Board (IRB) or other body that approves or reviews research concerning the safety, toxicity, or efficacy of Services.  If two or more Services are part of the same plan of treatment or diagnosis, all of the Services are excluded if one of the Services is subject to approval or review by the IRB or such other body.

**Experimental or Investigational Services.**  A Service is experimental or investigational for a Member's condition if, at the time the Service is or will be provided to the Member, the Service is provided pursuant to informed consent documents that describe the Service as experimental or investigational, or pursuant to any other written protocol, disclosure form or other similar document that describes the Service as experimental or investigational.  If two or more Services are part of the same plan of treatment or diagnosis, all of the Services are excluded if one of the Services is experimental or investigational.

**Reversal of Voluntary Infertility.**  Services to reverse voluntary, surgically induced infertility.

**Routine Foot Care Services.**  Routine foot care Services that are not medically necessary.

**Services Not Generally and Customarily Available.**  Any Service not generally and customarily available in the Service Area unless it is generally accepted medical practice to refer patients outside the Service Area for such Service.

**Sexual Dysfunction.**  Drugs, injections, equipment, supplies and prosthetics (except prosthetics which are provided to and covered for Senior Advantage Members) related to treatment of sexual dysfunction.

**Services for Confined Members.**  Services provided or arranged by criminal justice institutions for Members confined therein, unless the Services would be covered as Emergency Services under section S.

**Take home supplies.**  Supplies for home use such as bandages, gauze, tape, antiseptics, and ace-type bandages, except as covered by Medicare for Medicare Members.

**Transportation** (other than covered ambulance services), lodging and living expenses.

**Medical services/care or items** for which coverage has been exhausted, is not listed as covered, or is excluded.

B.    <u>Limitations</u>.  The rights of Members and obligations of Health Plan, Hospitals, Medical Group and Physicians under the Kaiser Permanente Certificate of Insurance are subject to the following limitations:

**Unusual Circumstances.**  If, due to unusual circumstances, such as (a) complete or partial destruction of facilities, war, riot, civil insurrection, labor disputes not involving Health Plan, Hospitals or Medical Group, major disaster, disability of a significant part of Hospital or Medical Group personnel, epidemic, or similar causes, or (b) labor disputes involving Health Plan, Hospitals or Medical Group, the rendition or provision of professional services and other benefits

covered under the Kaiser Permanente Certificate is delayed or rendered impractical, Hospitals, Medical Group and Physicians will, within the limitation of available facilities and personnel, use their best efforts to provide professional services and other benefits covered under the Kaiser Permanente Service Agreement, but, with regard to (a), neither Health Plan, Hospitals, Medical Group nor any Physician shall have any liability or obligation on account of such delay or such failure to provide professional services or other benefits, and with regard to (b), the provision of non-emergent care may be deferred until after resolution of the labor dispute.

**Injuries or Illnesses Caused or Alleged to be Caused by Third Parties or in Motor Vehicle Accidents.**

(a)     Services Received at Kaiser Permanente or Health Plan designated Facilities.  "Third Party Liability Injuries" are an injury or illness (i) caused or alleged to be caused by any act or omission of another party giving rise to a legal claim against another party, insurer or organization, or (ii) incurred in a motor vehicle accident, irrespective of fault.  Medical services and other benefits are furnished by Physicians, Group and Hospitals for Third Party Liability Injuries at full charges; Payment of these charges is the Member's responsibility.

Member shall make immediate payment to Health Plan from the proceeds of any settlement, judgment or other payment received from or on behalf of any other party, insurance company or organization for Third Party Liability Injuries, and Health Plan (or its designee) shall have a first priority lien on the settlement, judgment or other payment for that purpose.  However, subject to section 6-B(2)(c) of the Kaiser Permanente Certificate, the Member is not required to pay Health Plan any amount for Services covered under the Kaiser Permanente Certificate for Third Party Liability Injuries, in excess of the total amount that the Member (or his or her estate, parent or legal guardian) receives from or on behalf of any other party, whether by settlement, judgment, or otherwise, and as medical payments under the Hawaii Motor Vehicle Accident Reparations Act ("Hawaii Motor Vehicle Insurance Law") or under any other state or federal legislation of similar purpose or import.

Member's duty of repayment applies to any such settlement, judgment or other payment proceeds obtained, even if such proceeds do not specifically include medical expenses, or are stated to be for general damages only, or are obtained on Member's behalf by a parent, estate, or legal representative, or are distributed to other persons, or are obtained without any admission of liability or causation by the third party or payor.

No reductions for attorneys' fees, costs or other expenses may be made from the amounts owing to Health Plan for Third Party Liability Injuries.

At Health Plan's (or its designee's) request, the Member (or his or her estate, parent or legal guardian) shall execute a lien form directing his or her attorney or the third party to make payments due hereunder directly to Health Plan (or its designee).  Health Plan's rights under this section will be enforceable regardless if the Member executes the lien form.

Health Plan's right of reimbursement shall include, but not be limited to, any recovery the Member receives from (i) uninsured motorist coverage, (ii) underinsured motorist coverage, (iii) workers compensation coverage, (iv) no-fault, or (v) any other liability coverage.

Subject to section 6-B(2)(c) of the Kaiser Permanente Certificate, if a Member makes reasonable efforts to obtain payment on account of the Third Party Liability Injuries, and remits all amounts of proceeds obtained to Health Plan or its nominees (up to the value of Services received for Third Party Liability Injuries, computed at full charges), charges for Services covered under the Kaiser Permanente Certificate for Third Party Liability Injuries are canceled to the extent they exceed the amount recovered.  If no recovery is effected, all charges for Services covered under the Kaiser Permanente Certificate are canceled.  These provisions do not affect Members' obligations to pay any applicable Deductible or Supplemental Charges.

(b)     Services Received at Non-Kaiser Permanente Facilities.  Payment of these charges for Third Party Liability Injuries is the Member's responsibility.  Subject to section 6-B(2)(c) of the Kaiser Permanente Certificate, payments by Health Plan under section S of the applicable benefit schedule to physicians, hospitals and other non-Kaiser providers are limited to amounts in excess of any monetary recovery from or on behalf of any other party, any insurance or other benefit to which the Member (or his or her estate, parent or legal guardian) may be entitled.  These provisions do not affect Members' obligations to pay any applicable Deductible or Supplemental Charges.

(c)     Other Provisions.

(i)      Except for Senior Advantage Members, the benefits provided under this section (including cancellation of charges) are not available to the extent of all medical benefits to which the Member was entitled under the Member's auto insurance policy or under the Hawaii Motor Vehicle Insurance Law prior to any use, transfer or exhaustion of said benefits by the Member, which the Member does not use to pay for medical services under this section.

(ii)      Health Plan has the option of becoming subrogated to all claims and causes of action that the Member may have against another party, insurer or organization for damages on account of the Third Party Liability Injuries.

(iii)      Members must:  (1) cooperate in protecting Health Plan's interests under this provision; (2) execute and deliver to Health Plan or its designee all liens, assignments, consents, releases, authorizations or other documents which Health Plan determines are necessary or proper to permit it or its designee to determine the applicability of, and enforce Health Plan's rights under this section, and Members hereby authorize and direct any person making any payment on account of any such injury or illness to pay to Health Plan or its designee so much thereof as necessary to discharge the Member's obligations under the Kaiser Permanente Certificate; and (3) notify Health Plan of any actual or potential claim or legal action which the Member anticipates bringing or has brought against any third party arising from alleged acts or omissions not later than thirty (30) calendar days subsequent to submitting or filing a claim or legal action against another party.  The Member shall do nothing to prejudice Health Plan's interest under these provisions.  To be eligible for partial or complete cancellation of charges, or to have payments made under section S of the benefit schedule, Members must comply with the provisions of section 6-B(2) of the Kaiser Permanente Certificate.

(iv)      Health Plan shall have a first priority lien on the proceeds of any settlement or judgment for Third Party Liability Injuries.  The provisions of section 6-B(2) of the Certificate apply even if the total amount of the recovery on account of the injury or illness is less than the Member's actual loss and regardless of how the proceeds are characterized or itemized.

(d)      Special Provisions for Members Entitled to Medicare Benefits.  When Hospitals have provided Services to a Medicare Member for Third Party Liability Injuries, Hospitals will, in compliance with federal law, seek reimbursement under the medical expense payment provisions of any motor vehicle insurance policy covering the Member.  Each such Member must furnish information about the existence and terms of any such policy, and complete and submit all claims, releases and other documents necessary for Hospitals to comply with federal law.

**Surrogacy Arrangement.**  A Surrogacy Arrangement is one in which a Member agrees (orally or by written agreement) to become pregnant and to surrender the baby to another person or persons who intend to raise the child.  Services the Member receives related to conception, pregnancy, or delivery in connection with a Surrogacy Arrangement are called "Surrogacy Health Services".  Surrogacy Health Services are covered under the Kaiser Permanente Certificate to the extent of surrogacy conception, pregnancy and delivery of a baby.  However, the Member must reimburse Health Plan for the costs of Surrogacy Health Services, out of the compensation the Member or the Member's payee are entitled to receive under the Surrogacy Arrangement.  By accepting Surrogacy Health Services, the Member automatically assigns to Health Plan their right to receive payments that are payable to them or to their payee under the Surrogacy Arrangement, regardless of whether those payments are characterized as being for medical expenses.  To secure Health Plan's rights, Health Plan will also have a lien on those payments.  Those payments shall first be applied to satisfy Health Plan's lien.  The assignment and Health Plan's lien will not exceed the total amount of compensation the Member or the Member's payee is entitled to receive under the Surrogacy Arrangement.  Within 30 days after entering into a Surrogacy Arrangement, Members must send Health Plan written notice of the Surrogacy Arrangement, including the names and addresses of the other parties to the Arrangement, and a copy of any contracts or other documents explaining the Arrangement, to:

Kaiser Permanente
711 Kapiolani Boulevard
Honolulu, Hawaii 96813
Attention:  Customer Service Center

Members must complete and send to Health Plan all consents, releases, authorizations, lien forms, and other documents that are reasonably necessary for Health Plan to determine and protect any rights Health Plan may have under this "Surrogacy Arrangement" section.  Members must not take any action prejudicial to Health Plan's rights.  If a Member's estate, parent, guardian, or conservator asserts a claim against a third party based on the Surrogacy Arrangement, the Member's estate, parent, guardian, or conservator, and any settlement or judgment recovered by the estate, parent, guardian, or conservator, shall be subject to Health Plan's liens and other rights to the same extent as if the Member had asserted the claim against the third party, as described in section 6-B(2).

**Refusal to Accept Treatment.**  Certain Members may, for personal reasons, refuse to accept procedures or treatment recommended by Physicians.  Physicians may regard such refusal as incompatible with the continuance of a satisfactory physician-patient relationship and as obstructing the provision of proper medical care.  Physicians use their best efforts to render all necessary and appropriate professional services in a manner compatible with a Member's wishes, insofar as this can be done consistently with the Physician's judgment regarding proper medical practice.  If a Member refuses to follow a recommended treatment or procedure for a condition, and the Physician believes that no professionally acceptable alternative exists, the Member will be so advised.  If the Member still refuses to follow the recommended treatment or procedure, then neither Medical Group, Hospitals, Health Plan nor any Physician has any further responsibility to provide any alternative treatment or procedure sought by Member for that condition.

C.    <u>Coordination of Benefits</u>.  The services covered under the Service Agreement are subject to coordination of benefits (COB) rules.  If Members have medical coverage with another health plan or insurance company, the Plan will coordinate benefits with the other coverage in accordance with the current National Association of Insurance Commissioners (NAIC) Model Regulation Rules for Coordination of Benefits.

# HAWAII VISION BENEFITS

**Your base health plan coverage provides:**
**Care in the Medical Office**
1.  Routine eye examinations for eyeglasses
2.  Diagnosis, treatment and continued care for conditions related to disease or injuries of the eye by an eye specialist

**Your Hawaii Vision Benefit provides these additional services and benefits:**

| Optical Services and Benefits | Benefits | You pay |
|---|---|---|
| | $150 allowance (see section below, titled "Pediatric Vision Care," for optical coverage for pediatric members). | All costs greater than the $150 allowance once every calendar year. |
| | When prescription is filled at a Kaiser Permanente Optical Center, allowance may be used toward the following eyewear and services: | |
| | • *Glasses frames and/or lenses, or* | |
| | • *Contact lens/contact lens exam and fitting services* | |
| | Limitations: The $150 allowance is a one-time benefit per calendar year.  If the entire allowance is not used during your initial visit any unused portion of the allowance cannot be used for the remainder of that calendar year and will not be carried forward to the next calendar year. | |
| | **Exclusions:** | |
| | • *Contact lens or lenses not medically required.* | |
| | • *Non-prescription eyewear such as cosmetic colored contact lenses, non-prescription athletic, industrial safety and sunglass eyewear* | |
| | • *Any medical services or eyewear from non-Kaiser Permanente providers or non-Kaiser Permanente optical facilities* | |

National (including Hawaii and Puerto Rico)

- *Contact lens exams (if the $150 allowance has been exhausted)*
- *All costs exceeding the $150 allowance.*

| Pediatric Vision Care (for members up to age 19) | Benefits | You pay |
|---|---|---|
| | Eye examination once per calendar year | No charge |
| | When prescribed by a Kaiser Permanente optometrist or physician, one pair of polycarbonate single vision, lined bifocal or lined trifocal lenses per calendar year | No charge |
| | One frame per calendar year.  *Note:  Frame must be from the "value collection frames" available at Vision Essentials by Kaiser Permanente clinic locations.* | No charge |
| | In lieu of frames and lenses, one pair of non-disposable contact lenses, including fitting and dispensing, or an initial supply of disposable contact lenses, including fitting and dispensing, not more than once every 12 months. *Covered contact lenses include:* <br><br> • *Standard (one pair annually):  one contact lens per eye (total of two lenses), or* <br> • *Monthly (six-month supply):  six lenses per eye (total of 12 lenses), or* <br> • *Bi-Weekly (three month supply):  six lenses per eye (total of 12 lenses), or* <br> • *Dailies (one month supply):  30 lenses per eye (total of 60 lenses).* | No charge |
| | When determined by a Kaiser Permanente physician, medically necessary contact lenses.  *Note:  Contact lenses may be medically necessary and appropriate in the treatment of certain conditions such as Keratoconus, Pathological Myopia, Aphakia, Anisometropia, Aniseikonia, Aniridia, Corneal Disorders, Post-traumatic Disorders, Irregular, and Astigmatism.* | No charge |
| | One low vision hand-held or page magnifier device (including fitting and dispensing), once every 24 months | No charge |

## ADDITIONAL INFORMATION ON HAWAII COVERAGE

You are covered for medically necessary services within the Hawaii service area at Kaiser Permanente facilities, and which are provided or arranged by a Kaiser Permanente physician.  All care and services need to be coordinated by a Kaiser Permanente physician.

*Unless explicitly described in a particular benefit section (e.g. physical therapy is explicitly described under the hospice benefit section), each medical service or item is covered in accord with its relevant benefit section.  For example, drugs or laboratory services related to in vitro fertilization are not covered under the in vitro fertilization benefit.  Drugs related to in vitro fertilization are covered under the prescribed drugs benefit section.  Laboratory services related to in vitro fertilization are covered under the laboratory services benefit section.*

Your employer may have purchased benefits (referred to as "riders") that override some of the benefits listed above.  Riders, if any, are described above after the Exclusions and Limitations section.

Carrier:  The Hawaii medical coverage is insured by Kaiser Permanente Group Health Plan ("Kaiser Permanente").

> The information in this Section is only a summary, and does not fully describe the Hawaii medical benefit coverage.  For more details on benefit coverage, exclusions, limitations, and plan terms, or for information, please refer to the Certificate issued by Kaiser Permanente, to the *Our physicians and locations* directory for practitioner and provider availability, and to the Member handbook.  This summary is meant to be reviewed in conjunction with those other sources.  If there is a discrepancy between this Guide and the underlying insurance policy, the insurance policy will prevail.

National (including Hawaii and Puerto Rico)

## VIRTUAL VISITS PROGRAM

### ELIGIBILITY

Employees and eligible dependents who are enrolled in the UnitedHealthcare medical plans generally may use the Virtual Visits service.  Virtual Visits are not available in Puerto Rico or in Hawaii.

### COST OF COVERAGE

There are no additional premiums for the Virtual Visits service.  However, there is a $10 charge for each Virtual Visit consultation when you are a member in the UnitedHealthcare PPO 600 medical plan and a $49 charge for each Virtual Visit consultation when you are a member in the UnitedHealthcare PPO 2000 medical plan.  The $10 and $49 consultation charges will count toward your annual deductible and out-of-pocket maximum.

### OVERVIEW OF VIRTUAL VISITS

The Virtual Visits service is available through UnitedHealthcare and provides you and your eligible dependents with 24 hours per day, 7 days per week, 365 days per year access to doctors and pediatricians by phone, mobile or online video to diagnose, treat and prescribe medications (if necessary) for common health issues, including:

- Bladder infection / Urinary tract infection
- Bronchitis
- Coughs
- Cold and Flu Symptoms
- Diarrhea
- Fever
- Migraine/headaches
- Pinkeye
- Rash
- Sinus problems
- Sore throat
- Stomach ache

With your consent, Virtual Visits will provide information about your consult to your primary care physician.  However, Virtual Visits does not replace your primary care physician.

### HOW TO USE VIRTUAL VISITS

Login to www.myuhc.com and choose from provider sites where you can register for a virtual visit.  After registering and requesting a visit, you will pay your portion of the service costs, and then you will enter a virtual waiting room.  During your visit, you will be able to talk to a doctor about your health concerns, symptoms and treatment options.

| |
|---|
| To contact Virtual Visits:<br>Go online to www.myuhc.com and select "Virtual Visit." |

# DENTAL PLAN

## WHO'S ELIGIBLE?

Please see "Who's Eligible" under "General Information About Your Benefits" on page B-1.

**The Preferred Dentist Program** – If you use dentists who participate in the Dental Plan or are preferred providers, you will pay less for dental care.  The cost is lower because discounted prices have been negotiated with providers in the network.  You may also go out of the network and use any dental provider you choose, but you will pay a larger share of a non-discounted cost.

You don't have to enroll in a Medical plan to have Dental coverage.  You can select Dental coverage only.

If you live in Hawaii, you are offered a Dental Plan provided by Hawaii Dental Service, instead of the United Healthcare coverage described below.  Please see page E-17 for more information about your Hawaii Dental Service benefits.

> Please see the Certificate issued by UnitedHealthcare to obtain more information about dental coverage outside Hawaii.  The Certificate describes exclusions that may apply to you.  Copies of the Certificate are available at no cost from Total Rewards.

**NETWORK PROVIDERS:**  Toll free numbers and websites for you to obtain listings of network providers in your area may be found on page B-8 of this Summary.

## UNITED HEALTHCARE DENTAL BENEFITS SUMMARY

The table below provides an overview of the Plan's Annual Deductible, Out-of-Pocket Maximum, Annual Maximum Benefit and Lifetime Maximum Benefits.

| Plan Features | Network | Non-Network |
|---|---|---|
| **Annual Deductible** | | |
| Individual | $50 | |
| Family | $150 | |
| **Annual Maximum Benefit** | | |
| Individual | $1,500 | |
| **Lifetime Maximum Benefit for Orthodontic Services** | $1,000 per Covered Person, per lifetime for persons under age 19 | |

| Benefit Description & Limitation | Percentage of Eligible Expenses Payable by the Plan: | |
|---|---|---|
| | **Network** | **Non-Network**[*] |
| *You must also pay the amount of the Dentist's fee, if any, which is greater than the Eligible Expense. | | |
| **DIAGNOSTIC SERVICES** | | |
| **Bacteriologic Cultures** | 100% | 100% |

| Benefit Description & Limitation | Percentage of Eligible Expenses Payable by the Plan: | |
| --- | --- | --- |
| | Network | Non-Network[*] |
| *You must also pay the amount of the Dentist's fee, if any, which is greater than the Eligible Expense. | | |
| **Viral Cultures** | 100% | 100% |
| **Bite-Wing Radiographs**<br>Limited to 1 series of films per 12 months<br>Intraoral Bitewing Radiographs | 100% | 100% |
| **Complete Series or Panorex Radiographs**<br>Limited to one time per 36 months. | 100% | 100% |
| **Oral/Facial Photographic Images**<br>Limited to 1 time per consecutive 36 months. | 100% | 100% |
| **Diagnostic Casts**<br>Limited to one time per 24 months. | 100% | 100% |
| **Extraoral Radiographs**<br>Limited to 1 film per 36 months. | 100% | 100% |
| **Intraoral - Complete Series (including bitewings)**<br>Limited to 1 time per consecutive 36 months. Vertical bitewings cannot be billed in conjunction with a complete series. | 100% | 100% |
| **Individual Periapical Radiographs**<br>Intraoral Periapical Radiographs | 100% | 100% |
| **Pulp Vitality Tests**<br>Limited to 1 charge per visit, regardless of how many teeth are tested. | 100% | 100% |
| **Intraoral Occlusal Film** | 100% | 100% |
| **Periodic Oral Evaluation**<br>Limited to 2 times per consecutive 12 months. | 100% | 100% |

National (except Hawaii)

| Benefit Description & Limitation | Percentage of Eligible Expenses Payable by the Plan: | |
| --- | --- | --- |
| | Network | Non-Network* |
| *You must also pay the amount of the Dentist's fee, if any, which is greater than the Eligible Expense. | | |
| **Comprehensive Oral Evaluation** Limited to 2 times per consecutive 12 months. Not Covered if done in conjunction with other exams. | 100% | 100% |
| **Limited or Detailed Oral Evaluation** Limited to 2 times per consecutive 12 months. Only 1 exam is Covered per date of service. | 100% | 100% |
| **Comprehensive Periodontal Evaluation - new or established patient** Limited to 2 times per consecutive 12 months. | 100% | 100% |
| **Adjunctive Pre-Diagnostic Test that aids in detection of mucosal abnormalities including premalignant and malignant lesions, not to include cytology or biopsy procedures** Limited to 1 time per consecutive 12 months. | 100% | 100% |
| **PREVENTIVE SERVICES** | | |
| **Dental Prophylaxis Cleanings** Limited to two times per consecutive 12 months. | 100% | 100% |
| **Fluoride Treatments** Fluoride Treatments - child Limited to Covered Persons under the age of 16 years, and limited to 2 times per consecutive 12 months. | 100% | 100% |
| **Sealants** Limited to Covered Persons under the age of 16 years and once per first or second permanent molar every consecutive 36 months. | 100% | 100% |

National (except Hawaii)

| Benefit Description & Limitation | Percentage of Eligible Expenses Payable by the Plan: | |
| --- | --- | --- |
| | **Network** | **Non-Network**[*] |
| *You must also pay the amount of the Dentist's fee, if any, which is greater than the Eligible Expense. | | |
| **Space Maintainers**<br>Limited to Covered Persons under the age of 16 years, once per consecutive 60 months. Benefit includes all adjustments within 6 months of installation. | 100% | 100% |
| **Re-Cement Space Maintainers**<br>Limited to 1 per consecutive 6 months after initial insertion. | 100% | 100% |
| **MINOR RESTORATIVE SERVICES** | | |
| **Emergency Treatment**<br>Palliative care is often employed in cases of pain in emergency situations. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Amalgam Restorations Fillings**<br>Multiple restorations on one surface will be treated as a single filling. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Composite Resin Restorations Fillings**<br>Composite Resin Restorations - Anterior<br>Multiple restorations on one surface will be treated as a single filling. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Gold Foil Restorations**<br>Multiple restorations on one surface will be treated as a single filling. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **ENDODONTICS** | | |
| **Apexification**<br>Limited to 1 time per tooth per lifetime. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Apicoectomy and Retrograde filling**<br>Limited to 1 time per tooth per lifetime. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Hemisection**<br>Limited to 1 time per tooth per lifetime. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |

National (except Hawaii)

| Benefit Description & Limitation | Percentage of Eligible Expenses Payable by the Plan: | |
|---|---|---|
| | **Network** | **Non-Network**[*] |
| *You must also pay the amount of the Dentist's fee, if any, which is greater than the Eligible Expense. | | |
| **Root Canal Therapy**<br><br>Limited to 1 time per tooth per lifetime. Dentist who performed the original root canal should not be reimbursed for the retreatment for the first 12 months. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Retreatment of Previous Root Canal Therapy**<br><br>Dentist who performed the original root canal should not be reimbursed for the retreatment for the first 12 months. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Root Resection/Amputation**<br><br>Limited to 1 time per tooth per lifetime. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Therapeutic Pulpotomy**<br><br>Limited to 1 time per primary or secondary tooth per lifetime. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Pulpal Therapy (resorbable filling) - Anterior or Posterior, Primary Tooth (excluding final restoration)**<br><br>Limited to 1 time per tooth per lifetime. Covered for anterior or posterior teeth only. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Pulp Caps - Direct/Indirect – excluding final restoration**<br><br>Not covered if utilized solely as a liner or base underneath a restoration. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Pulpal Debridement, Primary and Permanent Teeth**<br><br>Limited to 1 time per tooth per lifetime. This procedure is not to be used when endodontic services are done on same date of service. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **PERIODONTICS** | | |
| **Crown Lengthening**<br><br>Limited to 1 per quadrant or site per consecutive 36 months. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |

| Benefit Description & Limitation | Percentage of Eligible Expenses Payable by the Plan: | |
| --- | --- | --- |
| | Network | Non-Network[*] |
| *You must also pay the amount of the Dentist's fee, if any, which is greater than the Eligible Expense. | | |
| **Gingivectomy/Gingivoplasty** <br> Limited to 1 per quadrant or site per consecutive 36 months. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Gingival Flap Procedure** <br> Limited to 1 per quadrant or site per consecutive 36 months. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Osseous Graft** <br> Limited to 1 per quadrant or site per consecutive 36 months. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Osseous Surgery** <br> Limited to 1 per quadrant or site per consecutive 36 months. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Guided Tissue Regeneration** <br> Limited to 1 per quadrant or site per consecutive 36 months. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Soft Tissue Surgery** <br> Limited to 1 per quadrant or site per consecutive 36 months. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Periodontal Maintenance** <br> Limited to 2 times per consecutive 12 months following active or adjunctive periodontal therapy, exclusive of gross debridement. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Full Mouth Debridement** <br> Limited to once per consecutive 36 months. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Provisional Splinting** <br> Cannot be used to restore vertical dimension or as part of full mouth rehabilitation, should not include use of laboratory based crowns and/or fixed partial dentures (bridges). | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |

| Benefit Description & Limitation | Percentage of Eligible Expenses Payable by the Plan: | |
| --- | --- | --- |
| | Network | Non-Network[*] |
| *You must also pay the amount of the Dentist's fee, if any, which is greater than the Eligible Expense. | | |
| Exclusion of laboratory based crowns or bridges for the purposes of provisional splinting. | | |
| **Scaling and Root Planning**<br>Limited to 1 time per quadrant per consecutive 24 months. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Localized Delivery of Antimicrobial**<br>Agents via a controlled release vehicle into diseased crevicular tissue, per tooth, by report<br>Limited to 3 sites per quadrant, or 12 sites total, for refractory pockets, or in conjunction with scaling or root planing, by report. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **ORAL SURGERY** | | |
| **Alveoloplasty** | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Biopsy**<br>Limited to 1 biopsy per site per visit. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Frenectomy/Frenuloplasty** | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Incision and Drainage**<br>Limited to 1 per site per visit. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Removal of a Benign Cyst/Lesions**<br>Limited to 1 per site per visit. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Removal of Torus**<br>Limited to 1 per site per visit. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |

National (except Hawaii)

| Benefit Description & Limitation | Percentage of Eligible Expenses Payable by the Plan: | |
| --- | --- | --- |
| | Network | Non-Network[*] |
| *You must also pay the amount of the Dentist's fee, if any, which is greater than the Eligible Expense. | | |
| **Root Removal** <br><br> Limited to 1 time per tooth per lifetime. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Simple Extraction** <br><br> Limited to 1 time per tooth per lifetime. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Surgical Extraction of Erupted Teeth or Roots** <br><br> Limited to 1 time per tooth per lifetime. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Surgical Extraction of Impacted Teeth** <br><br> Limited to 1 time per tooth per lifetime. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Surgical Access, Surgical Exposure, or Immobilization of Unerupted Teeth** <br><br> Limited to 1 time per tooth per lifetime. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Primary Closure of a Sinus Perforation** <br><br> Limited to 1 per tooth per lifetime. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Placement of Device to Facilitate Eruption of Impacted Tooth** <br><br> Limited to 1 time per tooth per lifetime. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Transseptal Fiberotomy/Supra Crestal Fiberotomy, by report** <br><br> Limited to 1 time per tooth per lifetime. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Vestibuloplasty** <br><br> Limited to 1 time per site per consecutive 60 months. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Bone Replacement Graft for Ridge Preservation - per site** <br><br> Limited to 1 per site per lifetime Not Covered if done in conjunction with other bone graft replacement procedures. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |

National (except Hawaii)

| Benefit Description & Limitation | Percentage of Eligible Expenses Payable by the Plan: | |
| --- | --- | --- |
| | Network | Non-Network[*] |
| *You must also pay the amount of the Dentist's fee, if any, which is greater than the Eligible Expense. | | |
| **Excision of Hyperplastic Tissue or Pericoronal Gingiva** Limited to 1 per site per consecutive 36 months. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Appliance Removal (not by dentist who placed appliance) includes removal of arch bar** | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Tooth Reimplantation and/or Transplantation Services** Limited to 1 per site per lifetime. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Oroantral Fistula Closure** Limited to 1 per site per visit. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **ADJUNCTIVE SERVICES** | | |
| **Analgesia** Covered when Necessary in conjunction with Covered Dental Services. If required for patients under 6 years of age or patients with behavioral problems or physical disabilities or if it is clinically Necessary. Covered for patients over age of 6 if it is clinically Necessary. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Desensitizing Medicament** | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **General Anesthesia** Covered when Necessary in conjunction with Covered Dental Services. If required for patients under 6 years of age or patients with behavioral problems or physical disabilities or if it is clinically Necessary. Covered for patients over age of 6 if it is clinically Necessary. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |

National (except Hawaii)

| Benefit Description & Limitation | Percentage of Eligible Expenses Payable by the Plan: | |
|---|---|---|
| | Network | Non-Network[*] |
| *You must also pay the amount of the Dentist's fee, if any, which is greater than the Eligible Expense. | | |
| **Local Anesthesia**<br><br>Not Covered in conjunction with operative or surgical procedure. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Intravenous Sedation and Analgesia**<br><br>Covered when Necessary in conjunction with Covered Dental Services. If required for patients under 6 years of age or patients with behavioral problems or physical disabilities or if it is clinically Necessary. Covered for patients over age of 6 if it is clinically Necessary. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Therapeutic Drug Injection, by report/Other Drugs and/or Medicaments, by report**<br><br>Limited to 1 per visit. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Occlusal Adjustment** | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Occlusal Guards**<br><br>Limited to 1 guard every consecutive 36 months and only covered if prescribed to control habitual grinding. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Occlusal Guard Reline and Repair**<br><br>Limited to relining and repair performed more than 6 months after the initial insertion. Limited to 1 time per consecutive 12 months. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Occlusion Analysis - Mounted Case**<br><br>Limited to 1 time per consecutive 60 months. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **Palliative Treatment**<br><br>Covered as a separate benefit only if no other services, other than exam and radiographs, were done on the same tooth during the visit.  Often employed in cases of pain in emergency situations. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |

National (except Hawaii)

| Benefit Description & Limitation | Percentage of Eligible Expenses Payable by the Plan: | |
| --- | --- | --- |
| | Network | Non-Network[*] |
| *You must also pay the amount of the Dentist's fee, if any, which is greater than the Eligible Expense. | | |
| **Consultation (diagnostic service provided by dentists or physician other than practitioner providing treatment.)** Not Covered if done with exams or professional visit. | 100% after you meet the Annual Deductible | 80% after you meet the Annual Deductible |
| **MAJOR RESTORATIVE SERVICES** Replacement of complete dentures, fixed or removable partial dentures, crowns, inlays or onlays previously submitted for payment under the plan is limited to 1 time per consecutive 60 months from initial or supplemental placement. | | |
| **Coping** Limited to 1 per tooth per consecutive 60 months. Not Covered if done at the same time as a crown on same tooth. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Crowns – Retainers/Abutments** Limited to 1 time per tooth per consecutive 60 months. Not Covered if done in conjunction with any other inlay, onlay and crown codes except post and core buildup codes. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Crowns - Restorations** Limited to 1 time per tooth per consecutive 60 months. Covered only when a filling cannot restore the tooth. Not Covered if done in conjunction with any other inlay, onlay and crown codes except post and core buildup codes. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Temporary Crowns - Restorations** Limited to 1 time per tooth per consecutive 60 months. Covered only when a filling cannot restore the tooth. Not Covered if done in conjunction with any other inlay, onlay and crown codes except post and core buildup codes. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Inlays/Onlays – Retainers/Abutments** Limited to 1 time per tooth per 60 consecutive months. Not Covered if done in conjunction with any other inlay, onlay | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |

| Benefit Description & Limitation | Percentage of Eligible Expenses Payable by the Plan: | |
| --- | --- | --- |
| | **Network** | **Non-Network**[*] |
| *You must also pay the amount of the Dentist's fee, if any, which is greater than the Eligible Expense. | | |
| and crown codes except post and core buildup codes. | | |
| **Inlays/Onlays - Restorations**<br><br>Limited to 1 time per tooth per consecutive 60 months. Covered only when a filling cannot restore the tooth. Not Covered if done in conjunction with any other inlay, onlay and crown codes except post and core buildup codes. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Pontics**<br><br>Limited to 1 time per tooth per consecutive 60 months. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Retainer-Cast Metal for Resin Bonded Fixed Prosthesis**<br><br>Limited to 1 time per tooth per consecutive 60 months. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Pin Retention**<br><br>Limited to 2 pins per tooth; not covered in addition to cast restoration. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Post and Cores**<br><br>Covered only for teeth that have had root canal therapy. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Re-cement Bridges**<br><br>Re-Cement Inlays/Onlays, Crowns, Bridges and Post and Core<br><br>Limited to those performed more than 12 months after the initial insertion. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Sedative Filling**<br><br>Covered as a separate benefit only if no other service, other than x-rays and exam, were done on the same tooth during the visit. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |

National (except Hawaii)

| Benefit Description & Limitation | Percentage of Eligible Expenses Payable by the Plan: | |
| --- | --- | --- |
| | **Network** | **Non-Network**[*] |
| *You must also pay the amount of the Dentist's fee, if any, which is greater than the Eligible Expense. | | |
| **Stainless Steel Crowns**<br><br>Limited to 1 time per tooth per consecutive 60 months. Covered only when a filling cannot restore the tooth. Prefabricated esthetic coated stainless steel crown - primary tooth, are limited to primary anterior teeth. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **FIXED PROSTHETICS**<br>Replacement of complete dentures, fixed or removable partial dentures, crowns, inlays or onlays previously submitted for payment under the plan is limited to 1 time per consecutive 60 months from initial or supplemental placement. | | |
| **Fixed Partial Dentures (Bridges)**<br><br>Limited to 1 time per tooth per consecutive 60 months. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **REMOVABLE PROSTHETICS**<br>Replacement of complete dentures, fixed or removable partial dentures, crowns, inlays or onlays previously submitted for payment under the plan is limited to 1 time per consecutive 60 months from initial or supplemental placement. | | |
| **Full Dentures**<br><br>Limited to 1 per consecutive 60 months. No additional allowances for precision or semi-precision attachments. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Partial Dentures**<br><br>Limited to 1 per consecutive 60 months. No additional allowances for precision or semi-precision attachments. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Relining Dentures and Rebasing Dentures**<br><br>Limited to relining/rebasing performed more than 6 months after the initial insertion. Limited to 1 time per consecutive 12 months. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **Tissue Conditioning - Maxillary or Mandibular**<br><br>Limited to 1 time per consecutive 12 months. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |

National (except Hawaii)

| Benefit Description & Limitation | Percentage of Eligible Expenses Payable by the Plan: | |
|---|---|---|
| | Network | Non-Network[*] |
| *You must also pay the amount of the Dentist's fee, if any, which is greater than the Eligible Expense. | | |
| **Repairs to Full Dentures, Partial Dentures, Bridges**<br><br>Repairs or Adjustments to Full Dentures, Partial Dentures, Bridges or Crowns.<br><br>Addition of teeth to existing removable denture or bridgework.<br><br>Limited to repairs or adjustments performed more than 12 months after the initial insertion. Limited to 1 per consecutive 6 months. | 60% after you meet the Annual Deductible | 50% after you meet the Annual Deductible |
| **ORTHODONTICS** | | |
| **Orthodontic Services**<br><br>Services or supplies furnished by a Dentist to a Dependent under age 19 in order to diagnose or correct misalignment of the teeth or the bite. The extended coverage provision does not apply to orthodontic services. | 50% | 50% |
| **Appliance Therapy, Fixed or Removable**<br><br>Limited to 1 time per consecutive 60 months. This includes retainers, habit appliances, and any fixed or removable interceptive orthodontic appliances. | 50% | 50% |
| **Cephalometric Film**<br>Limited to 1 per consecutive 12 months. Can only be billed for orthodontics. | 50% | 50% |

Exclusions

Except as may be specifically provided in the United Healthcare Certificate, the following are not covered. Capitalized terms are defined in the United Healthcare Certificate.

1. Dental Services that are not Necessary.

2. Hospitalization or other facility charges.

3. Any Dental Procedure performed solely for cosmetic/aesthetic reasons. (Cosmetic procedures are those procedures that improve physical appearance.)

National (except Hawaii)

4.  Reconstructive Surgery regardless of whether or not the surgery which is incidental to a dental disease, injury, or Congenital Anomaly when the primary purpose is to improve physiological functioning of the involved part of the body.

5.  Any Dental Procedure not directly associated with dental disease.

6.  Any Dental Procedure not performed in a dental setting.

7.  Procedures that are considered to be Experimental, Investigational or Unproven. This includes pharmacological regimens not accepted by the American Dental Association (ADA) Council on Dental Therapeutics. The fact that an Experimental, Investigational or Unproven Service, treatment, device or pharmacological regimen is the only available treatment for a particular condition will not result in Coverage if the procedure is considered to be Experimental, Investigational or Unproven in the treatment of that particular condition.

8.  Placement of dental implants, implant-supported abutments and prostheses.

9.  Drugs/medications, obtainable with or without a prescription, unless they are dispensed and utilized in the dental office during the patient visit.

10. Services for injuries or conditions covered by Worker's Compensation or employer liability laws, and services that are provided without cost to the Covered Person by any municipality, county, or other political subdivision. This exclusion does not apply to any services covered by Medicaid or Medicare.

11. Setting of facial bony fractures and any treatment associated with the dislocation of facial skeletal hard tissue.

12. Treatment of benign neoplasms, cysts, or other pathology involving benign lesions, except excisional removal. Treatment of malignant neoplasms or Congenital Anomalies of hard or soft tissue, including excision.

13. Replacement of complete dentures, and fixed and removable partial dentures or crowns, if damage or breakage was directly related to Dental error. This type of replacement is the responsibility of the Dentist. If replacement is necessary because of patient non-compliance, the patient is liable for the cost of replacement.

14. Services related to the temporomandibular joint (TMJ), either bilateral or unilateral. Upper and lower jaw bone surgery (including that related to the temporomandibular joint). No Coverage is provided for orthognathic surgery, jaw alignment, or treatment for the temporomandibular joint.

15. Charges for failure to keep a scheduled appointment without giving the dental office 24 hours notice.

16. Expenses for dental procedures begun prior to the Covered Person's eligibility with the Plan.

17. Fixed or removable prosthodontic restoration procedures for complete oral rehabilitation or reconstruction.

18. Attachments to conventional removable prostheses or fixed bridgework. This includes semi-precision or precision attachments associated with partial dentures, crown or bridge abutments, full or partial overdentures, any internal attachment associated with an implant prosthesis, and any elective endodontic procedure related to a tooth or root involved in the construction of a prosthesis of this nature.

19. Procedures related to the reconstruction of a patient's correct vertical dimension of occlusion (VDO).

20. Replacement of crowns, bridges, and fixed or removable prosthetic appliances inserted prior to Plan coverage unless the patient has been eligible under the Plan for 12 continuous months. If loss of a tooth

requires the addition of a clasp, pontic, and/or abutment(s) within this 12 month period, the Plan is responsible only for the procedures associated with the addition.

21. Replacement of missing natural teeth lost prior to the onset of Plan Coverage until the patient has been Covered under the Plan for 12 continuous months.

22. Occlusal guards used as safety items or to affect performance primarily in sports-related activities.

23. Placement of fixed partial dentures solely for the purpose of achieving periodontal stability.

24. Services rendered by a Dentist with the same legal residence as a Covered Person or who is a member of a Covered Person's family, including spouse, brother, sister, parent or child.

25. Dental Services otherwise Covered under the Plan, but rendered after the date individual Coverage under the Plan terminates, including Dental Services for dental conditions arising prior to the date individual Coverage under the Plan terminates, except those conditions Covered under the Extension of Benefits in Section 3.

26. Acupuncture; acupressure and other forms of alternative treatment, whether or not used as anesthesia.

27. Orthodontic coverage does not include the installation of a space maintainer, any treatment related to treatment of the temporomandibular joint, any surgical procedure to correct a malocclusion, replacement of lost or broken retainers and/or habit appliances, and any fixed or removable interceptive orthodontic appliances previously submitted for payment under the plan.

28. In the event that a non-Network Dentist routinely waives Coinsurance and/or the Deductible for a particular Dental Service, the Dental Service for which the Coinsurance and/or Deductible are waived is reduced by the amount waived by the non-Network Dentist.

29. Foreign Services are not Covered unless required as an Emergency.

30. Dental Services received as a result of war or any act of war, whether declared or undeclared or caused during service in the armed forces of any country.

31.  Any Dental Services or Procedures not listed in the United HealthCare Certificate.

> **IMPORTANT:**  The information above is only a summary.  It does not fully describe your dental benefit coverage.  For more details on your benefit coverage, exclusions, limitations, and plan terms, or for information, please refer to the United Healthcare Certificate.  If there is a discrepancy between this Guide and the underlying insurance policy, the United Healthcare Certificate will prevail.

National (except Hawaii)

# HAWAII DENTAL SERVICE

The following is the **only** Dental Plan option available in Hawaii.

## Hawaii Dental Service ("HDS") Dental Benefits — Group No. 3910

*This summary is a brief description of your HDS dental benefits. All benefits are governed by the provisions of the Company's agreement with HDS and HDS's procedure code guidelines. All dental claims must be filed within 12 months of the date of service for HDS claims payment.*

| SUMMARY OF BENEFITS | HDS COPAYMENT PERCENTAGE | WAIT PERIOD (months) |
|---|---|---|
| **PLAN MAXIMUM** per person per calendar year | $1000 | |
| **DEDUCTIBLE AMOUNT** per calendar year (does not apply to benefits covered at 100%) | $30/person | |
| **DIAGNOSTIC** | | |
| • Examination — twice per calendar year | 100% | N/A |
| • Bitewing X-rays — twice per calendar year through age 14; once per calendar year thereafter | 100% | N/A |
| • Other X-rays (full mouth X-rays limited to once every five years) | 70% | N/A |
| **PREVENTIVE** | | |
| • Cleanings — twice per calendar year | 100% | N/A |
|     Expectant mothers — Cleanings or *Periodontal Maintenance three times per calendar year | | |
|     Diabetic patients — Cleanings or *Periodontal Maintenance four times per calendar year | *70% | |
|     *Periodontal Maintenance benefit level | | |
| • Fluoride - twice per calendar year (through age 19) | 100% | N/A |
| • Fluoride — high risk — once per calendar year | 100% | N/A |
| • Space maintainers (through age 17) | 100% | N/A |
| • Sealants (through age 18) — One treatment application, once per lifetime only to permanent molar with no prior occlusal restorations, regardless of the number of surfaces sealed | 100% | N/A |
| **RESTORATIVE** | | |
| • Amalgam (silver-colored) fillings | 70% | N/A |
| • Composite (white — colored) fillings - limited to anterior (front) teeth | 70% | N/A |
| • Crowns and gold restorations (once every seven years when teeth cannot be restored with amalgam or composite fillings) | 50% | 12 |
| NOTE: Composite (white) and Porcelain (white) restorations on posterior (back) teeth will be processed as the alternate benefit of the metallic equivalent — the patient is responsible for the cost difference up to the amount charged by the dentist | | |
| **ENDODONTICS** | 70% | N/A |
| • Pulpal therapy | | |
| • Root canal treatment, retreatment, apexification, apicoectomy | | |
| **PERIODONTICS** | 70% | N/A |
| • Periodontal scaling and root planing — once every two years | | |
| • Gingivectomy, flap curettage and osseous surgery — once every three years | | |
| • Periodontal Maintenance — twice per calendar year after qualifying periodontal treatment | | |
| **PROSTHODONTICS** | 50% | 12 |
| • Fixed bridges (once every seven years; ages 16 and older) | | |
| • Dentures - complete and partial (once every seven years; ages 16 and older) | | |
| • Implants (covered as an alternate benefit) | 50% | 12 |

| SUMMARY OF BENEFITS | HDS COPAYMENT PERCENTAGE | WAIT PERIOD (months) |
|---|---|---|
| **ORAL SURGERY** | 70% | N/A |
| **ADJUNCTIVE GENERAL SERVICES** | 70% | N/A |
| • Palliative treatment (for relief of pain but not to cure) | 70% | N/A |
| **ORTHODONTICS** | 50% | |

$1000 lifetime maximum amount paid in eight quarterly payments of $125.00.

Per eligible Child

*Orthodontic services are not covered if services were started prior to the date the patient became eligible under this employer's plan.*

*If a patient's eligibility ends prior to the completion of the orthodontic treatment, payments will not continue.*

*If your employer elects to remove the orthodontic benefit, coverage will end on the last day of the month that the change occurred.*

## Access to HDS Information 24/7
## Visit HDS Online at *www.HawaiiDentalService.com* to:

**Access your online account today!**
- Log on to the HDS website at **www.HawaiiDentalService.com**
- Click on "New User"
- Complete the "Member Registration" form
- Select "yes" to "Request electronic Explanation of Benefits"
- Click on "Register User" button
- An e-mail will be sent to you with a link. Click on the link to activate your account.

**SEARCH**
- For an HDS participating dentist by specialty, location, handicap accessibility, weekend hours, and more
- For a Delta Dental participating dentist in the Mainland, Guam or Saipan

**DOWNLOAD & PRINT**
- A summary of your benefits for tax purposes
- Blank claim forms
- An HDS identification card
- HDS Notice of Privacy Practices

**CHECK**
- Whether you and/or your dependents are eligible for HDS benefits
- What services are covered by your plan
- What the limits are of each type of covered service and how much you have used

**VIEW**
- Your own tooth chart- see what services have been performed on each tooth
- Your EOB statements (and print them out)
- A list of frequently asked questions
- HDS contact information

**REQUEST**
- To receive an e-mail when your claim is processed
- To receive EOB statements through e-mail
- An HDS identification card to be mailed to you

## How to Contact HDS

**Customer Service Representatives**

**From Oahu:** 529-9248
**Toll-free:** 1-800-232-2533, ext. 248
Toll-free fax: 1-866-590-7988

Monday through Friday
7:30 a.m. — 4:30 p.m., Hawaii Standard Time

**Send Written Correspondence to:**

Hawaii Dental Service, Attn: Customer Service, 700 Bishop Street, Suite 700, Honolulu, HI 96813-4196

E-mail: HDSCustomerService@HawaiiDentalService.com

IMPORTANT: Please see the Certificate issued by HDS to obtain more information about Hawaii dental coverage. The Certificate describes exclusions that may apply to you. Copies of the Certificate are available at no cost from Total Rewards. If there is a discrepancy between this Guide and the underlying insurance policy, the insurance policy will prevail.

## VISION PLAN

### WHO'S ELIGIBLE?

Please see "Who's Eligible" under "General Information About Your Benefits" on page B-1.

### THE VISION SERVICE PLAN OPTION

Employees in all locations can elect vision coverage under the Vision Service Plan ("VSP") option.

*For routine eye exams, participants should seek care from an optometrist or ophthalmologist w*ho participates in the VSP network.  The VSP Vision Care Program provides affordable, quality vision care nationwide.  The program provides substantial discounts on eyeglasses and contact lenses if you use a network provider.

You don't have to enroll in a Medical plan to have Vision coverage.  You can select Vision coverage only.

You have a choice of coverages, the Basic Plan or the Premier Plan, but they operate in the same manner.

| VISION I (STANDARD PLAN) | | |
|---|---|---|
| IN-NETWORK | OUT-OF-NETWORK | BENEFIT FREQUENCY |
| Exams:<br>☐  $20 copay | ☐  Up to $50 | ☐  Once every calendar year |
| Lenses:<br>☐  Single, $20 copay<br>☐  Lined Bifocal, $20 copay<br>☐  Lined Trifocal, $20 copay<br>☐  Progressive Lenses, $50-$160 copay | ☐  Up to $50<br>☐  Up to $75<br>☐  Up to $100<br>☐  Up to $75 | ☐  Once every calendar year |
| Frames:<br>☐  Up to $130<br>☐  After $20 copay | ☐  Up to $70 | ☐  Once every other calendar year |
| Contact Lenses (in lieu of lenses/frames):<br>☐  Up to $130<br>☐  Contact lens exam (fitting and evaluation), up to $60 copay | ☐  Up to $105 | ☐  Once every calendar year |

| VISION II (PREMIER PLAN) | | |
|---|---|---|
| IN-NETWORK | OUT-OF-NETWORK | BENEFIT FREQUENCY |
| Exams:<br>☐  $15 copay | ☐  Up to $50 | ☐  Once every calendar year |
| Lenses:<br>☐  Single, $15 copay<br>☐  Lined Bifocal, $15 copay<br>☐  Lined Trifocal, $15 copay<br>☐  Progressive Lenses, $50-$160 copay | ☐  Up to $50<br>☐  Up to $75<br>☐  Up to $100<br>☐  Up to $75 | ☐  Once every calendar year |
| Frames:<br>☐  Up to $200<br>☐  After $20 copay | ☐  Up to $70 | ☐  Once every calendar year |
| Contact Lenses (in lieu of lenses/frames):<br>☐  Up to $200<br>☐  Contact lens exam (fitting and evaluation), up to $60 copay | ☐  Up to $105 | ☐  Once every calendar year |

National

**Using your VSP benefit is easy.**

- **Find an eyecare provider who's right for you.**
  You can choose any eyecare provider—your local VSP doctor, a retail chain affiliate, or any other provider. Once your benefit is effective, visit **vsp.com** for your complete benefit description.  To find a VSP doctor or retail chain affiliate, visit **vsp.com** or call (800) 877-7195.

- **Review your benefit information.**
  Visit **vsp.com** to review your plan coverage before your appointment.

- **At your appointment, tell them you have VSP.**
  There is no ID card if you use a VSP network provider, but for out-of-network service you must complete a claim form.

**That's it!  VSP will handle the rest**—there are no claim forms to complete when you see a VSP doctor or retail chain affiliate, but for out-of-network service you must complete a claim form.

**Choice in Eyewear**

From classic styles to the latest designer frames, you'll find hundreds of options for you and your family. Choose from great brands, like bebe®, Calvin Klein, Disney, FENDI, Nike, and Tommy Bahama®.

---

**IMPORTANT:**  The information above is only a summary.  It does not fully describe your vision benefit coverage.  For more details on your benefit coverage, exclusions, limitations, and plan terms, or for information, please refer to the Group Vision Care Policy issued by VSP.  If there is a discrepancy between this Guide and the underlying insurance policy, the insurance policy will prevail.

## EMPLOYEE ASSISTANCE PROGRAM

### WHO'S ELIGIBLE?

- All employees and their household members (which includes children away from home in college).

### And When?

- First day of employment.

### COST OF COVERAGE

The Company will assume all costs for initial assessment for employees and their eligible dependents. If additional assistance is necessary, referrals to resources that may be covered under your medical plan will be initiated. The Medical Plan covers both in-patient and outpatient mental health services. Please refer to your particular Medical Plan for specific plan provisions regarding mental health services.

### OVERVIEW OF THE EMPLOYEE ASSISTANCE PROGRAM

The Employee Assistance Program (EAP) is a network of services designed to assist employees and their family members cope with personal life issues. This resource provides professional confidential assistance to employees and family members who are experiencing problems that may affect their general wellbeing or their job performance. The services are voluntary, confidential and free of charge. The EAP network is staffed with Master's and Doctoral level Clinicians, Certified Public Accountants and Certified Financial Planners, Attorneys, and Work-Life specialists who will assess the issue and provide you with referrals for issues such as:

- Stress, anxiety, depression
- Problems that affect job performance
- Family relationships or Marital Concerns
- Substance Abuse
- Coping with a Serious Illness or Death
- Major Life Changes
- Financial Problems
- Legal Problems
- Child and Elder Care
- Moving and Relocation
- College Planning
- Pet Care
- Making Major Purchases
- Home Repair
- Tobacco Cessation Program for Health Enthusiasts & Spouses

| To reach the EAP network: |
|---|
| ComPsych at 1-844-491-1740 / TDD: 1-800-697-0353 or |
| www.guidanceresources.com; Web ID: VitaminEAP |

National

# THE HEALTH CARE FLEXIBLE SPENDING ACCOUNT (FSA)

> **Puerto Rico Employees:** The Hacienda currently does not permit pre-tax Flexible Spending Accounts (FSAs) to be offered in Puerto Rico.  You will be notified if the situation changes.

## WHO'S ELIGIBLE?

Eligibility for the Health Care FSA benefit follows the rules under see "Who's Eligible" under "General Information About Your Benefits" on page B-1 except employees in Puerto Rico are not eligible to participate.

> **Note:** If you are eligible, you also may be able to enroll if you experience a status change event listed below.

## WHY ENROLL?

- You can reduce your taxable income
- You can use the Health Care FSA to pay for eligible health care expenses for yourself, your Spouse and your "qualified dependents."  The expenses cannot be covered by any health care coverage you may have, and the services associated with these expenses were incurred during a period of active participation in the Health Care FSA.  For this purpose, a Domestic Partner (and his or her children) generally will not be considered "qualified dependents," but a child under age 27 may be a qualified dependent.  Please consult with your tax professional if you have any questions.
- You can participate in the Health Care FSA even if you do not enroll for coverage under the Medical, Dental or Vision plans.
- Fast reimbursement by check or direct deposit.  Debit cards also are available for use in connection with the Health Care FSA; see the discussion beginning on page H-3.
- You can choose your own providers.

## WHEN YOU CAN ENROLL OR CHANGE YOUR COVERAGE

1) The Annual Enrollment Period;
2) Within 30 or 90 days of your first day of employment, as applicable, if you are eligible upon hire; or
2) Within 31 days of a qualified Change in Status, such as:
    - Legal change in marital status
    - Change in the number of qualified dependents
    - Termination of coverage obtained because of employment of your Spouse
    - Change in employment status of you, your Spouse or your qualified dependents

## HOW TO ENROLL

- Contact Total Rewards for information about how to enroll.
- You enroll for each Plan Year separately.  **You must re-enroll each year to continue participation.**

## YOUR ANNUAL ELECTION

You can contribute from $100 to $2,700 a year to your Health Care FSA.  This $2,700 annual limit does not include any pre-tax contributions deducted from your pay and applied toward your health coverage under the Company's Medical, Dental and Vision plans.  This $2,700 limit was set by the IRS as of January 1, 2019, and may increase in the future.  You will be informed of any increase during the Annual Enrollment Period.

National (except Puerto Rico)

Your Health Care FSA will be credited, as of the beginning of each Plan Year (or the date your participation begins if you commence participation during a Plan Year), with the total amount of your annual election for purposes of reimbursement of health-related eligible expenses during the Plan Year (or, for mid-year commencement, during the remainder of the Plan Year). Your Health Care FSA then will be debited for each reimbursement to you of eligible Expenses. A separate Health Care FSA is established each Plan Year that you elect to participate in the Health Care FSA.

> **Important:** Set aside no more than you think you will use. If your annual election exceeds your eligible claims for the Plan Year, the IRS requires that you forfeit the difference.

## EXAMPLES OF ELIGIBLE EXPENSES

- Deductibles for medical, dental, prescription drug or mental health coverages
- Medical co-payments
- Dental co-payments
- Prescription drug co-payments
- Glasses/contact lenses not covered by a vision plan
- Over the counter medicines (if prescribed by a physician)
- Well-baby care
- Expenses beyond amounts covered by insurance, such as braces for children's teeth

More examples of eligible expenses can be found in IRS Publication 502, "Medical and Dental Expenses." However, not all the expenses listed in that publication, e.g., long term care, can be reimbursed under the Health Care FSA.

## REIMBURSEMENT

Reimbursement is not considered income, and you are never taxed on it. You can mail or fax your claim form to the Claims Administrator. Claims are processed for payment on a daily basis. You may elect.

- A check mailed directly to your home, or
- An electronic wire transfer into your bank account.

In addition, a debit card can be used for Health Care FSA transactions. More information on the debit card and reimbursement begins on page H-3.

## TERMINATION OF EMPLOYMENT

Upon your termination of employment, the Health Care FSA will operate differently depending on whether or not you are eligible for, and elect, continuation coverage under COBRA.

- *If you elect COBRA*: If you are eligible for COBRA with respect to the Health Care FSA, you will be required to make periodic after-tax payments of the required contributions for the period of COBRA coverage. The period of COBRA coverage will not extend beyond the end of that Plan Year. If you elect COBRA and pay the applicable premiums, you can submit for reimbursement any eligible expenses incurred through the expiration of the COBRA period.

- *If you do not elect (or are not eligible for) COBRA*: Eligible expenses incurred before the termination of your employment may be reimbursed to the extent of the amount remaining in your Health Care FSA at that time. Your request for reimbursement of such expenses must be submitted no later than 90 days following the termination of your employment.

## HOW DO I CLAIM REIMBURSEMENT?

Under the Health Care FSA, you may complete and submit a written claim (a "traditional paper claim") for reimbursement, or you can use an electronic payment card (the "Card") to pay the expense as described below.

### A.    Traditional Paper Claims:

Under the Health Care FSA, in order to receive reimbursement for an eligible expense, send your original bill and proof of payment, along with a claim form, to the Claims Administrator.  Once your claim has been processed and approved, the Claims Administrator will make the reimbursement as soon as administratively feasible.  Claim forms are available by calling the Claims Administrator at (866) 451-3399 or from its website www.discoverybenefits.com.

If you are employed through December 31, you can request reimbursement for eligible expenses incurred during the portion of the Plan Year during which you participated in the respective FSAs.  If you terminate employment, if your Health Care FSA coverage is continued on COBRA (through at most) December 31, you can request reimbursement for Eligible Expenses incurred through the end of your COBRA coverage.  Information about COBRA continuation coverage for the Health Care FSA appears on page S-4.

Requests for reimbursements must be made by the March 31st immediately following the end of the Plan Year.  After that date, your Health Care FSA for the preceding Plan Year will be closed and any remaining amounts not used for reimbursements will be forfeited from your Health Care FSA as required by IRS rules.

The original bill and proof of payment that you submit must indicate the following:

(i)    The provider's name and the nature of the expense (e.g. what type of service or treatment was provided), and if the expense is for an over-the-counter drug other than insulin, the written statement must evidence that a doctor prescribed the drug;

(ii)   The date the expense was incurred; and

(iii)  The amount of the expense.

### B.    Electronic Payment Card:

The Discovery FSA debit card (the "Card") administered by the Claims Administrator allows you to pay for Eligible Expenses under the Health Care FSA when the expenses are incurred.  Here is how the Card works:

(i)    You first must elect to use the card.  To be eligible for the Card, you must agree to abide by the terms and conditions described here and in the cardholder agreement, including any limitations as to Card usage.  By accepting and using the Card, you agree to be bound by the terms and conditions contained in the cardholder agreement, including any fees applicable to use of the Card.

(ii)   You must certify to proper use of the Card.  As specified in the cardholder agreement and as required by the Program, you must certify that amounts in your Health Care FSA will be used only for Eligible Expenses for which you have not been reimbursed and that you will not seek reimbursement for the expenses from any other source.  Failure to abide by this certification may result in a penalty, as well as termination of Card use privileges.

(iii)  You swipe the Card at the health care provider like you do any other credit or debit card.  When you incur a Eligible Expense, you swipe the Card at the provider's office or facility much as you would a typical credit or debit card.  The provider is paid for the expense up to the maximum reimbursement amount available under your Health Care FSA (or as otherwise limited by the Program) at that time you swipe the Card.  You are responsible for keeping track of your available balance.  Merchants generally will not be able to determine your available balance.  You can access your available balance online at www.discoverybenefits.com, or by calling the Claims Administrator at (866) 451-3399, seven days a week, 24 hours a day.

National (except Puerto Rico)

(iv)  You can use the Card only at authorized providers.  Before you use the Card at a merchant other than a health care provider or a pharmacy, you must ask them whether they have an electronic inventory system that is appropriate (by IRS standards) for use with a health care benefit plan.  Many large retailers do.

(v)  You must obtain and retain a receipt/third party statement each time you swipe the Card.  By using the Card and as required by the Program, you agree to retain your receipts to verify your transactions for your tax records and for possible Card usage verification.

In order to comply with IRS requirements, you must obtain a third party statement from the provider (e.g., receipt, invoice, etc.) that includes the following information each time you swipe the Card:

(a)  The provider's name and the nature of the expense (e.g. what type of service or treatment was provided), and if the expense is for an over-the-counter drug other than insulin, the written statement must indicate the name of the drug and refer to the prescription for that drug;

(b)  The date the expense was incurred; and

(c)  The amount of the expense.

The IRS requires that the Card administrator perform periodic audits of purchases to confirm that only eligible items and services have been obtained.  Therefore, you need to retain all itemized third party statements for purchases made with the Card, so that they are available upon request.  Note that transactions will have to be reversed if receipts are lost and cannot be submitted for audits.  This may include treating as taxable amounts previously treated as pre-tax.

(vi)  You must pay back any improperly paid claims.  If you are unable to provide adequate or timely substantiation as requested by the Claims Administrator, you must repay the Program or the Company for the unsubstantiated expense.  Further, your use of the Card will be suspended until you have made full reimbursement of the unsubstantiated expense.  To the extent you fail to reimburse the Health Care FSA, the amount of the unsubstantiated expense, as well as any taxes, fines or penalties, may be withheld from your pay as permitted by law.  Unreimbursed amounts may be offset against reimbursements of Eligible Expenses for which you have made an otherwise valid paper claim, or may be reported as additional taxable income to you.

You may view the debits and credits posted to your account for each statement period at www.discoverybenefits.com. If the Claims Administrator has your email address, it will notify you of statement availability by email.  Also, you can access information detailing your Card activity at www.discoverybenefits.com, or by calling (866) 451-3399, seven days a week, 24 hours a day.

National (except Puerto Rico)

## SHORT TERM DISABILITY (STD)

### WHO'S ELIGIBLE?

Active, full-time Employees in the categories listed below earning an annual salary from the Employer of at least $15,000, and excluding any person employed on a temporary or seasonal basis.  If you work in California, Hawaii, New Jersey, New York, Puerto Rico or Rhode Island, you are covered under the respective state/Commonwealth short term disability plan and this STD plan is supplemental to those plans.  Contact Total Rewards for more information.

### Is there a Waiting Period?

Executive, Director and Customer Support Center Employee, Store Manager, Nutritionist and Consultant:  30 days of continuous employment.*

All other Employees: 90 days of continuous employment.*

*Time served as a part-time employee will count toward satisfaction of the Waiting Period.

### What is my effective date for this coverage?

Executive, Director and Customer Support Center Employee, Store Manager, Nutritionist and Consultant:  30 days of continuous employment:  The 31st day of employment, provided you timely enroll.

All other Employees:  The 91st day of employment, provided you timely enroll.

- If you are not actively at work on that date, you will be covered when you return to work.

- If you do not sign up when you are first eligible to enroll, your enrollment will be subject to Reliance's approval of a person's proof of good health (evidence of insurability).

- Your eligibility for STD benefits will be subject to a pre-existing limitation exclusion for disabilities occurring in the first 12 months of STD coverage.  The exclusion will apply if you received medical treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or medicine for the sickness or injury, whether specifically diagnosed or not, causing your disability, during the 12-month period immediately prior to the effective date of your STD coverage.  (This requirement does not apply to short term disability benefits provided under state/Commonwealth law if you work in California, Hawaii, New Jersey, New York, Puerto Rico or Rhode Island.)

### COST OF COVERAGE

You pay the full cost of this coverage on an after-tax basis.  As a result, your STD benefits under the Program will be tax-free.

### WHAT IS COVERED

STD benefits provide weekly income if you are disabled.  If you are absent from work due to pregnancy, illness or injury that is not work-related, you also may be able to receive STD benefits.

### FILING CLAIMS

Contact Matrix at 1-888-477-5110 or www.matrixabsence.com for the necessary claim forms.

### WHEN COVERAGE STOPS

Coverage will cease immediately upon the earliest of the following events:

- The Program terminates;
- This STD plan terminates;
- You are no longer in an eligible class of employees;

National

- You fail to pay the required premiums;
- You enter military service (other than Reserve or National Guard); or
- You retire or your employment terminates for any other reason.

## ELIMINATION PERIOD

The elimination period (the period of absence from work) before benefits begin is:

- 7 calendar days for Injury
- 7 calendar days for Sickness

## WEEKLY INCOME BENEFIT:

Each eligible Employee may elect an amount of insurance equal to 66⅔% of his or her weekly earnings to a maximum benefit of $1,250 per week.

In no event will the weekly income benefit be less than $25.00.

## MAXIMUM BENEFIT PERIOD

Benefits, for one period of disability, will be paid up to a maximum of twelve (12) weeks.

## ELIGIBLE EMPLOYEES WORKING IN CALIFORNIA, HAWAII, NEW JERSEY, NEW YORK, PUERTO RICO OR RHODE ISLAND

If you are an eligible Employee working in one of the states listed above or the Commonwealth of Puerto Rico, you are covered under the respective state/Commonwealth statutory disability benefit plan.  Short term disability coverage under those state/Commonwealth plans is not considered part of the Program.  Contact Total Rewards for more information regarding those coverages.

**Carrier:**  The STD benefits are insured by Reliance Standard Life Insurance Company ("Reliance").

> **IMPORTANT**:  Please see the applicable Certificate issued by Reliance to obtain more information about the short term disability coverage.  Copies of the Certificates are available at no cost from Total Rewards.  If there is a discrepancy between this Guide and the underlying insurance policy, the insurance policy will prevail.

National

## LONG TERM DISABILITY (LTD)

### WHO'S ELIGIBLE?

Each active, full-time Employee, excluding any person employed on a temporary or seasonal basis, according to the following classifications:

CLASS 1:  Executive

CLASS 2:  Director

CLASS 3:  Customer Support Center Employee

CLASS 4:  Store Manager, Field Training Managers, Nutritionist, and Consultant

CLASS 5:  Assistant Store Manager

### Is there a Waiting Period?

CLASSES 1, 2, 3 & 4:  30 days of continuous employment.*

CLASS 5:  90 days of continuous employment.*

*Time served as a part-time employee will count toward satisfaction of the waiting period.  Time served with Super Supplements will also count toward satisfaction of the waiting period.

### What is my effective date for this coverage?

CLASSES 1, 2, 3 & 4:  The day immediately following completion of the waiting period described above.

CLASS 5:  The day immediately following completion of the waiting period described above.

▪   If you are not actively at work on that date, you will be covered when you return to work.

### COST OF COVERAGE

The Company pays the full cost of this coverage.

### WHAT QUALIFIES AS A LONG TERM DISABILITY?

To be initially considered disabled, you must be prevented by bodily injury or sickness from performing the material and substantial duties of your occupation and you must be under the regular care of a physician. Reliance must receive proof that you are disabled and will periodically request that you submit proof of your continued disability.  Please consult the applicable Certificate issued by Reliance for the precise definition of disability and information about the proof of disability that is required by Reliance.

You may be determined to be partially, rather than fully, disabled.  Also, your disability may, after an initial period, be determined by your inability to perform the duties of any gainful activity.  Please consult the applicable Certificate for more information.

### ELIMINATION PERIOD

The elimination period (the period of absence from work) before benefits begin is 90 consecutive days of total disability:

### MONTHLY BENEFIT:

The Monthly Benefit is an amount equal to 60% of an eligible Employee's Covered Monthly Earnings, payable in accordance with the section of the Certificate entitled "Benefit Amount."

The maximum monthly benefit for Classes 1 and 2 is $15,000, corresponding to $25,000 of Covered Monthly Earnings.  The maximum monthly benefit for Classes 3,4 & 5 is $10,000, corresponding to $16,667 of Covered Monthly Earnings.

National

In no event will the monthly income benefit be less than $100.00 (but subject to offset as described below).

## OTHER INCOME BENEFITS

If you are eligible to receive benefits from certain sources, your long term disability benefit will be reduced (offset) by those other benefits, whether or not actually paid.  Below is a list of the more common offsets, but this list is not exhaustive.  Refer to the applicable Certificate for further information on what sources of income are, or are not, offsets.

- Income from any employer or any occupation for compensation or profit;
- Social Security Disability and Retirement programs for you or your dependents;
- Workers' Compensation;
- Sick pay, salary continuation or severance pay, excluding vacation pay;
- Benefits payable under Workers' Compensation or a similar law, including amounts for vocational therapy;
- Benefits payable for any state income benefit law or similar law or any unemployment benefit law or similar law;
- Any group insurance payable for the same disability; or
- Any disability or retirement benefits received under a retirement plan.

A more complete list of offsets may be found in the applicable Certificate.

## MAXIMUM DURATION OF BENEFITS

Benefits will not be paid beyond the longer of the Duration of Benefits (specified below) or age 65:

| Age at Disablement | Duration of Benefits (in years) |
|---|---|
| 61 or less | To Age 65 |
| 62 | 3½ |
| 63 | 3 |
| 64 | 2½ |
| 65 | 2 |
| 66 | 1¾ |
| 67 | 1½ |
| 68 | 1¼ |
| 69 or more | 1 |

## WHEN COVERAGE STOPS

Coverage stops - unless you are disabled - on the earliest of:
- The date the Program terminates;
- The date you no longer meet the eligibility requirements;
- The date you are no longer in an eligible class;
- The date you enter military service (other than Reserve or National Guard);
- The date the group insurance policy terminates.

## WHEN MONTHLY BENEFITS STOP

Monthly benefits will stop on the earliest of:
- the date you cease to be disabled;
- the date of your death;

- the maximum duration of benefits (as shown above) has ended; or
- the date you fail to provide any required proof of disability.

## WHEN LTD BENEFITS ARE <u>NOT</u> PAID

Payment of these benefits will not occur if your disability arises is caused by:

- An act of war, declared or undeclared;
- An intentionally self-inflicted injury;
- Your committing a felony; or
- An injury or sickness that occurs while you are confined in any penal or correctional institution.

Please see the Certificate issued by Reliance for a complete list of these exclusions.

## HOW TO FILE A CLAIM

- Contact Matrix at 1-800-866-2301 or www.matrixabsence.com for the necessary claim forms.
- Written proof of disability must be presented
- Reliance has the right to investigate a claim at any time. At Reliance's expense you may be required to be examined by specialists they choose, including physicians, psychologists, etc. Benefits may be denied if you fail to cooperate in the investigation.

Carrier: The LTD benefits are insured by Reliance.

<div style="border:1px solid black; padding:10px;">

**IMPORTANT**: Please see the applicable Certificate issued by Reliance to obtain more information about the long term disability coverage. Copies of the Certificates are available at no cost from Total Rewards. If there is a discrepancy between this Guide and the underlying insurance policy, the insurance policy will prevail.

</div>

## BASIC LIFE INSURANCE

### WHO'S ELIGIBLE?

Each active, full-time Employee of the Company, and excluding any person employed on a temporary or seasonal basis, according to the following classifications:

CLASS 1:  All Eligible Executives
CLASS 2:  All Eligible Directors
CLASS 3:  All Eligible Customer Support Center Employees
CLASS 4:  All Eligible Store Managers, Field Training Managers and Nutritionists
CLASS 5:  All Eligible Variable Hourly Employees
CLASS 6:  All Other Eligible Employees
CLASS 7:  All Eligible Assistant Managers

### Is there a Waiting Period?

CLASSES 1, 2, 3, and 4:  30 days of continuous employment.*
CLASSES 5, 6 and 7:  90 days of continuous employment.*
*Time served as a part-time employee will count toward satisfaction of the waiting period.

### What is my effective date for this coverage?

The day after you complete your waiting period described above.

- If you are not actively at work on that date, you will be covered when you return to work.

### AMOUNT OF COVERAGE

- CLASS 1:  Three (3) times earnings, rounded to the next higher $1,000, to a maximum of $500,000.
- CLASS 2:  Two (2) times earnings, rounded to the next higher $1,000, to a maximum of $350,000.
- CLASSES 3, 4 and 7:  One (1) times earnings, rounded to the next higher $1,000, to a maximum of $100,000.
- CLASSES 5 and 6:  $25,000.

### COST OF COVERAGE

The Company pays the full premium for Basic Life Insurance coverage (in the amounts described immediately above) for eligible Employees; however, under IRS rules you are subject to income tax on the value of Company-provided coverage that exceeds $50,000.  Any additional coverage (in excess of the amount described immediately above) for an Employee is paid for by the Employee on an after-tax (payroll deduction) basis.  See the section of this Summary below under the caption "Optional Life Insurance" for information about optional life insurance coverage.

### YOUR BENEFICIARY

You can name a beneficiary to receive your death benefits at any time by completing a life insurance beneficiary form.  Benefits payable upon your death are payable to the beneficiary living at the time (other than the Company).  Unless otherwise specified, if more than one beneficiary survives you, all surviving beneficiaries will share equally.  If no beneficiary is alive on the date of your death or you do not elect a beneficiary, Sun Life, at its option, may make payments as follows:

(1)    your Spouse or your Domestic Partner named on an Affidavit of Domestic Partnership, if living; or

(2)    if there is no surviving Spouse or Domestic Partner named on an Affidavit of Domestic Partnership, to your surviving children in equal shares; or

(3)    if there is no surviving Spouse or Domestic Partner named on an Affidavit of Domestic Partnership or children, to your surviving parents in equal shares; or

National

(4)     if there is no surviving Spouse or Domestic Partner named on an Affidavit of Domestic Partnership, children or parents, to your surviving brothers and sisters in equal shares; or

(5)     if none of the above, to your estate.

The definitions of Spouse and Domestic Partner can be found in the Key Terms and Definitions section beginning on page Y-1.  Please note that a civil union partner generally is not considered a spouse for these purposes.

> **It is important to keep your beneficiary designation up to date, and to file a beneficiary designation for each coverage that provides death benefits.**

## PAYMENT OF BENEFITS

If you die while covered for life insurance, death benefits will be paid to your beneficiary, after satisfactory proof of death is received.  Your beneficiary must submit a certified original death certificate to Sun Life Assurance Company of Canada.

## REDUCTION IN THE PRINCIPAL AMOUNT

Upon attainment of age 65, an insured's benefit amount will automatically reduce, as follows:

| Age | % of Pre-age 65 Benefit Amount |
|---|---|
| 65 - 69 | 65% |
| 70 - 74 | 45% |
| 75 or more | 30% |

## WHEN COVERAGE STOPS

Coverage stops on the earliest of:

- The date the Program terminates;
- The date the policy terminates;
- The date you are no longer in an eligible class or your job classification is no longer eligible for the benefit;
- The last day for which any required premium has been paid;
- The date you enter active duty in any armed services during a time of war (declared or undeclared);
- The date of termination in which your employment terminates.  Ceasing to be "actively at work" will be deemed termination of employment, except:
  - Insurance may be continued for up to 6 months after you have been given an approved leave of absence.
  - Insurance may be continued for up to 12 months after you are absent from work due to injury or illness.
- The date you cease to be "actively at work" due to a labor dispute, including any strike, work reduction or lockout.

## CONVERSION PRIVILEGE

Your Basic Life Insurance coverage may be converted to an individual policy when coverage stops (and under certain conditions if the policy terminates).  <u>An application for conversion must be made and the first premium paid within 31 days after coverage stops</u>.  Contact Sun Life Assurance Company of Canada at 800-247-6875 for more information about the conversion privilege.

National

## PORTABILITY

If, prior to age 70, your Basic Life Insurance ceases due to your termination of employment, you may apply for portable coverage on your own life up to the amount of Basic Life Insurance that ceased, to a maximum of $500,000. <u>An application for portable coverage must be made and the first premium paid within 31 days after coverage stops</u>. Contact Sun Life Assurance Company of Canada at 800-247-6875 for more information about the portability privilege.

**Carrier:** The Basic Life Insurance benefits are insured by Sun Life Assurance Company of Canada.

<u>**IMPORTANT**</u>: Please see the applicable Certificate issued by Sun Life Assurance Company of Canada to obtain more information about the Basic Life Insurance coverage. Copies of the Certificates are available at no cost from Total Rewards. If there is a discrepancy between this Guide and the underlying insurance policy, the insurance policy will prevail.

National

## ACCIDENTAL DEATH AND DISMEMBERMENT (AD&D) INSURANCE

### WHO'S ELIGIBLE?

Employees covered for life insurance also are covered for AD&D insurance benefits.  AD&D coverage begins at the same time as coverage for life insurance benefits (as described in the preceding section).

### AMOUNT OF COVERAGE

- An additional amount equal to your life insurance coverage (as described in the preceding section) is payable to you or your beneficiary for accidental loss of life.  Note that, because the life insurance coverage reduces after age 64, a corresponding reduction also occurs in your AD&D coverage.

- If you die while covered for AD&D insurance, death benefits will be paid to your beneficiary under the same process as for life insurance, but only after satisfactory proof of death is received.

> **It is important to keep your beneficiary designation up to date, and to file a beneficiary designation for each coverage that provides death benefits.**

### COST OF COVERAGE

The Company pays the full cost of this coverage (in the amount described above) for eligible Employees.

### BENEFITS

Benefits for accidental loss are payable only if all of these conditions are met:

- The person sustains an accidental bodily injury while a covered person;

- The loss results directly from that injury and from no other cause; and

- The person suffers the loss within 365 days after the accident.

### BENEFITS AMOUNT PAYABLE

The amount payable depends on the type of loss, as shown below.  All benefits are subject to the Limitation Per Accident below:

| Loss of or by reason of: | Percent of the Principal Amount of Insurance |
|---|---|
| Life | 100% |
| Both Hands | 100% |
| Both Feet | 100% |
| Sight of Both Eyes | 100% |
| Speech and Hearing | 100% |
| One Hand and One foot | 100% |
| One Hand and Sight of One Eye | 100% |
| One Foot and Sight of One Eye | 100% |
| Paraplegia | 75% |
| Hemiplegia | 50% |
| One Hand | 50% |
| One Foot | 50% |
| Sight of One Eye | 50% |
| Speech or Hearing | 50% |
| Thumb and Index Finger of Same Hand | 25% |

National

## LIMITATION PER ACCIDENT

No more than the principal amount of insurance coverage on a person at the time of the accident will be paid for all losses resulting from injuries sustained in that accident.

## When AD&D Benefits are not paid – losses caused directly or indirectly, wholly or partly by:

The AD&D insurance covers losses from most accidents but does not cover losses relating to certain conditions, acts or activities.  A benefit will not be payable for a loss:

1. Caused by suicide or intentionally self-inflicted injuries;

2. Caused by or resulting from war or any act of war, declared or undeclared;

3. To which sickness, disease or myocardial infarction, including medical or surgical treatment thereof, is a contributing factor;

4. Sustained during the insured's commission or attempted commission of an assault or felony;

5. To which the insured's acute or chronic alcoholic intoxication is a contributing factor; or

6. To which the insured's voluntary consumption of an illegal or controlled substance or a non-prescribed narcotic or drug is a contributing factor.

Please see the Certificate issued by Sun Life Assurance Company of Canada for a complete list of these exclusions.

## WHEN COVERAGE STOPS

Coverage stops on the earliest of:

- The date the Program terminates;
- The date the policy terminates;
- The date you are no longer in an eligible class or your job classification is no longer eligible for the benefit;
- The last day for which any required premium has been paid;
- The date you enter active duty in any armed services during a time of war (declared or undeclared);
- The date of termination in which your employment terminates.  Ceasing to be "actively at work" will be deemed termination of employment, except:
  - Insurance may be continued for up to 6 months after you have been given an approved leave of absence.
  - Insurance may be continued for up to 12 months after you are absent from work due to injury or illness.
- The date you cease to be "actively at work" due to a labor dispute, including any strike, work reduction or lockout.

AD&D insurance coverage is subject to portability rights under the same terms same time as coverage for life insurance benefits (as described in the preceding section), but unlike life insurance, AD&D insurance cannot be converted to an individual policy when coverage stops.

**Carrier:**  The AD&D Insurance benefits are insured by Sun Life Assurance Company of Canada.

**IMPORTANT**:  Please see the applicable Certificate issued by Sun Life Assurance Company of Canada to obtain more information about the AD&D coverage.  Copies of the Certificates are available at no cost from Total Rewards.  If there is a discrepancy between this Guide and the underlying insurance policy, the insurance policy will prevail.

National

## OPTIONAL LIFE INSURANCE

## OPTIONAL GROUP TERM LIFE COVERAGE

You can choose to participate in the Optional Life Insurance Plan.  The Optional Life Insurance Plan offers you the opportunity to obtain additional life insurance protection and to choose the level of coverage that is right for you.

## WHO'S ELIGIBLE?

Employees covered for basic life insurance also are eligible for optional life insurance.

### What is my effective date for this coverage?

The day after you complete your waiting period described above, provided you enroll by the end of your waiting period.  If you are not eligible upon hire but you transfer to an eligible position, you have 30 days from the date of your transfer to enroll.

- If you are not actively at work on that date, you will be covered when you return to work.

## COST OF COVERAGE

You pay the full cost of Optional Life insurance coverage.  Your premium is deducted from your paycheck on an after-tax basis.

## AMOUNT OF COVERAGE YOU CAN CHOOSE

Coverage is available for One (1), Two (2), Three (3), Four (4) or Five (5) times your covered annual earnings, rounded to the next higher $1,000, but not to exceed $500,000.  The minimum amount of insurance is $10,000.[2]

> **It is important to keep your beneficiary designation up to date, and to file a beneficiary designation for each coverage that provides death benefits.**

## GUARANTEED ISSUE

Optional Life Insurance coverage is subject to Sun Life Assurance Company of Canada's approval of a person's proof of good health (evidence of insurability) if you decline coverage during your initial eligibility period and then want coverage at a later date.

## REDUCTION IN THE PRINCIPAL AMOUNT

Upon attainment of age 65, an insured's benefit amount will automatically reduce, as follows.  This reduction also applies to Employees who are age 65 or over on their Individual Effective Date.

| Age | % of Pre-age 65 Benefit Amount |
|---|---|
| 65 - 69 | 65% |
| 70 - 74 | 45% |
| 75 or more | 30% |

## WHEN COVERAGE STOPS

Optional Life Insurance coverage ends on the earliest of:

- The date the Program terminates;
- The date the policy terminates;
- The date you request, in writing, to have your insurance terminated;

---

[2]     Certain grandfathered employees are eligible for different amounts of life insurance coverage.

National

- The date you are no longer in an eligible class or your job classification is no longer eligible for the benefit;
- The last day for which any required premium has been paid;
- The date you enter active duty in any armed services during a time of war (declared or undeclared);
- The date of termination in which your employment terminates.  Ceasing to be "actively at work" will be deemed termination of employment, except:
  - Insurance may be continued for up to 6 months after you have been given an approved leave of absence.
  - Insurance may be continued for up to 12 months after you are absent from work due to injury or illness.
- The date you cease to be "actively at work" due to a labor dispute, including any strike, work reduction or lockout.

## CONVERSION PRIVILEGE

Your Optional Life Insurance coverage may be converted to an individual policy when coverage stops (and under certain conditions if the policy terminates).  An application for conversion must be made and the first premium paid within 31 days after coverage stops.  Contact Sun Life Assurance Company of Canada at 800-247-6875 for more information about the conversion privilege.

## PORTABILITY

If, prior to age 70, your Optional Life Insurance ceases due to your termination of employment, you may apply for portable coverage on your own life up to the amount of your Optional Life Insurance that ceased, to a maximum of $500,000.  An application for portable coverage must be made and the first premium paid within 31 days after coverage stops.  Contact Sun Life Assurance Company of Canada at 800-247-6875 for more information about the portability privilege.

**Carrier:**  The Optional Life Insurance benefits are insured by Sun Life Assurance Company of Canada.

> **IMPORTANT**:  Please see the Certificate issued by Sun Life Assurance Company of Canada to obtain more information about the Optional Life Insurance coverage.  Copies of the Certificate are available at no cost from Total Rewards.  If there is a discrepancy between this Guide and the underlying insurance policy, the insurance policy will prevail.

**NOTE**:  Optional Life Insurance coverage is not considered to have been offered under the Code Section 125 portion of the Program.  Also, the Code Section 125 portion of the Program does not currently operate in Puerto Rico.

National

## SPOUSAL OPTIONAL LIFE INSURANCE

## SPOUSAL OPTIONAL GROUP TERM LIFE COVERAGE

You can choose to participate in the Spousal Optional Group Term Life Plan.  The Spousal Optional Group Term Life Plan offers your spouse the opportunity to obtain life insurance protection.

## WHO'S ELIGIBLE?

Employees covered for basic life insurance also are eligible for spousal optional life insurance.

### What is my effective date for this coverage?

The day after you complete your waiting period described above, provided you enroll by the end of your waiting period.  If you are not eligible upon hire but you transfer to an eligible position, you have 30 days from the date of your transfer to enroll.

▪       If you are not actively at work on that date, you will be covered when you return to work.

## AMOUNT OF COVERAGE YOU CAN CHOOSE

Coverage is available in the amount of $25,000 or $50,000.  You may not elect Spousal Optional Group Term Life insurance coverage in excess of the amount of your Optional Life Insurance coverage.

## COST OF COVERAGE

You pay the full cost of Spousal Optional Group Term Life insurance coverage.  Your premium is deducted from your paycheck on an after-tax basis.

> **It is important to keep your beneficiary designation up to date, and to file a beneficiary designation for each coverage that provides death benefits.**

## GUARANTEED ISSUE

Spousal Optional Group Term Life Insurance coverage is subject to Sun Life Assurance Company of Canada's approval of a person's proof of good health (evidence of insurability) if you decline coverage for your spouse during your initial eligibility period and then want coverage for your spouse at a later date, or if you elect to increase the amount of your Spousal Optional Group Term Life Insurance coverage.

## WHEN COVERAGE STOPS

Spousal Optional Group Term Life Insurance coverage ends on the earliest of:

▪       The date the Program terminates;

▪       The date the policy terminates;

▪       The date you request, in writing, to have your insurance terminated;

▪       The date you are no longer in an eligible class or your job classification is no longer eligible for the benefit;

▪       The date your spouse attains age 70;

▪       The last day for which any required premium has been paid;

▪       The date you enter active duty in any armed services during a time of war (declared or undeclared);

▪       The date of termination in which your employment terminates.  Ceasing to be "actively at work" will be deemed termination of employment, except:

●       Insurance may be continued for up to 6 months after you have been given an approved leave of absence.

National

- Insurance may be continued for up to 12 months after you are absent from work due to injury or illness.
  - The date you cease to be "actively at work" due to a labor dispute, including any strike, work reduction or lockout.

## CONVERSION PRIVILEGE

Spousal Optional Group Term Life Insurance coverage may be converted to an individual policy when coverage stops (and under certain conditions if the policy terminates), *provided* you also convert your Basic and Optional Life Insurance coverages.  <u>An application for conversion must be made and the first premium paid within 31 days after coverage stops</u>.  Contact Sun Life Assurance Company of Canada at 800-247-6875 for more information about the conversion privilege.

## PORTABILITY

If, prior to age 70, your Optional Life Insurance ceases due to your termination of employment, you may apply for Spousal Optional Group Term Life Insurance portable coverage on your covered spouse's life up to the amount of your Spousal Optional Group Term Life Insurance that ceased, *provided* you also port your Basic and Optional Life Insurance coverages.  <u>An application for portable coverage must be made and the first premium paid within 31 days after coverage stops</u>.  Contact Sun Life Assurance Company of Canada at 800-247-6875 for more information about the portability privilege.

> **IMPORTANT**:  Please see the Certificate issued by Sun Life Assurance Company of Canada to obtain more information about the Spousal Optional Group Term Life Insurance coverage.  Copies of the Certificate are available at no cost from Total Rewards.  If there is a discrepancy between this Guide and the underlying insurance policy, the insurance policy will prevail.

**NOTE**:  Spousal Optional Group Term Life Insurance coverage is not considered to have been offered under the Code Section 125 portion of the Program.  Also, the Code Section 125 portion of the Program does not currently operate in Puerto Rico.

National

# DEPENDENT CHILD OPTIONAL LIFE INSURANCE

## DEPENDENT CHILD OPTIONAL GROUP TERM LIFE COVERAGE

You can choose to participate in the Dependent Child Optional Life Insurance Plan.  The Dependent Child Optional Life Insurance Plan offers you the opportunity to obtain life insurance protection for each dependent child up to age 26.  If your child is unmarried, age 26 or older, incapable of self-sustaining employment because of a mental retardation, developmental disability or physical handicap, and financially more than 50% dependent on you, then he or she will continue to be a dependent under the Dependent Child Optional Life Insurance Plan for as long as this condition exists.

## WHO'S ELIGIBLE?

Employees covered for basic life insurance also are eligible for dependent optional life insurance.

### What is my effective date for this coverage?

The day after you complete your waiting period described above, provided you enroll by the end of your waiting period.  If you are not eligible upon hire but you transfer to an eligible position, you have 30 days from the date of your transfer to enroll.

- If you are not actively at work on that date, you will be covered when you return to work.

## AMOUNT OF COVERAGE

Coverage is available in the amount of $10,000 for each eligible child.

Your Dependent Group Life Insurance coverage cannot exceed 100% of your Optional Life Insurance coverage.

## COST OF COVERAGE

You pay the full cost of Dependent Child Optional Life Insurance coverage.  Your premium is deducted from your paycheck on an after-tax basis.

> **It is important to keep your beneficiary designation up to date, and to file a beneficiary designation for each coverage that provides death benefits.**

## GUARANTEED ISSUE

Dependent Child Optional Life Insurance coverage is subject to Sun Life Assurance Company of Canada's approval of a child's proof of good health (evidence of insurability) if you decline coverage for your child during your initial eligibility period and then want coverage for your child at a later date.

## WHEN COVERAGE STOPS

Dependent Child Optional Life Insurance coverage ends on the earliest of:
- The date the Program terminates;
- The date the policy terminates;
- The date you request, in writing, to have your insurance terminated;.
- The date you are no longer in an eligible class or your job classification is no longer eligible for the benefit;
- The date your dependent child attains age 26 (unless he or she is unmarried, incapable of self-sustaining employment due to mental retardation, developmental disability or physical handicap, and financially more than 50% dependent on you, in which case coverage ends when such condition ceases);
- The last day for which any required premium has been paid;

National

- ▪ The date you enter active duty in any armed services during a time of war (declared or undeclared);
- ▪ The date of termination in which your employment terminates. Ceasing to be "actively at work" will be deemed termination of employment, except:
  - Insurance may be continued for up to 6 months after you have been given an approved leave of absence.
  - Insurance may be continued for up to 12 months after you are absent from work due to injury or illness.
- ▪ The date you cease to be "actively at work" due to a labor dispute, including any strike, work reduction or lockout.

## CONVERSION PRIVILEGE

Dependent Child Optional Life Insurance coverage may be converted to an individual policy when coverage stops (and under certain conditions if the policy terminates), *provided* you also convert your Basic and Optional Life Insurance coverages. An application for conversion must be made and the first premium paid within 31 days after coverage stops. Contact Sun Life Assurance Company of Canada at 800-247-6875 for more information about the conversion privilege.

## PORTABILITY

If, prior to age 70, your Optional Life Insurance ceases due to your termination of employment, you may apply for Dependent Child Optional Life Insurance portable coverage on your covered dependent's life up to the amount of your Dependent Child Optional Life Insurance that ceased, *provided* you also port your Basic and Optional Life Insurance coverages. An application for portable coverage must be made and the first premium paid within 31 days after coverage stops. Contact Sun Life Assurance Company of Canada at 800-247-6875 for more information about the portability privilege.

> **IMPORTANT**: Please see the Certificate issued by Sun Life Assurance Company of Canada to obtain more information about the Dependent Child Optional Life Insurance coverage. Copies of the Certificate are available at no cost from Total Rewards. If there is a discrepancy between this Guide and the underlying insurance policy, the insurance policy will prevail.

**NOTE**: Dependent Child Optional Life Insurance coverage is not considered to have been offered under the Code Section 125 portion of the Program. Also, the Code Section 125 portion of the Program does not currently operate in Puerto Rico.

National

## CRITICAL ILLNESS COVERAGE

### WHO'S ELIGIBLE?

Please see "Who's Eligible" under "General Information About Your Benefits" on page B-1. You must be actively at work for your coverage to begin.

### OPTIONAL CRITICAL ILLNESS COVERAGE

You can choose to participate in the Optional Critical Illness Insurance Plan. The Optional Critical Illness Plan helps protect employees and their families from financial loss by providing a lump-sum benefit upon diagnosis of a covered condition. Depending on the diagnosis, the Critical Illness benefit will pay either the full benefit or a partial benefit.

A Recurrence benefit will pay a lump-sum benefit to Insureds diagnosed with a covered condition for which SunLife previously paid a benefit. The diagnosis must be for a new event (not a re-diagnosis of the covered condition previously paid for), and a certain number of months must pass between diagnoses. Recurrence Benefit payments are limited to once per applicable covered condition. Certain covered conditions require that specific criteria be met in order for a Recurrence Benefit to be paid.

To promote healthy lifestyles and early detection, the Critical Illness benefit will pay employees, Spouse/Domestic Partners, and children $50 once per calendar year, when proof of an eligible health screening, such as a wellness visit is received.

### COST OF COVERAGE

You pay the full cost of Optional Critical Illness insurance coverage. Your premium is based on your coverage election amount and you age at the time of election. Your premium is deducted from your paycheck on an after-tax basis.

### AMOUNT OF COVERAGE YOU CAN CHOOSE

Employees may elect coverage in $5,000 increments from $5,000 to $30,000 with a guarantee issue amount of $30,000. Employees may also elect coverage for Spouses and Domestic Partners in $2,500 increments from $2,500 to $15,000 with a guarantee issue amount of $15,000. Employees may elect coverage for their dependent children in $2,500 increments from $2,500 to $5,000 with a guarantee issue amount of $5,000.

### WHEN COVERAGE STOPS

Coverage stops on the earliest of:

- The date the Program terminates;
- The date the policy terminates;
- The date you are no longer in an eligible class or your job classification is no longer eligible for the benefit;
- The last day for which any required premium has been paid;
- The date you enter active duty in any armed services during a time of war (declared or undeclared);
- The date of termination in which your employment terminates. Ceasing to be "actively at work" will be deemed termination of employment, except:
  - Insurance may be continued for up to 6 months after you have been given an approved leave of absence.
  - Insurance may be continued for up to 12 months after you are absent from work due to injury or illness.

- The date you cease to be "actively at work" due to a labor dispute, including any strike, work reduction or lockout.

## PORTABILITY

Insureds may port an amount up to their remaining amount of insurance in force under the qualifying group insurance policy on the date such insurance terminates.

# ACCIDENT COVERAGE

## WHO'S ELIGIBLE?

Eligibility for Accident Coverage follows the rules under see "Who's Eligible" under "General Information About Your Benefits" on page B-1 except employees in Puerto Rico are not eligible to participate.  You must be actively at work for your coverage to begin.

## OPTIONAL ACCIDENT COVERAGE

The Accident Plan provides accident insurance protection for a wide range of covered benefits. Injured employees and their dependents may use the cash benefits however they want—to satisfy deductibles, pay out-of-pocket medical expenses, or pay household bills, for example. Benefits for injuries are payable once for each covered accident (unless stated otherwise in the plan policy), and benefits for hospital stays and related care are payable up to a specific number of days or visits for each covered accident. Accident insurance is a limited benefit policy. It provides accident coverage only. It does not provide basic hospital, basic medical, or major medical insurance.

To promote healthy lifestyles and early detection, the Accident benefit will pay employees, Spouse/Domestic Partners, and children $50 once per calendar year, when proof of an eligible health screening, such as a wellness visit is received.

## COST OF COVERAGE

You pay the full cost of Optional Accident insurance coverage. Your premium is based on your coverage election of either high or low coverage as defined in Sunlife's policy and the tier in which you enroll (Employee only, Employee and Spouse, Employee and Children, or Employee and Family). Your premium is deducted from your paycheck on an after-tax basis.

## AMOUNT OF COVERAGE YOU CAN CHOOSE

Employees may elect either low or high coverage and have the option to include both spouses/domestic partner and dependent children.

## WHEN COVERAGE STOPS

Coverage stops on the earliest of:

- The date the Program terminates;
- The date the policy terminates;
- The date you are no longer in an eligible class or your job classification is no longer eligible for the benefit;
- The last day for which any required premium has been paid;
- The date you enter active duty in any armed services during a time of war (declared or undeclared);
- The date of termination in which your employment terminates.  Ceasing to be "actively at work" will be deemed termination of employment, except:
  - Insurance may be continued for up to 6 months after you have been given an approved leave of absence.
  - Insurance may be continued for up to 12 months after you are absent from work due to injury or illness.
- The date you cease to be "actively at work" due to a labor dispute, including any strike, work reduction or lockout.

National (except Puerto Rico)

## PORTABILITY

Employees who terminate employment and who meet other eligibility criteria may apply to port accident insurance.

## BUSINESS TRAVEL ACCIDENT INSURANCE

### WHO'S ELIGIBLE?

All full-time active employees and consultants working solely for the Company who are traveling on the business of, or at the expense of, the Company outside their country of residence or permanent assignment for no more than 180 consecutive days per one trip.

CLASS 1: CEO, CFO, COO

CLASS 2:  Chief Brand Officer, Chief Digital Officer, Chief Information Officer, Sr. VP Retail Operations, Sr. VP Human Resources, Sr. VP General Counsel, Chief Merchandising Officer, Sr. VP Supply Chain and DC, VP Real Estate & Development, Sr. VP Chief Accounting Officer, VP Internal Audit & LP, VP Division Merch Manager (2), VP Scientific & Regulatory, VP Retail Operations, VP Inventory, VP Pricing and Competitive Intelligence, VP Customer Engagement, VP Head of Content, VP New Business & FP&A, VP Deputy General Counsel, Director of International Development

CLASS 3: All Other Eligible Employees

### What is my effective date for this coverage?

- ▪ Coverage starts automatically, if you are actively at work on the date you become eligible.  There is no need to enroll.

### COST OF COVERAGE

The Company pays the full cost of the business travel accident insurance coverage for eligible Employees.

### COVERAGE

- ▪ Coverage is provided if an accident occurs while on authorized Company business and injury is sustained.

- ▪ 24-Hour Accident Protection

### AMOUNT OF COVERAGE

| Principal Sum | Hazard |
|---|---|
| CLASS 1:  Three (3) times earnings to a maximum of $2,000,000 | Business and Pleasure |
| CLASS 2:  Three (3) times earnings to a maximum of $1,000,000 | Business Only |
| CLASS 3:  $50,000 | Business Only |

The Business Travel Accident Insurance coverage provides a payment based upon a percentage of the above-indicated Principal Sum.

> **It is important to keep your beneficiary designation up to date, and to file a beneficiary designation for each coverage that provides death benefits.**

The Business Travel Accident Insurance coverage provides payment when the loss occurs within 365 days after the date of the accident.  Benefits are payable in addition to any payments for life or AD&D insurance when a covered accident results in any of the following losses to an insured person.

| Loss of or by reason of: | Percent of the Principal Sum |
|---|---|
| Loss of life ......................................................................................................................................... | 100% |
| Loss of any **two**:  Loss of Hand, Loss of Foot, Loss of Sight of One Eye, Loss of Speech, Loss of Hearing ........................................................................................................ | 100% |

Loss of Use of Both Arms and Both Legs (Quadriplegia) ...................................................................... 100%

Loss of Use of Both Arms or Both Legs or of One Arm and One Leg (Hemiplegia, Paraplegia) ................................. 75%

Loss of any **one**:  Loss of Hand, Loss of Foot, Loss of Sight of One Eye,
   Loss of Speech, Loss of Hearing ........................................................................................................ 50%

Loss of Use of One Arm or One Leg, or Both Hands, or Both feet, or One Hand and One Foot ................................. 50%

Loss of Thumb and Index Finger of Same Hand .................................................................................... 50%

Loss of Use of One Hand or One Foot................................................................................................... 25%

"Loss of Use" benefits are payable after you satisfy a 30-day elimination or waiting period.

## LIMITATION PER ACCIDENT

No more that the Principal Sum of insurance coverage on a person at the time of the accident will be paid for all losses resulting from injuries sustained in that accident.

## AGGREGATE LIMITATION PER ACCIDENT

If more than one insured person suffers a covered loss in the same accident, Federal Insurance Company ("Federal") will not pay more than $10,000,000 in benefits.  This aggregate limit will be divided proportionately among the claimants based on the Principal Sum.

## WHEN BENEFITS ARE NOT PAID

Payment of these benefits is conditional on loss due to death or accidental bodily injury, which excludes (among others):

- Travel or flight in aircraft owned, leased, or operated on behalf of the Company;
- Aircraft pilot or crew;
- Disease or illness;
- Incarceration;
- Service in the armed forces (including Reserve and National Guard);
- Specialized aviation;
- Suicide or intentional injury;
- Trade sanctions; or
- War.

Please see the Certificate issued by Federal for a complete list of these exclusions.

## HOW TO FILE A CLAIM

- Contact Federal Insurance Company ("Chubb Group of Companies") as listed on page W-4 for claim forms; and
- Submit written proof of death or accidental injury.

## WHEN COVERAGE STOPS

Business Travel Accident Insurance coverage stops on the earliest of:
- The date the Program terminates;
- The date your employment terminates;
- The date you no longer meet the eligibility requirements;

National

- The date you are no longer in an eligible class;
- The date you enter military service (other than Reserve or National Guard); or
- The date the group insurance policy terminates.

**Carrier:** The Business Travel Accident Insurance benefits are insured by Federal.

**IMPORTANT**:  Please see the Certificate issued by Federal to obtain more information about the Business Travel Accident Insurance coverage.  Copies of the Certificate are available at no cost from Total Rewards. If there is a discrepancy between this Guide and the underlying insurance policy, the insurance policy will prevail.

National

# BUSINESS TRAVEL ACCIDENT INSURANCE

## WHO'S ELIGIBLE?

All full-time active employees and consultants working solely for the Company who are traveling on the business of, or at the expense of, the Company outside their country of residence or permanent assignment for no more than 180 consecutive days per one trip.

CLASS 1: All full-time active employees and consultants working solely for the Company who are traveling on the business of, or at the expense of, the Company outside their country of residence or permanent assignment for no more than 180 consecutive days per one trip.

CLASS 2 (dependents):  Not Covered

## What is my effective date for this coverage?

- Coverage starts automatically, if you are actively at work on the date you become eligible.  There is no need to enroll.

## COST OF COVERAGE

The Company pays the full cost of the business travel accident insurance coverage for eligible Employees.

## COVERAGE

### *MEDICAL ILLNESS AND INJURY INSURANCE*

| | |
|---|---|
| **Calendar Year Medical Benefit Maximum** | $300,000 |
| **Calendar Year Deductible** | $0 |
| **Coinsurance (paid by Cigna)** | 100% |
| **Out of Pocket Coinsurance Maximum** | None |
| **Prescription Drug** | 100% of covered expenses, when medically necessary while on an approved international business trip, this benefit includes replacement medicine for lost prescriptions that are medically necessary during an international trip |
| **Emergency Dental (includes dental accident & alleviation of sudden unexpected pain)** | $1,000 calendar year maximum |
| **Personal Deviation (Sojourn)** | Not Covered |
| **Room and Board Inside the U.S.** | Average Semi-Private Room Rate |
| **Room and Board Outside the U.S.** | Average Semi-Private Room Rate |
| **Pre-Existing Condition** | None, subject to the calendar year maximum |
| **Medical Evacuation & Repatriation** | $100,000 |
| **War Risk** | Not Covered |
| **Accidental Death and Dismemberment (AD&D)** | Covered. Please refer to AD&D schedule for benefit information. |

| **Covered (AD&D) Class** | **Class Definition** |
|---|---|
| **Class 1 (employee)** | All full-time active employees and consultants working solely for the Company  who are traveling on the business of, or at the expense of, the Company |

National

outside their country of residence
or permanent assignment for no
more than 180 consecutive days
per one trip.

## *ACCIDENTAL DEATH OR DISMEMBERMENT INSURANCE*

The insurance provides benefits for accidental death or dismemberment. The amount that may be payable is based on the Amount of Principal Sum.

| | |
|---|---|
| **Amount of Principal Sum** | $100,000 |
| **War Risk** | Not Covered |
| | |
| **Aggregate Limit of Liability** | $500,000 for all covered persons |
| | |
| **This includes forms of transportation such as air, bus train, and boat** | Not more than the Policy Aggregate Maximum specified above will be paid for all Covered Losses for all Covered Persons as the result of any one Covered Accident. If this amount does not allow all Covered Persons to be paid the amounts this policy otherwise provides, the amount paid for each Loss bears to the Aggregate Limit of Liability. |

| Table of Losses and Benefits | % of Principal Sum |
|---|---|
| Loss of Life or Two or more members | 100% |
| Loss of Speech AND Hearing | 100% |
| Loss of Speech OR Hearing | One-half (1/2) the Principal Sum |
| Loss of One member | One-half (1/2) the Principal Sum |
| Thumb and index finger from the same hand | One-fourth (1/4) the Principal Sum |

Such payment shall be in addition to any other indemnity payable as of the date of loss, but only one (1) amount, the larger applicable amount, shall be payable for all such losses resulting from one accident. The "Principal Sum" is the amount specified as such in the Schedule.

**Member**: shall mean a hand, foot, or eye

**Loss:** shall mean, with respect to:

o hands and feet, actual severance through or above wrist or ankle joints;
o with respect to eyes, entire irrecoverable loss of sight;
o with respect to speech, the total irrecoverable loss of speech which does not allow audible communications in any degree
o with respect to hearing which cannot be corrected by any hearing aid or device
o with respect to thumb and index finger means complete severance through or above the metacarpophalangeal joints, (the joints between the fingers and the hand).

## HOW TO FILA A CLAIM

### Accessing is easy:

**1.** Go to CignaEnvoy.com.

**2.** Select from the "I am a customer" box, "I am an international business traveler."

**3.** Log on by entering the username and password provided by your Human Resources manager and located below.

 As an added convenience, Cigna now offers the ability to submit MBA claims directly through Cigna Envoy® (www.CignaEnvoy.com). All registered users can file an online claim simply by following these steps:

 1. Go to CignaEnvoy.com and select from the "I am a customer" box, "I am an international business traveler."

National

**2.** Log on by entering the username and password:

Username:

Password:

**3.** Select "Online Claims" on the navigational toolbar at the top of the page.

**4.** On this website, you will need to provide:

✓✓ Details about your claim

✓✓ Travel dates

✓✓ Preferred payment method

✓✓ Banking information (per payment method)

✓✓ Other coverage information (if applicable)

## EXCLUSIONS: MEDICAL ILLNESS AND INJURY

In addition to any benefit specific exclusion, benefits will not be paid for any Covered Medical Illness or Injury which directly or indirectly, in whole or in part, is caused by or results from any of the following:

1. Injury or Sickness which results from or in the course of an Insured's regular occupation for wage or profit. (This does not apply to a corporate officer, partner or sole proprietor who is not insured under Workers' Compensation Employer's Liability Law or similar law).

2. flight in, boarding or alighting from an Aircraft or any craft designed to fly above the Earth's surface:

a. except as a fare-paying passenger on a regularly scheduled commercial or charter airline;

b. being flown by the Covered Person or in which the Covered Person is a member of the crew;

c. being used for:

i. crop dusting, spraying or seeding, giving and receiving flying instruction, fire fighting, sky writing, sky diving or hang-gliding, pipeline or power line inspection, aerial photography or exploration, racing, endurance tests, stunt or acrobatic flying; or

ii. any operation that requires a special permit from the FAA, even if it is granted (this does not apply if the permit is required only because of the territory flown over or landed on);

d. designed for flight above or beyond the earth's atmosphere;

e. an ultra-light or glider;

f. being used by any military authority, except an Aircraft used by the Air Mobility Command or its foreign equivalent;

g. being used for the purpose of parachuting or skydiving;

3. Injury or Sickness for which an Insured is entitled to benefits under Workers' Compensation Law, Employer's Liability Law or similar law.

4. travel in or on any off-road motorized vehicle not requiring licensing as a motor vehicle;

5. participation in any motorized race or contest of speed

6. an accident if the Covered Person is the operator of a motor vehicle and does not possess a valid motor vehicle operator's license; except while participating in Driver's Education Program;

7. travel in any Aircraft owned, leased or controlled by the Company, or any of its subsidiaries or affiliates. An Aircraft will be deemed to be 'controlled' by the Company if the Aircraft may be used as the Company wishes for more than 10 straight days, or more than 15 days in any year;

8. Sickness occurring while the Insured is serving on full-time active duty in the Armed Forces of any country or international authority;

S-3

National

9. Hospital confinement, surgery, treatment, service or supply for which:

a. the charge is payable or reimbursable by or through a plan or program of any governmental agency;

b. or charges which would not have been made if the person had no insurance.

10. To the extent that payment is unlawful where the person resides when the expenses are incurred.

11. To the extent that they are more than Maximum Reimbursable Charges.

12. Injury as a result of a commission of a felony.

13. Attempted suicide or intentionally self-inflicted Injury, while sane or insane.

14. Eyeglasses, contact lenses, hearing aids, or examinations for prescription or fitting thereof.

15. Cosmetic or plastic surgery except;

a. when necessary as a result of an Injury or Sickness occurring while Insured; or

b. reconstructive surgery when such service is incidental to or follows surgery resulting from Injury or Sickness.

16. Hospital confinement, care or treatment which is not recommended and approved by a Physician.

17. Treatment or care of a person by a Physician or Nurse, if the Physician or Nurse is a member of the Insured's immediate family or ordinarily resides with the Insured.

18. Private Duty Nursing.

19. Obesity / Bariatric surgery.

20. Physical examinations unless required because of Injury or Sickness.

21. Dental Expenses unless the result of an accident to sound natural teeth or alleviation of sudden unexpected dental pain, then the benefit is limited to $1,000.00 per calendar year up to the medical maximum.

22. Expenses related to alcoholism, chemical dependency or drug addiction.

23. Operating any type of vehicle while under the influence of alcohol or any drug, narcotic or other intoxicant including any prescribed drug for which the Covered Person has been provided a written warning against operating a vehicle while taking it. Under the influence of alcohol, for purposes of this exclusion, means intoxicated, as defined by the law of the state and or country in which the Covered Accident occurred.

24. Expenses incurred during vacation travel when not in conjunction with a business trip unless specified on the Insurance Schedule.

25. Claim payments which are illegal under applicable law.

26. Medical treatments or procedures deemed not Medically Necessary as determined by the Company.

27. The Covered Persons being Intoxicated. "Intoxicated" means having a blood alcohol level of .08 or higher;

28. Any and all expenses incurred for medical services or treatment in the Insured's country of permanent residence

29. expenses incurred if the original or ancillary purpose of your trip is to obtain medical treatment;

30. Injury or Sickness caused by war, or an act of war, whether declared or undeclared, riot, civil commotion or police action.

31. Routine maternity treatment.

## EXCLUSIONS: ACCIDENTAL DEATH AND DISMEMBERMENT

Coverage for business travel is not provided during any of the following:

1. normal commuting between the Covered Person's home and place of work;

2. travel to another location where the Covered Person is expected to be assigned for more than 180 days;

3. any activity not authorized or organized, or not reimbursable, by the Company;

4. the Covered Person's Personal Deviation, unless shown in the *Schedule of Benefits*;

5. the Covered Person's driving any vehicle or Private Passenger Automobile for pay or hire;

## COBRA CONTINUATION OF YOUR COVERAGE

## COBRA CONTINUATION GENERALLY

**Medical, Dental, Vision and Health Care FSA**

If Medical, Dental, Vision or Health Care FSA coverage (the "group health plan" components of the Program) for you or your dependents ends, you may have the opportunity to continue the coverage for a certain period under "COBRA"–the federal Consolidated Omnibus Budget Reconciliation Act, as amended.  You must pay the full cost of the COBRA coverage, plus an administrative fee.  Special rules, described later in this section, apply to COBRA continuation of the Health Care FSA.

*You may have other options available to you when you lose group health coverage.*  For example, you may be eligible to buy an individual plan through the Health Insurance Marketplace (as defined under the Affordable Care Act).  By enrolling in coverage through the Marketplace, you may qualify for lower costs on your monthly premiums and lower out-of-pocket costs.  Additionally, you may qualify for a 30-day special enrollment period for another group health plan for which you are eligible (such as a Spouse's plan), even if that plan generally doesn't accept late enrollees.

**NOTE:**  The Company makes available to a covered Domestic Partner (or his or her dependents) the same options for continuing coverage that apply under COBRA, but such coverage does not have the same associated legal rights as does COBRA coverage.  COBRA coverage also does not apply to the disability, life insurance or accident insurance components of the Program.

### What is COBRA Continuation Coverage?

COBRA continuation coverage is a continuation of group health coverage when coverage would otherwise end because of a life event known as a "Qualifying Event" (Qualifying Events are listed below).  COBRA continuation coverage must be offered to each person who is a "qualified beneficiary."  A qualified beneficiary is someone who will lose group health coverage under the Program because of the occurrence of a Qualifying Event.  Depending on the type of Qualifying Event that occurs, Employees, Spouses of Employees, and dependent children of Employees may become qualified beneficiaries.  Under the Program, qualified beneficiaries who elect COBRA continuation coverage are required to pay for their coverage.

## HOW IS COBRA CONTINUATION COVERAGE PROVIDED

### Electing COBRA Coverage.

Once the Plan Administrator receives notice that a Qualifying Event has occurred, COBRA continuation coverage will be offered to each of the qualified beneficiaries.  Each qualified beneficiary has an independent right to elect COBRA continuation coverage.  However, elections need not be separate:  an Employee can elect COBRA continuation coverage for him or herself and his or her covered Spouse; and either parent can elect COBRA continuation coverage for a child who is a qualified beneficiary.

**DURING THE INITIAL COBRA ELECTION PERIOD, COVERAGE WILL BE TREATED AS HAVING TERMINATED, SUBJECT TO REINSTATEMENT IF THE ELECTION OF CONTINUATION COVERAGE AND PAYMENT OF PREMIUM IS MADE WITHIN THE APPLICABLE TIME LIMITS.**

### Cost of COBRA Continuation Coverage.

COBRA participants must pay monthly premiums for coverage.  In general, the COBRA premium is based on the participation election in effect immediately before the Qualifying Event, plus a 2 percent (2%) surcharge for administrative costs, and may be subject to an annual increase.

**Qualifying Events and Qualified Beneficiaries.**

An Employee will become a qualified beneficiary if he or she loses group health coverage under the Program because either one of the following Qualifying Events happens:

- His or her hours of employment are reduced, or

- His or her employment ends for any reason other than gross misconduct.

An Employee's Spouse will become a qualified beneficiary if the Spouse loses group health coverage under the Program because any of the following Qualifying Events happens:

- The Employee dies;

- The Employee's hours of employment are reduced;

- The Employee's employment ends for any reason other than his or her gross misconduct;

- The Employee becomes enrolled in Medicare (Part A, Part B, or both); or

- The Employee and his or her Spouse become divorced or legally separated.

An Employee's dependent children will become qualified beneficiaries if they will lose group health coverage under the Program because any of the following Qualifying Events happens:

- The parent-Employee dies;

- The parent-Employee's hours of employment are reduced;

- The parent-Employee's employment ends for any reason other than his or her gross misconduct;

- The parent-Employee becomes enrolled in Medicare (Part A, Part B, or both);

- The parents become divorced or legally separated; or

- The child stops being eligible for coverage under the Program as a "dependent child."

## Employer's Notification Obligations.

When the Qualifying Event is the end of employment (except for gross misconduct), reduction of hours of employment, the Employee's death or the Employee's becoming entitled to Medicare benefits (under Part A, Part B, or both), the Employer must notify the COBRA Administrator of the occurrence of the Qualifying Event within 30 days following the date coverage ends.

## Your Notification Obligations.

For the other Qualifying Events (divorce or legal separation of the Employee and Spouse, or a dependent child's losing eligibility for coverage as a dependent child), the Employee or a family member must notify the Plan Administrator within 60 days after the Qualifying Event occurs.  **Failure to notify the Plan Administrator in a timely manner may result in unavailability of COBRA coverage.**

## When is COBRA Continuation Coverage Available?

The Program will offer COBRA continuation coverage to each of the qualified beneficiaries after the COBRA Administrator has been notified that a Qualifying Event has occurred.  If COBRA continuation coverage is elected on a timely basis, COBRA continuation coverage will begin on the date that the group health coverage would otherwise have been lost.  Employees may elect COBRA continuation coverage on behalf of their Spouses, and parents may elect COBRA continuation coverage on behalf of their children.

## Duration of COBRA Coverage

The following describes the general rules for the duration of COBRA coverage.  A special rule, discussed below, applies to the Health Care FSA.

National

- If your coverage ends because of termination of employment (except for gross misconduct) or because you are no longer eligible (for example, if you become part-time and are regularly scheduled to work less than 30 hours per week), you can continue coverage for up to 18 months, subject to timely election and timely premium payments.  If you do not have coverage at the time the Qualifying Event occurs (for example, if you have chosen the "No Coverage" option), COBRA continuation coverage is not available.

- If your family experiences another Qualifying Event during the usual 18 months of COBRA continuation coverage, the Spouse and dependent children in your family can get up to 18 additional months of COBRA continuation coverage, for a maximum of 36 months, if the Plan Administrator is properly notified about the second Qualifying Event.  This extension may be available to the Spouse and any dependent children getting COBRA continuation coverage if the Employee or former Employee dies; becomes entitled to Medicare benefits (under Part A, Part B, or both); gets divorced or legally separated; or if the dependent child stops being eligible under the Plan as a dependent child.  This extension is available only if the second Qualifying Event would have caused the Spouse or dependent child to lose group health plan coverage under the Program had the first Qualifying Event not occurred.

- If you or anyone in your family covered under the group health plan is determined by Social Security to be disabled and the Plan Administrator is notified in a timely fashion, you and your entire family may be entitled to get up to an additional 11 months of COBRA continuation coverage, for a maximum of 29 months.  The disability would have to have started at some time before the 60th day of COBRA continuation coverage and must last at least until the end of the 18-month period of COBRA continuation coverage.  You or another family member must notify the Plan Administrator in writing of the Social Security determination within 60 days of the determination in order for the extended period of coverage to be available.  An additional premium is permitted to be charged for the extended coverage; affected individuals will be notified if an additional charge is implemented.

- If your Spouse or dependent becomes ineligible for coverage under the Program because of a separation or divorce, or because of your death, your Spouse or dependent will have the opportunity to continue coverage through COBRA for up to 36 months.

- If one of your dependent children becomes ineligible for group health plan coverage under the Program because of age, or because of your death, your dependent can continue coverage through COBRA for up to 36 months.

- A newborn infant of yours or a child placed for adoption with you will be entitled to receive COBRA continuation coverage as a qualified beneficiary having dependent COBRA rights.  Treating a newborn infant or adopted child as a qualified beneficiary is important if during the first 18 months of COBRA continuation following your termination of employment or reduction in hours there is a second Qualifying Event – your death, divorce or legal separation, entitlement to Medicare or the dependent child ceasing to be a "dependent" under the Program – that allows a qualified COBRA beneficiary to elect up to 36 months of coverage (computed from the initial Qualifying Event).

- If you become entitled to Medicare, and within the next 18 months your employment terminates or you have a reduction in hours, your dependents are entitled to up to 36 months of COBRA coverage.

- If you become covered by another group health plan and that plan contains a pre-existing condition limitation that affects you, you can continue COBRA coverage under the Program until the earlier of the date the exclusions no longer apply or the date your COBRA coverage would otherwise end.

- In no event will COBRA coverage of you or your dependents extend beyond 36 months.

You will receive additional information about your opportunity to continue coverage under COBRA from our COBRA administrator when your medical, vision and or dental coverage end.  It is your responsibility however, to notify the Plan Administrator within 60 days when a Spouse or dependent becomes ineligible for

coverage, so he or she can receive information about continued coverage opportunities. **Failure to notify the Plan Administrator in a timely manner may result in the unavailability of COBRA coverage.**

If the medical, vision or dental coverages under the Program change during the period that you, your Spouse or your dependents are continuing COBRA coverage, your coverage generally will change accordingly.

<u>NOTE</u>:  If your address changes after you become eligible for, or while you are on, COBRA continuation coverage, you should be sure to file a written notice of your change of address with Total Rewards.

## HOW COBRA CONTINUATION COVERAGE COULD END

Coverage under COBRA will end for you or your qualified beneficiaries if any of these situations occur:

- You do not make the required monthly payments on a timely basis.

- You or a qualified beneficiary obtain coverage under another group health plan (for example, the medical plan of a new employer).  This will not cause the continued coverage to terminate before the end of any period for which any benefits for pre-existing conditions are excluded or limited under another health care plan.  (Those who are not covered by the other plan can continue COBRA coverage under the usual rules.)

- You or a qualified beneficiary become entitled to Medicare.  (Those who are eligible for, but not enrolled in, Medicare can continue COBRA coverage under the usual rules, but subject to coordination of benefits provisions.)

- You reach the end of your continuation coverage period.

- Your coverage under the Program is cancelled for causes such as falsification of claims or obtaining prescription drugs under false pretenses.

- The Company cancels all group health plan coverage for it and all of its affiliates.

In such a situation, COBRA coverage will terminate, even if you or your dependent had not otherwise reached the end of the coverage period.

## COBRA COVERAGE FOR THE HEALTH CARE FSA

In order to have access to your Health Care FSA following a Qualifying Event (as described above), special rules under COBRA allow you to continue contributing on an after-tax basis.  If you continue making contributions for the rest of the calendar year, you can then submit claims for expenses incurred until the end of the year.  If you choose **not** to continue contributions with after-tax dollars, then you can submit claims only for expenses incurred through your termination date, up to the full amount you had elected and which was not previously reimbursed.  However, you cannot submit claims for expenses incurred after your termination date.

If you elect COBRA continuation, your contributions are after-tax, and you will receive no tax benefits by using your Health Care FSA.  However, after-tax contributions may be worthwhile if there is a significant amount of money credited to your account before you leave, and you do not have enough unreimbursed expenses incurred before you leave to use up the balance in your account.

### Are There Other Coverage Options Besides COBRA Continuation Coverage?

Yes.  Instead of enrolling in COBRA continuation coverage, there may be other coverage options for you and your family through the Health Insurance Marketplace, Medicaid, or other group health plan coverage options (such as a Spouse's plan) through what is called a "special enrollment period."  Some of these options may cost less than COBRA continuation coverage.  You can learn more about many of these options at www.HealthCare.gov.

National

### If You Have Questions.

If you have questions about COBRA continuation coverage, you can contact Discovery Benefits, Inc. at 1-866-451-3399.  If you have further questions, you may contact Total Rewards or the Plan Administrator.  For more information about your rights under ERISA, including COBRA, the Affordable Care Act, and other laws affecting group health plans, you may also contact the nearest Regional or District Office of the U.S. Department of Labor's Employee Benefits Security Administration (EBSA) in your area or visit www.dol.gov/ebsa.  (Addresses and phone numbers of Regional and District EBSA Offices are available through EBSA's website.)  For more information about the Marketplace, visit www.HealthCare.gov.

### Keep the Program Informed of Address Changes

To protect your family's rights, let the Plan Administrator know about any changes in the addresses of family members.  You also should keep a copy, for your records, of any notices you send to the Plan Administrator.

## OTHER IMPORTANT INFORMATION

## CLAIMS AND APPEALS PROCEDURES

> **EXHAUSTION OF REMEDIES**
> **You cannot institute any action or proceeding for a claim for benefits under the Program until you have exhausted the procedures relating to Claims and Appeals described in this Section, the brochures and the certificates.  All interpretations, determinations and decisions of the Committee or its delegates with respect to any claim or appeal are deemed final, conclusive and binding on all parties.**

If you wish to make a claim for benefits, you should refer to the relevant portion below.  If your claim relates to basic eligibility or the salary deferral feature, your claim should be filed with the Plan Administrator.  If your claim relates to the extent of specific coverage, your claim should be filed with the appropriate Claims Administrator.  Please note that if a benefit under the Program is provided through an insurance policy, the Committee has delegated to the insurer issuing such insurance policy all of the Committee's powers and duties relating to the interpretation and construction of that insurance policy.

## CLAIMS AND APPEALS – ELIGIBILITY OR SALARY DEFERRALS ONLY

If a claim relates only to your eligibility for a particular coverage (for example, whether you are a full-time employee eligible for long term disability coverage) or with respect to salary deferrals (for example, whether a deferral should be pre-tax or after-tax or a change in elections should be permitted), send the claim directly to the Committee.  In that event, the Program will follow the procedures described below under the Health Care FSA Claims and Appeals section.  Also, if facts about your employment are relevant to your claim, you should submit with your claim any information regarding such employment that you believe to be pertinent.  However, if you file a claim for benefits and your eligibility arises as an issue in regard to that claim, the procedures governing claims for that type of benefits will be followed.

If there is a final adverse determination of your claim, you may have the right to bring a civil action under ERISA.  See the pages captioned "Your ERISA Rights under the Vitamin Shoppe Industries Inc. Health and Welfare Benefits Program" later in this Guide.

## CLAIMS AND APPEALS – MEDICAL, DENTAL AND VISION PLANS

The procedures applicable to the processing of benefit claims and claim appeals submitted for Medical Plan (PPO and Puerto Rico) are stated in the particular brochure provided by UnitedHealthcare.  The procedures applicable to the processing of benefit claims and claim appeals submitted for the Hawaii Medical Plan are stated in the particular brochure provided by Kaiser Permanente.  For Medical benefits, the Medical Plan will comply with any additional claim and appeal rules required under the Affordable Care Act, to the extent applicable.  These rules do not apply to standalone dental or vision claims or to Health Care FSA claims.

The procedures applicable to the processing of benefit claims and claim appeals submitted for the Dental Plans (United HealthCare Dental and Hawaii Dental Service) are stated in the brochures provided with respect to the specific coverage.  Vision claims generally are made to VSP and the procedures applicable to the processing of benefit claims and claim appeals are stated in the brochure provided by VSP.  If you work in Hawaii and have elected to receive vision benefits through Kaiser Permanente, your vision claims are made to Kaiser Permanente and the procedures applicable to the processing of benefit claims and claim appeals are stated in the brochure provided by Kaiser Permanente.

## CLAIMS AND APPEALS -- HEALTH CARE FSA

Any claim you have with respect to participation, contributions, benefits or other aspects of the operation of the Health Care FSA must be made in writing to the Claims Administrator (see "Information About the

Program in Section X for contact information). With regard to a claim that is denied in whole or in part (for these purposes, a Card "swipe" that is denied is not considered a denied claim), the Claims Administrator will generally notify you of the decision in writing within thirty (30) days of receipt of the claim (this period may be extended by the Claims Administrator for an additional fifteen (15) days for matters beyond the control of the Claims Administrator, including in cases where a claim is incomplete). The Claims Administrator will provide written notice of any extension, including the reasons for the extension and the date by which a decision by the Claims Administrator is expected to be made. Where a claim is incomplete, the extension notice will also specifically describe the required information, will allow you forty-five (45) days from receipt of the notice in which to provide the specified information, and the period for making the determination will be tolled from the date on which the extension notice is sent to you until the date on which you respond to the plan's request for information.

The notice of a denied claim will set out the following:

- a specific reason or reasons for the denial;

- the specific plan provision on which the denial is based;

- a description of any additional material or information necessary for you to validate the claim and an explanation of why such material or information is necessary;

- appropriate information of the steps to be taken if you wish to appeal the Claims Administrator's decision, including your right to submit written comments and have them considered, your right to review (upon request and at no charge) relevant documents and other information, and your right to file suit under ERISA Section 502(a) with respect to any adverse determination after appeal of your claim, to the extent applicable.

If your claim is denied in whole or part and you wish to pursue your claim, you (or your authorized representative) must request review upon written application to the Committee. Your appeal must be made in writing within one hundred and eighty (180) days of your receipt of the notice that the claim was denied. If you do not appeal on time, you will lose the right to appeal the denial and the right to file suit in court, to the extent applicable. Your written appeal should state the reasons that you feel your claim should not have been denied. It should include any additional facts and/or documents that you feel support your claim. You will have the opportunity to ask additional questions and make written comments, and you may review (upon request and at no charge) documents and other information relevant to your appeal.

Your appeal will be reviewed and decided by the Committee or its delegate in a reasonable time not later than sixty (60) days after the Committee receives your request for review. The Committee or its delegate may, in its discretion, hold a hearing on the denied claim. Any medical expert consulted in connection with your appeal will be different from and not subordinate to any expert consulted in connection with the initial claim denial. The identity of a medical expert consulted in connection with your appeal will be provided. If the decision on review affirms the initial denial of your claim, you will be furnished with a notice of adverse benefit determination on review setting forth:

- the specific reason(s) for the decision on review;

- the specific plan provision(s) on which the decision is based;

- a statement of your right to review (upon request and at no charge) relevant documents and other information;

- if an "internal rule, guideline, protocol, or other similar criterion" is relied on in making the decision on review, a description of the specific rule, guideline, protocol, or other similar criterion or a statement that such a rule, guideline, protocol, or other similar criterion was relied on and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to you upon request;

- a statement of your right to bring suit under ERISA Section 502(a), to the extent applicable; and

National

- the following statement "You and your plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office."

<u>Salary Deferrals and Eligibility for a Particular Coverage</u>

The salary deferral feature of the Program is not subject to ERISA, but the same claims procedures described above for the Health Care FSA (except for references to a Card, medical experts, ERISA and voluntary alternative dispute resolution) will apply to claims with respect to salary deferrals. The claims procedures described above for the Health Care FSA also will apply to claims with respect to eligibility for a particular coverage.

## RELEASE OF INFORMATION

Please note that in order for your claim for benefits to be processed, disclosure by your health care provider(s) of "protected health information" to the particular Claims Administrator and/or to the Committee usually is required. Refusal to consent to or authorize the disclosure of relevant health information will in most cases constitute grounds to deny the claim for benefits.

## CLAIMS AND APPEALS – SHORT TERM DISABILITY INSURANCE; LONG TERM DISABILITY INSURANCE; LIFE AND ACCIDENT INSURANCE AND EMPLOYEE ASSISTANCE PROGRAM

The procedures applicable to the processing of benefit claims and claim appeals submitted for the STD, LTD, Life, AD&D and Optional Life Insurance coverages are stated in the certificate provided by the Insurer with respect to the specific insured benefit. Claims regarding the Employee Assistance Program are made to ComPsych by calling 1-844-491-1740.

The procedures applicable to the processing of benefit claims and claim appeals submitted for the Business Travel Accident Insurance coverage are stated in the certificate provided by the Insurer with respect to the specific insured benefit. You and/or your beneficiary have the right to make a written demand at any time for non-binding arbitration in the event of a dispute.

---

**ERISA STATUS:** The Medical, Dental, Vision, EAP, Health Care FSA, STD, LTD, Basic Life and AD&D, Optional Life, Critical Illness, Accident Coverage and and Business Travel Accident coverages are ERISA benefits and subject to that law.

---

## LIMITATIONS PERIODS AND JURISDICTION

You must fully exercise all claim and appeal rights provided in this Section U prior to bringing a civil action under ERISA Section 502(a) to recover benefits due you under the terms of the Program, to enforce your rights under the terms of the Program or to clarify your rights to future benefits under the terms of the Program. Furthermore, subject to any shorter period contained in an applicable Certificate, you may not bring any civil action seeking review of an appeal denial later than one (1) year after you have exhausted all your claim and appeal rights set forth above.

Should you decide to bring a civil action, you may seek and obtain such relief only in the federal district court whose jurisdiction includes Hudson County, New Jersey. By accepting benefits (whether the payment of such benefits is made to you, your covered dependents or on your or your covered dependents' behalf to any provider) from the Program, you and your covered dependents (and your or your covered dependents' representatives, agents, assigns, guardians, estates, heirs or beneficiaries) hereby submit to such jurisdiction, waiving whatever rights may correspond to you or your covered dependents (or your or your covered dependents' representatives, agents, assigns, guardians, estates, heirs or beneficiaries) by reason of your or your covered dependents' (or their) present or future domicile.

## COORDINATING BENEFITS WITH OTHER PLANS, SUBROGATION AND RIGHT OF RECOVERY

If you or a covered dependent incurs health expenses that also are covered by another health plan or by Medicare, the two plans work together to determine how your benefits are paid. This process is called "coordination of benefits."

If an expense is covered by two plans (with Medicare considered another plan for this purpose), one will have first responsibility for the expense – this is called the primary plan. When the primary plan has paid its benefits, the other plan may make additional payment, depending on its provisions. If the Program is primary, it will pay benefits as if it were the only plan. If the Program is secondary, it generally will calculate the benefits it would have paid if you had no other coverage, compare this amount to the benefits you have already received from your other plan, and pay only the difference, if any. Benefits paid under other plans include benefits that would have been paid if proper claims had been filed on time. More information is found in the certificate prepared by your Insurer or Claims Administrator.

The Program and the insurance policies under the Program also have features often referred to as "facility of payment," "right of recovery" and "subrogation." These terms refer to the right of the Program or the Insurers to recoup benefits paid to you or your covered dependent if the action causing the illness, injury or condition and consequent Program expenses was the fault of another person. These features also are described in the brochures prepared by your Insurer or Claims Administrator.

## FACILITY OF PAYMENT

Whenever payments which should have been made under the Program in accordance with its provisions have been made under any other plans, the Program shall have the right, exercisable alone and in its full discretion, to pay over to any organizations making such other payments any amounts it shall deem to be warranted in order to satisfy the intent of the coordination of benefits provision, and any amount so paid shall be deemed to be benefits paid under the Program and to the extent of such payments, the Program shall be fully discharged from liability.

Also, if you or your covered dependent incur expenses as a result of a condition, illness or accident (such as a fall in a store) for which payment may be available through another source, a claim may be submitted for these expenses and payment considered by the Program. The Program may advance benefit payment in order to assist the covered individual during his or her time of need. A covered individual may be asked to sign a "right of recovery agreement" prior to any such advancement of a Program payment. The Program will, however, have the right to recover from the responsible person any benefits paid even if such a "right of recovery agreement" was not signed. In addition, the Program will have the right to recover any payments that were made to, or on behalf of, a covered individual and which caused a duplicate payment to be made for the same expense or loss. These payments will be considered as overpayments under the Program. By accepting benefits under the Program, a covered individual agrees to cooperate with and assist the Program in recovering any benefits for which other payment is available. Acceptance of benefits from the Program automatically assigns to the Program any rights to recovery to the extent of payment made by the Program. Overpayments may also occur because a mistake is made regarding coverage, whether as to an expense item or to a currently covered individual.

## RECOVERY OF OVERPAYMENT

If the Program makes an overpayment, the Program will have the right, at any time, to:

- Recover that overpayment from the person to whom or on whose behalf it was made; or

- Offset the amount of that overpayment from a future claim payment,

National

irrespective of to whom such amount was paid. You or your covered dependent shall, upon request, execute and deliver such instruments and papers as may be required and shall do whatever else is necessary to secure such rights to the Program.

## SUBROGATION

As soon as the Program has paid any benefit to you or your covered dependent, the Program shall be subrogated to all rights of recovery you or your covered dependent have against any person who has made, or may be liable for or legally responsible for, payment to you or your covered dependent due to any injury, illness or condition, to the full extent of benefits provided or to be provided by the Program.

## REIMBURSEMENT

If you or your covered dependent receive any payment from any person (including from insurance coverage) as a result of an injury, illness or condition, the Program has the right to recover, and be reimbursed for, all amounts the Program has paid and will pay as a result of that injury, illness or condition, up to and including the full amount you or your covered dependent receive or are entitled to receive from such person even if any portion of such amount is for, or is designated as being for, damages other than those for which Program benefits were or may be provided.

## CONSTRUCTIVE TRUST

By accepting benefits (whether the payment of such benefits is made to you or your covered dependent or made on your or your covered dependent's behalf by any provider) from the Program, you or your covered dependent (and your or your covered dependent's representative, agent, assign, guardian, estate, heir or beneficiary) agree to serve as a constructive trustee over the funds that you or your covered dependent (or your or your covered dependent's representative, agent, assign, guardian, estate, heir or beneficiary) receive or may receive from a responsible person as a result of your or your covered dependent's injury, illness or condition. Failure to hold such funds in trust will be deemed a breach of your or your covered dependent's (and your or your covered dependent's representative's, agent's, assign's, guardian's, estate's, heir's or beneficiary's) fiduciary duty to the Program.

## LIEN RIGHTS

The Program will automatically have a lien to the extent of benefits paid by the Program for the treatment of the illness, injury, or condition for which the responsible person is liable. The lien shall be imposed upon any recovery, whether by settlement, judgment or otherwise, related to treatment for any illness, injury, or condition for which the Program paid benefits (with your or your covered dependent's representative, agent, assign, guardian, estate, heir or beneficiary as constructive trustee with respect to such recovery). The lien may be enforced against any person who possesses funds representing the amount of benefits paid by the Program including, but not limited to, you; your covered dependent; your or your covered dependent's representative, agent, assign, guardian, estate, heir or beneficiary; the responsible person; the responsible person's representative or agent (including the responsible person's insurer); or any other source. The lien shall not be subject to principles of unjust enrichment, assertion of a "common fund" doctrine or its equivalent or any other equitable defenses (including, but not limited, to a defense that the recovery is no longer in the possession of a constructive trustee or is otherwise dissipated or not traceable).

## FIRST-PRIORITY CLAIM

By accepting benefits (whether the payment of such benefits is made to you or on your behalf to any provider) from the Program, you and your covered dependents acknowledge that the Program's recovery rights are a first priority claim against all responsible persons and are to be paid to the Program before any other claim for your or your covered dependent's damages. The Program shall be entitled to full reimbursement on a first-dollar basis from any responsible person's payments, even if such payment to the Program will result in a

recovery that is insufficient to make you or your covered dependent whole or to compensate you or your covered dependent in whole or in part for the damages sustained. The Program is not required to participate in or pay court costs, expenses or attorney fees you or your covered dependent incur to pursue your or your covered dependent's damage claim.

## WORKERS COMPENSATION

If benefits are paid under the Program and the Program determines you received Workers Compensation benefits for the same incident, the Program has the right to recover, as described above with respect to the subrogation and right of recovery provisions. The Program's rights will be applied even though:

- The Workers Compensation benefits are in dispute or are made by means of settlement or compromise;
- No final determination is made that bodily injury or illness was sustained in the course of or resulted from your employment;
- The amount of Workers Compensation due to medical or health care is not agreed upon or defined by you or the Workers Compensation carrier; or
- The medical or health care benefits are specifically excluded from the Workers Compensation settlement or compromise.

You hereby agree that, in consideration for the coverage provided by this Program, you will notify the Program of any Workers Compensation claim you make, and that you agree to reimburse the Program as described above.

If benefits are paid under the Program, and you or your covered dependent recover from a responsible party by settlement, judgment or otherwise, the Program has a right to recover from you or your covered dependent an amount equal to the amount the Program paid.

## APPLICABILITY TO ALL SETTLEMENTS AND JUDGMENTS

The terms of these subrogation and right of recovery provisions shall apply, and the Program is entitled to full recovery, regardless of whether any liability for payment is admitted by any responsible person and regardless of whether your or your covered dependent's settlement or judgment identifies the benefits the Program provided or purports to allocate any portion of such settlement or judgment to payment of expenses other than expenses paid or payable by the Program. The Program is entitled to recover from any and all settlements or judgments, even those designated as pain and suffering, non-economic damages or general damages only.

## OFFSET RIGHTS

The Program has the right to offset against any future Program payments, benefits or obligations any amounts which you or your covered dependent have received as a recovery from a responsible person and have not already paid over to the Program in compliance with these subrogation and right of recovery provisions.

## COOPERATION

You and your covered dependents shall fully cooperate with the Program's efforts to recover its benefits paid. It is your and your covered dependents' duty to notify the Program within 30 days of the date when any notice is given to any person, including an insurance company or attorney, of your or your covered dependent's intention to pursue or investigate a claim to recover damages or obtain compensation due to an injury, illness or condition you or your covered dependents have sustained. You, your covered dependents and your and your covered dependents' agents shall provide all information requested by the Program, the Claims Administrators or their representatives including, but not limited to, completing and submitting any applications or other forms, statements or documents as the Program may reasonably request. You and your covered dependents (and your or your covered dependents' representatives, agents, assigns, guardians, estates, heirs or beneficiaries) agree to take any legal action that the Program deems necessary to protect and facilitate

National

enforcement of the Program's rights under these provisions.  Failure to provide this information, to file an appropriate action or to complete and submit any applications or other forms, statements or documents, may result in the termination of your or your covered dependents' Program benefits or the institution of court proceedings against you or your covered dependents (or your or your covered dependents' representatives, agents, assigns, guardians, estates, heirs or beneficiaries).

You and your covered dependents shall do nothing to jeopardize or prejudice the Program's subrogation or recovery interest or to jeopardize or prejudice the Program's ability to enforce the terms of these provisions. This includes, but is not limited to, refraining from making any settlement or recovery that attempts to reduce or exclude the full cost of all benefits provided by the Program.

You and your covered dependents acknowledge that the Program has the right to conduct an investigation regarding the injury, illness or condition in order to identify any responsible person.  The Program reserves the right to notify the responsible person and his or her agents of its lien and its subrogation and right of recovery rights, including the constructive trust provisions.  Agents include, but are not limited to, insurance companies and attorneys.

## INTERPRETATION

If a claim is made that these coordination of benefits, subrogation and right of recovery provisions are ambiguous or if questions arise concerning the meaning or intent of any of their terms, the Committee has the sole authority and discretion to resolve all disputes regarding the interpretation of these provisions.

## RELEASE OF INFORMATION

The Program may need additional facts or information to properly apply the coordination of benefits, subrogation or right of recovery provisions.  By filing a claim for benefits under the Program, you and your covered dependents authorize the Program to obtain, and the other plan(s) and your or your covered dependent's representative, agent, assign, guardian, estate, heir or beneficiary to release, such information as the Program deems necessary for the enforcement or administration of the Program's coordination of benefits, subrogation or right of recovery provisions.

## EARLY TERMINATION OF COVERAGE

Your or your covered dependents' coverage under the Program may be terminated prospectively, or cancelled retroactively, for causes such as falsification of claims, obtaining prescription drugs under false pretenses or wrongfully obtaining coverage for an ineligible individual.  The Program reserves the right to verify whether your covered dependents meet the applicable eligibility requirements, and failure to fully and timely respond to the request for verification may result in termination of coverage for your dependents.

## LIMITATIONS ON ACCESS TO PROTECTED HEALTH INFORMATION

## PRIVACY RULE

In fulfillment of the requirements of the "Privacy Rule" under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the following provisions apply to the Medical Plan, the Dental Plan, the EAP and the Health Care FSA maintained under the Program but only if the Company has access to protected health information ("PHI"):

Access to PHI.  Consistent with the Privacy Rule, only those persons holding positions with the Company and its Affiliates, as identified below, shall be permitted access to individually identifiable health information of Program participants and beneficiaries deemed PHI under the Privacy Rule.  Such persons shall be restricted in their use and disclosure of PHI to Program administrative purposes such as those described as "payment" and "health care operations" under the Privacy Rule.  More particularly, such uses and disclosures may include: evaluating the Program's claims experience; seeking proposals for insurance or reinsurance of Program benefits; reporting to stop-loss carriers, if any; administering case, quality and utilization management programs; determining the application of Program provisions to particular claims; and assisting covered persons with claims advocacy to external decision makers.

The classes of positions within the workforce of the Company or its Affiliates that may receive, use, disclose or have access to PHI for the purposes set forth above are:

- Members of the Benefits Committee;
- Total Rewards group and Human Resources Department supervisors and personnel;
- Finance Department supervisors and personnel; and
- Loss Prevention supervisors and personnel; and
- Legal Counsel.

This list does not limit participant or beneficiary disclosures.

Reporting Disclosures of PHI.  Participants or beneficiaries of the Program with knowledge that:

- employees of the Company or its Affiliates, other than employees in the positions identified in above, have used or disclosed PHI;
- employees in the positions identified above have used or disclosed PHI outside the scope of Program administration (as more fully described above; or
- employees of the Company or its Affiliates have acted contrary to the Company covenants described below, may report such non-conforming activity to the Program's Privacy Officer, as identified in the Program's Notice of Privacy Practices, who will work with appropriate Program and Company personnel to correct the breach or deficiency, mitigate the effect of the breach or deficiency, and impose appropriate disciplinary sanctions.

Program Sponsor Certification Requirement.  In accordance with the certification requirement of Section 164.504(f)(2)(ii) of the Privacy Rule, the Company hereby certifies that it will:

- not use or further disclose PHI created in connection with the Program except as required by law or for Program administrative purposes as described above, as such administrative purposes may be modified from time to time;
- arrange for any agents or subcontractors of the Company or its Affiliates that receive PHI to use and disclose PHI consistent with the above;

- not use or disclose PHI for employment-related actions or in connection with benefits or benefit plans outside the scope of what the Company has, for Privacy Rule purposes, deemed the health care component of the Program except when authorized to do so by the covered person;

- report to the Program any use or disclosure, of which it becomes aware, of PHI that is inconsistent with the uses or disclosures provided for above;

- make available to the Program the PHI in any "designated record set" (as such term is defined in the Privacy Rule) related to covered persons that the Company or its Affiliates have control of, in accordance with the access requirements of the Privacy Rule;

- make available for amendment, to the extent required by the Privacy Rule, PHI in a designated record set which is related to covered persons;

- make information available to the Program for, or provide the Program with, an accounting of disclosures of PHI (to the extent required by the Privacy Rule, e.g., other than for treatment, payment, health care operations or other exempt purposes) related to covered persons in response to such persons' exercise of their rights under the Privacy Rule;

- make its internal practices, books and records relating to the use and disclosure of PHI received from the Program available to the Secretary of the Department of Health and Human Services to assist the Secretary in determining Program compliance with the Privacy Rule;

- where feasible, return to the Program or destroy any PHI received from the Program when such PHI is no longer needed by the Company or its Affiliates for the purposes that permitted the Program to make the disclosure and, where return or destruction is not feasible, to limit the future use of such PHI to the situations that make its return or destruction not feasible; and

- restrict access of employees to the PHI related to the Program, other than as subjects of the PHI, except where such employees are in job classifications designated above and engaged in the use or disclosure of PHI for the purposes described above.

## SECURITY RULE

In fulfillment of the requirements of Section 164.314(b)(1) of the security rule under HIPAA (the "Security Rule"), the following provisions apply to the Medical Plan, the Dental Plan and the Health Care FSA maintained under the Program but only if the Company has access to PHI.  In such event, the Company hereby certifies that it will:

- implement administrative, physical, and technical safeguards (including written policies and procedures) that reasonably and appropriately protect the confidentiality, integrity and availability of electronic PHI that it creates, receives, maintains or transmits on behalf of the Program, as required by the Security Rule;

- ensure that any agents (including subcontractors), to whom it provides electronic PHI received from, or created or received by the Program, agree to implement reasonable and appropriate safeguards to protect the Program's electronic PHI;

- report to the Program any security incidents of which it becomes aware.  For this purpose a security incident means the attempted or successful unauthorized access, use, disclosure, modification, destruction of information or interference with system operations in an information system and such other incidents as are identified in the Security Rule from time to time; and

- ensure that adequate separation between the Program and the Company required by Section 164.504(f)(2) of the Privacy Rule is supported by reasonable and appropriate security measures.

National

# ADDITIONAL INFORMATION

## HOW BENEFITS MAY BE FORFEITED OR DELAYED

There are certain situations under which reimbursements may be forfeited or delayed. Most of these circumstances are spelled out in the previous sections, but payments also may be forfeited or delayed if you:

- do not file a claim for reimbursement properly or on time (see "Your Rights Under ERISA");
- do not furnish information required to complete or verify a claim; or
- do not have a current address on file with the Company or the particular Claims Administrator.

To the extent the Program is self-insured, uncashed checks for the payment of benefits will not escheat to the state, but will be used to offset the administrative costs of the Program. The Plan Administrator is entitled to rely on the last address you provided to the Program and has no obligation to search for or ascertain your whereabouts. If the Plan Administrator determines that there are no extenuating circumstances, after one (1) year of the date of the check (unless a Program document expressly provides for a different period), the Program's obligation to pay the benefit underlying the uncashed check is extinguished.

You also should be aware that if the Program mistakenly pays a greater benefit than a person is eligible for, or pays benefits that were not authorized by the Program, the Plan Administrator or its delegates may seek any permissible remedy allowed by law to recover benefits paid in error.

## CLAIM FRAUD

The Claims Administrators regularly evaluate claims to detect fraud or false statements and will notify the Company regarding these matters. If a claim has been submitted for payment or paid by the Program as a result of fraudulent representations, the Committee or the Claims Administrators may seek reimbursement, and also may elect to pursue the matter by pressing criminal charges. Falsification of claims or of dependent eligibility information is grounds for disciplinary action, up to and including termination of employment, and possible civil action.

## COMPLIANCE WITH FEDERAL LAW

The Program is governed by regulations and rulings of the IRS and the U.S. Department of Labor, and current federal income tax law. The Program always will be construed to comply with these regulations, rulings and laws. Generally, the federal law "pre-empts" (that is, takes precedence over) state law.

## COLLECTIVE BARGAINING AGREEMENTS

The Program may also be referred to in collective bargaining agreements entered into by, or applicable to, your employer. You may ask Total Rewards whether a collective bargaining agreement applies to you.

## OWNERSHIP OF BENEFITS

- The benefits described here are exclusively for Program participants. Except as provided by the Program, the Code, the Puerto Rico Internal Revenue Code or ERISA, no monies, property or equity of any nature whatsoever under the Program or contracts, policies, benefits, or monies payable therefrom are subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, attachment, encumbrance, garnishment, mortgage, lien, or charge of any kind, nor shall any health or welfare benefit, until actually paid to you (or your estate or beneficiary), be in any manner subject to your debts or liabilities;
- Any attempt to alienate, sell, transfer, assign, pledge or otherwise encumber any such benefit, prior to receipt thereof by you (or your or beneficiary), in violation of the restrictions set forth above is void and of no effect; and

▪ Benefit payments (or portions thereof) under the Program are not in any way subject to any legal process, execution, attachment or garnishment, cannot be used for the payment of any legal claim against you (or your estate or beneficiary) and are not subject to the jurisdiction of any bankruptcy court or insolvency proceedings by operation of law or otherwise.

▪ Notwithstanding the foregoing, you may request that, in the discretion of the Plan Administrator, a payment or reimbursement for a benefit that is covered under the Program that you have a right to receive, instead be paid to a qualified health care provider who has provided the services for which such payment or reimbursement is claimed.  Where benefits are paid directly to a doctor, hospital or other provider of care (other than to a state Medicaid agency), such direct payments are provided in the discretion of the Plan Administrator as a convenience to you and do not imply an enforceable assignment of Program benefits or the right to receive such benefits.  If there is any dispute as to whether a request made pursuant to this provision should be honored, the Committee's decision shall be final, binding and conclusive on all affected parties.

## PROGRAM ADMINISTRATION

Your benefits as a participant in the Program are provided under the terms of the Program, as well as the insurance policies and administrative services contracts, if any, issued to the Company.  The Program is maintained for the exclusive benefit of Program participants.  The Plan Administrator has the exclusive authority and sole and absolute discretion to interpret the Program, to determine eligibility for benefits, and to make any factual determination, resolve factual disputes, and decide all matters in connection with the interpretation, administration and operation of the Program or the determination of eligibility for benefits.

Under the Program, the Plan Administrator may delegate some or all of its powers and duties relating to the interpretation and construction of the Program to a third party.  The Plan Administrator has delegated general responsibility for the Program to the Committee, and also has delegated certain responsibilities to the Claims Administrators.  The Claims Administrators generally have complete authority and sole and absolute discretion to determine whether you have incurred a covered expense for which reimbursement may be payable under their portion of the Program and to determine the amount of, and administer the payment of, any such reimbursements under the Program.  Further, the Plan Administrator has delegated to each Insurer that has issued an insurance policy or contract under the Program the authority to interpret conclusively its own policy or contract.  In addition, the Plan Administrator may delegate some of its routine administrative duties under the Program to Total Rewards.

Except as otherwise provided herein, all decisions of the Plan Administrator, the Claims Administrators and the Insurers shall be conclusive and binding upon all similarly situated individuals.  Please note that no other person or group has any authority to interpret the terms of the Program (or Program documents), or to make any promises to you about them.

## AMENDMENT OF PROGRAM

The Company reserves the right to amend, modify, suspend or terminate all or any portion of the Program at any time by action of an authorized officer as provided in the Program document.

## INFORMATION ABOUT THE PROGRAM

| Plan Name | Policy/Group Number | Type of Plan | Claims Administrator or Insurer | Phone Number | Web / Email Address |
|---|---|---|---|---|---|
| Vitamin Shoppe Industries Inc. Health & Welfare Benefits Program | Plan Number 501 | Welfare Benefit Plan | Benefits Administration 300 Harmon Meadow Blvd. Secaucus, NJ 07094 | (201)552-6000 | vstotalrewards@ vitaminshoppe.com |
| Medical PPO Plans | 908882 | Self-Insured | United HealthCare Services, Inc. 9900 Bren Road East Minnetonka, MN 55343  For appeals, contact: | (866) 633-2482 for UHC PPO 350 and Puerto Rico plans and (866) 734-7678 | www.myuhc.com |

| Plan Name | Policy/Group Number | Type of Plan | Claims Administrator or Insurer | Phone Number | Web / Email Address |
|---|---|---|---|---|---|
| | | | United HealthCare - Appeals P.O. Box 30432 Salt Lake City, UT 84130-0432 | for UHC PPO 2000 plan | |
| **Prescription Drug Benefits Under the PPO Plans** | 908882 | Self-Insured | Optum RX P O Box 29077 Hot Springs, AR  71903 | (866) 633-2482 for UHC PPO 350 and Puerto Rico plans and (866) 734-7678 for UHC PPO 2000 plan | www.myuhc.com |
| **Virtual Visits Program** | | Self-Insured | Virtual Visits | None | Log in to www.myuhc.com and select "Virtual Visits" |
| **Puerto Rico Medical Plan** | 908882 | Fully Insured | United HealthCare Services, Inc. 9900 Bren Road East Minnetonka, MN  55343 | (866) 633-2482 | www.myuhc.com |
| **Hawaii Medical Plan** | 04720 | Fully-Insured | Kaiser Permanente 711 Kapiolani Boulevard Honolulu, Hawaii 96813, Attention:  Customer Service Center | Oahu: (808) 432-5955 Neighbor Islands: (800) 966-5955 | www.kp.org |
| **Wellness Program** | | Self-insured | Virgin Pulse | (888) 671-9395 | www.join.virginpulse.com |
| **WorkStride Program** | | Self-Insured | Johns Hopkins | (844) 446-6229 | www.workstride.org |
| **Balance Program** | | Self-Insured | Johns Hopkins | | www.healthy.works/balance/ |
| **Dental Plan** | 908882 | Self-Insured | UnitedHealthcare P.O. Box 30432 Salt Lake City, UT  84130-0432 | (877) 816-3596 | www.myuhc.com |
| **Hawaii Dental Service** | Group No. 3910-0001 | Fully Insured | Hawaii Dental Service Attn:  Customer Service 700 Bishop Street, Suite 700 Honolulu, HI  96813-4196 | (800) 232-2533 | www.HawaiiDentalService.com |
| **Vision Plan** | 12297484 | Fully Insured | Vision Service Plan Insurance Company 3333 Quality Drive Rancho Cordova, CA  95670 | (800) 877-7195 | www.vsp.com |
| **Employee Assistance Plan** | | Fully Insured | ComPsych Corporation NBC Tower - 13th Floor 455 N. Cityfront Plaza Drive Chicago, IL 60611 | (844) 491-1740 | www.guidanceresources.com; Web ID:  VitaminEAP |
| **Health Care FSA** | | Self-Insured | Discovery Benefits, Inc. P O Box 2079, -Omaha, NE 68103-2079 | 1-866-451-3399 | https://www.discoverybenefits.com |
| **Short Term Disability Plan** | VPS 325478 | Fully Insured | Reliance Standard Insurance Company 2001 Market Street, Suite 1500 Philadelphia, PA  19103-7090 | (800) 351-7500 | www.rsli.com |
| **Long Term Disability Plan** | LTD 120148 | Fully Insured | Reliance Standard Insurance Company 2001 Market Street, Suite 1500 Philadelphia, PA  19103-7090 | (800) 351-7500 | www.rsli.com |
| **Basic Life, AD&D and Optional Life Insurance Plans** | 237729 | Fully Insured | Sun Life Assurance Company of Canada One Sun Life Executive Park, SC3331 Wellesley Hills, MA  02481 | (800) 247-6875 from 8am to 8pm EST | www.sunlife.com/us |
| **Critical Illness Insurance** | | Fully Insured | Sun Life Assurance Company of Canada One Sun Life Executive Park, SC3331 Wellesley Hills, MA  02481 | (877) 820-5306 | www.sunlife.com/us |
| **Accident Insurance** | | Fully Insured | Sun Life Assurance Company of Canada One Sun Life Executive Park, SC3331 Wellesley Hills, MA  02481 | (877) 820-5306 | www.sunlife.com/us |

| Plan Name | Policy/Group Number | Type of Plan | Claims Administrator or Insurer | Phone Number | Web / Email Address |
|---|---|---|---|---|---|
| **Business Travel Accident Plan** | 6477-42-41 | Fully Insured | Federal Insurance Company Chubb Group of Insurance Companies 15 Mountain View Road P.O. Box 1615 Warren, NJ 07061-1615 | U.S. & Canada: (888) 987-5920 International Collect: (240) 330-1571 | www.chubb.com/travelhelp/eb.html group ID: H2CHEB; password: 20130503 |
| **COBRA** | 132993785-NC | | Discovery Benefits, Inc. P O Box 2079, -Omaha, NE 68103-2079 | 1-866-451-3399 | https://www.discoverybenefits.com |

# PROGRAM FACTS

| | |
|---|---|
| Program Name | Vitamin Shoppe Industries Inc. Health and Welfare Benefits Program |
| Type of Plan | Welfare Benefits |
| Program Sponsor | Vitamin Shoppe Industries Inc. |
| Employer Identification Number<br>Plan Number | 13-2993785<br>501 |
| Plan Administrator and Named Fiduciary | Vitamin Shoppe Industries Inc.<br>300 Harmon Meadow Blvd.<br>Secaucus, NJ  07094 |
| Agent for Service of Legal Process | Vitamin Shoppe Industries Inc.<br>Health and Welfare Benefits Program<br>300 Harmon Meadow Blvd.<br>Secaucus, NJ  07094<br>ATTN:  General Counsel |
| Plan Year<br>(Financial Records of the Program are kept on a Plan Year basis) | |
| Plan Funding | January 1 – December 31 |
| Employers participating as of January 1, 2019 and EINs | Vision, STD, LTD, AD&D, Business Travel Accident and Life Insurance, Accident and Critical Illness benefits are funded through the purchase of insurance policies.  PPO and Puerto Rico Medical coverages and the FSA are self-insured by the Company.  Hawaii Medical is insured.  Dental coverage is insured or self-insured, depending on the option available to you.  You make contributions toward the costs of certain coverages. |

| Name | EIN # |
|---|---|
| Vitamin Shoppe, Inc. | 11-3664322 |
| Vitamin Shoppe Industries Inc. | 13-2993785 |
| Vitamin Shoppe Mariner, Inc. | 46-1516298 |
| Vitamin Shoppe Global, Inc. | 46-3461168 |
| Vitamin Shoppe Procurement Services, Inc. | 47-2188021 |
| FDC Vitamins, LLC d/b/a Nutri Force Nutrition | 76-0846590 |
| Hercules, LLC | 46-5767963 |

## YOUR ERISA RIGHTS UNDER THE VITAMIN SHOPPE INDUSTRIES INC. HEALTH AND WELFARE BENEFITS PROGRAM

### *ERISA ENTITLES YOU TO THE FOLLOWING:*

#### *Receive Information about Your Program and Benefits*

- Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites, all documents governing the Program, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the Program with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration (formerly known as the Pension and Welfare Benefits Administration).

- Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Program, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The Plan Administrator may make a reasonable charge for the copies.

- Receive a summary of the Program's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

#### *Continue Group Health Plan Coverage*

- Continue health care coverage for yourself, your Spouse or your dependents if there is a loss of coverage under the Program as a result of a Qualifying Event. You or your dependents may have to pay for such coverage. Review this summary plan description and the documents governing the Program on the rules governing your COBRA continuation coverage rights.

- Reduction or elimination of exclusionary periods of coverage for preexisting conditions under your group health plan.

#### *Prudent Actions by Program Fiduciaries*

In addition to creating rights for Program participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate the Program, called "fiduciaries" of the Program, have a duty to do so prudently and in the interest of you and other Program participants and beneficiaries. No one, including your employer, your union or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or from exercising your rights under ERISA.

#### *Enforce Your Rights*

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Program documents or the latest annual report from the Program and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator. If you have a claim for benefits, which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. In addition, if you disagree with the Program's decision or lack thereof concerning the qualified status of a medical child support order, you may file suit in Federal court. If it happens that Program fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If

you are successful the court may order the person you have sued to pay these costs and fees.  If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

*Assistance with Your Questions*

If you have any questions about the Program, you should contact the Plan Administrator.  If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210.  You also may obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

National

## KEY TERMS & DEFINITIONS

In addition to the terms defined below, certain terms have special meanings when used in the descriptions of the coverages on the previous pages. These terms, which may not have the same meaning as in ordinary usage, generally are defined in the applicable certificate.

**Affiliate** is a business entity that is at least 80% owned, either directly or indirectly, by the Company or an entity that is in the same controlled group of entities as the Company.

**Affordable Care Act** means the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Act of 2010, as such amends the applicable provisions of the Code, ERISA, and the Public Health Service Act, and regulations thereunder.

**Annual Enrollment Period** means the annual enrollment period in Autumn when eligible Employees can make their benefits coverage elections.

**Card** is the debit card which may be available for your use in connection with the Health Care FSA, as described beginning on page H-4.

**Certificate** means a brochure, booklet or similar communication issued by an Insurer or other Claims Administrator that contains detailed information regarding a particular benefit offering. For those coverage for which there is a Certificate, the information in this Guide is only an overview and is incomplete without reference to the Certificate. If there is a discrepancy between the information in this Guide and the Certificate, the Certificate should be considered more accurate.

**Change in Status** means any of the qualifying events listed in #3 on page B-2.

**Child** means a natural child, a stepchild, a legally-adopted child, a child placed with you for adoption, a child placed with you as a foster child, a grandchild in your court-ordered custody or a child for whom the Company has received a "qualified medical child support order" ("QMCSO"). A copy of the procedures used by the Plan Administrator to determine if a medical child support order is a QMCSO under the Program may be obtained free of charge from Total Rewards. For purposes of eligibility under the Program, the term "your Child" includes the Child of your Domestic Partner named on an Affidavit of Domestic Partnership.

**Claims Administrator** is a company that reviews claims directly and is responsible for processing and initially determining whether you have incurred an eligible expense for which reimbursement may be payable under the Program or whether coverage is available under the Program. Claims Administrators initially determine the amount of, and administers the payment of, coverage availability or reimbursements under the self-insured components of the Program. Claims Administrators also may provide customer service for Program participants. Claims Administrators that are Insurers have been delegated the authority to make final decisions regarding the policies or contracts they have issued.

**Code** means the U.S. Internal Revenue Code of 1986, as amended. References to sections of the Code include Treasury regulations thereunder.

**Committee** is the Benefits Administration Committee for the Vitamin Shoppe Industries Inc. Health and Welfare Benefits Program. You may write the Committee at: Benefits Administration Committee, Vitamin Shoppe Industries Inc. Health and Welfare Benefits Program, c/o Vitamin Shoppe Industries Inc., 2101 91st Street, North Bergen, NJ 07047.

**Company** generally means Vitamin Shoppe Industries Inc. or an Affiliate of Vitamin Shoppe Industries Inc. that has elected, with the permission of Vitamin Shoppe Industries Inc., to have some or all of its employees

eligible for participation in the Program.  The participating employers as of January 1, 2019 are listed in the chart on page X-1.  However, when used in connection with the amendment, termination or administration of the Program, the term "Company" means Vitamin Shoppe Industries Inc., or any successor thereto.

**Dependent** has different meanings under the Program.  A dependent generally means a Spouse or any individual you are eligible to claim as a dependent on your federal income tax return.  However, there are individuals, such as a Domestic Partner and his or her dependents, who can be covered by a Company group health plan, but might not be eligible to have premiums for such benefits paid on a pre-tax basis, or to have expenses reimbursed under the Health Care FSA.  Further, some individuals may be considered dependents for purposes of having premiums paid pre-tax under the Pre-Tax Premium Payment Plan or having expenses reimbursed under the Health Care FSA, but not for the Dependent FSA, for example, because such individual is not under age 13.

**Domestic Partner** means the individual with respect to whom an associate has filed an Affidavit of Domestic Partnership with the Company and that relationship has not ended through either death of the partner or the filing of an Affidavit of Termination of Domestic Partnership with the Company.

**Employee**, for purposes of the Program, means an individual who is regularly employed full-time or part-time by, and is paid on the regular U.S. payroll of, the Company.  Certain hourly payroll and all temporary employees, or anyone in a class of employees excluded from Program participation by the Company, are generally not eligible to participate in some or all components of the Program, nor are employees covered by a collective bargaining agreement unless the agreement and the Program provide for such Program participation.  Individuals employed by Affiliates that are not participating employers in the Program are not eligible for coverage under the Program.  An individual classified as an independent contractor or a leased employee by the Company, or any individual who provides services to the Company while being paid for such services by a business other than the Company, shall not be considered an Employee even if this individual is considered a common law employee of the employer for any other purpose.

**ERISA** means the Employee Retirement Income Security Act of 1974, as amended, and regulations issued thereunder.

**FSA** means a Health Care Flexible Spending Account.

**Insurer** means an insurance carrier or other health services corporation issuing any policy or contract that provides any of the benefits offered through this Program.

**IRS** means the U.S. Internal Revenue Service.

**Plan** means a component of the Program, such as the medical plan, vision plan, the dental plan, the flexible spending account plan, the disability plan or the life insurance plan.

**Plan Administrator** for the Vitamin Shoppe Industries Inc. Health and Welfare Benefits Program is Vitamin Shoppe Industries Inc.  Vitamin Shoppe Industries Inc. has delegated day-to-day administrative responsibility for the Program to Total Rewards.  You may write to Total Rewards (Vitamin Shoppe Industries Inc. Health and Welfare Benefits Program), c/o Vitamin Shoppe Industries Inc., 2101 91st Street, North Bergen, NJ  07047.

**Plan Year** means the calendar year.

**Program** means the Vitamin Shoppe Industries Inc. Health and Welfare Benefits Program, which includes component Plans such as the medical plan, vision plan, the dental plan, the flexible spending account plan, the disability plan and the life insurance plan.

National

**Qualifying Event** means one of the changes in circumstances that may make you or your covered dependent eligible for COBRA continuation coverage of group health coverage under the Program.

**Reasonable and Customary (R&C)** charge generally means the prevailing charge made by providers of similar expertise for a similar procedure in a particular geographic area, as determined by the relevant Claims Administrator.  A specific certificate may use a variation on this term, e.g. UCR in an United Healthcare Certificate, or a variation on this definition; the specific definition used in a certificate will govern as to benefits provided under that certificate.

**Spouse** generally means, at the time in question, a lawful opposite-sex or same-sex spouse (including a common-law spouse in states where that is recognized) as determined under the laws of the jurisdiction in which the marriage occurred.  However, for state and local tax purposes there may be differences in the treatment of same-sex spouses and opposite-sex spouses.  You can contact Total Rewards for more information about such possible differences or if you have a question whether a particular provision applies to your same-sex spouse.  Also, consult your own tax advisor for more information.   All uses in this SPD of terms such as "married" refer to marriage to such a Spouse.  Please note that a civil union generally is not considered marriage for these purposes.

**Total Rewards** means the Total Rewards division of the Human Resources Department of the Company.  You generally can obtain information about the Program and the benefits offered under the Program by calling Total Rewards at 1-800-670-8747, 8:30 A.M. to 5:00 P.M. Eastern time Monday through Friday, or email them at VStotalrewards@vitaminshoppe.com.

National

## Index

Benefit Commencement Date ....................................B-1
CHIP ...............................................................................B-2
Claims and Appeals.......................................................R-1
COBRA.....................................................................H-3, Q-1
Collective Bargaining Agreements ..............................R-10
Company...........................................................................1
Dependents ..................................................................B-1
Eligible ...........................................................................B-1
Elimination Period ........................................................J-1
Employee Assistance Program.....................................G-1
Employer...........................................................................1
Employer Identification Number ................................S-1
ERISA..............................................................................R-3
Flexible Spending Account (FSA)..................................H-1
FMLA..............................................................................B-4
Guide ................................................................................1
Health Savings Account (HSA) ...................................C-22
HIPAA.............................................................................R-7
Kaiser Permanente .....................................................C-30

Named Fiduciary .........................................................S-1
Network Providers ......................................................B-7
Non-Tobacco User Discount........................................C-2
Participating Employers ..............................................S-1
Plan Administrator ......................................................S-1
Plan Number ................................................................S-1
Plans ............................................................................A-1
Pre-Tax Premium Plan ................................................B-3
Program.......................................................................A-1
Program Administration............................................R-11
Program Sponsor.........................................................S-1
Protected Health Information (PHI) ...........................R-7
Reasonable & Customary ...........................................C-1
Special Enrollment Period ..........................................B-2
Virtual Visits ................................................................D-1
Vision Service Plan (VSP)............................................F-1
Wellness Program ......................................................C-2
Workers Compensation ..............................................R-6

56299531v.9

# EXHIBIT "E"



STD - PRA        

United HealthCare Services, Inc.
GREENSBORO SERVICE CENTER
PO BOX 740800
ATLANTA GA 30374-0800
PHONE: 1-877-842-3210

# PROVIDER
# REMITTANCE ADVICE

| | |
|---|---|
| DATE: | 09/10/20 |
| TIN: | 463500730 |
| NPI: | 1609271295 |
| PAYEE NAME: | OASIS MEDICAL AND SURGICAL WEL |
| TRACE NUMBER: | TV 12127246 |
| PAYMENT: | $0.00 |
| GROUP NUMBER: | 908882 |
| GROUP NAME: | VITAMIN SHOPPE INDUSTRIES |

OASIS MEDICAL AND SURGICAL WEL
SUJAL P PATEL MD
85 HARRISTOWN RD STE 103
GLEN ROCK NJ 07452

## PATIENT: FRANK ███████████

| | | | | |
|---|---|---|---|---|
| SUBSCRIBER ID: | A 916077154 | SUBSCRIBER NAME: | | CLAIM NUMBER: CC57121810 0148040323 |
| CLAIM DATE: | 03/06/20-03/06/20 | DATE RECEIVED: | 06/08/20 | PRODUCT: CHOYC+ |
| REND PROV ID: | 1467748301 | REND PROV: | S. P PATEL MD | |

| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CD | CLM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| 000100013633 | | | | | $26,481.34 | | | | $0.00 | $26,481.34 |

### SERVICE LINE DETAIL(S)

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 03/06/20 - 03/06/20 | | 64999 | RT | | 1 | | $26,481.34 | | $26,481.34 | PR | 50 | $0.00 | 0N, N661 |
| CLAIM# CC57121810 0148040323 | | | | | SUBTOTAL | | | $26,481.34 | | $26,481.34 | | | $0.00 | |

PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

| | | | | |
|---|---|---|---|---|
| SUBSCRIBER ID: | A 916077154 | SUBSCRIBER NAME: | | CLAIM NUMBER: CE75278846 0148227222 |
| CLAIM DATE: | 03/06/20-03/06/20 | DATE RECEIVED: | 03/19/20 | PRODUCT: CHOYC+ |
| REND PROV ID: | 1467748301 | REND PROV: | S. P PATEL MD | |

| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CD | CLM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| 000100013633 | | | | | $52,962.68 | | | | $0.00 | |

### SERVICE LINE DETAIL(S)

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CP5U5W9D DCW1 | 03/06/20 - 03/06/20 | | 64999 | RT | | 1 | | $26,481.34 | | $26,481.34 | CO | 226 | $0.00 | B6, N706 |
| CP5U5W9D DCW1 | 03/06/20 - 03/06/20 | | 64999 | RT | | 1 | | $26,481.34 | | $26,481.34 | CO | 226 | $0.00 | B6, N706 |
| CLAIM# CE75278846 0148227222 | | | | | SUBTOTAL | | | $52,962.68 | | $52,962.68 | | | $0.00 | |

WE DENIED CLAIM NUMBER CA07711485 0128987407 RECEIVED ON 03/19/20 BECAUSE THE INFORMATION REQUESTED ON 04/20/20 HAS NOT BEEN RECEIVED.

PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

| | | |
|---|---|---|
| | TOTAL PAYABLE TO PROVIDER | $0.00 |

STD - PRA

 UnitedHealthcare®

# PROVIDER
# REMITTANCE ADVICE

DATE: 09/10/20
TIN: 463500730
NPI: 1609271295
PAYEE NAME: OASIS MEDICAL AND
SURGICAL WEL
TRACE NUMBER: TV 12127246
PAYMENT: $0.00
GROUP NUMBER: 908882
GROUP NAME: VITAMIN SHOPPE
INDUSTRIES

NOTES

CO226    CONTRACTUAL OBLIGATIONS - INFORMATION REQUESTED FROM THE BILLING/RENDERING PROVIDER WAS
NOT PROVIDED OR NOT PROVIDED TIMELY OR WAS INSUFFICIENT/ INCOMPLETE.

PR50    PATIENT RESPONSIBILITY - THESE ARE NON-COVERED SERVICES BECAUSE THIS IS NOT DEEMED A 'MEDICAL
NECESSITY' BY THE PAYER.

0N    PAYMENT FOR THIS SERVICE IS DENIED. OUR CLINICAL STAFF REVIEWED THE INFORMATION SENT AND
DETERMINED THAT THE SERVICE WAS NOT MEDICALLY NECESSARY. YOUR BENEFIT PLAN ONLY COVERS
SERVICES THAT ARE MEDICALLY NECESSARY. A NETWORK PROVIDER MAY NOT BILL THE MEMBER UNLESS
WRITTEN PERMISSION WAS GIVEN BEFORE THE SERVICE WAS RECEIVED.

B6    BENEFITS FOR THIS SERVICE ARE DENIED. WE SENT A LETTER TO THE PROVIDER ASKING FOR ADDITIONAL
INFORMATION. WE HAVE NOT RECEIVED A RESPONSE.

N661    DOCUMENTATION DOES NOT SUPPORT THAT THE SERVICES RENDERED WERE MEDICALLY NECESSARY.

N706    MISSING DOCUMENTATION.

THE MEMBER, PROVIDER, OR AN AUTHORIZED REPRESENTATIVE MAY REQUEST RECONSIDERATION OR APPEAL THE DECISION BY SUBMITTING COMMENTS,
DOCUMENTS OR OTHER INFORMATION TO UNITEDHEALTHCARE. NETWORK PROVIDERS SHOULD REFER TO THE ADMINISTRATIVE GUIDE FOR CLAIM
RECONSIDERATION OR APPEAL INFORMATION. IF YOU ARE A NETWORK PROVIDER APPEALING A CLINICAL OR COVERAGE DETERMINATION ON BEHALF OF
A MEMBER, OR A NON-NETWORK PROVIDER APPEALING A DECISION ON BEHALF OF A MEMBER, FOLLOW THE PROCESS FOR APPEALS IN THE MEMBER'S
BENEFIT PLAN DOCUMENT.  DECISIONS ON APPEALS MADE ON BEHALF OF MEMBERS WILL BE COMPLETED IN 30 DAYS OF SUBMISSION OR WITHIN THE
TIMEFRAME REQUIRED BY LAW.

UnitedHealthcare is improving service to you by adopting electronic payments & statements (EPS) as a standard way to pay claims. EPS will dramatically
reduce the time and effort your organization spends on administering paper checks and explanation of benefits.  Get a head start and enroll today by
selecting the electronic payments & statements link found on the home page www.UHCprovider.com or contact us at 1-866-UHC-FAST
(1-866-842-3278), option 5.  For more information about our free or low cost solutions for submitting claims electronically to UnitedHealthcare and other
payers, please contact us toll free at 1-800-842-1109, option 3.

# EXHIBIT "F"

Unitedhealthcare
Po Box 740800

Atlanta, GA  30374

**HEALTH INSURANCE CLAIM FORM**

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

| | | PICA | | | | | | | | | PICA | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

1. MEDICARE  MEDICAID  TRICARE  CHAMPVA  GROUP HEALTH PLAN  FECA BLK LUNG  OTHER   **X** (Member ID#)   1a. INSURED'S I.D. NUMBER (For Program in Item 1)  **916077154**

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)  **Francesco**

3. PATIENT'S BIRTH DATE  SEX  **X** M  F

4. INSURED'S NAME (Last Name, First Name, Middle Initial)

5. PATIENT'S ADDRESS (No., Street)  6. PATIENT RELATIONSHIP TO INSURED  7. INSURED'S ADDRESS (No., Street)

b. RESERVED FOR NUCC USE  c. OTHER ACCIDENT?  YES  **X** NO  c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME  10d. CLAIM CODES (Designated by NUCC)  d. IS THERE ANOTHER HEALTH BENEFIT PLAN?  YES  NO  *If yes, complete items 9, 9a, and 9d.*

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED  **Signature On File**  DATE  **03/06/20**

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED  **SIGNATURE ON FILE**

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)  **11 09 18**  QUAL.  **439**

15. OTHER DATE  QUAL.  MM  DD  YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM  MM DD YY  TO  MM DD YY

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE  **DN**  **Sujal P Patel**  17a.  17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  FROM  MM DD YY  TO  MM DD YY

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)  **Corrected Claim**

20. OUTSIDE LAB?  YES  **X** NO  $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)  ICD Ind.  **0**

A. **M4837**  B.  C.  D.
E.  F.  G.  H.
I.  J.  K.  L.

22. RESUBMISSION CODE  ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From | | | To | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MM | DD | YY | MM | DD | YY | | | | | | | | | | | |
| 03 | 06 | 2020 | 03 | 06 | 2020 | 22 | N | 64999 | RT | A | 26,481 | 34 | 1 | | | 207XS0117X |
| | | | | | | | | | | | | | | | NPI | 1467748301 |
| 2 | | | | | | | | | | | | | | | NPI | |
| 3 | | | | | | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER  **463500730**  SSN  EIN **X**

26. PATIENT'S ACCOUNT NO.  **000100013633**

27. ACCEPT ASSIGNMENT?  **X** YES  NO

28. TOTAL CHARGE  $ **26,481 34**

29. AMOUNT PAID  $

30. Rsvd for NUCC Use  **26,481 34**

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

**Patel, Sujal P**
**Patel MD, Sujal P**
**07/08/2022**

SIGNED  DATE

32. SERVICE FACILITY LOCATION INFORMATION
**Hudson Regional Hospital Op**
**55 Meadowlands Parkway**
**Secaucus NJ  07094-2977**

a.  b.

33. BILLING PROVIDER INFO & PH #  **844  366-8800**
**Oasis Medical And Surgical Wellness**
**85 Harristown Rd Suite 103**
**GLEN ROCK NJ  07452-3323**

a. **1609271295**  b.

NUCC Instruction Manual available at: www.nucc.org  MB-0D3W-M7PA  PLEASE PRINT OR TYPE  CR061657  APPROVED OMB-0938-1197 FORM 1500 (02-12)

# EXHIBIT "G"



**85 Harristown Rd, Suite 103 Glen Rock, NJ 07452**
**Telephone: 844-366-8800**
**Facsimile:   844-366-8800**

*Bryan J. Massoud, MD,  Keith P. Johnson, M.D.,  Sujal Patel, MD,  Rajnik Raab, MD,*
*Ralph Wheeler, MD,  Anissa Hashemi, DPM, Gbolahan Okubadejo, MD, Ralph Daniel, PA-C, Umara Suri, PA-C*

January 20, 2020

United Health Care

PO BOX 740800

Atlanta,GA 30374

Re:  FRANCESCO ███████ I

    Claim #:  916077154

    Date of Service:   3/6/2020

    CPT Code: 64999

    Diagnoses: M48.36, M48.37

To whom it may concern,

Please be advised CPT Code 64999 was billed because there is no other code which best describes the
work performed.  However, we used CPT Code 63185-52 as the "comparison CPT code" for a 2 LEVEL
DORSAL RHIZOTOMY which was documented on page 2 of the report, to reflect the same RVU, hence
billing the amount of $ 26481.34 X2.

I would hope the above information will assist your review of these services. If I could be of further
assistance, please do not hesitate to contact me at 844-366-8800

Thank you for your attention regarding this matter.

Sincerely,

Billing Department



**Code Description**

## 63185

Laminectomy with rhizotomy: 1 or 2 segments

**Lay Description (Code)**

A rhizotomy is performed on the anterior nerve roots to stop involuntary spasmodic movements associated with paraplegia or torticollis. It is also performed on the posterior nerve roots to eliminate pain in a restricted area. The patient is face down. The physician makes a midline incision overlying the affected vertebrae. The fascia are incised. The paravertebral muscles are retracted. Laminectomy is performed. The physician identifies the anterior or posterior nerve roots to be divided. Each is lifted with a nerve hook and severed. Fascia, muscles and ligaments are allowed to fall back into place. The incision is closed with layered sutures. Report 63185 if the procedure includes one or two segments; report 63190 if the procedure includes two or more segments.



MEDICAL AND WELLNESS GROUP

**85 Harristown Rd, Suite 103 Glen Rock, NJ 07452**
**Telephone: 844-366-8800**
**Facsimile:   844-366-8900**

*Keith P. Johnson, M.D., Sujal Patel, MD, Rajnik Raab, MD,*
*Ralph Wheeler, MD,  Anissa Hashemi, DPM, Ralph Daniel, PA-C, Umara Suri, PA-C*

May 5, 2021

To: UHC

RE: Francesco █████████
ID# 916077154
DOB: █████████

To Whom It May Concern,

This letter is to appeal processing claim for your subscriber and our patient Francesco █████████ for date of service 3/06/2020.

On this day patient underwent on L4 and L5 dorsal ramus Rhizotomy with mechanical destruction of nerves. The 60 years old male was complaining of neck and low back pain. He was involved in a motor vehicle accident on 10/09/2018, injuring his neck and low back. The patient has failed conservative treatment including physical therapy, anti-inflammatory medication, and two lumber epidural injections with short-term pain relief.

The best option for Mr. █████████ to relive his back pain and help with daily activities was Rhizotomy procedure. Rhizontomy is a surgical procedure to sever nerve roots in the spinal cord. The procedure effectively relives chronic back pain and muscle spasms, and provide lasting low back pain relief by disabling the sensory nerve at the facet joint.

We obtained authorization from UHC for CPT code 64635 (authorization #A090574291) that is usually billed for Rhizontomy. The procedure that Dr. Patel perform to MR. █████████ on 3/06/2020 was more complex than CPT codes 64635. The CPT code 64999 was billed for each level because there is no other code which best describes work performed (open procedures). Dr. Patel did open procedure that is documented on the operative report. CPT code 64635 is only for close procedures. There are sometimes

situation that surgeon has to use different techniques that were not planned for better results on each patient condition, pain and/or injury.

Consider Rhizotomy to be medically necessary for Mr. ▮▮▮▮▮▮▮, we expect that your coverage of this procedure would be consistent with coverage of other medically necessary procedures.

We respectfully request that claim for date of service 3/06/2020, be promptly processed for the service rendered to your subscriber as allowed by the State prompt payment regulations. Your attention on this matter will be greatly appreciated.

Sincerely,

Margaret Tyszko
Director of Revenue Cycle
Oasis Medical and Surgical Wellness Group, LLC
85 Harristown Road
Glen Rock, NJ 07452

**UnitedHealthcare®**

| For all appeals <u>except</u> for Item 11 (overpayment) submit mail to:<br>UnitedHealthcare Appeals<br>PO Box 30559<br>Salt Lake City, UT 84130 | For appeals related to Item 11 (overpayment), submit to:<br>UnitedHealth Group Recovery Services<br>PO Box 740804<br>Atlanta, GA  30037-2804 |
|---|---|
| If by courier service, submit to:<br>UnitedHealthcare Appeals<br>216-B Bullsboro Dr.<br>Newman, GA 30263 | |

**YOU MUST COMPLETE A SEPARATE APPLICATION FOR EACH CLAIM APPEALED.**
**SIGNATURE MUST BE COMPLETE AND LEGIBLE. THIS FORM MUST BE DATED.**

### A. Provider Information

**1. Provider Name:** Sujal Patel
**2. TIN/NPI:** 463500730

**3. Provider Group (if applicable):** Oasis Medical and Surgical Wellness Group

**4. Contact Name:** Margaret Tyszko
**5. Title** Director of Revenue Cycle

**6. Contact Address:** 85 Harristown Road, Glen Rock NJ 07452

**7. Phone:** 8443668800
**8. Fax:** 8448846029
**9. Email:** mtyszko@oasismed.com

### B. Patient Information

**1. Patient Name** Francesco ███████
**2. Ins. ID:** 916077154

**3. Did you Attach a copy of** (check the appropriate response):
a. the assignment of benefits? ☒ Yes   ☐ No   ☐ NA
b. The *Consent to Representation in Appeals of Utilization Management Determinations and Authorization to Release of Medical Records for UM Appeal and Arbitration of Claims?* (Consent form is **required for review of medical records** if the matter goes to arbitration) ☐ Yes   ☐ No

### C. Claim Information

**1. Claim Number** (if known): CE75278846
**2. Date of Service:** 03/06/2020

**3. Authorizaton Number:** A090574291

**4. Claim filing method** (check only one):
a. ■ electronic (**submit** a copy of the electronic acceptance report from Our clearinghouse or Us)
b. ☐ facsimile (**submit** a copy of the fax transmittal)
c. ☐ paper claim by mail or courier service (**submit** a copy of the delivery confirmation evidence)

**5. Check the reason(s) why you are filing this appeal** (check all that apply and be specific about billing codes and reason for dispute):
a. ☐ Action has not been taken on this claim
b. ■ Dispute of a denied claim – provide **date of denial**  ___/___/___
c. ☐ Claim was paid but not in a timely manner (provide more information):
　　☐ Yes ☐ No   Additional information was requested? If yes, date: ___/___/___
　　☐ Yes ☐ No   Additional information provided:  If yes, date )  ___/___/___
　　☐ Yes ☐ No   Prompt Payment Interest paid correctly?
d. ☐ Claim was paid, but the amount paid is in dispute
e. ☐ Codes in dispute ___/___/___/___/___/___/___/
f. ☐ Dispute of an overpayment or the amount of overpayment (Attach a copy of overpayment request)
g. ☐ Dispute of carrier's offset amount against this claim (Attach a copy of the A/R)

### D. Reason for Appeal (Required)

Please see attached appeal letter

| **UnitedHealthcare®** | For all appeals *except* for Item 11 (overpayment) submit mail to:<br>UnitedHealthcare Appeals<br>PO Box 30559<br>Salt Lake City, UT 84130 | For appeals related to Item 11 (overpayment), submit to:<br>UnitedHealth Group Recovery Services<br>PO Box 740804<br>Atlanta, GA  30037-2804 |
|---|---|---|
| | If by courier service, submit to:<br>UnitedHealthcare Appeals<br>216-B Bullsboro Dr.<br>Newman, GA 30263 | |

Provider Name: Sujal Patel, MD                Contact Number: 844-366-8800

Patient Name: Francesco ████████

**You may provide additional information in an attachment to explain why you are disputing Our handling of the claim. You must be specific about billing codes and reason for dispute.**

**The following should be submitted with your appeal (copies only):**

**In an attachment, explain why you dispute handling of the claim. Be specific about billing codes. Also submit (copies only):**

- The relevant claim form
- The relevant Explanation(s) of Benefits or Remittance Advice
- A statement specifying the line items that you are appealing
- Copies of any overpayment requests or A/R notice
- Information We previously requested that you have not yet submitted, if available
- Itemization of the contract provisions you believe We are not complying with, including a copy of the pertinent section of your contract
- Pertinent correspondence between you and Us on this matter
- A description of pertinent communications between you and Us on this matter that were not in writing
- Relevant sections of the National Correct Coding Initiative (NCCI) or other coding support you relied upon IF the dispute concerns the disposition of billing codes
- Other documents you may believe support your position in this dispute (this may include medical records)

Attachments: ☑ Yes   ☐ No

Signature: _____                Date 05 /05 /2021

# Important to Note

**In order to ensure your Internal Payment Appeal is eligible to meet processing requirements for the External Binding Arbitration Program**

- **The Internal Appeal Form must be sent to the address posted on Our website;**
- **The Internal Appeal Form must have a complete signature (first and last name);**
- **The Internal Appeal Form Must be Dated;**
- **There is a signed and dated Consent to Representation in Appeals of UM Determinations and Authorization for release of Medical records in UM Appeals and Independent Arbitration of Claims Form.**

# EXHIBIT "H"

Oasis Medical & Surgical Wellness Group
85 Harristown Rd, Suite 103
Glen Rock, NJ 07452

**Bryan J. Massoud, MD, Keith P. Johnson, M.D., Sujal Patel, MD, Rajnik Raab, MD,
Ralph Wheeler, MD, Anissa Hashemi DPM, Gbolahan Okubadejo, MD, Ralph Daniel, PA-C, Umara Suri, PA-C**

## ASSIGNMENT OF BENEFITS

1. I, the undersigned, hereafter referred to as "the patient", do hereby assign all of my rights and interests to Oasis Medical Group, hereafter referred to as "the medical provider" to pursue and obtain payment from the above mentioned insurance carrier. This assignment shall include, but not limited to all rights available to me pursuant to the Personal Injury Protection Statues of New Jersey

2. I, assign, to the medical provider, all my rights and benefits under the insurance contract for payment for services rendered to me. However, upon consent of both parties, same shall be revocable.

3. I, the patient, do hereby understand and acknowledge that if I willfully refuse to comply with reasonable requests of the insurance carrier, payment of my medical bills may be denied and I will be held responsible for same.

4. I, the patient, authorize my bodily injury attorney to pay directly to the medical provider any monies due on my account or have same deducted from any settlement made on my behalf.

5. I, the patient, do hereby direct my health insurance carrier and/or other insurance carrier to issue payment on my behalf directly to the medical provider. Further, in the event that the health carrier and /or other insurance carrier fails to forward the check to the medical provider, I will endorse and sign the check to the medical provider within five (5) days of receipt of same.

6. I, the patient, do hereby acknowledge that I will not file suit and/or arbitration for the payment of the above provider's medical bills unless I am requested to do so by the medical provider. I understand that the above referenced medical provider has an attorney and will collect payment on my behalf from the insurance carrier.

7. In the event that the insurance carrier and/or the vendor designated by the insurance carrier does not accept my assignment, or my assignment is challenged for being invalid, I execute this limited/special power of attorney and appoint and authorize the medical provider and counsel on behalf of the medical provider to file suit and/or arbitration directly against the carrier in my name and/or allow the medical provider to amend the law suit and/ or arbitration to include my name.

Print Name:  Francesco  ▮▮▮                    Date: 6/12/19

Signature:  ▮▮▮Frank▮▮▮

Witness ▮▮▮

This message, and any documents attached hereto, may contain confidential or proprietary information intended only for the use of the addressee(s) named above or may contain information that is legally privileged. If you are not the intended addressee, or the person responsible for delivering it to the intended addressee, you are hereby notified that reading, disseminating, distributing or copying this message is strictly prohibited. If you have received this message by mistake, please immediately notify us by replying to the message and delete the original message and any copies immediately thereafter. Thank you for your cooperation.

Name: Salvemini, Francesco                    DOB: 09/30/1960                    Date:

# Civil Case Information Statement

## Case Details: BERGEN | Civil Part Docket# L-006176-22

**Case Caption:** OASIS MEDICAL AND SU RGICAL  VS
UNITEDHEALTHCARE,

**Case Initiation Date:** 11/17/2022

**Attorney Name:** LORI B SHLIONSKY

**Firm Name:** CALLAGY LAW

**Address:** 650 FROM RD STE 240
PARAMUS NJ 07652

**Phone:** 2012611700

**Name of Party:** PLAINTIFF : Oasis Medical and Surgical

**Name of Defendant's Primary Insurance Company**
(if known): None

**Case Type:** CONTRACT/COMMERCIAL TRANSACTION

**Document Type:** Complaint

**Jury Demand:** NONE

**Is this a professional malpractice case?**  NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same
transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Oasis Medical and Surgical?**
**NO**

### THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
#### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual
management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
    **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
    **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the
court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

11/17/2022
Dated

/s/ LORI B SHLIONSKY
Signed

## SUPERIOR COURT OF NEW JERSEY
## LAW DIVISION: CIVIL PART, BERGEN COUNTY

**OASIS MEDICAL AND SURGICAL WELLNESS on assignment of
FRANCESCO S.**

*Plaintiff(s) / Petitioner(s)*

v.

Case No.: BER-L-006176-22

**UNITEDHEALTHCARE, INC.**

*Defendant(s) / Respondent(s)*

## AFFIDAVIT OF SERVICE

I, Andreanna Taherkhanchi, being duly sworn, state:

I, Andreanna Taherkhanchi, declare under penalty of perjury that the following is true and correct: At the time of service, I was a competent adult not having a direct interest in the litigation.

I served the following documents on UnitedHealthcare, Inc in Ramsey County, MN on December 1, 2022 at 2:36 pm at 1010 Dale St N, St Paul, MN 55117 by leaving the following documents with Bob Gustafson who as Intake Specialist at CT Corporation System, Inc. is authorized by appointment or by law to receive service of process for UnitedHealthcare, Inc.

Track Assignment Notice
Summons
Complaint, Exhibits A- H, and Civil Case Information Statement

Additional Description:
I delivered the documents to Bob Gustafson, Intake Specialist for Registered Agent CT Corporation System, Inc.

White Male, est. age 55, glasses: Y, Gray hair, 180 lbs to 200 lbs, 6' to 6' 3".
Geolocation of Serve: http://maps.google.com/maps?q=44.971496582,-93.1263177874
Photograph: See Exhibit 1

Signature
Andreanna Taherkhanchi
(507) 722-1077

AISHA A ABDI
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/2023

Subscribed and sworn to before me this _6_ day of _December_,
_____, by _Aisha Abdi_.

Witness my hand and official seal.

_Aisha Abdi_

My commission expires: _1/31/2023_

Notary Public

Job #204980                    Matter: Francesco Salvemini                    Page 1

BERGEN COUNTY COURTHOUSE
SUPERIOR COURT LAW DIV
BERGEN COUNTY JUSTICE CTR RM 415
HACKENSACK       NJ 07601-7680

                                        TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (201) 221-0700
COURT HOURS  8:30 AM - 4:30 PM

                        DATE:   NOVEMBER 17, 2022
                        RE:     OASIS MEDICAL AND SU RGICAL  VS UNITEDHEALTHCARE,
                        DOCKET: BER L -006176 22


     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 2.

     DISCOVERY IS   300 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

     THE PRETRIAL JUDGE ASSIGNED IS:  HON RACHELLE L. HARZ

      IF YOU HAVE ANY QUESTIONS, CONTACT TEAM      003
AT:  (201) 527-2600.

     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
     PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH R.4:5A-2.
                        ATTENTION:
                                ATT: LORI B. SHLIONSKY
                                CALLAGY LAW
                                650 FROM RD
                                STE 240
                                PARAMUS          NJ 07652


ECOURTS

Amanda Lyn Genovese, Bar No. 901632012
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 218-5621
Facsimile: (212) 218-5526
*Attorneys for Defendant*
*UNITEDHEALTHCARE, INC.*

| | |
|---|---|
| OASIS MEDICAL AND SURGICAL WELLNESS on assignment of FRANCESCO S., | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: CIVIL PART [Bergen] |
| Plaintiff, | DOCKET NO. BER-L-006176-22 |
| v. | **NOTICE OF MOTION** |
| UNITEDHEALTHCARE, INC., | **Return Date: May 12, 2023** |
| Defendant. | |

**TO:**   Lori B. Shlionsky, Esq.
CALLAGY LAW, PC
650 From Road, Suite 240
Paramus, NJ 07652

**PLEASE TAKE NOTICE** that on the 12th of May, 2023 at 9:00 a.m. or as soon thereafter as counsel may be heard, the undersigned attorneys for Defendant UNITEDHEALTHCARE, INC. ("United"),[1] will move before the Superior Court of New Jersey, Law Division, Bergen County at 10 Main Street, Hackensack, New Jersey 07601, for an Order: (i) to dismiss in its entirety the Complaint filed by Plaintiff Oasis Medical And Surgical Wellness pursuant to R. 4:6-2(e) for

---

[1] Defendant has been incorrectly identified as "UnitedHealthcare, Inc." United HealthCare Services, Inc. has responded as if named as a party. United reserves its right to seek relief in the future regarding the improper party—nothing herein shall be construed as a waiver of that right.

failure to state a claim upon which relief can be granted; and (ii) for such other and further relief in Defendant's favor as this Court may deem just and proper.

**PLEASE TAKE FURTHER NOTICE** that in support of the within Motion, Defendant shall rely upon the accompanying Memorandum of Law in Support of its Motion to Dismiss the Complaint; Declaration of Amanda Lyn Genovese with exhibits; and upon all the pleadings and proceedings herein.

**PLEASE TAKE FURTHER NOTICE**, that pursuant to <u>R.</u> 1:6-2(d), Defendant hereby requests oral argument if timely opposition is filed.

**PLEASE TAKE FURTHER NOTICE**, that at the time and place aforesaid, Defendant will request that the Proposed Order submitted herewith be entered by the Court.

Dated:  April 12, 2023
New York, New York

SEYFARTH SHAW LLP
*Attorneys for Defendant*
*UNITEDHEALTHCARE, INC.*


By: _____*/s/ Amanda Lyn Genovese*_____
Amanda Lyn Genovese, Bar No. 901632012
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

2

94044516v.3

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2023, I electronically filed the foregoing NOTICE OF MOTION; DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT; DECLARATION OF AMANDA LYN GENOVESE WITH EXHIBITS A, B AND C-COMPENDIUM OF UNPUBLISHED DECISIONS CITED IN DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT; AND PROPOSED ORDER, via the NJ eCourts online system, which sent service and notification of such filing to the following counsel for Plaintiff:

Lori B. Shlionsky, Esq.
CALLAGY LAW, PC
650 From Road, Suite 240
Paramus, NJ 07652

_____/s/ Amanda Lyn Genovese_____
Amanda Lyn Genovese

DATED: April 12, 2023

94044516v.3

Amanda Lyn Genovese, Bar No. 901632012
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 218-5621
Facsimile: (212) 218-5526
*Attorneys for Defendant*
*UNITEDHEALTHCARE, INC.*

| | |
|---|---|
| OASIS MEDICAL AND SURGICAL WELLNESS on assignment of FRANCESCO S., <br><br> Plaintiff, <br><br> v. <br><br> UNITEDHEALTHCARE, INC., <br><br> Defendant. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: CIVIL PART [Bergen] <br><br> DOCKET NO. BER-L-006176-22 <br><br> **PROPOSED ORDER** |

This matter having come before the Court by motion of Seyfarth Shaw LLP, attorneys for attorneys for Defendant UNITEDHEALTHCARE, INC. ("United"), for dismissal of the Complaint, pursuant to R. 4:6-2(e) (the "Motion"), and the Court having considered the Complaint, the papers submitted in support of and in opposition to the Motion, the Court having stated its reasons, and for good cause shown,

It is on this _____ day of _____, 2023,

**ORDERED** that Defendant's Motion to dismiss the Complaint is **GRANTED** in its entirety, and Plaintiff's Complaint is dismissed with prejudice.

SO ORDERED.

_____
HON. RACHELLE L. HARZ

This motion was:
____ Unopposed
____ Opposed

94046180v.3

| | |
|---|---|
| OASIS MEDICAL AND SURGICAL WELLNESS on assignment of FRANCESCO S., <br><br> Plaintiff, <br><br> v. <br><br> UNITEDHEALTHCARE, INC., <br><br> Defendant. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: CIVIL PART [Bergen] DKT. NO.: BER-L-006176-22 <br><br> CIVIL ACTION |

**MEMORANDUM OF LAW OF DEFENDANT UNITEDHEALTHCARE, INC. IN SUPPORT OF ITS MOTION TO DISMISS**

SEYFARTH SHAW LLP
620 Eighth Avenue
New York, NY 10016
Telephone: (212) 218-5621
Facsimile: (212) 218-5526
Amanda Lyn Genovese, Bar No. 901632012

*Attorneys for Defendant*
*UNITEDHEALTHCARE, INC.*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF FACTS .................................................................... 2

ARGUMENT ............................................................................. 4

I.     STANDARD OF REVIEW ............................................................ 4

II.    PLAINTIFF'S COMPLAINT should be dismissed in its entirety ................................ 5

    A.    ERISA Expressly Preempts Each Of Plaintiff's Causes Of Action...................... 5

    B.    Plaintiff's Breach Of Contract Claim (First Cause of Action) Fails As A Matter Of Law................................................................ 7

    C.    Plaintiff's Unjust Enrichment Claim (Second Cause of Action) Fails As A Matter Of Law............................................................... 8

    D.    Plaintiff's Promissory Estoppel Claim (Third Cause of Action) Should Be Dismissed As It Is Duplicative And Fatally Deficient........................... 9

    E.    Plaintiff's Breach Of Duty Of Good Faith And Fair Dealing Claim (Fourth Cause of Action) Should Be Dismissed; There Is No Improper Motive. ............ 11

CONCLUSION......................................................................... 12

94068516v.1

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aetna Health, Inc. v. Davila*,
    542 U.S. 200 (2004)................................................................................................6

*Banco Popular N. Am. v. Gandi*,
    184 N.J. 161 (2005) .............................................................................................5

*Bauer v. Nesbitt*,
    198 N.J. 601 (2009) .............................................................................................4

*Berlin Med. Assocs., P.A. v. CMI New Jersey Operating Corp.*,
    No. A-3034-04T5, 2006 WL 2162435 (N.J. Super. Ct. App. Div. Aug. 3,
    2006) ...................................................................................................................8

*Bijeau-Seitz v. Atl. Coast Mortg. Servs., Inc.*,
    No. CIV. 12-6372 RBK/AMD, 2013 WL 3285979 (D.N.J. June 28, 2013) ..........11

*Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc.*,
    No. CIV. 11-2775 JBS/JS, 2012 WL 762498 (D.N.J. Mar. 6, 2012) ...................7, 9

*Caputo v. Nice-Pak Products, Inc.*,
    300 N.J. Super. 498, 693 A.2d 494 (App. Div. 1997), *certification denied*, 151
    N.J. 463, 700 A.2d 876 (1997)............................................................................8

*Castro v. NYT Television*,
    370 N.J. Super. 282 (App. Div. 2004) .................................................................9

*Coyle v. Englander's*,
    199 N.J. Super. 212 (App. Div. 1985) .................................................................7

*Ctr. for Special Procs. v. Connecticut Gen. Life Ins. Co.*,
    No. CIV.A. 09-6566 MLC, 2010 WL 5068164 (D.N.J. Dec. 6, 2010) ...................9

*Donnelly v. Option One Mortg. Corp.*,
    No. CIV. 11-7019 ES, 2012 WL 4490642 (D.N.J. Sept. 26, 2012) ......................11

*Edwards v. Prudential Prop. & Cas. Co.*,
    357 N.J. Super. 196, *cert. denied*, 176 N.J. 278 (App. Div. 2003)...........................4

*EnviroFinance Grp., LLC v. Env't Barrier Co., LLC*,
    440 N.J. Super. 325 (App. Div. 2015) .................................................................8

*F. Bender, Inc. v. Jos. L. Muscarelle, Inc.*,
    304 N.J. Super. 282 (App. Div. 1997) .................................................................9

ii

*Farese v. McGrarry*,
    237 N.J. Super. 385, 568 A.2d 89 (App. Div. 1989) ................................................8

*Fustok v. UnitedHealth Grp., Inc.*,
    No. 12-CV-787, 2012 WL 12937486 (S.D. Tex. Sept. 6, 2012) ............................10

*Gotham City Orthopedics, LLC v. Aetna Inc.*,
    No. CV2014915SDWLDW, 2021 WL 1541069 (D.N.J. Apr. 19, 2021)................7

*Green v. Morgan Props.*,
    215 N.J. 431 (2013) ...............................................................................................4

*Hassler v. Sovereign Bank*,
    644 F. Supp. 2d 509 (D.N.J. 2009), *aff'd*, 374 F. App'x 341 (3d Cir. 2010) ........11

*Hillsborough Rare Coins, LLC v. ADT LLC*,
    No. CV 16-916 (MLC), 2017 WL 1731695 (D.N.J. May 2, 2017)........................8

*Jones v. Marin*,
    No. CIV. 07-0738 (WHW), 2009 WL 2595619 (D.N.J. Aug. 20, 2009) ...............10

*Kiss Elec., LLC v. Waterworld Fiberglass Pools, N.E., Inc*.,
    No. CIV.A. 14-3281 RBK, 2015 WL 1346240 (D.N.J. Mar. 25, 2015) ...............10

*Kollman v. Hewitt Assocs., LLC*,
    487 F.3d 139 (3d Cir. 2007)..................................................................................7

*Lobiondo v. O'Callaghan*,
    357 N.J. Super. 488 (App. Div. 2003) ...................................................................9

*Malaker Corp. S'holders Protective Comm. v. First Jersey Nat. Bank*,
    163 N.J. Super. 463 (App. Div. 1978) ...........................................................1, 8, 10

*Moser v. Milner Hotels, Inc*.,
    6 N.J. 278, 78 A.2d 393 (1951)..............................................................................8

*Neurosurgical Care of New Jersey, PA v. United Healthcare Ins. Co*.,
    No. CV 22-1333, 2022 WL 17585882 (D.N.J. Dec. 12, 2022) ............................5

*Nostrame v. Santiago*,
    420 N.J. Super. 427 (App. Div. 2011), *aff'd*, 213 N.J. 109 (2013).........................4

*Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co*.,
    967 F. 3d 218 (3d Cir. 2020)..................................................................................7

*Printing Mart-Morristown v. Sharp Elecs. Corp.*,
    116 N.J. 739 (1989) ...............................................................................................4

iii

*Scheidt v. DRS Techs., Inc.*,
    424 N.J. Super. 188 (App. Div. 2012) .......................................................................4

*J.D. ex rel. Scipio-Derrick v. Davy*,
    415 N.J. Super. 375 (App. Div. 2010) .......................................................................4

*Sickles v. Cabot Corp.*,
    379 N.J. Super. 100 (App. Div. 2005) .......................................................................5

*St. Peters Univ. Hosp. v. N.J. Bldg. Laborers Statewide Welfare Fund*,
    431 N.J. Super. 446 (App. Div. 2013) .......................................................................6

*White Consol. Indus., Inc. v. Lin*,
    372 N.J. Super. 480 (App. Div. 2004) .......................................................................6

*Yapak, LLC v. Massachusetts Bay Ins. Co.*,
    No. CIV. 3:09-CV-3370, 2009 WL 3366464 (D.N.J. Oct. 16, 2009) ....................11

Pursuant to *R*. 4:6-2(e), Defendant UNITEDHEALTHCARE, INC. ("United"),[1] by its attorneys, SEYFARTH SHAW LLP, respectfully submits this memorandum of law in support of its motion to dismiss the Complaint[2] of Plaintiff OASIS MEDICAL AND SURGICAL WELLNESS ("Plaintiff") in its entirety and with prejudice.

## **PRELIMINARY STATEMENT**

Plaintiff, an "out-of-network" medical provider, brings this action against United seeking additional payments for medical services rendered to Francesco S. ("Patient FS"), a beneficiary of an ERISA-governed[3] health benefits plan administered by United.  While Plaintiff acknowledges that it does *not* have negotiated reimbursement rates with United for the services allegedly rendered to Patient FS, it still demands payment of its full billed charges.  Nothing in the Complaint, Patients FS' ERISA-governed plan, or the law permits such relief.

Plaintiff's Complaint fails for multiple, independent reasons.  *First*, each of Plaintiff's claims against United are expressly preempted by ERISA, which provides the exclusive remedy for the recovery of benefits under an ERISA-governed plan.  *Second*, Plaintiff's breach of contract, unjust enrichment, and breach of the duty of good faith and fair dealing claims suffer from fatal defects because, *inter alia*, (i) Plaintiff fails to allege a breach; (ii) Plaintiff requests duplicative relief; (iii) Plaintiff did not confer any benefit on United; (iv) Plaintiff fails to allege how United was unjustly enriched; and (v) Plaintiff fails to allege an improper motive.  *Third*, nowhere in the Complaint does Plaintiff allege promises for the payment of its full billed charges for the services

---

[1] Defendant has been incorrectly identified as "UnitedHealthcare, Inc."  United HealthCare Services, Inc. has responded as if named as a party.  United reserves its right to seek relief in the future regarding the improper party—nothing herein shall be construed as a waiver of that right.

[2] A true and correct copy of the Complaint ("Compl.") is attached as Exhibit A to the Declaration of Amanda Lyn Genovese ("Genovese Decl."), submitted concurrently herewith.

[3] The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*., as amended ("ERISA").

rendered to Patient FS.  In fact, Plaintiff alleges the opposite by citing to a definition in an out-of-date plan document that refers to payment of less than 50% of billed charges; and, moreover, concedes that it billed an entirely different CPT code[4] than what was allegedly pre-authorized by United; Plaintiff's promissory estoppel claim fails.

Based on the foregoing, and the arguments asserted herein, Plaintiff's Complaint should be dismissed in its entirety and with prejudice.

## STATEMENT OF FACTS[5]

Plaintiff asserts four causes of action against United: (i) the First Cause of Action is for "breach of contract"; (ii) the Second Cause of Action is for "unjust enrichment"; (iii) the Third Cause of Action is for "promissory estoppel"; and (iv) the Fourth Cause of Action is for "breach of the covenant of good faith and fair dealing."

### Allegations in the Complaint

Plaintiff alleges that it is proceeding "on an Assignment of Benefits from Patient," that it "is and was a healthcare provider in the State of New Jersey," and it is "not participating in the network of providers associated with the benefits provided by the plan."  (Compl. ¶¶ 1, 12, 19.) Plaintiff alleges that "Principal had health insurance through his spouse's employer, Vitamin Shoppe Industries which provided health insurance benefits via a group insurance contract

---

[4] The Current Procedural Terminology ("CPT"), which is developed and published each year by the American Medical Association, is a standardized coding language and numerical methodology that is designed to accurately categorize, describe, and communicate healthcare services.  Healthcare providers use the CPT coding system to describe and report services that they rendered to members of health benefit plans.

[5] For purposes of this motion only, United references the allegations of the Plaintiff's Complaint, as required by the Rules of Court.  However, United does not accept the Complaint's conclusory allegations, which are unsupported by well-pleaded facts.  Nor does United concede that Plaintiff's allegations are true and correct and, as such, reserves its right to dispute the alleged factual statements contained in the Complaint.

administered by third-party UnitedHealthcare, Inc." (*Id.* ¶ 1.) In referring to what Plaintiff alleges to be the operative Vitamin Shoppe health plan, Plaintiff attaches a plan document with an effective date of January 1, 2019.[6] (*See id.* ¶ 11, Ex. D.)

Medical services were allegedly rendered to Patient FS on March 6, 2020 by physicians affiliated with Plaintiff. (*Id.* ¶¶ 3–4.) Prior to rendering the services, Plaintiff alleges that it contacted "a representative of Defendant named 'Theo E.' and received prior authorization for CPT 64653." (*Id.* ¶ 7.) Plaintiff, however, acknowledges that "CPT 64999" was billed, not CPT 64653. (*Id.* ¶ 9.)

Plaintiff asserts that "[o]n September 10, 2020, UnitedHealthcare denied the claim in its entirety" resulting in an alleged underpayment of $26,481.34. (*Id.* ¶ 12–13.)[7] Notwithstanding the fact that Plaintiff readily admits that CPT 64999 was not part of its alleged preauthorization (*see, supra*), Plaintiff avers that it "finds the denial improper." (*Id.* ¶ 16.) Plaintiff also alleges that it "exhausted all administrative remedies," without detailing when or how it attempted to do so. (*Id.* ¶ 18.)

**Procedural History**

On or about November 17, 2022, Plaintiff filed the Complaint. Thereafter, counsel for the parties conferred regarding an extension to United's responsive pleading deadline. United now timely moves to dismiss Plaintiff's Complaint.

---

[6] In Exhibit D to the Complaint, Plaintiff attaches a 2019 plan document, despite Plaintiff specifically alleging a 2020 date of service. Concurrently herewith, United submits the operative plan document with an effective date of January 1, 2020 for Group Number 90882, which is consistent with the information listed in Exhibit A to the Complaint. (*See* Genovese Decl., B.) For this motion under *R.* 4:6-2(e), the Court may consider or disregard the operative plan document, as Plaintiff fail to state a claim against United based on the allegations on the face of the Complaint, under the Plan attached to the Complaint, and/or under the operative health plan incorporated by reference.

[7] For purposes of clarity, Plaintiff's Complaint lists multiple paragraphs as "12" and "13," in addition to other numbering errors.

## ARGUMENT

## I.    STANDARD OF REVIEW

When deciding a motion to dismiss under *R*. 4:6-2(e), the test is "whether a cause of action is suggested by the facts." *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 746 (1989) (internal quotation and citation omitted).[8] The trial court can only grant a motion to dismiss for failure to state claim if, giving the plaintiff the benefit of all favorable inferences, a cause of action has not been stated. *See Printing Mart-Morristown,* 116 N.J. 739.  In determining if a claim is adequately pleaded, the court's "inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint." *Green v. Morgan Props.*, 215 N.J. 431, 451 (2013) (quoting *Printing Mart–Morristown*, 116 N.J. at 746); *Bauer v. Nesbitt*, 198 N.J. 601, 610 (2009) ("[i]f not pled in a complaint, a cause of action cannot spring to life...").

Since *Printing Mart*, the Appellate Division and the Supreme Court have clarified for the lower courts, "*New Jersey is a 'fact' rather than a 'notice' pleading jurisdiction, which means that a plaintiff must allege facts to support his or her claim rather than merely reciting the elements of a cause of action*." *Nostrame v. Santiago*, 420 N.J. Super. 427, 436 (App. Div. 2011), *aff'd*, 213 N.J. 109 (2013) (emphasis added).  Moreover, "conclusory, vague and speculative" allegations are insufficient to set forth a factual element of a cause of action. *J.D. ex rel. Scipio-Derrick v. Davy*, 415 N.J. Super. 375, 396 (App. Div. 2010); *Scheidt v. DRS Techs., Inc*., 424 N.J. Super. 188, 193 (App. Div. 2012).  And, a motion to dismiss "may not be denied based on the possibility that discovery may establish the requisite claim; rather, the legal requisites for plaintiffs' claim must be apparent from the complaint itself." *Edwards v. Prudential Prop. & Cas. Co.*, 357 N.J. Super.

---

[8] Copies of all unpublished decisions cited are attached as Exhibit C to the Genovese Decl. in the order they appear.

196, 202, *cert. denied*, 176 N.J. 278 (App. Div. 2003); *Banco Popular N. Am. v. Gandi*, 184 N.J.

161, 166 (2005) ("[I]f the complaint states no basis for relief and discovery would not provide one,

dismissal is the appropriate remedy.") (citations omitted). It is plaintiff's duty to point to

allegations "which, if proven, would constitute a valid cause of action." *Sickles v. Cabot Corp.*,

379 N.J. Super. 100, 106 (App. Div. 2005).

## II.   PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY

### A.   ERISA Expressly Preempts Each Of Plaintiff's Causes Of Action.

Plaintiff's Complaint is entirely premised on an entitlement to recover benefits under the

ERISA-governed Plan—*there is no other basis*. To be sure, on the face of the Complaint:

- Plaintiff alleges that it is proceeding "on an Assignment of Benefits from Patient" (*id*. ¶ 19);

- Plaintiff "screen shots" a definition in the Plan directly into its Complaint (*id*. ¶ 11);

- Plaintiff alleges that it "exhausted all administrative remedies" under the Plan (*id*. ¶ 18);

- Plaintiff alleges that United "breached the [Plan] with the Patient" (*id*., First Cause of Action (Breach of Contract), ¶ 2);

- Plaintiff alleges that "Plaintiff was underpaid pursuant to the health benefit plan" (*id*., Second Cause of Action (Unjust Enrichment), ¶ 2);

- Plaintiff alleges that "Defendant made representations to Plaintiff concerning payment in accordance with the health benefit plan," "Defendant failed to comply with the terms of the Summary Plan Description," and "Plaintiff reasonably relied upon the representations made by the SPD" (*id*., Third Cause of Action (Promissory Estoppel), ¶¶ 10-12); and

- Plaintiff alleges that "Defendants owed Plaintiff an obligation to act in good faith and deal fairly with him regarding the terms of the SPD" (*id*., Fourth Cause of Action (Breach of the Duty of Good Faith and Fair Dealing), ¶¶ 10-12.)

*See Neurosurgical Care of New Jersey, PA v. United Healthcare Ins. Co*., No. CV 22-1333, 2022

WL 17585882, at *3 (D.N.J. Dec. 12, 2022) (dismissing state law claims as expressly preempted

where "Plaintiffs' overarching theory appears to be that they are owed payment under the Plan.").

94068516v.1

ERISA was created to ensure employee benefit plans would be subject to a uniform nationwide regulatory scheme, and not a patchwork of inconsistent state regulations. To that end, ERISA includes "expansive pre-emption provisions" to safeguard that the regulation of employee benefit plans remains "exclusively a federal concern." *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quotation omitted). ERISA § 514(a) provides that ERISA "shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan" covered by the Statute."[9] 29 U.S.C. § 1144(a). "Courts have given the phrase 'relate to' a broad commonsense meaning." *St. Peters Univ. Hosp. v. N.J. Bldg. Laborers Statewide Welfare Fund*, 431 N.J. Super. 446, 455 (App. Div. 2013) (citing *Pilot Life Ins. Co.*, 481 U.S. at 47). "A 'law "relates to" an employee benefit plan . . . if it has a connection with or reference to such a plan.'" *St. Peters Univ. Hosp.*, 431 N.J. Super. at 455 (quoting *Bd. of Trs. of Operating Eng'rs Local 825 Fund Serv. Facilities v. L.B.S. Constr. Co.*, 148 N.J. 561, 565 (1997)). "A state law claim relates to an employee benefit plan if 'the existence of an ERISA plan [is] a critical factor in establishing liability' and 'the trial court's inquiry would be directed to the plan[.]'" *St. Peters Univ. Hosp.*, 431 N.J. Super. at 456 (quoting *1975 Salaried Ret. Plan for Eligible Emps. of Crucible, Inc. v. Nobers*, 968 F.2d 401, 406 (3d Cir.), *cert. denied*, 506 U.S. 1086 (1993)).

Each of Plaintiff's claims directly challenge the administration of the Plan, which is governed by ERISA.[10] Because Plaintiff's causes of action all involve "the calculation and

---

[9] The only state laws not expressly preempted under ERISA are those that "regulate insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A). This exception is inapplicable to self-funded plans due to ERISA's "deemer" clause, 29 U.S.C. § 1144(b)(2)(B). *See White Consol. Indus., Inc. v. Lin*, 372 N.J. Super. 480, 488 (App. Div. 2004) (holding self-insured ERISA plans are exempt from state law regulating insurance by ERISA's "deemer" clause). The Plan is self-funded. (Genovese Decl., B.)

[10] Under ERISA, an "employee welfare benefit plan" includes "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or

payment of the benefit due to a plan participant," which goes to "the essence of the function of an ERISA plan," *Kollman v. Hewitt Assocs., LLC*, 487 F.3d 139, 150 (3d Cir. 2007), ERISA § 514(a) requires Plaintiff's state law cause of action to be dismissed. *See Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co*., 967 F. 3d 218, 24–42 (3d Cir. 2020) (quantum meruit claim preempted by ERISA § 514(a)); *Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc.*, No. CIV. 11-2775 JBS/JS, 2012 WL 762498, at *5 (D.N.J. Mar. 6, 2012) (state law claims, including quantum meruit claim, were preempted by ERISA § 514(a) because it was "clear that 'the existence of an ERISA plan [was] a critical factor in establishing liability") (citation omitted); *Gotham City Orthopedics, LLC v. Aetna Inc*., No. CV2014915SDWLDW, 2021 WL 1541069, at *2 (D.N.J. Apr. 19, 2021) (dismissing state law claims as preempted where plaintiff alleged that the insurer "underpaid" the provider for orthopedic services: "Courts routinely hold that when a party challenges the denial of ERISA benefits, but restyles those claims as common-law causes of action based on breach of contract, the implied covenant of good faith and fair dealing, promissory estoppel, or quantum meruit, those claims are preempted").

### B.    Plaintiff's Breach Of Contract Claim (First Cause of Action) Fails As A Matter Of Law.

To prevail on a breach of contract claim, a plaintiff must establish three elements:  (1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiff's alleged damages. *See Coyle v. Englander's*, 199 N.J. Super. 212, 1088 (App. Div. 1985).

While Plaintiff references an out-of-date version of the Plan and a definition of "Reasonable and Customary," it fails to plead why that provision of the Plan was violated. Plaintiff

---

otherwise, . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment[.]"  29 U.S.C. § 1002(1).

merely alleges that Patient FS received medical services, a corresponding claim was denied, and that Plaintiff wants to be paid its full billed charges.  That is not enough.  Plaintiff's failure to allege how United failed to perform, as well as the specific terms of the Plan that were breached, is fatal to its breach of contract claim.  *See EnviroFinance Grp., LLC v. Env't Barrier Co., LLC*, 440 N.J. Super. 325, 345 (App. Div. 2015) (noting that it is plaintiff's burden to allege that the opposing party "fail[ed] to perform a defined obligation under the contract").

### C.   Plaintiff's Unjust Enrichment Claim (Second Cause of Action) Fails As A Matter Of Law.

Plaintiff's unjust enrichment claim should be dismissed for three reasons.

*First*, Plaintiff's unjust enrichment claim is duplicative of its breach of contract claim.  *See Berlin Med. Assocs., P.A. v. CMI New Jersey Operating Corp.,* No. A-3034-04T5, 2006 WL 2162435 (N.J. Super. Ct. App. Div. Aug. 3, 2006), at *11 ("[T]here is no ground for imposing an additional obligation [under quasi-contract or unjust enrichment] when there is a valid unrescinded contract that governs [the parties'] rights").  The duplicative nature of the two claims is undeniable: Plaintiff seeks the exact same relief.  (*Compare* Compl., First Cause of Action (Breach of Contract) ¶ 3 *with* Compl., Second Cause of Action (Unjust Enrichment) ¶ 8.)[11]

*Second*, no claim for unjust enrichment can survive where, as here, the parties' respective rights and obligations are set out in the terms of contract(s)—the Plan.  *See Hillsborough Rare*

---

[11]  To the extent that Plaintiff attempts to argue that it may plead unjust enrichment as an alternative theory of recovery to a breach of contract claim, that is not available here, as there is an contract (the Plan) governing the subject matter of this dispute.  *See Moser v. Milner Hotels, Inc*., 6 N.J. 278, 280-281, 78 A.2d 393, 394 (1951) ("Having pleaded an express contract, the plaintiff cannot without showing a rescission, recover on quasi-contract"); *Caputo v. Nice-Pak Products, Inc*., 300 N.J. Super. 498, 504-505, 693 A.2d 494, 497 (App. Div. 1997), *certification denied*, 151 N.J. 463, 700 A.2d 876 (1997) (recovery can only be had for unjust enrichment if the jury finds there was no valid contract); *Farese v. McGrarry*, 237 N.J. Super. 385, 392, 568 A.2d 89, 93 (App. Div. 1989) (recovery is not available on a theory of implied contract where parties have made an express contract, unless the express contract has either been rescinded by consent or materially breached).

*Coins, LLC v. ADT LLC*, No. CV 16-916 (MLC), 2017 WL 1731695, at *6 (D.N.J. May 2, 2017).

Notably, because Plaintiff alleges it is proceeding "on an Assignment of Benefits from Patient,"

(Compl. ¶ 19), recovery is unavailable. *See Ctr. for Special Procs. v. Connecticut Gen. Life Ins.*

*Co.*, No. CIV.A. 09-6566 MLC, 2010 WL 5068164, at *5 (D.N.J. Dec. 6, 2010) ("Recovery under

an unjust enrichment or a quantum meruit theory is unavailable where an express agreement exists,

and therefore Plaintiff's claim as assignee of benefits takes precedence over its 'non-derivative'

basis for the claim, which is not predicated on an express contract.").

    *Third*, to establish unjust enrichment as a basis for quasi-contractual liability, "a plaintiff

must show both that [the] defendant received a benefit and that retention of the benefit would be

unjust." *Castro v. NYT Television*, 370 N.J. Super. 282, 299 (App. Div. 2004) (citing *VRG Corp.*

*v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994)).  It is a basic requirement that defendant receive

some value for which equity requires defendant to pay: "that there be unjust enrichment."  *F.*

*Bender, Inc. v. Jos. L. Muscarelle, Inc.*, 304 N.J. Super. 282, 285 (App. Div. 1997).

    Here, Plaintiff fails to allege any facts suggesting that it conferred a benefit upon United;

Plaintiff only alleges that it provided medical services to Patient FS.  (Compl. ¶ 6.)  Nor does

Plaintiff even attempt allege how United might have been enriched under these circumstances.  *See*

*Broad St.*, 2012 WL 762498, at *8-9.

    For any of the foregoing reasons, Plaintiff's unjust enrichment claim should be dismissed.

    **D.    Plaintiff's Promissory Estoppel Claim (Third Cause of Action) Should Be**
    **Dismissed As It Is Duplicative And Fatally Deficient.**

    There are no factual allegations to establish the essential elements of a promissory estoppel

claim: "1) a clear and definite promise; 2) made with the expectation that the promisee will rely

upon it; 3) reasonable reliance upon the promise; 4) which results in definite and substantial

detriment." *Lobiondo v. O'Callaghan*, 357 N.J. Super. 488, 499 (App. Div. 2003).  "[P]romissory

9

estoppel generally serves as a stop-gap where no valid contract exists to enforce a party's promise."

*Kiss Elec., LLC v. Waterworld Fiberglass Pools, N.E., Inc.*, No. CIV.A. 14-3281 RBK,  2015 WL

1346240, at *5 (D.N.J. Mar. 25, 2015).

      In the Complaint, Plaintiff alleges that "Defendant failed to comply with the terms of the

Summary Plan Description," (Compl., Third Cause of Action (<u>Promissory Estoppel</u>) ¶ 11), while

also alleging a valid contract (the Plan):  "Defendants provide health insurance benefits to the

insured Patient and through their actions breached the contract with the Patient." (*Id.*, First Cause

of Action (<u>Breach of Contract</u>) ¶ 2.)  A promissory estoppel claim "cannot be maintained where a

valid contract fully defines the parties' respective rights and obligations."  *Jones v. Marin*, 2009

No. CIV. 07-0738 (WHW), WL 2595619, at *6 (D.N.J. Aug. 20, 2009).

      Moreover, Plaintiff's allegations belie a "clear and definite promise," as Plaintiff cites to a

cherry-picked definition from an out-of-date plan document that specifically cuts against a request

for full billed charges:  "Covered benefits are generally *paid at 50% of R&C charges*."  (*Id.* ¶ 11

(emphasis added).)  Nor can Plaintiff attempt to shoehorn the alleged preauthorized services into

a promise to pay its full billed charges—Plaintiff acknowledges that it did not receive a pre-

authorization for "CPT 64999," *which is what it billed.  (Id.* ¶ 9.)  In short, Plaintiff concedes that

there is no promise and its own allegations fail to establish "the 'clear and definite promise' [that

is] the sine qua non for applicability of [promissory estoppel]."  *Malaker Corp. S'holders*

*Protective Comm. v. First Jersey Nat. Bank*, 163 N.J. Super. 463, 479-80 (App. Div. 1978)

*Malaker Corp.*, 163 N.J. Super. at 479-80 (dismissing promissory estoppel claim because the

alleged implied promise for a bank loan, where neither the amount of the loan nor the collateral

was specified, was not sufficiently clear or definite).[12]

    E.    **Plaintiff's Breach Of Duty Of Good Faith And Fair Dealing Claim (Fourth Cause of Action) Should Be Dismissed; There Is No Improper Motive.**

To state a claim for a breach of the covenant of good faith and fair dealing, a plaintiff must allege that the defendant acted "in bad faith or with a malicious motive...to deny the plaintiff some benefit of the bargain originally intended by the parties, even if that benefit was not an express provision of the contract." *Yapak, LLC v. Massachusetts Bay Ins. Co.*, No. CIV. 3:09-CV-3370, 2009 WL 3366464, at *2 (D.N.J. Oct. 16, 2009) (citing *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 225 (2005); *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 251 (2001)). To satisfy the "improper motive" element, a plaintiff must allege more than "the defendant's discretionary decisions benefited the defendant and disadvantaged the plaintiff." *Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509, 518 (D.N.J. 2009), *aff'd*, 374 F. App'x 341 (3d Cir. 2010) (citing *Wilson*, 168 N.J. at 246) (exercise of discretion for "ordinary business purposes" does not constitute improper motive, and "[w]ithout bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance."). Here, while Plaintiff baldly alleges "misconduct," *there are no factual allegations to support an improper motive.* (Compl. ¶ 16.)[13]

Further, "a plaintiff cannot maintain both [a] breach [of contract and breach of the covenant

---

[12] Nor are there allegations in Plaintiff's Complaint that its purported reliance was foreseeable to United. Foreseeability of reliance does not exist even where an insurer confirms coverage for alleged treatment before the services were provided. *See Fustok v. UnitedHealth Grp., Inc.*, No. 12-CV-787, 2012 WL 12937486, at *5 (S.D. Tex. Sept. 6, 2012) (prior approval of treatment does not "necessarily lead to foreseeability of reliance by the promisor").

[13] This allegation is nothing more than an unadorned conclusion that falls far short of meeting Plaintiff's pleading burden. *See Donnelly v. Option One Mortg. Corp.*, No. CIV. 11-7019 ES, 2012 WL 4490642, at *10 (D.N.J. Sept. 26, 2012) (dismissing breach of implied covenant of good faith and fair dealing claim because allegation of improper motive was a conclusion "devoid of factual matter").

94068516v.1

of good faith and fair dealing] claims based on the same conduct." *Bijeau-Seitz v. Atl. Coast Mortg. Servs., Inc*., No. CIV. 12-6372 RBK/AMD, 2013 WL 3285979, at *5 (D.N.J. June 28, 2013).  Nothing in the Complaint differentiates Plaintiff's breach of contract claim from its breach of the covenant of good faith and fair dealing claim—in fact, Plaintiff seeks the exact same relief. (*Compare* Compl., First Cause of Action (<u>Breach of Contract</u>) ¶ 3 *with* Compl., Fourth Cause of Action (<u>Breach Of Duty Of Good Faith And Fair Dealing</u>) ¶ 17.)

## **CONCLUSION**

Defendant UNITEDHEALTHCARE, INC. respectfully requests that the Court dismiss the Complaint in its entirety and with prejudice.

Dated:  April 12, 2023
New York, New York                     SEYFARTH SHAW LLP


By: <u>*/s/ Amanda Lyn Genovese*</u>
Amanda Lyn Genovese

*Attorneys for Defendant*
*UNITEDHEALTHCARE, INC.*

94068516v.1

Amanda Lyn Genovese, Bar No. 901632012
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 218-5621
Facsimile: (212) 218-5526
*Attorneys for Defendant*
*UNITEDHEALTHCARE, INC.*

| | |
|---|---|
| OASIS MEDICAL AND SURGICAL WELLNESS on assignment of FRANCESCO S., <br><br> Plaintiff, <br><br> v. <br><br> UNITEDHEALTHCARE, INC., <br><br> Defendant. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION: CIVIL PART [Bergen] <br><br> DOCKET NO. BER-L-006176-22 <br><br> **DECLARATION OF COUNSEL IN SUPPORT OF MOTION TO DISMISS** |

AMANDA LYN GENOVESE, ESQ., hereby certifies as follows:

1.      I am an attorney-at-law of the State of New Jersey.  I am a partner with the law firm of Seyfarth Shaw LLP, counsel for Defendant UNITEDHEALTHCARE, INC. ("Defendant"),[1] in the above-captioned matter.  I am fully familiar with the facts set forth herein.

2.      This Certification is submitted in support of Defendant's Motion to Dismiss Plaintiff OASIS MEDICAL AND SURGICAL WELLNESS' ("Plaintiff") Complaint pursuant to Rule 4:6-2(e) of the Rules Governing the Courts of the State of New Jersey.

---

[1] Defendant has been incorrectly identified as "UnitedHealthcare, Inc."  United HealthCare Services, Inc. has responded as if named as a party.  United reserves its right to seek relief in the future regarding the improper party—nothing herein shall be construed as a waiver of that right.

3.      A true and accurate copy of the Complaint and its accompanying exhibits are attached hereto as Exhibit A.

4.      Upon information and belief, and based on information retrieved from United's business records, a true and accurate copy of operative plan document with an effective date of January 1, 2020 for Group Number 90882 is attached hereto as Exhibit B.

5.      A true and accurate copy of the Compendium of Unpublished Decisions is attached hereto as Exhibit C.

I certify that the foregoing statements made by me are true to the best of my knowledge. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


DATED: April 12, 2023


_____/s/ Amanda Lyn Genovese_____
Amanda Lyn Genovese

-2-

94052721v.3

# EXHIBIT C

Amanda Lyn Genovese, Bar No. 901632012
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 218-5621
Facsimile: (212) 218-5526
*Attorneys for Defendant*
*UNITEDHEALTHCARE, INC.*

| | |
|---|---|
| OASIS MEDICAL AND SURGICAL WELLNESS on assignment of FRANCESCO S., | SUPERIOR COURT OF NEW JERSEY LAW DIVISION:  CIVIL PART [Bergen] |
| Plaintiff, | DOCKET NO. BER-L-006176-22 |
| v. | **RETURN DATE: May 12, 2023** |
| UNITEDHEALTHCARE, INC., | |
| Defendant. | |

<u>**COMPENDIUM OF UNPUBLISHED DECISIONS CITED IN DEFENDANT UNITEDHEALTHCARE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT**</u>

Dated:  April 12, 2023

Of Counsel and on the Brief:
         Amanda Lyn Genovese, Esq.

SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5621

For  the  convenience  of  the  Court,  Defendant  UNITEDHEALTHCARE,  INC.

("Defendant"),  provide  herewith  copies  of  all  unpublished  decisions  cited  in  Defendant's

Memorandum of Law in Support of Its Motion to Dismiss Plaintiff's Complaint in the order they

appear.

**CASES**                                                                 **TAB**

Neurosurgical Care of New Jersey, PA v. United Healthcare Ins. Co.,
    No. CV 22-1333, 2022 WL 17585882 (D.N.J. Dec. 12, 2022) ...............................................1

Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc.,
    No. CIV. 11-2775 JBS/JS, 2012 WL 762498 (D.N.J. Mar. 6, 2012) ......................................2

Gotham City Orthopedics, LLC v. Aetna Inc.,
    No. CV2014915SDWLDW, 2021 WL 1541069 (D.N.J. Apr. 19, 2021)................................3

Berlin Med. Assocs., P.A. v. CMI New Jersey Operating Corp.,
    No. A-3034-04T5, 2006 WL 2162435 (N.J. Super. Ct. App. Div. Aug. 3,
    2006) ...............................................................................................................................4

Hillsborough Rare Coins, LLC v. ADT LLC,
    No. CV 16-916 (MLC), 2017 WL 1731695 (D.N.J. May 2, 2017)........................................5

Ctr. for Special Procs. v. Connecticut Gen. Life Ins. Co.,
    No. CIV.A. 09-6566 MLC, 2010 WL 5068164 (D.N.J. Dec. 6, 2010) ..................................6

Kiss Elec., LLC v. Waterworld Fiberglass Pools, N.E., Inc.,
    No. CIV.A. 14-3281 RBK, 2015 WL 1346240 (D.N.J. Mar. 25, 2015) ..................................7

Jones v. Marin,
    No. CIV. 07-0738 (WHW), 2009 WL 2595619 (D.N.J. Aug. 20, 2009) ................................8

Fustok v. UnitedHealth Grp., Inc.,
    No. 12-CV-787, 2012 WL 12937486 (S.D. Tex. Sept. 6, 2012) ............................................9

Yapak, LLC v. Massachusetts Bay Ins. Co.,
    No. CIV. 3:09-CV-3370, 2009 WL 3366464 (D.N.J. Oct. 16, 2009) ...................................10

Bijeau-Seitz v. Atl. Coast Mortg. Servs., Inc.,
    No. CIV. 12-6372 RBK/AMD, 2013 WL 3285979 (D.N.J. June 28, 2013) .........................11

Donnelly v. Option One Mortg. Corp.,
    No. CIV. 11-7019 ES, 2012 WL 4490642 (D.N.J. Sept. 26, 2012) ......................................12

Dated:  April 12, 2023
New York, New York

SEYFARTH SHAW LLP
*Attorneys for Defendant*
*UNITEDHEALTHCARE, INC.*


By: ____*/s/ Amanda Lyn Genovese*____
Amanda Lyn Genovese, Bar No. 901632012
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5621

TAB 1

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 6 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 206 of 302
PageID: 214
Neurosurgical Care of New Jersey, PA v. United Healthcare..., Slip Copy (2022)

2022 WL 17585882
Only the Westlaw citation is currently available.
**Not for Publication**
United States District Court, D. New Jersey.

NEUROSURGICAL CARE OF
NEW JERSEY, PA and Roderick
J. Clemente, MD, Plaintiffs,

v.

UNITED HEALTHCARE
INSURANCE COMPANY, Defendant.

Civil Action No. 22-1333
|
Signed December 12, 2022

**Attorneys and Law Firms**

Mark Andrew Clemente, Clemente Mueller, P.A., Cedar Knolls, NJ, for Plaintiffs.

Robert J. Norcia, Stradley Ronon Stevens & Young, LLP, Philadelphia, PA, for Defendant.

**OPINION & ORDER**

John Michael Vazquez, UNITED STATES DISTRICT JUDGE

**\*1** Presently before the Court is a motion to dismiss filed by Defendant United Healthcare Insurance Company ("United").[1] D.E. 7. Plaintiffs filed a brief in opposition, D.E. 12, to which Defendant replied, D.E. 18.[2] The Court reviewed the parties' submissions and decided the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons set forth below, Defendant's motion to dismiss is **GRANTED**.

**I. FACTUAL AND PROCEDURAL BACKGROUND**
Plaintiffs, a healthcare services provider and neurosurgeon in New Jersey, bring suit to recover payments incurred when providing allegedly necessary medical services to patient "G.E.".[3] G.E. is a beneficiary of an employee welfare plan (the "Plan") that is administered by United. Compl. ¶ 5; Stalinski Cert. ¶ 2, Ex. 1. The Plan is governed by

the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* Stalinski Cert., Ex. 1 at 181. Plaintiffs allege that they performed surgery on G.E. in August 2017 and billed United for $215,857. Compl. ¶¶ 6-10. United denied payment, claiming that the procedure was not medically necessary. *Id.* ¶ 12.

Plaintiffs filed suit in the Superior Court of New Jersey on February 2, 2022, asserting five state-law based claims against United. D.E. 1-1. Overall, Plaintiffs allege that United should have covered and paid for G.E.'s surgery under the Plan. United removed the matter to this Court on March 11, 2022, based on diversity jurisdiction. *See* Notice of Removal ¶ 4. Defendant subsequently filed the instant motion, seeking to dismiss the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). D.E. 7.

**II. STANDARD OF REVIEW**
**\*2** United moves to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). For a complaint to survive dismissal under Rule 12(b)(6), it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Further, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016). In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). Restatements of the elements of a claim are legal conclusions, and therefore, are not entitled to a presumption of truth. *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). The Court, however, "must accept all of the complaint's well-pleaded facts as true" and give a plaintiff the benefit of all reasonable inferences flowing therefrom. *Fowler*, 578 F.3d at 210.

**III. ANALYSIS**
United argues that Plaintiffs' Complaint is expressly preempted by Section 514(a) of ERISA and therefore must be dismissed. Def. Br. at 6-10. Plaintiffs counter that Section 514 does not apply because their claims are permitted under Section 502 of ERISA. Plfs. Opp. at 8. Plaintiffs appear to misconstrue ERISA preemption as to its application and effect

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 7 of 14   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 207 of 302
PageID: 215
Neurosurgical Care of New Jersey, PA v. United Healthcare..., Slip Copy (2022)

because even if the Court were to agree with Plaintiffs, the matter would have to be dismissed for failure to bring a claim under Section 502.[4]

Under ERISA, the term " 'preemption' is used ... in more than one sense." *In re U.S. Healthcare, Inc.*, 193 F.3d 151, 160 (3d Cir. 1999). The two forms of preemption found in ERISA are "complete preemption" under Section 502(a) and "ordinary preemption" under Section 514(a). *Joyce v. RJR Nabisco Holdings Corp.*, 126 F.3d 166, 171 (3d Cir. 1997). "[C]omplete preemption operates to confer original federal subject matter jurisdiction notwithstanding the absence of a federal cause of action on the face of the complaint." *In re U.S. Healthcare*, 193 F.3d at 160. In other words, if ERISA completely preempts a state law cause of action, then a defendant may remove the matter to federal court on that basis alone, "even if the well-pleaded complaint rule is not satisfied."[5] *Joyce*, 126 F.3d at 171. Here, Defendant removed the matter based on this Court's diversity jurisdiction. *See* Notice of Removal ¶ 4. Thus, while Section 502(a) may provide an independent basis for the Court's subject matter jurisdiction, it is not the basis invoked by Defendant.

Section 514 preemption, or ordinary preemption, is an affirmative defense that a defendant can assert against a state-law based claim. *In re U.S. Healthcare*, 193 F.3d at 160. Section 514(a) is "a broad express preemption provision" that provides as follows: "the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan[.]" 29 U.S.C. § 1144(a); *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 226 (3d Cir. 2020). "The purpose of this broad preemption clause [is] to ensure [that] plans and plan sponsors [are] subject to a uniform body of benefit law, minimizing the administrative and financial burden of complying with conflicting requirements of the various States." *Jorgensen v. Prudential Ins. Co. of Am.*, 852 F. Supp. 255, 260-61 (D.N.J. 1994) (citing *Ingersoll-Rand v. McClendon*, 498 U.S. 133, 142 (1990)).

**\*3** "State law," for Section 514 preemption purposes, is defined as "all laws, decisions, rules, regulations, or State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). State common law claims may also fall within this definition. *Plastic Surgery Ctr., P.A.*, 967 F.3d at 226. A claim "relates to" a plan "if it has either (1) a 'reference to' or (2) a 'connection with' that plan." *Id.* Further a state-law claim references an ERISA plan if it is "premised on" the plan. Recently, the Third Circuit "distille[d] two overlapping

categories of claims 'premised on' ERISA plans." *Id.* The categories are (a) "claims predicated on the plan or plan administration, e.g., claims for benefits due under a plan or where the plan is a critical factor in establishing liability" and (b) "claims that involve construction of the plan or require interpreting the plan's terms." *Id.* at 230 (internal quotations and punctuation omitted). Claims that are preempted by Section 514 are typically dismissed for failure to state a claim. *See, e.g.*, *Sleep Tight Diagnostic Ctr., LLC v. Aetna Inc.*, 399 F. Supp. 3d 241, 250-51 (D.N.J. 2019) ("Indeed, courts within this district have consistently dismissed claims for breach of contract, quantum meruit, promissory estoppel, and negligence when they arise from an ERISA-governed plan on the basis of [Section 514] preemption.").

Here, Plaintiffs plead that G.E. is a beneficiary of a United health insurance plan, Compl. ¶ 5, that Plaintiffs billed United for medical care they provided to G.E., *id.* ¶ 10, and that United denied payment to Plaintiffs for G.E.'s medical care after United determined that the care was not medically necessary, *id.* ¶ 12. Plaintiffs' overarching theory appears to be that they are owed payment under the Plan. Accordingly, Plaintiffs' claims are predicated on the Plan and its administration. This conclusion is buttressed by Plaintiffs' own arguments in opposition to the current motion. Plaintiffs first maintain that they could have asserted their claims as Section 502 claims.[6] *See* Plfs. Opp. at 8. Plaintiffs also reference portions of the Plan to demonstrate that the care was medically necessary, as defined by the Plan. *See id.* at 10-11 (quoting Plan language). Plaintiffs' claims, therefore, are preempted by Section 514(a) because they relate to an ERISA benefit plan. *See Menkes v. Prudential Ins. Co. of Am.*, 762 F.3d 285, 296 (3d Cir. 2014) ("Claims involving denial of benefits ... require interpreting what benefits are due under the plan" and "are expressly preempted"); *Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266, 278 (3d Cir. 2001) ("Thus, suits against HMOs and insurance companies for denial of benefits, even when the claim is couched in terms of common law negligence or breach of contract, have been held to be preempted by § 514(a)."). In other words, Section 514 prohibits Plaintiffs from asserting their state-law claims because they are based on the Plan. The Court cannot decide Plaintiffs' claims without looking at and interpreting the Plan. Plaintiffs' Complaint, therefore, is expressly preempted and dismissed.[7]

## IV. CONCLUSION

For the foregoing reasons, and for good cause shown

Neurosurgical Care of New Jersey, PA v. United Healthcare..., Slip Copy (2022)

IT IS on this 12th day of December, 2022,

**ORDERED** that Defendant's motion to dismiss (D.E. 7) is **GRANTED** and the Complaint is **DISMISSED**; and it is further

**ORDERED** that the dismissal is without prejudice. Plaintiffs shall have thirty (30) days to file an amended complaint that cures the deficiencies noted herein. If Plaintiffs do not file an amended pleading within that time, the matter will be dismissed with prejudice.

**All Citations**

Slip Copy, 2022 WL 17585882

Footnotes

1   United states that United HealthCare Services, Inc. is the correct entity in this matter. Def. Br. at 1.

2   For purposes of this Opinion, the Court refers to Defendant's brief in support of its motion (D.E. 7-1) as "Def. Br."; Plaintiffs' opposition (D.E. 12) as "Plf. Opp."; and Defendant's reply (D.E. 18) as "Def. Reply".

3   The factual background is taken from Plaintiffs' Complaint ("Compl."). D.E. 1-1. When reviewing a motion to dismiss, a court accepts as true all well-pleaded facts in the Complaint. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir. 2009). A court may also consider any document integral to or relied upon in the Complaint. *Schmidt v. Skolas,* 770 F.3d 241, 249 (3d Cir. 2014) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997)). Here, United maintains that in deciding this motion, the Court can rely on the relevant plan document. Def. Br. at 5-6; *see also* Stalinski Cert., Ex. 1 (the "Plan"). Plaintiffs do not appear to disagree. Accordingly, the Court considers the Plan, as it is relied upon and integral to the Complaint.

    In their opposition brief, however, Plaintiffs include two exhibits: an assignment of benefits (Exhibit A) and the Certification of Plaintiff Roderick J. Clemente, MD (Exhibit B). *See* D.E. 12. The assignment of benefits is not referenced in or integral to Plaintiffs' Complaint, and the Certification addresses many facts that are also not set forth in the Complaint. Consequently, the Court did not consider Exhibits A or B in deciding Defendant's motion.

4   The Court notes that although Plaintiffs argue that their claims are allowed under Section 502, Plaintiffs do not assert any Section 502 claims in their Complaint. Plaintiffs cannot amend their Complaint through a brief. *Pa. ex rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir. 1984)). And because Plaintiffs did not assert any claims pursuant to Section 502, the Court does not (and cannot at this time) address the merits of any Section 502 claim.

5   ERISA's complete preemption provision, Section 502, is a misnomer because it is "really a jurisdictional rather than a preemption doctrine, as it confers exclusive federal jurisdiction in certain instances where Congress intended the scope of a federal law to be so broad as to entirely replace any state-law claim." *Marin Gen. Hosp. v. Modesto & Empire Traction Co.,* 581 F.3d 941, 945 (9th Cir. 2009).

6   Section 502(a) permits a plan participant or beneficiary to assert a civil claim to, amongst other things, "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

7   Because Plaintiffs' claims are preempted, the Court need not address United's other argument that the claims are not plausibly pled. *See* Def. Br. at 11-15. And again, the Court is not addressing Plaintiffs' argument in opposition that their claims are permissible under Section 502 because Plaintiffs do not plead a Section 502 claim in the Complaint.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

TAB 2

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 10 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 210 of 302
PageID: 218
Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

2012 WL 762498
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

BROAD STREET SURGICAL
CENTER, LLC, Plaintiff,

v.

UNITEDHEALTH GROUP,
INC., et al., Defendants.

Civil No. 11–2775 (JBS/JS).
|
March 6, 2012.

**Attorneys and Law Firms**

Andrew Joseph Karcich, Esq., Joanne Eskin Sutkin, Esq., Lynch, Karcich & Yellin, Voorhees, NJ, for Plaintiff Broad Street Surgical Center, LLC.

Scott A. Resnik, Esq., Katten, Muchin & Rosenman, LLP, New York, NY, for Defendants UnitedHealth Group, Inc. and United Healthcare Services, Inc.

*OPINION*

SIMANDLE, Chief Judge.

**I. INTRODUCTION**

**\*1** This matter is before the Court on Defendants UnitedHealth Group, Inc. and United Healthcare Services, Inc.'s ("Defendants" or "United") motion to dismiss the first amended complaint [Docket Item 4] and Plaintiff Broad Street Surgical Center, LLC's ("Plaintiff") motion for leave to file a second amended complaint [Docket Item 18]. The Plaintiff is a non-participating provider of medical services who provided services to patients who were covered under various insurance policies or plans administered by the Defendants. The instant action arises out of United's denial to reimburse claims submitted by the Plaintiff for services rendered to United's insureds.

For the reasons discussed herein, the Court will grant in part and deny in part Plaintiff's motion to file a second amended complaint. The Court will dismiss Defendant's motion to dismiss as moot.

**II. BACKGROUND**

Plaintiff is an ambulatory surgical facility that provides services associated with outpatient surgery to patients, including Patients 1–50, and is located in New Jersey. (Pl.'s Ex. A to the Affidavit of JoAnne Eskin Sutkin in support of motion for leave to amend complaint and file opposition to motion to dismiss, hereinafter "Proposed Second Amended Complaint") (Sec.Am.Comp.¶ 4). United is an insurer providing insurance coverage to insureds and beneficiaries within New Jersey, including Patients 1–50. (Prop.Sec.Am.Comp.¶ 6.) The Plaintiff was a non-participating provider of Services in that it did not have a contract with Defendants to accept agreed rates for the Services provided to the Patients with agreements or who were otherwise beneficiaries, with the Defendants. The Services provided to Patients 1–50 were out of network services. (Prop.Sec.Am.Comp.¶ 14.)

Plaintiff provided surgical facility services associated with outpatient surgery to Patients 1–50, who were at the time of the services, insured by Defendants under various United insurance agreements or agreements to which United was or is the Third Party Administrator. (Prop.Sec.Am.Comp.¶ 10.)

Prior to rendering services to Patients 1–50, Plaintiff's representative telephoned the Defendants and spoke with a Defendants' agent to confirm out of network coverage for the requested services. During each telephone call, the Plaintiff's representative stated where she was calling, provided United with the tax i.d. number of the Plaintiff, identified the patient by name, date of birth and policy number, as well as the procedure being performed. In each telephone call, Plaintiff's representative and employee was informed by United that there was coverage for Plaintiff's facility fees and for the procedures involved. (Prop.Sec.Am.Comp.¶¶ 15–26.)

Plaintiff received assignments of benefits ("AOBs") from Patients 1–50, each of which had out of network benefits for ambulatory surgery under their respective insurance agreements or plans with Defendants, some of which are or may be ERISA plans. (Prop.Sec.Am.Comp.¶ 30.)

**\*2** From the Spring of 2009 to approximately September 2009, the Defendant paid claims submitted by the Plaintiff for services rendered to patients insured by United. (Prop.Sec.Am.Comp.¶ 33.)

On and after September 2009, Plaintiff made claims for payments for services provided by Plaintiff to Patients 1–

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 11 of 101   Trans ID: LCV20231258369

Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 211 of 302
PageID: 219

Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

50 as a service provider or alternately as an assignee of the patients. (Prop.Sec.Am.Comp.¶ 39.) As of September 2009 to the present, Defendants have denied insurance coverage and refuse to pay Plaintiff for services provided to Patients 1–50. (Prop.Sec.Am.Comp.¶ 40.) According to the explanation of benefits, the Defendants denied all of Plaintiff's claims on and after September 2009 for the following reason: "We cannot pay this claim because we are unable to verify state licensure of a facility or criteria to support the provider billing type. Proof of facility licensure or hospital affiliation is required." (Prop.Sec.Am.Comp.¶ 37.)

Pursuant to various letters, Defendants base their refusal to pay for the Services provided by Plaintiff to Patients 1–50 because the Plaintiff is not licensed with the New Jersey Department of Health as an ambulatory care facility and therefore no benefits are available for expenses incurred at the facility and that the wrong form was utilized for submission of the claims. (Prop.Sec.Am.Comp.¶ 41.)

From March 2009 until the present, the Plaintiff submitted to the Defendant 59 claims for payment relating to 15 patients. There are 14 employee benefit plans that govern the payment of Plaintiff's claims.[1] (Defs.' Ex. 2, Affidavit of Stacy A. Chalupsky "Chalupsky Aff." at ¶ 4.) Of these 14 plans, 13 are governed by the Employee Retirement Income Security Program, 29 U.S.C. §§ 1001, et seq. (hereinafter "ERISA.") The remaining plan is not an ERISA plan and governs 5 of Plaintiff's claims. (Chalupsky Aff. at ¶ 5.)

In addition, in or about September of 2009, Plaintiff entered into a contract with Beech Street, a VIANT Network ("Beech Street") as a health care provider with the Beech Street network. This contract had an effective date of September 3, 2009. The Beech Street contract included United as a payor within its network, subject to the terms of the contract, including the obligation to make payments to Plaintiff. (Prop.Sec.Am.Comp.¶ 74.) Under the Beech Street contract, Plaintiff is entitled to be paid for covered services at 80% of usual billed charges, less applicable co-payments, deductibles and coinsurance by payors, which identified payors specifically include United. (Prop.Sec.Am.Comp. ¶ 73.) United as a participating payor with Beech Street, authorized Beech Street to enter into contracts on their behalf, including but not limited to, the contract with the Plaintiff. (Prop.Sec.Am.Comp.¶ 76.)

The Plaintiff filed the instant action in the Superior Court of New Jersey, Law Division, Camden County and subsequently filed a first amended complaint, seeking payment for the services rendered to Patients 1–50. [Docket Item 1.] The first amended complaint brought claims against the Defendants for: breach of contract, breach of the Beech Street contract, quantum meruit, third party beneficiary, contract by custom or dealing, reasonable reliance/arbitrary and disparate treatment, and tortious interference.

**\*3** The Defendants then removed the case to this Court. [Docket Item 2.] The Defendants then filed the instant motion to dismiss. [Docket Item 4.] The Plaintiff filed opposition to the dismissal motion [Docket Item 24] and filed a motion for leave to file a second amended complaint [Docket Item 18]. The proposed second amended complaint alleges the following causes of action against the Defendants: breach of contract, breach of the Beech Street contract, unjust enrichment and quantum meruit, third party beneficiary, implied contract/contract by custom or dealing/implied covenant of good faith and fair dealing, reasonable reliance/arbitrary and disparate treatment, and tortious interference, negligent misrepresentation, arbitrary and capricious, promissory estoppel, ERISA—payment of benefits due/violation of ERISA 502(a)(1).

## III. PLAINTIFF'S MOTION TO FILE A SECOND AMENDED COMPLAINT

### A. Standard of Review
Rule 15(a)(2) provides that leave to amend should be freely given when justice so requires. Fed.R.Civ.P. The decision to permit amendment is discretionary. *Toll Bros., Inc. v. Township of Readington,* 555 F.3d 131, 144 n. 10 (3d Cir.2009). Among the legitimate reasons to deny a motion is that the amendment would be futile. *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1414 (3d Cir.1993) (citation omitted). Futility is determined by the standard of legal sufficiency set forth in Rule 12(b)(6), Fed.R.Civ.P. In *re Burlington Coat Factory Litigation,* 114 F.3d 1410, 1434 (3d Cir.1997). Accordingly, an amendment is futile where the complaint, as amended, would fail to state a claim upon which relief could be granted. *Id.*

A complaint sufficiently states a claim when it alleges facts about the conduct of each defendant giving rise to liability. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). These factual allegations must present a plausible basis for relief (i.e. something more than the mere possibility of legal misconduct). *See Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1951, 173 L.Ed.2d 868

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 12 of 101   Trans ID: LCV20231258369

Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 212 of 302
PageID: 220

Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

(2009). In assessing the complaint, the Court must "accept all factual allegations as true and construe the complaint in the light most favorable to the plaintiff." *Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008) (quoting *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 374 n. 7 (3d Cir.2002)).

The Plaintiff's Second Amended Complaint alleges ten counts. First, the Court will address the issue of ERISA preemption. Second, the Court will examine each of Plaintiff's alleged causes of action to determine if a plausible basis for relief is presented.

### A. ERISA PREEMPTION

The Defendants argue that Counts I through X of Plaintiff's proposed second amended complaint, to the extent these counts are seeking benefits under the ERISA plans, are completely preempted by ERISA's civil enforcement provision, § 502(a). The parties do not dispute that 13 of the 14 plans at issue are ERISA plans. The Defendants do not argue that ERISA preempts Counts I through X of Plaintiff's complaint as to the remaining non-ERISA plan.

**\*4** ERISA's civil enforcement provision provides that a civil action may be brought "by a participant or beneficiary" to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 29 U.S.C. § 1132(a)(1)(B). ERISA's civil enforcement mechanism has "such extraordinary pre-emptive power" that all state law causes of action that are within its scope are completely preempted. *Pascack Valley Hosp. v. Local 464A UFCW Welfare,* 388 F.3d 393, 399–400 (3d Cir.2004) (quoting *Aetna Health Inc. v. Davila,* 542 U.S. 200, 209, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004)). In *Pascack* the Third Circuit outlined the test, provided by the Supreme Court in *Davila,* for determining whether a claim falls within the scope of § 502(a). A claim is completely preempted if (1) the plaintiff could have brought the action under § 502(a) and (2) no other legal duty supports the plaintiff's claim." *Pascack,* 388 F.3d at 400.

In this case, the Plaintiff is suing in both its capacity as the assignee of the benefits of Patients 1–50 as well as its non-derivative capacity as a service provider. To the extent that Plaintiff is seeking to recover benefits due under the ERISA plans to Patients 1–50 as a beneficiary by virtue of the assignments of benefits, Counts I through X are completely preempted by ERISA's civil enforcement provision. The Plaintiff could have brought this action as a civil enforcement

action under § 502(a) and no other legal duty supports the Plaintiff's claims.

To the extent that the Plaintiff is suing in its non-derivative capacity as a service provider in Counts I through X, these claims are not completely preempted through ERISA's civil enforcement provision because the Plaintiff is neither a "participant" nor a "beneficiary" since it is an out of network provider, and therefore could not bring suit pursuant to § 502(a).

However, ERISA contains, in addition to its complete preemption power under § 502(a), an express preemption provision. Section 514(a) provides, with some exceptions not relevant here, that "the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ..." 29 U.S.C. § 1144(a). The Supreme Court has given broad meaning to "relate to," stating: "[T]he phrase 'relate to' [is] given its broad commonsense meaning, such that a state law 'relate[s] to' a benefit plan in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 47, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). The Third Circuit instructs that a state law claim relates to an employee benefit plan if "the existence of an ERISA plan [is] a critical factor in establishing liability" and "the trial court's inquiry would be directed to the plan." *1975 Salaried Ret. Plan for Eligible Employees of Crucible, Inc. v. Nobers,* 968 F.2d 401, 406 (3d Cir.1992) (citing *Ingersoll–Rand Corp. v. McClendon,* 498 U.S. 133, 139–40, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990)).

**\*5** Plaintiff's state law claims raised in Counts I through VII, IX and X,[2] which are asserted in Plaintiff's non-derivative capacity as a service provider, are expressly preempted by ERISA because they "relate to" an ERISA benefits plan. Each of Plaintiff's claims in Counts I[3] through VII, IX and X are all grounded in the premise that the Defendants were required to pay Plaintiff for services the Plaintiff provided to Patients 1–50 who were covered under ERISA benefit plans. It is clear that "the existence of an ERISA plan [is] a critical factor in establishing liability" under Counts I through VII, IX and X, and therefore, these claims are expressly preempted.

Accordingly, Counts I through VII, IX and X of Plaintiff's complaint are preempted by ERISA and will be dismissed as to the ERISA plans.

Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

However, Plaintiff's claim for negligent misrepresentation raised in Count VIII is a closer issue. The Plaintiff claims that in telephone conversations between Plaintiff's representatives and Defendants' representatives, the Defendants' representatives negligently misrepresented and informed Plaintiff's representatives that the facility fees and services provided to Patients 1–50 were covered services and would be reimbursed under the Plans. (Prop.Sec.Amend.Comp.¶ 174.) The Plaintiff argues this tort claim was committed by the Defendant and is independent of the plan. The Defendants maintain that this claim relates to the ERISA plan and should be preempted. In addition, the Defendants argue that this is not the type of case where a negligent misrepresentation claim is appropriate because Plaintiff's injury stems from the alleged breach of the contracts between Patients 1–50.

The court finds the reasoning articulated in *McCall v. Metropolitan Life Insurance Company,* 956 F.Supp. 1172 (D.N.J.1996) persuasive and therefore, Plaintiff's negligent misrepresentation claim raised in its non-derivative capacity in Count VIII is not preempted.

*McCall* held that a negligent misrepresentation claim was sufficiently independent of an ERISA plan and therefore was not preempted by ERISA. *Id.* at 1186. The district court reached this conclusion because it was "unable to discern from the statute the congressional intent to preclude a party," such as an out of network provider, from bringing a misrepresentation claim. *Id.* Importantly, the court noted that health care providers, such as Plaintiff in this case, who are neither beneficiaries nor participants under the ERISA statute are not able to bring suit in their own name under ERISA. Consequently, if ERISA's express preemption provision is interpreted so broadly as to preempt Plaintiff's negligent misrepresentation claim, then health care providers such as the Plaintiff, "would be stripped of the right to bring suit for tortious conduct such as that which allegedly occurred in this case, where negligent misrepresentations by private claims reviewers to health care providers induce the providers to render extended medical services and care." *Id.* at 1186.

**\*6** The court also cited pragmatic justifications for its holding, explaining:

> In determining whether a patient is eligible for coverage under a health care plan, health care providers customarily verify the patient's coverage with the insurer's agents. *See Memorial Hosp. Sys.,* 904 F.2d at 246. If coverage is confirmed, the patient is generally admitted "without

further ado." *Id.* The result sought by Met Life and Healthmarc in this case would, by rendering both ERISA remedies and state-law remedies unavailable to health care providers, effectively immunize such health care managers and plan administrators from certain fraudulent and negligent misrepresentations made to health care providers. In turn, if ERISA were interpreted as precluding claims for negligent or fraudulent misrepresentations of health benefits administrators and managed care consultants to health care providers who rely upon promises of coverage, critical health care decisions would be delayed while the provider determined for itself whether its medical services would be covered under the specific terms of each prospective patient's plan. In the real world, providers place reliance upon the benefit plan interpretations of benefits administrators and managed care consultants functioning as intermediaries between the provider and the patient's benefit plan. Under the interpretation of 29 U.S.C. § 1144 espoused by Met Life and Healthmarc, such health care providers would be forced to demand payment up front or impose other costly inconveniences before admitting a patient for treatment. *See Memorial Hosp. Sys.,* 904 F.2d at 247. There is nothing in the language of ERISA or pertinent ERISA case law that compels such an inefficient result. *Id.* at 1186–87.

The court finds this reasoning equally applicable in the instant action. Therefore, the Plaintiff's proposed negligent misrepresentation claim asserted in its own non-derivative capacity as an out of network service provider is not preempted by ERISA. Whether the Plaintiff's allegations state a sufficient claim upon which relief can be granted will be discussed below in subsection B(10).

**B. Sufficiency of Plaintiff's Claims**
The Plaintiff's proposed second amended complaint alleges ten state law claims as to the one non-ERISA plan. As to the 13 ERISA plans, the Plaintiff brings a claim pursuant to ERISA's enforcement provision, § 502(a), 29 U.S.C. § 1132(a)(1). Each claim will be address separately below.

**1. Breach of Contract**
To state a claim for breach of contract, a plaintiff "must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing there from; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot,* 507 F.3d 188, 203 (3d Cir.2007).

BER-L-006176-22  04/12/2023 6:03:28 PM  Pg 14 of 101  Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW  Document 1-2  Filed 06/20/23  Page 214 of 302
PageID: 222
Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

The Plaintiff's complaint alleges that "there is no written policy provision or plan document that prohibits payment of Services provided at 'unlicensed' ambulatory care facilities which are wholly physician owned with single operating rooms such as Plaintiff herein ." (Prop.Sec.Amend.Comp.¶ 91.) Therefore, the Defendants' refusal to pay Plaintiff for services rendered to Patients 1–50, which were otherwise covered, was a breach of the non-ERISA provider agreement.

**\*7** The Defendants argue that the Plaintiff has failed to sufficiently allege the second element of its breach of contract claim. Specifically, the Defendant argues that Plaintiff's allegation that the plan documents for Patients 1–50 did not prohibit payment of services at unlicensed ambulatory care facilities to be vague because the Plaintiff fails to state the express terms or provisions Defendants have actually breached. The Plaintiff argues, and alleges in its complaint, that the Defendants have failed to provide the Plaintiff with the specific plan document at issue despite the Plaintiff's multiple requests. Without the specific plan document, the Plaintiff argues it is unable to allege the violation of an express provision because it does not know the content of the express provisions.

The court finds the Plaintiff has stated a sufficient claim for breach of contract. It is clearly alleged that the reason the Defendants refused to pay the Plaintiff's for the services provided to Patients 1–50 was because the Plaintiff's facility was not licensed by the state of New Jersey. The Plaintiff alleges the absence of a provision which prohibits payments for services provided at 'unlicensed' ambulatory care facilities. Therefore, the Defendants' refusal to remit payment for the services rendered, if proved, would be a breach of the plan agreement as to the non-ERISA plan. Under the facts alleged, it is clear that Plaintiff's complaint states a cause of action for breach of contract.

Therefore, the Plaintiff will be permitted to amend its complaint alleging a claim for breach of contract as to the nonERISA plan only.

### 2. Breach of Contract—Beech Street
The complaint next alleges that the Defendants breached the Beech Street Contract by failing to pay the Plaintiff for services provided to Patient's 1–50. The Beech Street contract entitles the Plaintiff to be paid for covered services at 80% of usual billed charges less applicable co-payments, deductibles and co-insurance by payors. (Prop.Sec.Amend.Comp.¶

103.) The Plaintiff then alleges that the Defendants authorized Beech Street to enter into contracts on their behalf, including the contract with the Plaintiff herein. (Prop.Sec.Amend.Comp.¶ 104.) The Plaintiff maintains that it has made demand for payment of its outstanding claims under the Beech Street contract, but the Defendants have failed to remit payments. (Prop.Sec.Amend.Comp.¶ 105.)

The Defendants argue that they cannot be sued for breach of a contract to which they are not a party. The Plaintiff maintains that it sufficiently alleged an agency relationship between Beech Street and the Defendants to establish a breach of contract claim.

It is well established that a principal is bound to contracts executed by an agent if it is within the agent's authority to contract on behalf of that principal. *Mesce v. Automobile Ass'n of New Jersey,* 8 N.J.Super. 130, 135, 73 A.2d 586 (App.Div.1950) ("It is, of course, the general rule that the principal is bound by the acts of the agent within the apparent authority which he knowingly permits the agent to assume or which he holds the agent out to the public as possessing.") *See Union Trust Co. v. Wekfern Food Corp .,* No. 86–728, 1988 U.S. Dist. LEXIS 11858, \*12, 1988 WL 113354 (D.N.J. October 5, 1988) and *Alicea v. New Brunswick Theological Seminary,* 244 N.J.Super. 119, 128, 581 A.2d 900 (App.Div.1990).

**\*8** The Plaintiff's complaint, as to the non-ERISA plan, sufficiently alleges that Beech Street entered into the contract as an agent for the United. Accordingly, if such agency is shown, United, as the principal, may be liable for breach of contract through the acts of its agent, Beech Street. Therefore, the Plaintiff will be permitted amend its complaint to include a breach of contract based upon the Beech Street contract with regard to the non-ERISA plan.

### 3. Unjust Enrichment and Quantum Meruit
Plaintiff's claims for unjust enrichment and quantum meruit allege that the Plaintiff provided services to Patients 1–50 after receiving verbal confirmation from the Defendants that these services were covered under the insurance plans and the Defendants subsequently refused to remit payment for the services.

In order to state claim under the quasi-contractual theory of quantum meruit, a plaintiff must establish four elements: (1) the performance of services in good faith; (2) the acceptance of the services by the person to whom they

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 15 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 215 of 302
PageID: 223
Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

are rendered; (3) an expectation of compensation therefore; and (4) the reasonable value of the services. *Sean Wood, L.L.C. v. Hegarty Group, Inc.,* 422 N.J.Super. 500, 513 (App.Div.2011). "Quasi-contractual recovery on the basis of quantum meruit rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Id.* at 512.

In order to establish a claim for unjust enrichment, "a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554, 641 A.2d 519 (1994).

It is well established that claims of quantum meruit and unjust enrichment do not exist where a valid express contract exists concerning the same subject matter. "Quasi-contract liability will not be imposed ... if an express contract exists concerning the identical subject matter." *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.,* 716 F.2d 220, 226–27 (3d Cir.1983).

In this case, the non-ERISA insurance plan of Patients 1–50, to which Plaintiff is the assignee of benefits, governs the instant dispute and takes precedence over any non-derivative claim Plaintiff has as a service provider.

Further, to state a claim for quantum meruit and unjust enrichment, the benefit at issue must have been conferred on United, as the Defendants. *See Alpert, Golberg, Butler, Norton & Weiss, P .C. v. Quinn,* 410 N.J.Super. 510, 544 n. 6, 983 A.2d 604 (2009); 405 *Monroe Co. v. City of Asbury Park,* 40 N.J. 457, 464, 193 A.2d 115 (1963).

In this case, the Plaintiff provided services to Patients 1–50 and any benefit conferred was conferred on Patients 1–50, not United. United, as the insurance company, "derives no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money to the insured-which hardly can be called a benefit." *Travelers Indem. Co. of Conn. v. Losco Group, Inc.,* 150 F.Supp.2d 556, 563 (S.D.N.Y.2001).

**\*9** Therefore, Plaintiff will not be permitted to amend its complaint to include claims for unjust enrichment and quantum meruit as such claims would be futile.

### 4. Third Party Beneficiary
This claim is set forth by the Plaintiff as an alternative to its breach of contract claim in the event the Plaintiff is not entitled to recovery as a service provider or the Assignments

of Benefits are not recognized. The Defendants argue that this claim is redundant to Plaintiff's breach of contract claim and should be dismissed.

Under the Federal Rules of Civil Procedure, a plaintiff may plead alternative claims for relief, regardless of consistency. Fed.R.Civ.P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency").

The Plaintiff alleges sufficient factual allegations to support its claim as a third party beneficiary. Therefore, as to the non-ERISA plan, the Plaintiff will be permitted to amend its complaint to include a claim as a third party beneficiary.

### 5. Promissory Estoppel
This claim for promissory estoppel is also asserted by the Plaintiff in the alternative to its breach of contract claim to the extent that the Plaintiff may not be recognized as the assignee and/or the contract claims are not cognizable. The Defendants argue that this claim should be dismissed because the representations made by Defendants' representatives to the Plaintiff did not constitute independent promises to pay separate and apart from the breach of contract claims. Rather, the Defendants' representatives made representations which only pertained to coverage under the insurance contracts.

In order to allege a claim for promissory estoppel, a plaintiff must show four elements: (1) a clear and definite promise; (2) made with the expectation that the promisee would rely upon it; (3) reasonable reliance; and (4) definite and substantial detriment. *Toll Bros., Inc. v. Board of Chosen Freeholders of County of Burlington,* 194 N.J. 223, 253, 944 A.2d 1 (2008).

In this case, the proposed second amended complaint sets forth in detail the alleged conversations between the Plaintiff's representatives and the Defendants' representatives regarding payment for services provided by the Plaintiff to Patients 1–50. During these conversations, the Plaintiff's representative provided the Defendants' representative with detailed information about the patient, the Plaintiff, and the services to be rendered, including: the tax i.d. number of the Plaintiff, identification of the patient by name, date of birth and policy number, as well as the specific procedure being performed. In each telephone call, Plaintiff's representative was informed by the Defendants' representative that there was coverage for Plaintiff's facility fees and for the procedures involved. (Prop.Sec.Am.Comp.¶¶ 15–26.)

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 16 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 216 of 302
PageID: 224
Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

These conversations alleged in the complaint constituted clear and definite promises upon which the Plaintiff relied in rendering services to Patients 1–50. The facts alleged here, that Defendants' representatives confirmed that Plaintiff would receive reimbursement for services provided to Patients 1–50, are separate from the Plaintiff's breach of contract claim which is premised on the improper denial of payment based on state licensure. While the Plaintiff has alleged a breach of contract claim, that should not foreclose the Plaintiff from alleging promissory estoppel in the alternative. As discussed above, a plaintiff may plead alternative claims for relief, regardless of consistency. Fed.R.Civ.P. 8(d) (3) ("A party may state as many separate claims or defenses as it has, regardless of consistency").

*10 Therefore, the Plaintiff will be permitted to amend its complaint to include a claim for promissory estoppel as to the non-ERISA plan.

### 6. Implied Contract/Contract by Custom or Dealing/ Implied Covenant of Good Faith and Fair Dealing

The Plaintiff alleges that from Spring 2009 to September 2009, the Defendants paid Plaintiff for services provided to its patients who were Defendants' insureds and beneficiaries pursuant to the Assignments of Benefits ("AOBs") signed by the patients, or alternately by reason of an obligation to make payment to Plaintiff as a medical provider, or alternately pursuant to the applicable insurance agreements and/or the Beech Street agreement. (Prop.Sec.Am.Comp.¶ 136.) The Plaintiff alleges that this course of conduct constituted an implied promise to continue payment to Plaintiff for services provided to Defendants' insureds. (Prop.Sec.Am.Comp.¶ 137.)

The Defendants argue that Plaintiff's claim for "Implied Contract/Contract by Custom or Dealing/Implied Covenant of Good Faith and Fair Dealing" should be dismissed because the Plaintiff does not set forth any facts that would allow the Court or the Defendants to discern the alleged terms of the Defendants' promise and/or contract to pay. The Defendants maintain that the complaint does not identify a specific oral representation which supports an implied contract.

The Plaintiff has not opposed the dismissal of this claim. The court agrees that the Plaintiff's allegations are insufficient to allow the court to discern the alleged terms of the Defendants' alleged implied contract. Therefore, the court will deny Plaintiff leave to amend its complaint to allege a count for

"Implied Contract/Contract by Custom or Dealing/Implied Covenant of Good Faith and Fair Dealing."

### 7. Reasonable Reliance/Arbitrary and Disparate Treatment

The Defendants argue that "Reasonable Reliance/Arbitrary and Disparate Treatment" is not a recognized cause of a action under either state or federal law. The Plaintiff has not opposed Defendants' motion as to this claim.

As the Plaintiff has not put forth any legal basis for its "Reasonable Reliance/Arbitrary and Disparate Treatment" claim, the Plaintiff will not be permitted to file an amended complaint alleging this count as such claim would be futile.

### 8. Arbitrary and Capricious

Similarly, the Defendants argue that "Arbitrary and Capricious" is a standard of review, not an independent cause of action. The Plaintiff has not opposed Defendants' motion to dismiss this claim.

As the Plaintiff has not put forth any legal basis for its "Arbitrary and Capricious" claim, and as arbitrary and capricious is clearly a standard of review and not an independent cause of action, Plaintiff will not be permitted to file an amended complaint alleging this count as such claim would be futile.

### 9. Tortious Interference

The Plaintiff alleges in its proposed second amended complaint that the Defendants interfered with Plaintiff's contractual, business and patient relations by intentionally and maliciously refusing to pay for services rendered by the Plaintiff to Patients 1–50. (Prop.Sec.Am.Comp.¶¶ 165–171.)

*11 Under New Jersey law, a complaint based on tortious interference with prospective economic advantage must allege three elements: (1) a protectable right—a prospective economic or contractual relationship; (2) the interference was done intentionally and with malice; (3) the interference caused the loss of the prospective gain; and (4) the injury caused damage. *Printing Mart–Morristown v. Sharp Electronics Corp.,* 116 N.J. 739, 751, 563 A.2d 31 (1989).

Importantly, "it is fundamental to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 17 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 217 of 302
PageID: 225
Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

the relationship." *Id.* at 752, 563 A.2d 31. A cause of action for tortious interference "was not meant to upset the rules governing the contractual relationship itself." *Id.* at 753, 563 A.2d 31. "Where a person interferes with the performance of his or her own contract, the liability is governed by principles of contract law." *Id.*

The Defendants argue that they are a party to the insurance contracts at issue and therefore, a claim for tortious interference with prospective economic advantage is inappropriate and contract laws govern the instant dispute. The Plaintiff does not oppose the Defendants' motion to dismiss as to this claim.

The court finds the Defendants' argument persuasive. The Defendants are a party to the insurance contracts at issue in this case, and therefore, a claim for tortious interference is inappropriate. Therefore, the Plaintiff will not be permitted to amend its complaint to include a cause of action for tortious interference with prospective economic advantage.

### 10. Negligent Misrepresentation

As discussed above, the Plaintiff's proposed second amended complaint alleges a claim of negligent misrepresentation, which this court concluded *infra* was not preempted by ERISA. The Plaintiffs allege that in telephone conversations between Plaintiff's representatives and Defendants' representatives, the Defendants' representatives negligently misrepresented and informed Plaintiff's representatives that the facility fees and services provided to Patients 1–50 were covered services and would be reimbursed under the Plans. (Prop.Sec.Amend.Comp.¶ 174.)

In order to state a claim for negligent misrepresentation, a plaintiff must allege "an incorrect statement, negligently made and justifiably relied on, which results in economic loss." *Konover Const. Corp. v. East Coast Const. Services Corp.,* 420 F.Supp.2d, 366, 370 (D.N.J.2006). While a fiduciary duty between the parties is not an element of a claim for negligent misrepresentation, courts have held that "a plaintiff seeking to recover for negligent misrepresentation must plead that the defendant owed it a duty of care." *Roll v. Singh,* No. 07–04136, 2008 W.L. 3413863, *20 (D.N.J. June 26, 2008).

The Defendants argue that Plaintiff fails to state a claim because it did not allege the Defendants owed it a duty of care. However, the existence of a duty is a question of law to be decided by the court, not an issue of fact. *Endre v. Arnold,* 300

N.J.Super. 136, 142, 692 A.2d 97 (App.Div.1997) ("Whether a duty exists is solely a question of law to be decided by a court and not by submission to a jury.") Therefore, the Plaintiff need not expressly plead that the Defendants owed it a duty of care. Rather, in order to survive a motion to dismiss, the Plaintiff need only allege sufficient facts for a court to find a basis for the imposition of a duty between the parties.

**\*12** New Jersey law sets forth several factors for a court to consider in determining whether a duty exists.

> determination of the existence of a duty ultimately is a question fairness and policy. An important, although not dispositive consideration, is the foreseeability of injury to others from the defendant's conduct. Also important are the nature of the risk posed by the defendant's conduct, the relationship of the parties, and the impact on the public of the imposition of a duty of care.

*Snyder v. American Ass'n of Blood Banks,* 144 N.J. 269, 292, 676 A.2d 1036 (1996) (citations omitted).

In this case, the court finds that the Plaintiff has sufficiently alleged facts to support a finding that the Defendants owed the Plaintiff a duty of care. The Plaintiff has alleged that it is a provider of medical services and relied on representations of the Defendants, an insurer providing insurance coverage to insureds and beneficiaries within New Jersey, in ultimately providing medical services to Patients 1–50. The court finds the reasoning in *McCall,* 956 F.Supp. at 1187, persuasive and applicable to the instant action. Specifically:

> If health benefits administrators and managed care consultants fail to act reasonably in making representations concerning insurance coverage, financial harm will likely be inflicted on the medical companies that provide treatment in reliance upon promises of payment. This threatened harm, moreover, can easily be avoided if companies ... ensure the accuracy of their representations or refrain from making assurances of coverage in instances in which they do not have the authority to do so. As discussed previously, health care providers are often compelled by circumstances to rely on the representations made by benefits administrators and managed care consultants. Thus, the general public and companies involved in the delivery of medical care have a vital interest in ensuring that health plan administrators and medical consultants exercise due care in making such representations concerning insurance coverage. *See Snyder,* 144 N.J. at 292, 676 A.2d 1036 (imposing on blood "clearing house" duty to exercise due care, because of

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 18 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 218 of 302
PageID: 226

Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

reliance of hospitals and patients on defendant for safety of nation's blood supply).

In this case, the United owed a duty to provide the Plaintiff with accurate information regarding reimbursement for medical services provided to United insureds. It was foreseeable that incorrect information would cause the Plaintiff and/or Patients 1–50 economic harm, as the cost of the medical services would not be covered by the insurance plan. Moreover, it is common for medical providers to verify coverage with a patient's insurance prior to administering any care in order to prevent the possibility of financial harm to the patient and the service provider. The general public has a significant interest in ensuring that representations made to medical service providers by insurance company representatives are accurate in order avoid incurring unnecessary expense and to provide efficient care. The Court does not have occasion to consider whether an insurance carrier may disclaim the healthcare provider's ability to rely upon such oral advice of coverage, since that circumstance is not presented in the pleadings under review.

**\*13** Therefore, the Plaintiff will be permitted to amend its complaint to include a claim for negligent misrepresentation as to the ERISA and non-ERISA plans.

**11. ERISA enforcement**
Finally, the Plaintiff alleges a claim pursuant to ERISA's civil enforcement provision, § 502(a), 29 U.S.C. § 1132(a)(1)(B), as to the 13 ERISA plans. As discussed above, ERISA provides a private cause of action for a participant or beneficiary to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 29 U.S.C. 1132(a).

The Defendant argues that the Plaintiff has failed to state a claim under ERISA because the Plaintiff has not identified any specific provision of the 13 ERISA plans that United has allegedly breached. The Plaintiff argues that it provided specific language from the Summary Plan Descriptions("SPDs") for 4 of the 13 ERISA plans at issue. As to the other plans, the Plaintiff argues, and alleges in its complaint, that the Defendants have failed to provide the plan documents to the Plaintiff despite numerous requests.

"A plaintiff seeking to recover under section 502(a)(1)(B) must demonstrate that the benefits are actually 'due'; that is, he or she must have a right to benefits that is legally enforceable against the plan" and that the plan administrator improperly denied him or her those benefits. *Hooven v. Exxon Mobil Corp.,* 465 F.3d 566, 574 (3d Cir.2006). "ERISA's framework ensures that employee benefit plans be governed by written documents and summary plan descriptions, which are the statutorily established means of informing participants and beneficiaries of the terms of their plan and its benefits." In re Unisys Corp. Retiree Medical Ben. ERISA Litigation, 58 F.3d 896, 902 (3d Cir.1995).

The Plaintiff alleges in its complaint that it provided pain management injections to nine patients. (Prop.Sec.Am.Comp.¶¶ 16–24.) Prior to providing these injections, the Plaintiff's representative confirmed coverage for the service and facility fees with Defendants' representatives. (Prop. Sec. Am. Comp. ¶¶ 16–24 .) The Plaintiff cites to four SPDs of the thirteen ERISA plans at issue to support its claim. (Prop.Sec.Am.Comp.¶¶ 51–63.) Specifically, the Plaintiff alleges:

52. For example, the Ernst & Young Flexible Benefits Program SPD provides that "once the deductible is satisfied, the plan pays a percentage (based on your benefit election) of eligible expenses ... You have the freedom to choose any physician or hospital." Under the Open Access Plan Summary, outpatient treatment is specifically covered and includes "outpatient hospital." Under the "$2,500.00 Deductible Plan Summary" outpatient treatment specifically includes both "outpatient surgery-hospital" and "outpatient surgery."

53. The SPD for Administaff of Texas, Inc. similarly provides for benefits for outpatient surgery both in and out of network. Eligible expenses specifically include non-network benefits. The SPD states "Pay for Covered Health Services Provided by Non–Network Providers: In accordance with any state prompt pay requirements, we will pay Benefits after we receive your request for payment that includes all required information ..."

**\*14** 54. The Administaff SPD specifically provides for coverage for surgery—outpatient which includes "surgery and related services received on an outpatient basis at a hospital or alternate facility or in a physician's office" providing benefits which include "the facility charge and the charge for supplies and equipment." Further, "alternate facility" is defined as "a health care facility that is not a hospital and that provides one or more of the following services on an out-patient basis, as permitted by law: surgical services ..."

55. Under the Interpublic Group of Companies, Inc. SPD, outpatient surgery is specifically covered when "received on an outpatient basis at a hospital or alternate facility."

56. Under the Bridgestone Americas Holding, Inc. SPD, in-network and out-of-network benefits are available for "surgical outpatient Hospital or Treatment Facility." In fact, covered expenses include "Outpatient Surgery," and the SPD states: "The Plan also requires that specific surgeries be performed on an outpatient basis in order for the Plan's normal benefits to apply."

57. The Bridgestone SPD also specifically provides that, "If there is any conflict between the brief description presented here and the official Plan document, the Plan document will govern."

58. None of the SPDs provided by United have language indicating that claims cannot or may not be paid because a facility does not have state licensure.

59. Defendants' insurance agreements and plans applicable to the claims they denied for payment to Plaintiff, do not in writing prohibit payment to otherwise lawfully authorized unlicensed ambulatory care facilities including Plaintiff's facility. It is believed that Defendants' denials are in violation of the terms of the insuring agreements at issue.

60. With the exception of the Administaff SPD, the SPDs do not define "alternate facility" and do not limit payment to outpatient surgical facilities that are licensed by the state. The Administaff SPD definition specifically included a facility such as Plaintiff, which performs surgical services on an outpatient basis.

61. Plaintiff meets any reasonable interpretation of "alternate facility" under the SPDs, as it is an ambulatory surgical facility and pursuant to State of New Jersey, Department of Health Regulations, 8 N.J.A.C. 43A, is not required by the State of New Jersey to be "licensed."
(Prop.Sec.Am.Comp.¶¶ 52–61.)

However, these allegations do not establish, or even address, whether pain injections are a covered benefit under the plan or how pain injections relate to outpatient surgery. In addition, these allegations generally cite to the SPD and do not provide the court with enough factual information to determine whether the pain injections were indeed covered services under the plan. Further, while the Plaintiff alleges that none of the SPDs provided by Defendants have language

indicating that claims cannot or may not be paid because a facility does not have state licensure, the Plaintiff has not attached these SPDs for the court's review.

**\*15** As to the remaining nine ERISA plans, the Plaintiff provides no support in its complaint for these claims because the Plaintiff does not provide any facts supporting its allegations that benefits are due and owing under the plans. Without information as to the terms and provisions of the plan documents, the complaint fails to state a claim upon which relief can be granted.

To the extent that the Defendants failed to provide the Plaintiff with the requested documents, ERISA provides that plan administrators shall "upon written request of any participant or beneficiary furnish a copy of the latest updated summary, plan description." 29 U.S.C. § 1024(b)(4). A beneficiary may enforce this obligation under ERISA's civil enforcement provision, 29 U.S.C. § 1132(c).

The Plaintiff has not followed the procedure prescribed by ERISA to obtain copies of the plan. It is the Plaintiff's burden of proof to have the plan documents and cite to specific plan provisions when filing a civil complaint to obtain ERISA benefits. As the Plaintiff has not cited to or attached the plan documents for the remaining nine ERISA plans, the Plaintiff has failed to state a claim under ERISA's civil enforcement provision.

Therefore, the Plaintiff will not be permitted to amend its complaint to bring a cause of action under ERISA's civil enforcement provision at this time, as such claim is incomplete as alleged. However, the court will grant the Plaintiff leave to file a motion to amend within sixty (60) days of the date of this order to correct the above deficiencies or in the alternative, to allege a claim enforcing United's obligation to provide the plan documents pursuant to 29 U.S.C. § 1024(b)(4).

### C. Motion to Dismiss
As the court has granted in part and denied in part Plaintiff's motion to amend the complaint, the Defendants' motion to dismiss will be dismissed as moot.

### IV. CONCLUSION
For the reasons discussed above, the court will grant in part and deny in part Plaintiff's motion to file a second amended complaint. The Plaintiff will be granted leave

Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

file a second amended complaint alleging the following causes of action as to the non-ERISA plan: Breach of Contract; Breach of Contract–Beech Street; Third Party Beneficiary; and Promissory Estoppel. The Plaintiff will also be granted leave to amend the complaint to allege a negligent misrepresentation claim against both ERISA and non-ERISA plans.

The court will deny Plaintiff leave to amend its complaint as to the Unjust Enrichment/Quantum Meruit claim, the Implied Contract/Contract by Custom or Dealing/Implied Covenant of Good Faith and Fair Dealing claim, the Reasonable Reliance claim, the Arbitrary and Capricious claim, and the Tortious Interference claim (as such claims are futile) and the ERISA enforcement claim (which is insufficiently pled at present). However, the Plaintiff will be granted leave to file a

subsequent motion to amend to correct the deficiencies of the ERISA civil enforcement claim or to allege a claim enforcing United's obligation to provide the plan documents pursuant to 29 U.S.C. § 1024(b)(4) within sixty (60) days of the date of this order.

*16  Since the court has granted in part and denied in part Plaintiff's motion to file a second amended complaint, the court will dismiss Defendant's motion to dismiss as moot.

The accompanying Order will be entered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 762498

Footnotes

1    In addition to the complaint, a court may consider material "integral to or explicitly relied upon in the complaint" without converting a motion to dismiss into one for summary judgment. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997). In this case, United has included the Affidavit of Stacy A. Chalupsky, an employee of United, in support of its motion to dismiss. Ms. Chalupsky's affidavit serves to identify which Plans are governed by ERISA and which are not. As this information is integral to the Plaintiff's complaint, the court may properly consider Ms. Chalupsky's affidavit without converting this motion to a summary judgment motion.

2    Counts I through VII, IX and X allege the following causes of action: Breach of Contract (Count I); Breach of Contract—Beech Street (Count II); Unjust Enrichment and Quantum Meruit (Count III); Third Party Beneficiary (Count IV); Implied Contract/Contract by Custom or Dealing/Implied Covenant of Good Faith and Fair Dealing (Count V); Reasonable Reliance/Arbitrary and Disparate Treatment (Count VI); Tortious Interference (Count VII); Arbitrary and Capricious (Count IX); and Promissory Estoppel (Count X).

3    To the extent the Plaintiff argued that its breach of contract claim in Count I was not preempted by ERISA in Plaintiff's capacity as a service provider because of an independent provider agreement, the court finds this argument unpersuasive. It is undisputed that the Plaintiff was an out of network provider and did not have a provider agreement with the Defendants. Therefore, the Plaintiff's reliance on *Blue Cross of California v. Anesthesia Care Associates Medical Group, Inc.,* 187 F.3d 1045 (9th Cir.1999), is without merit.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

TAB 3

2021 WL 1541069
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

GOTHAM CITY

ORTHOPEDICS, LLC, Plaintiff,

v.

AETNA INC., Aetna Health Inc., Aetna Life
Insurance Company, Aetna Insurance Company
of Connecticut, Non-New Jersey Aetna
Plans 1-10 and John Does 1-10, Defendants.

Civil Action No. 20-14915 (SDW)(LDW)
|
Signed April 19, 2021

**Attorneys and Law Firms**

Keith J. Roberts, Paul Matthew Bishop, Shannon M. Carroll, Brach Eichler LLC, Roseland, NJ, for Plaintiff.

Colin D. Dougherty, Benjamin McCoy, Fox Rothschild LLP, Blue Bell, PA, Matthew A. Baker, Connell Foley LLP, Cherry Hill, NJ, for Defendants Aetna Inc., Aetna Health Inc., Aetna Life Insurance Company, and Aetna Insurance Company of Connecticut.

Colin D. Dougherty, Benjamin McCoy, Fox Rothschild LLP, Blue Bell, PA, for Defendant Non-New Jersey Aetna Plans 1-10.

**OPINION**

WIGENTON, District Judge.

**\*1** Before this Court is Defendants Aetna, Inc., Aetna Health Inc., Aetna Life Insurance Company, Aetna Insurance Company of Connecticut, and Non-New Jersey Aetna Plans 1-10's (collectively "Defendants" or "Aetna") Motion to Dismiss (D.E. 14-1) Plaintiff Gotham City Orthopedics, LLC's ("Plaintiff") Complaint (D.E. 1, Ex. A ("Compl.")) pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Jurisdiction is proper pursuant to 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1441(a) and 1445(a). This opinion is issued without oral argument pursuant to

Rule 78. For the reasons stated herein, Defendants' Motion is **GRANTED.**

**I. BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff is an orthopedic medical practice that operates in Passaic County, New Jersey. (Compl. ¶¶ 1, 7.) Plaintiff provided out-of-network "emergent, medically necessary surgical and medical services" to five patients (the "Patients") who were "covered under their employers' [Aetna] health insurance plan[s] and entitled to health benefits under these plans." (D.E. 1, ¶¶ 5, 8; Compl. ¶¶ 10, 21, 32, 43, 54, 70.) Plaintiff asserts that this required medical care "ar[ose] out of" the Patients' admission to "in-network facilit[ies]." (Compl. ¶¶ 15, 26, 37, 48, 59.) On September 14, 2020, asserting that Defendants underpaid Plaintiff for the medical services provided to the Patients, Plaintiff filed a Complaint in the Superior Court of New Jersey bringing state common law and statutory claims.[1] (*See* Compl.)

On October 23, 2020, Defendants removed the Complaint to this Court. (*See* D.E. 1.) Defendants moved to dismiss on February 12, 2021, alleging that Plaintiff has failed to state claims upon which relief can be granted, in part because the claims are federally preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.A. § 1001 *et seq.* (D.E. 14.) Plaintiff filed its opposition on March 22, 2021, and Defendants replied on March 29, 2021. (D.E. 20; D.E. 21.)

**II. STANDARD OF REVIEW**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This Rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted); *see also Phillips v. Cty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (stating that Rule 8 "requires a 'showing' rather than a blanket assertion, of an entitlement to relief"). In considering a Motion to Dismiss under Rule 12(b)(6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 231 (external citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 23 of 101   Trans ID: LCV20231258369
Gotham City Orthopedics, LLC v. Aetna Inc., Slip Copy (2023)

Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 223 of 302
PageID: 231

complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (discussing the *Iqbal* standard).

## III. DISCUSSION

### A. Counts I-IV

**\*2** Because ERISA was intended as a "broad...remedial scheme," *Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.*, 869 F. Supp. 278, 285 (D.N.J. 1994), "[g]enerally, a state law that 'relates to' an ERISA-governed plan is preempted," *Levine v. United Healthcare Corp.*, 402 F.3d 156, 164 (3d Cir. 2005) (citing ERISA, § 514(a), 29 U.S.C. § 1144(a) ("Section 514")). "State law" is statutorily defined as "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). "State common law claims fall within this definition ..." *Atl. Shore Surgical Assocs. v. Horizon Blue Cross Blue Shield of N.J.*, Civ. No. 17-07534, 2018 WL 2441770, at \*3 (D.N.J. May 31, 2018) (citation omitted). When considering whether a state law "relates to" a benefit plan, courts assess the extent to which the law "has a connection with or reference to such a plan." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S. Ct. 474, 479 (2020) (citation omitted). This requires considering whether analyzing the plan would be "a critical factor in establishing liability" under the state law, and whether the "court's inquiry would be directed to the plan" when assessing the claims. *See 1975 Salaried Ret. Plan for Eligible Emps. of Crucible, Inc. v. Nobers*, 968 F.2d 401, 406 (3d Cir. 1992).

Here, Plaintiff's common law claims clearly "relate to" the Patients' Aetna ERISA plans.[2] *See* 29 U.S.C. § 1144(a). Courts routinely hold that when a party challenges the denial of ERISA benefits, but restyles those claims as common-law causes of action based on breach of contract, the implied covenant of good faith and fair dealing, promissory estoppel, or quantum meruit, those claims are preempted. *See, e.g.*, *Sleep Tight Diagnostic Ctr., LLC v. Aetna Inc.*, 399 F. Supp. 3d 241, 250 (D.N.J. 2019); *Urbanik v. ITT Corp.*, Civ. No. 09-00627, 2009 WL 2132434, at \*4 (D.N.J. July 13, 2009); *Schmelzle v. Unum Life Ins. Co. of Am.*, Civ. No. 08-0734, 2008 WL 2966688, at \*3 (D.N.J. July 11, 2008). Plaintiff's Complaint is generally premised on Defendants' alleged wrongful denial of the Patients' benefits under their Aetna ERISA plans. (*See* Compl.) For example, the Complaint

repeatedly acknowledges that the Patients were insured under ERISA plans and demands payment according to those plan benefits. (*See, e.g., id.* ¶¶ 54 (patient was "insured through [ ] Aetna Open Choice POS II"), 79 ("Aetna knew ... that their members and beneficiaries are entitled to be covered for out-of-network emergency care"), 91 (discussing the "claims and issue benefits" of "Aetna's Plans though which Aetna's insureds receive benefits").)

**\*3** The Complaint does not suggest any circumstances that would remove Plaintiff's claims from the ERISA plans' scope and allow them to survive preemption. *Compare Haghighi v. Horizon Blue Cross Blue Shield of N.J.*, Civ. No. 19-20483, 2020 WL 5105234, at \*5 (D.N.J. Aug. 31, 2020) (dismissing breach of contract claim where "Plaintiffs ha[d] not alleged the existence of an independent agreement from the Plan") *with Jewish Lifeline Network, Inc. v. Oxford Health Plans, Inc.*, Civ. No. 15-0254, 2015 WL 2371635, at \*5 (D.N.J. May 18, 2015) (determining that, due to the Defendants' express promises regarding specific coverage, Plaintiff's claims were sufficiently removed from the ERISA plan). Although Plaintiff relies on the fact that its claims were brought in an individual capacity, the Complaint does not suggest any separate contractual relationship between Plaintiff and Defendants or assert that Defendants proffered any specific representations to Plaintiff (beyond the mere existence of the ERISA plans themselves). (*See* Compl.) As for Plaintiff's quantum meruit claim, "the insured individual, rather than the insurer, derives the benefit from a healthcare providers' provision of medical services." *Haghighi*, 2020 WL 5105234, at \*5. Thus, each of Plaintiff's common law claims must be dismissed.

### B. Count V

For similar reasons, Plaintiff's state statutory claim is also federally preempted. *See Advanced Orthopedics & Sports Med. Inst. v. Empire Blue Cross Blue Shield*, Civ. No. 17-08697, 2018 WL 2758221, at \*6 (D.N.J. June 7, 2018); *Cohen v. Horizon Blue Cross Blue Shield of N.J.*, Civ. No. 15-4528, 2017 WL 1206005, at \*3 (D.N.J. Mar. 31, 2017). This Court must interpret Section 514 "in light of the congressional intent to create an exclusive federal remedy in ERISA § 502(a). Under ordinary principles of conflict pre-emption, then, even a state law that can arguably be characterized as 'regulating insurance' will be pre-empted if it provides a separate vehicle to assert a claim for benefits outside of, or in addition to, ERISA's remedial scheme." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 217-18 (2004); 29 U.S.C. § 1144(a). Therefore, state laws that are

"specifically directed toward entities engaged in insurance" or that "substantially affect the risk pooling arrangement between the insurer and the insured" may be preempted. *Ky. Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 342 (2003).

The administrative regulations listed in Count V are preempted by ERISA. Each regulation "would affect the 'types of benefits provided by an ERISA plan,' " *Cohen*, 2017 WL 1206005, at *3 (discussing ERISA's preemption of N.J.A.C. 11:24–5.3), and assessing their application would "require reference" to the Patients' Aetna plans, *Advanced Orthopedics*, 2018 WL 2758221, at *6 (discussing ERISA's preemption of N.J.A.C. 11:22–5.8, 11:24–5.1, 11:24–5.3, and 11:24–9.l). "Indeed, the New Jersey regulations at issue here explicitly require an evaluation of whether the services for which reimbursement are sought are covered ...." *Advanced*

*Orthopedics*, 2018 WL 2758221, at *6. For example, Plaintiff asserts that Defendants "did not pay ... the amount due," which requires referring to "the Plan's out-of-network reimbursement provision[s]."[3] *Id.*; (*see, e.g.*, Compl. ¶¶ 18 (alleging that Defendants "drastically underpaid" Plaintiff), 103-06 (asserting that Plaintiff was not "paid a large enough amount").) Thus, Count V must also be dismissed.[4]

## CONCLUSION

**\*4**  Defendant's Motion to Dismiss is **GRANTED**. An appropriate order follows.

## All Citations

Slip Copy, 2021 WL 1541069

Footnotes

1   The Complaint contains some references to Cigna, which seem to be in error. (*See* Compl. ¶ 4.)

2   Curiously, although diversity jurisdiction exists in this case (*see* D.E. 1) and Plaintiff has not challenged removal or filed a motion to remand, Plaintiff seems to rely almost entirely on the complete preemption doctrine to challenge this motion to dismiss. (*Compare* D.E. 20 at 7 *with* D.E. 21 at 2 ("Unlike complete preemption, which creates jurisdiction where none would otherwise exist, express preemption merely displaces state claims and subjects them to dismissal.").)

    Here, this Court must assess whether Plaintiff's claims are expressly preempted under Section 514, and cases like those cited by Plaintiff assessing motions to remand are largely inapposite. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 200 (2004) (assessing a lower court decision regarding a motion to remand); *McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 145 (2d Cir. 2017) (same); *Progressive Spine & Orthopaedics, LLC v. Anthem Blue Cross Blue Shield*, Civ. No. 17-536, 2017 WL 4011203, at *6 (D.N.J. Sept. 11, 2017) (deciding case on motion to remand); *E. Coast Advanced Plastic Surgery v. Horizon Blue Cross Blue Shield of N.J.*, Civ. No. 18-7718, 2018 WL 6178869, at *1 (D.N.J. Nov. 26, 2018) (same); *but see Atlantic Shore Surgical Associates v. United Healthcare/Oxford*, Civ. No. 18-9506, 2019 WL 1382103, at *4 (D.N.J. Jan. 23, 2019) (discussing complete preemption and express preemption) and *Advanced Orthopedics & Sports Med. Inst. v. Empire Blue Cross Blue Shield*, Civ. No. 17-08697, 2018 WL 2758221, at *6 (D.N.J. June 7, 2018) (dismissing Plaintiff's claims as expressly preempted because they "require reference to the plan").

3   This Court notes that Plaintiff's opposition does not provide specific argument regarding the individual regulations listed in the Complaint or make a meaningful effort to distinguish Defendants' case law that identifies those same statutes as preempted by ERISA. (*See* D.E. 20 at 13-14, 23-28.); *cf. North Jersey Brain & Spine Center v. Aetna Life Ins. Co.*, Civ. No. L-5817-18, 2019 WL 4889507, at *11–12 (N.J. Super. L. Oct. 1, 2019) (refraining from dismissing claims based on ERISA preemption where plaintiffs "allege they *received preauthorization* from the respective plans as to coverage for the services to be provided and for payment of the Plaintiffs' UCR charges") (emphasis added); *Jeff Pan, MD, PC v. Aetna Life Ins. Co.*, Civ. No. 7273-18, 2019 WL 4889506, at *13 (N.J. Super. L. Oct. 1, 2019) (noting that "[t]he Complaints allege communications *seeking preauthorization* for hospital services to be rendered by the Plaintiffs, followed by authorization by the Defendants or a notification that such authorization was not necessary in light of the emergent nature of the services and the legal requirements imposed on both parties.") (emphasis added).

4   As Counts I-V are preempted by ERISA, this Court refrains from assessing whether each count has been sufficiently pleaded according to Rule 12(b)(6).

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

TAB 4

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 27 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 227 of 302
PageID: 235
Berlin Medical Associates, P.A. v. CMI New Jersey... Not Reported in A.2d...

2006 WL 2162435
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.

BERLIN MEDICAL ASSOCIATES, P.A.,
Berlin Physical Therapy, Joseph M. Hassman,
D.O., Delran Chiropractic, P.A., and Leonard
Strobel, D.O., on behalf of themselves and all
others similarly situated, Plaintiffs–Appellants,

v.

CMI NEW JERSEY OPERATING
CORPORATION, Consumer Health Network
Plus, LLC, Consumer Health Network Inc.,
Allsate New Jersey Insurance Company,
Liberty Mutual Fire Insurance Company,
Liberty Mutual Insurance Group, Liberty
Mutual Insurance Company, Liberty Insurance
Corporation, Liberty Mutual Managed
Care, Inc., Prudential Property and Casualty
Insurance Company of New Jersey, Selective
Insurance Company of America and State Farm
Indemnity Company, Defendants–Respondents.

Argued May 9, 2006.
|
Decided Aug. 3, 2006.

**Synopsis**
**Background:** Healthcare providers brought action against
preferred provider organization (PPO) and various insurers
within the PPO's network, alleging, among other things,
breach of contract and a violation of the covenant of good
faith and fair dealing. The Superior Court, Law Division,
Camden County, dismissed action. Healthcare providers
appealed.

**Holdings:** The Superior Court, Appellate Division, held that:

contract was ambiguous as to application of certain discounts;

providers' suffered no injury from PPO's failure to provide
them with notice of new insurers;

PPO was not liable for breach of contract with respect to
alleged untimeliness of payments;

claim for breach of implied covenant of good faith and fair
dealing was redundant of providers' contract based claims;
and

providers' claims against insurers regarding payments were
precluded by contract with PPO.

Affirmed in part, vacated in part, and remanded.

On appeal from the Superior Court of New Jersey, Law
Division, Camden County, L–2972–03.

**Attorneys and Law Firms**

Ellen M. Doyle (Malakoff, Doyle & Finberg) of the
Pennsylvania bar, admitted pro hac vice, Eric H. Weitz (Seidel
Weitz Garfinkle & Datz) and Andrew D. Stern, argued the
cause for appellants (Seidel Weitz Garfinkle & Datz, Ms.
Doyle and Mr. Stern, attorneys; Mr. Weitz, Mr. Stern and Ms.
Doyle, on the brief).

Joseph P. La Sala argued the cause for respondent State
Farm Indemnity Company (McElroy, Deutsch, Mulvaney &
Carpenter, attorneys; Mr. La Sala, of counsel and on the brief;
Nancy McDonald and Walter R. Krzastek, on the brief).

David D'Aloia argued the cause for respondent Allstate
New Jersey Insurance Company (Saiber, Schlesinger, Satz
& Goldstein, attorneys; Mr. D'Aloia and Agnes I. Rymer, of
counsel and on the brief).

Thomas P. Weidner argued the cause for respondents
Consumer Health Network Plus, LLC and Consumer Health
Network, Inc. (Windels Marx Lane & Mittendorf, attorneys;
Mr. Weidner, of counsel and on the brief; David Swerdlow,
on the brief).

David Menzel argued the cause for respondents Liberty
Mutual Fire Insurance Company, Liberty Mutual Insurance
Group, Liberty Insurance Corporation and Liberty Mutual

Berlin Medical Associates, P.A. v. CHN New Jersey..., Not Reported in A.2d...

Managed Care, Inc. (Cuyler Burk, attorneys; Mr. Menzel, of counsel and on the brief).

Robert J. Del Tufo argued the cause for respondent Prudential Property and Casualty Insurance Company of New Jersey (Skadden, Arps, Slate, Meagher & Flom, attorneys; Mr. Del Tufo and Andrew Muscato, of counsel and on the brief).

Brian T. Guthrie (Drinker, Biddle & Reath) of the Pennsylvania bar, admitted pro hac vice, argued the cause for respondent Selective Insurance Company of America (Drinker, Biddle & Reath, attorneys; Brian J. Waters and Mr. Guthrie, of counsel and on the brief).

Before Judges SKILLMAN, AXELRAD and SABATINO.

**Opinion**

PER CURIAM.

 **\*1** Plaintiffs, four health care providers, appeal the Law Division's dismissal under *R.* 4:6–2(e) of their uncertified class action seeking additional compensation from a preferred provider organization ("PPO") and from various insurance companies within that PPO's network. We affirm the dismissal of plaintiffs' claims against the defendant insurers in their entirety and also affirm the dismissal of several counts of the complaint against the PPO, but vacate the dismissal of the remaining counts against the PPO and remand those discrete claims for discovery and further proceedings.

I.

The named plaintiffs[1] are two physicians, a medical/physical therapy practice, and a chiropractic therapy practice. Plaintiffs respectively entered into contracts in the mid-to-late 1990s with defendant Consumer Health Network (CHN), a preferred provider organization, joining a network of over 11,000 doctors and other providers serving over 950,000 insured patients. The contracts related to plaintiffs' treatment of persons injured in automobile accidents and insurance payments made to those providers as part of the patients' Personal Injury Protection (PIP) benefits under New Jersey's automobile insurance laws. *See N.J.S.A.* 39:6A–1 *et seq.* By contracting with CHN, the providers obtained the advantages of referrals from a larger patient population and of faster payments, in exchange for accepting discounted rates for their services.[2]

The nine insurer defendants are automobile insurance companies or their affiliates,[3] who contracted with CHN to become payors for services provided to patients within the CHN network. The insurers joined the CHN network as a means of reducing the fees they would otherwise have to pay to health care providers for services covered by their insureds' PIP benefits. These arrangements are imprecisely described in the complaint, and in actual business practice, as CHN "leasing" to the defendant insurers its contractual right to pay the health care providers at discounted rates.

Plaintiffs styled their lawsuit as a class action, purporting to represent the following class:

> All New Jersey healthcare providers (excluding hospitals) who are or have been members of CHN's preferred provider network, and have had, subsequent to the period beginning six years prior to plaintiffs' filing their complaint on May 21, 2003(i) at least one bill for their services paid from PIP benefits provided by a New Jersey automobile insurance policy issued by one of the defendant insurers, *and* (ii) had that payment reduced to conform with CHN's network fee schedule.

Plaintiffs' complaint was dismissed by the Law Division before a motion for class certification under *R.* 4:32–2 or any class-related discovery took place.

Plaintiffs' complaint was filed in May 2003. Among other things, it alleged that CHN had breached its contracts with plaintiffs at various times between 1995 and 2002 by (1) taking unauthorized payment discounts on multiple-procedure visits; (2) applying unauthorized discounts on so-called "off-schedule" services; (3) providing insufficient notice to plaintiffs of the addition of insurance payors to the CHN network; (4) supplying inadequate patient coverage verification documents; (5) adding new insurers to the network without written payor agreements; and (6) other miscellaneous breaches. Plaintiff attached to the complaint as exhibits various provider agreements between CHN and Berlin Medical Associates (effective September 29, 1995), Berlin Physical Therapy (effective September 29, 1995), Dr. Joseph Hassman (effective December 31, 1995), Delran Chiropractic (effective May 8, 1996) and Dr. Leonard Strobel (effective January 8, 1997 and July 19, 2000).[4] Apart from these contractual claims, the complaint further included a count against CHN for alleged violations of the common-law covenant of good faith and fair dealing.

**\*2** With respect to the defendant insurers, plaintiffs alleged that the insurers had been unjustly enriched by making payments to plaintiffs below those sums required under plaintiffs' contracts with CHN. Although plaintiffs were not in privity with the insurers, they further asserted claims against the insurers based upon alternative theories that plaintiffs are assignees of their insured patients' rights against their respective insurance carriers under the third-party beneficiary doctrine. Lastly, plaintiffs asserted parallel claims against the insurers for violating principles of good faith and fair dealing.

Before discovery, in September 2003, defendants filed a joint motion to dismiss the complaint under *R.* 4:6–2(e) based upon an alleged failure to state claims upon which relief may be granted. After the court permitted some modest amendments to the complaint, the dismissal motion was renewed. The motion judge eventually heard oral argument on the motion on January 14, 2005, and issued an oral opinion that same day dismissing the complaint in all respects. This appeal ensued.

Plaintiffs argue that the motion judge erred procedurally in granting dismissal to all defendants before discovery was completed. Substantively, plaintiffs contend that the court erred by finding that contractually-based claims and other grounds for relief were not legally viable. Defendants, on the other hand, argue that the plaintiffs' claims, which were largely predicated on contractual documents either attached to or referred to in the complaint, were properly disposed of prior to the completion of discovery. Defendants further contend that plaintiffs' various theories, stripped to their essence, have no legal merit. Defendants additionally contend that plaintiffs' claims for relief are time-barred, both under specific contractual provisions governing billing disputes, and also under general principles of laches and ratification.

We examine each of these arguments in turn.

## II.

Plaintiffs first argue that the motion judge improperly dismissed their claims related to reductions (or "discounts") for what insurers in CHN's network would pay them, in circumstances where a plaintiff had provided more than one service to a patient on a particular day. Plaintiffs portray those multiple-procedure payment reductions as improper "double dipping" by the defendants.

The pertinent contract language on this issue, which evidently was commonly replicated in CHN's agreements with other providers during the relevant time frame, is presented in several provisions. As a general matter, Section 2.7, Standard Term 2, of CHN's provider agreement reads as follows:

> 2. Pursuant to the terms of the applicable Plan, Payor and its agent and the Eligible Person *shall pay* to Participating Provider *the lesser of Participating Provider's charges customarily billed to other patients or the amounts set forth in the applicable Fee Schedule* as full payment of any claim submitted by Participating Provider for Covered Services furnished to Eligible Persons pursuant to such Plan.

**\*3** [Emphasis added.]

The "applicable Fee Schedule" referred to in Standard Term 2 above is later described in the standard CHN provider agreement as follows:

> 1. *Fee Schedule.* The schedule of maximum reimbursement amounts pursuant to which Payors shall pay Participating Providers to provide Medically Appropriate Covered Services shall be *the lesser of the following:*

> 1.1 the current Fee Schedule of CHN, samples of which are provided to Provider from time to time;

> 1.2 any applicable state, federal or other mandated fee schedule; or

> 1.3 the actual fees or charges of Provider.

> [CHN Standard Provider Agreement, Section 2.8 Fee Schedule (emphasis added).]

Plaintiffs contend that, with respect to multiple-procedure visits, the defendant insurers in CHN's network paid plaintiffs less than the amounts prescribed by the contract provisions quoted above.

Specifically, plaintiffs allege that when a patient received multiple procedures in a single visit, the payors paid the discounted CHN fee schedule rate for the first procedure, but only fifty percent of the CHN rate for the second procedure and only twenty-five percent of the CHN rate for the third and any additional procedures. Such a "sliding-scale" of reduced payments for multiple-procedure visits substantially mirrors the standards applied to ordinary PIP reimbursements, pursuant to *N.J.A.C.* 11:3–29.4(f). That regulation prescribes that:

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 30 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 230 of 302
PageID: 238
Berlin Medical Associates, P.A. v. CMI New Jersey..., Not Reported in A.2d...

1. *When multiple or bilateral procedures are performed* on the same patient by the same provider at the same time or during the same visit, *it is virtually never appropriate for the fee to be the sum of the fees for each procedure.*

[*N.J.A.C.* 11:3–29.4(f)(1) (emphasis added).]
Instead, the regulation sets forth the following sliding scale:

The *primary procedure* at a single session shall be at [*one hundred*] percent of the eligible charge, the second procedure at no more than [*fifty*] *percent* of the upper limit in the fee schedule for that particular procedure, and if performed, any *additional procedures* at no more than [*twenty-five*] *percent* of the upper limits in the fee schedule for those particular procedures.

[*Ibid.* (emphasis added).]
Plaintiffs contend that defendants violated their contracts in calculating multiple-procedure payments by applying a similar 100%/50%/25% sliding scale to their already-discounted rates. By contrast, the PIP regulation applies the 100%/50%/25% percent sliding scale to a higher, market-based "eligible charge" which is set forth in the Appendix to *N.J.A.C.* 11:3–29. In essence, plaintiffs argue, defendants reduced their compensation twice: first by ratcheting down their rates to a discounted fee schedule below the normal PIP fee schedule, and then applying a sliding-scale discount to those already-lowered payment levels.

As a matter of contract interpretation, this issue boils down to the meaning of Sections 1.1, 1.2, and 1.3 of the contractual "Fee Schedule" provision we have quoted above. In summary, the contract specifies that the providers will be paid the lesser amount called for under three distinct categories of fees: (1) CHN's current fee schedule; (2) any applicable fee mandated by the government; or (3) the provider's actual fees. Plaintiffs interpret these provisions to mean that multiple-procedure discounts can only apply in the second category, i.e., to government rates such as those reflected in the PIP regulations in the *New Jersey Administrative Code.* Plaintiffs contend that, unless the government rates (as discounted for multiple procedures) are below CHN's rate schedule, the normal CHN rates must control. They further argue that multiple-procedure discounts are exclusive to the government rate category, and are not to apply to CHN's rates. Otherwise, plaintiffs claim, they will receive drastically-reduced payments for patient services rendered in a multiple-procedure scenario.[5]

**\*4** Defendants, on the other hand, contend that the contract language fully authorizes the application of multiple-procedure discounts to CHN rates. Defendants note that there is nothing in the contractual language that precludes such discounting. They also argue that multiple-procedure discounts are consistent with public policy by reducing automobile insurance premiums, and that otherwise the providers would reap windfalls in collecting their full charges when patients receive multiple procedures in the same visit, despite the fact that less time ordinarily would be expended in those visits than if the patient's need had been addressed in successive visits.

Faced with these competing interpretations, the motion judge granted CHN's motion to dismiss the complaint, even though no discovery had been taken on the issue. The motion judge's analysis was largely predicated on our earlier opinion regarding CHN's network in *Seaview, supra,* 366 *N.J.Super.* 501, 841 A.2d 917.

The issue before us in *Seaview* was whether CHN's general contractual arrangements for discounting payments to PIP providers within its network violated the PIP statute and regulations, or other facets of our State's automobile insurance laws. In *Seaview* we held that CHN's contracts did not violate those laws and regulations, and that the contracts are "entirely compatible with the no-fault scheme." *Id.* at 518, 841 A.2d 917. In that regard, we noted that CHN's PPO network "tend[s] to lessen the monetary obligations of insurers and insureds, a consequence which meets with the legislative intent of containing medical costs, lowering insurance premiums and benefiting New Jersey's consumers." *Ibid.*

*Seaview* did not, however, address the specific question, now before us, of the propriety of applying multiple-procedure billing discounts to CHN's already-discounted fee schedule. Hence, the motion judge's misimpression that *Seaview* resolved that specific issue in favor of the defendants was erroneous, and, indeed, defendants did not attempt on appeal to advance that position. At most, *Seaview* supplies a public-policy context for examining this discrete issue of discounting, but does not resolve it.

Because the applicable contractual fee provisions are susceptible to reasonable competing interpretations on how much plaintiffs were entitled to be paid for multiple procedure visits, the contract is ambiguous. The ambiguity lies in the meaning in Section 1 of the term "the lesser" fee, and whether

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 31 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 231 of 302 PageID: 239
Berlin Medical Associates, P.A. v. CHN New Jersey..., Not Reported in A.2d...

that meaning allows or disallows discounting for multiple-procedures of charges shown on CHN's fee schedule. Given that ambiguity, it was premature for the motion judge to resolve the issue in favor of defendants before discovery and a potential trial to ascertain the intent of the parties. *See Great Atlantic & Pacific Tea Co., Inc. v. Checchio,* 335 *N.J.Super.* 495, 502, 762 A.2d 1057 (App.Div.2000).

Although it may be appropriate on a motion to dismiss for a court to consider exhibits attached to a complaint, *see, e.g., City of Pittsburgh v. West Penn Power Co.,* 147 *F.*3d 256, 259 (3d Civ.1998)(applying the cognate provision at *Fed.R.Civ.P.* 12(b)(6)), the applicable test for whether a complaint survives such a motion under *R.* 4:6–2(e) merely requires that the non-movant show that a cause of action is "suggested" by the pleaded facts. *Printing Mart–Morristown v. Sharp Elecs. Corp.,* 116 *N.J.* 739, 746, 563 A.2d 31 (1989). We must search "the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." *Id., (quoting Di Cristofaro v. Laurel Grove Mem'l Park,* 43 *N.J.Super.* 244, 252, 128 A.2d 281 (App.Div.1957). At the preliminary, pre-discovery stage of the litigation, the court should not be "concerned with the ability of plaintiffs to prove the allegation[s] contained in the complaint[,]" and "[f]or purposes of analysis plaintiffs are entitled to every reasonable inference of fact." *Ibid.*

**\*5** Plaintiffs have offered in their complaint, as illustrated by the sample EOB forms they attached as exhibits, at least a plausible contention that the contract should not be read to authorize multiple-procedure discounts below CHN's already-discounted rates. We note, however, that defendants' competing interpretation also has logical force and ties in with the public policy benefits of overall medical cost containment.

We simply cannot tell from the face of the contract documents which interpretation is most faithful to the intent of the parties. We are also deprived of any parol evidence or other extrinsic proofs, such as deposition transcripts and other documentation, that might aid us in divining what was intended in the contract on this score. *See, e.g., Conway v. 287 Corporate Center Associates,* —— *N.J.* ——, —— (July 13, 2006), (slip. op. at 11–13) (noting the potential value of extrinsic evidence in "determining the intent and meaning" of an ambiguous contract). We also cannot discern from the face of the pleadings whether the drastic multiple-procedure discounts reflected in the sample EOB forms attached to the complaint are aberrational or, conversely, representative.

Those proofs should be developed through discovery, with the possibility of post-discovery summary judgment motions to evaluate whether any genuine issues of material fact persist.

Accordingly, we vacate the dismissal of those aspects of the amended complaint alleging that CHN breached its contractual obligations to plaintiffs by permitting insurers in CHN's network to apply excessive discounts for multiple-procedure visits. We remand that claim for further discovery and further proceedings.[6]

III.

As a second claim of insufficient compensation, plaintiffs allege that CHN breached their contracts by allowing insurers in the CHN network to apply improper discounts for certain medical procedures that were not listed on the CHN fee schedule. Plaintiffs contend that Sections 1.1 through 1.3 of Section 2.8 Fee Schedule in the contract, quoted above in Part II of this opinion, require that where a rate for a specific procedure is absent from the CHN fee schedule, the network insurer was obligated to pay the provider either the provider's usual charge or the ordinary PIP rate, whichever would be the lower of the two.

Defendants contend that the contract does not expressly preclude such so-called "off-schedule" discounting. They also point out that the CHN fee schedule attached to each provider's contract was merely a "sample," and that the contract recites in Section 2.8 that CHN's "current" fee schedule would control. The contract also reflects that "sample [fee schedules] are [to be] provided to [p]rovider[s] from time to time," suggesting that the fee schedule is subject to unilateral and periodic changes by CHN, including potential expansion to embrace other medical procedures, and that providers have no reason to rely on those "samples" as controlling future compensation levels. CHN further contends that the fee schedule attached to plaintiffs' complaint was only a "partial" schedule, and that the discounted services at issue actually were listed on a "fuller" fee schedule not appended to the complaint.

**\*6** The motion judge dismissed this claim as well, again citing to *Seaview* as support for that disposition. However, *Seaview* does not address this specific question either.

Having now considered the matter ourselves, we conclude that the propriety of plaintiffs' claims regarding payment for

Berlin Medical Associates, P.A. v. CHN New Jersey... Not Reported in A.2d...

"off-schedule" services is not ripe for disposition. We reach that conclusion for several reasons. First, there appears to be a significant factual dispute between the parties, one not amenable to a motion to dismiss or a pre-discovery motion for summary judgment, *see Printing Mart, supra,* 116 *N.J.* at 746, 563 *A.2d* 31, as to whether any so-called "off-schedule" discounting occurred at all, or whether plaintiffs are simply mistaken about the inclusivity of the prevailing fee schedule. Second, even if such discounting occurred, the contract again is ambiguous as to whether such discounting is permissible. We recognize that the goal of the CHN network is to manage medical costs while affording providers access to a wider network of insured patients, but those general objectives do not solve the particular question of whether off-schedule discounts were authorized, and, if so, how deep those discounts could be.

Accordingly, we likewise remand this discrete issue of alleged contractual breach for discovery and further proceedings.

IV.

Apart from their claims alleging insufficient compensation, plaintiffs also asserted what might be termed as "procedural" breaches by CHN in its administration of their respective contracts. In particular, plaintiffs allege that CHN breached their contracts by (1) failing to notify them of the addition of new insurer payors and of modifications from CHN's standard payment terms that CHN at times allowed for such new payors; (2) leasing network discounts without executing payor agreements; (3) failing to provide their patients with sufficient documentation identifying them as insureds of CHN network payors, and (4) failing to assure that their payors made timely payments and timely refunded improperly-taken discounts. Each of these claims were dismissed by the motion judge without extensive discussion.

All of these procedural claims are tied to specific provisions in CHN's provider agreements with plaintiffs. With respect to the addition of new payors, section 3.1.3 of the provider contracts specified:

3.1.3 If an additional Payor executes a Payor Agreement with CHN or an existing Payor revises a Payor Agreement and Section 3.1.2 applies, CHN shall provide notice to Provider of the identity of the Payor and any other information necessary for Provider to fulfill the obligations of Provider hereunder.

The contracts do not, however, specify any remedy if CHN failed to provide such timely notice to providers of a new payor's entry into the network.

Additionally, plaintiffs were entitled to receive notice of any modifications to CHN's standard payment terms which CHN granted to any payor, a right expressed in Section 3.2.1:

**\*7** During the term of this Agreement, CHN may (i) modify the Standard Terms; (ii) create separate terms for various CHN programs; or (iii) negotiate individual terms with a Payor. CHN shall submit the modified or negotiated terms to Provider. Provider shall have the option to reject the negotiated terms by serving written notice of such rejection upon CHN within thirty (30) days of the effective date of the notice from CHN.

Unlike Section 3.1.3, this provision concerning contract modification did contain a remedy for lack of notice, namely, the right of a provider to reject the negotiated modification within thirty days. If the provider communicated such a timely objection to CHN, then Section 3.2.3 of the contract would relieve the provider of the obligation to accept patients covered by such a payor:

If [a] Provider rejects any terms negotiated with an Individual Payor, Provider shall not be required to provide Covered Services to Eligible Persons of such Payor.

Although the motion judge dismissed these lack-of-notice claims for slightly different reasons, we concur with his determination that they are not cognizable in these circumstances. As noted above, the provider contracts afforded plaintiffs no remedy for failing to receive notice of the entry of a new payor expected to abide by CHN's standard payment terms. Significantly, Section 3.1.3, as contrasted with Section 3.2.3, makes no mention of a provider's right to object to such a new payor, or to opt out of accepting that new payor's patients. The absence of this particular form of notice, one which may well have been included simply as an administrative courtesy to the providers, carries with it no corresponding remedy in the contract.

Plaintiffs rather abstractly argue that they were damaged by the entry of new payors into the network, without receiving advance notice of such entry, in that they each had standing relationships with some or all of those payors as PIP insurers. This meant that plaintiffs were, in some instances, sustaining a reduction in the PIP fees they were accustomed to receiving from those insurers, because the payors switched from the PIP fee schedule to the discounted CHN fee schedule. This

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 33 of 101   Trans ID: LCV20231258369

Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 233 of 302 PageID: 241

Berlin Medical Associates, P.A. v. CHN New Jersey..., Not Reported in A.2d...

reduction in the applicable fees is broadly identified in plaintiffs' complaint as a source of harm.

However, the complaint does not allege that, on balance, plaintiffs sustained a net loss of compensation when new payors were added to the CHN network. Indeed, the objective of the network was to offer providers a wider source of referrals and greater efficiencies in collecting payments, in exchange for accepting discounts on their fees. *See Seaview, supra,* 366 *N.J.Super.* at 507, 841 A.2d 917. Although plaintiffs may have received lower fees per each patient procedure when such payors joined the network, they also should have received the offsetting advantages of gaining access to a greater number of enrollees and the potential economies of scale associated with what is claimed to be "the largest preferred provider organization (PPO) in New Jersey." *Ibid.* The complaint does not allege that plaintiffs suffered a net detriment when additional payors were added to the network. As a matter of general contract law, a breach only gives rise to a cause of action where the obligee actually sustains injury. *See Cumberland County Improvement Auth. v. GSP Recycling Co.,* 358 *N.J.Super.* 484, 503, 818 A.2d 431 (App.Div.) *certif. denied,* 177 *N.J.* 222, 827 A.2d 289 (2003); *Cromartie v. Carteret Sav. & Loan* 277 *N.J.Super.* 88, 104, 649 A.2d 76 (App.Div.1994). Here, the complaint falls short because it fails to allege that the fee discounts applied by the new payors exceeded the positive benefits to the providers flowing from the simultaneous expansion of the CHN referral network.

 **\*8** We also reject plaintiffs' claims pertaining to notice, both relative to the addition of new payors as well as relating to selective modifications allegedly afforded to some of those payors, given the ensuing considerable passage of time. Even though plaintiffs may not, as they allege in the complaint, have received formal notice that a new payor had been added and that the new payor may have negotiated with CHN a modification from the standard fee schedule, the EOB forms routinely transmitted to the providers with payments would have given plaintiffs actual notice of such developments. The EOB forms attached to plaintiffs' complaint as representative samples clearly show the identities of the payor insurance companies. The EOB forms also reflect which patient charges were approved, which payments were not approved, and the amount of each approved reimbursement. Despite that actual notice, plaintiffs each remained in the CHN network for many years and continued to accept patients and payments without invoking their right under Section 3.2.3 to abstain from treating patients from that referral source. Such inaction

on the part of the plaintiffs, which does not appear to be disputed, undercuts any potential legal merit to plaintiffs' contention that they were truly harmed by the absence of formal notice from CHN.[7]

Plaintiffs criticisms of CHN regarding inadequate patient documentation and untimely payments and refunds are likewise insufficient in these circumstances to support a viable cause of action for contractual breach.

On the documentation issue, we note that Section 2.7, Standard Term 6 ("Verification of Eligible Persons") of the provider contract only requires "appropriate written documentation" to be presented by each patient at the time of treatment. It is patent from the pleadings and their attachments that plaintiffs and their billing departments were well aware of the particular insurance companies covering their patients. Indeed, the underpayment claims presented in the complaint are founded upon a factual assumption that the providers pursued compensation from the identified insurers of each such patient, but received back less than what plaintiffs contend they deserved. There was no mystery regarding which insurers were involved. The in-network or out-of-network status of the payor insurance company would have been self-evident through review of the EOB Forms. We thus perceive no reason to set aside the motion judge's dismissal of those documentation claims.

 With respect to alleged untimeliness of payments, credits and refunds, plaintiffs fail to support their claims of breach with citations to any particular promises or assurances from CHN on those timing matters in the provider contracts. Although the contracts do specify in Section 2.7, Standard Term 5 ("Time for Payments") a forty-five day period for payors to make payments, followed by a ninety-day period for the payor or the provider to obtain "recourse," the contracts are bereft of any specific provisions requiring CHN to respond to complaints of untimeliness within any particular time frame. The contracts do contain a very general provision obligating CHN to "administer" the provider network, but plaintiffs can point to no language in the contracts in which CHN was itself bound to act on administrative matters within any specified time frames. Moreover, if plaintiffs are successful in proving that they were undercompensated on the two particular issues we have remanded, they may have an ancillary claim for prejudgment interest, an issue that has not been briefed and one that we do not resolve at this time.

Berlin Medical Associates, P.A. v. CMI New Jersey..., Not Reported in A.2d...

Case 2:23-cv-03372-BRM-CLW    Document 1-2    Filed 06/20/23    Page 234 of 302
PageID: 242

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 34 of 101   Trans ID: LCV20231258369

**\*9** In sum, a careful examination of the pleadings, the relevant contract provisions, and other materials attached by plaintiffs as exhibits to their complaint, reveals no genuine legal basis for plaintiffs' claims for damage based upon CHN's alleged procedural lapses, particularly given plaintiffs' undisputed failure to cease doing business with CHN promptly after such alleged shortcomings would have been apparent. We therefore sustain the motion judge's dismissal of these discrete claims against CHN.

V.

In addition to alleging various contractual breaches by CHN, plaintiffs attempt in Count II of the complaint to plead an independent claim for breach of the implied covenant of good faith and fair dealing. Relying on the same general factual allegations recited in Count I, plaintiffs contend that CHN violated the implied covenant by failing to administer its network properly and by failing to take reasonable measures to prevent or remedy the alleged deficiencies. We sustain the dismissal of this claim.

To be sure, our courts have long recognized that there "is an implied covenant of good faith and fair dealing" in every contract. *Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 182, 425 A.2d 1057 (1981); see also Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420, 690 A.2d 575 (1997).* However, this implied duty of fair dealing does not "alter the terms of a written agreement." *Rudbart v. N. Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 366, 605 A.2d 681, cert. denied, 506 U.S. 871, 113 S.Ct. 203, 121 L. Ed.2d 145 (1992).*

In general, our case law has recognized the potential for such an independent cause of action based upon the covenant of good faith and fair dealing in three situations: (1) to allow the inclusion of additional terms and conditions not expressly set forth in the contract, but consistent with the parties' contractual expectations; (2) to allow redress for a contracting party's bad-faith performance of an agreement, when it is a pretext for the exercise of a contractual right to terminate, even where the defendant has not breached any express term; and (3) to rectify a party's unfair exercise of discretion regarding its contract performance. *See Seidenberg v. Summit Bank, 348 N.J.Super. 243, 257, 260, 791 A.2d 1068 (App.Div.2002).* Viewing plaintiffs' complaint with liberality under *R.* 4:6–2(e), we nevertheless are satisfied that the motion judge did not err in dismissing Count II of plaintiffs' complaint invoking the implied covenant.

Plaintiffs, in essence, contend that they were treated shabbily by CHN in order for CHN to reap a commercial advantage by expanding its network with more providers and more payors while overlooking the proper administration of its contracts. Even assuming, for the sake of argument, such irresponsible behavior on the part of CHN, we perceive no analytic reason why plaintiffs' surviving contract-based claims seeking additional compensation would not suffice, if proven on remand, to achieve a just result.

**\*10** We discern no basis in the complaint to impute additional terms to the detailed contracts between CHN and its various providers. Nor does the complaint, as pleaded, offer sufficiently extreme facts to sustain a cause of action based upon a theory that CHN was performing its contractual duties in a "pretextual" manner to induce plaintiffs to terminate the relationship. If anything, it would appear that CHN would have a business motivation to keep providers such as plaintiffs within its network, not to expel them. Lastly, there are no portions of the standard provider contract cited by plaintiffs in which CHN was expressly reposed with discretion, thereby eliminating a covenant-based theory that CHN had abused its discretion.

In sum, plaintiffs' invocation of the implied covenant of good faith and fair dealing appears to be redundant and, at best, analytically tenuous. We therefore affirm the dismissal of Count II and leave plaintiffs to their surviving claims against CHN, predicated upon breaches of specific contractual terms regarding provider compensation.

VI.

We turn to plaintiffs' assorted claims against the defendant insurers. Although their complaint espouses various legal theories against the insurers, the essence of these claims is that the insurers allegedly should have paid more money to plaintiffs for treating their insured patients. Since the insurers were not in privity with plaintiffs, but rather dealt with plaintiffs under the umbrella of CHN's network, plaintiffs resort to legal doctrines other than contractual breach as their pleaded grounds for recovery against the insurers. In particular, plaintiffs invoke notions of unjust enrichment or quasi-contract; assignment; the implied covenant of good faith and fair-dealing; and the third-party beneficiary doctrine. The substance of those claims, however, is founded

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 35 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 235 of 302
Berlin Medical Associates, P.A. v. CMI New Jersey... Not Reported in A.2d...
PageID: 243

upon the same factual underpinnings presented in plaintiffs' claims against CHN.

We sustain the motion judge's dismissal of the claims against the insurers in their entirety. Even viewing, as we must, the complaint and the attached contractual documents in a generous fashion consistent with *Printing Mart, supra,* and *R.* 4:6–2(e), we agree with the motion judge that the claims against the insurers are not viable and that plaintiffs' recourse, if any, lies solely against CHN.

Plaintiffs' contracts with CHN require that any billing disputes between the providers and the payors shall be addressed with dispatch. More specifically, we note that Section 2.7, Standard Term 5.2 of the CHN standard provider contract established a mutual ninety-day deadline, both for providers and payors, to pursue any recourse against one another over billing disputes:

5.2 Payment by Payor of any claim shall be final ninety (90) days after payment and neither Payor or Provider shall have further recourse.

This plain language thus deems payment by the defendant insurers to plaintiffs as "final," declaring that neither the provider nor the payor would have further "recourse" following ninety days after the receipt of such a payment for a particular patient service. This time limitation, of course, offered reciprocal advantages to the plaintiffs, as they were able to rely upon the finality of payment revenues received from the payors after ninety days had elapsed without fear of demands for reimbursement or disgorgement.

**\*11** Despite this contractually-specified time bar, plaintiffs attempt to resurrect their payment grievances with the insurers in this lawsuit filed in May 2003, complaining about payments on services provided as long ago as 1995 through 2001,[8] by which point, according to the complaint, all of the named plaintiffs had left CHN's network. The motion judge appropriately recognized the pleaded claims against the insurers as an improper attempt to circumvent the bargained-for contractual time limits. There is nothing unconscionable about enforcing those time constraints particularly where, as here, plaintiffs are not individual patients but rather healthcare professionals and business enterprises. Simply stated, plaintiffs' claims against the insurers for additional payments are way out of time.

Although it is not necessary to our analysis, we also note that we harbor serious doubts about the substantive viability of plaintiffs' legal theories against the defendant insurers. Plaintiffs' unjust enrichment/quasi-contract theory against the insurers is contrary to the general, although not immutable, principle that "there is no ground for imposing an additional obligation [under quasi-contract or unjust enrichment] when there is a valid unrescinded contract that governs [the parties'] rights." *Shalita v. Twp. of Washington,* 270 *N.J.Super.* 84, 90–91, 636 A.2d 568 (App.Div.1994). Even if that obstacle were overcome, we perceive no conduct by the insurers here that was so patently unjust as to warrant an independent cause of action, particularly if plaintiff may obtain recourse on the discrete remanded underpayment issues against CHN.

As to plaintiffs' claim that they may pursue relief from the insurers as assignees of these patients' interests, we note that the statute of limitations to recover PIP benefits is two years, *see N .J.S.A.* 39:6A–13.1, and that plaintiffs' complaint filed in May 2003 would appear to be more than two years after most, if not all, of the payments were rendered to plaintiffs by the insurers for the services they provided between 1995 and 2001. *See Lech v. State Farm Ins. Co.,* 335 *N.J.Super.* 254, 258, 762 A.2d 269 (App.Div.2000) ("an assignee's rights can be no greater than those of the assignor").

We also perceive no indication that plaintiffs would have been intended as third-party beneficiaries in CHN's contracts with the various insurer defendants, and that the providers' legal status concerning those contracts is, at best, merely incidental. *See Reider Communities, Inc. v. N. Brunswick Twp.,* 227 *N.J.Super.* 214, 222, 546 A.2d 563 (App.Div.), *certif. denied,* 113 *N.J.* 638, 552 A.2d 164 (1988) (incidental third-party beneficiaries have no cause of action to enforce contractual promises).

Lastly, we reject plaintiffs' claims of breach of the implied covenant of good faith and fair dealing by the defendant insurers for similar reasons as those expressed concerning CHN in Part V of this opinion.[9]

Hence, we affirm the dismissal of the insurer defendants, there being no timely assertion by plaintiffs against the insurers of claims upon which relief against those defendants may be granted. *R.* 4:6–2(e).

**\*12** Affirmed as to the dismissal of the claims against insurer defendants; affirmed in part and vacated in part as to the claims against defendant CHN; remanded for further proceedings consistent with this opinion.

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 36 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 236 of 302
PageID: 244
Berlin Medical Associates, P.A. v. CHN New Jersey... Not Reported in A.2d...

**All Citations**

Not Reported in A.2d, 2006 WL 2162435

Footnotes

1    Plaintiffs specifically are Berlin Medical Associates, P.A., Delran Chiropractic, P.A., Joseph Hassman and Leonard Strobel. A fifth original plaintiff, Berlin Physical Therapy, was deleted when the complaint was amended. Because the legal analysis herein turns on no facts specific to any of the individually named plaintiffs we shall refer to them generically as "plaintiffs" throughout this opinion.

2    *See generally* our prior overview of CHN's contractual scheme in *Seaview Orthopaedics v. Nat'l Healthcare Resources, Inc.,* 366 *N.J.Super.* 501, 505–507, 841 A.2d 917 (App.Div.2004). For sake of brevity, we incorporate by reference here the factual background recited in *Seaview.*

3    The insurer defendants are Allstate New Jersey Insurance Company, Prudential Property and Casualty, Insurance Company of America, Selective Insurance Company, Liberty Mutual Insurance Company, and four Liberty Mutual affiliates (Liberty Mutual Fire Insurance Company, Liberty Mutual Insurance Group, Liberty Insurance Corporation and Liberty Mutual Managed Care, Inc.)

4    When plaintiffs amended the complaint in March 2004, they attached to it additional exhibits, including CHN's New Jersey Fee Schedule (effective June 1, 1998) and three sample Explanation of Benefit ("EOB") forms transmitted by several of the defendant insurers to Berlin Medical Associates in April, May, July and September 2000.

5    In a chart presented in their brief, which tracks a sample EOB Form involving three multiple procedures, plaintiffs depict how a $31.00 charge would get discounted down to only $4.50 if such "double-dipping" were permitted.

6    The miscellaneous documents supplied in the record by CHN, all of which are extraneous to the complaint, do not eliminate the need for a remand. The excerpt from CHN's 1996 Provider Manual does not specify the discount percentages that apply to multiple procedures, nor the interplay between the CHN rates and the PIP rates in that context. Also, CHN's December 17, 1997 letter notifying plaintiffs about the multiple-procedure discounts for physical therapy, effective February 1, 1998, does not resolve the propriety of such discounts taken for procedures not involving physical therapy, nor resolve the propriety of any discounts taken before February 1, 1998. The enforceability of that letter notice and its consistency with the contract language is also not self-evident on this incomplete record.

7    For similar reasons, we reject plaintiffs' effort in predicating a cause of action for contractual breach based upon the alleged absence of formal written agreements with certain new payors when they joined the network.

8    The complaint alludes to conduct by CHN as late as 2002, a time frame that presumably includes periods of claims administration after the contract terms ended.

9    This disposition makes it unnecessary for us to reach the insurer defendants' affirmative defenses of ratification and laches.

---

End of Document                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

TAB 5

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 38 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 238 of 302
PageID: 246
Hillsborough Rare Coins, LLC v. ADT LLC, Not Reported in Fed. Supp. (2017)

2017 WL 1731695
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

HILLSBOROUGH RARE
COINS, LLC, Plaintiff,

v.

ADT LLC, f/k/a ADT Security
Services, INC, et al., Defendants.

CIVIL ACTION NO. 16-916 (MLC)
|
Signed 05/02/2017

**Attorneys and Law Firms**

Bruce C. Licausi, Raritan, NJ, Randall J. Peach, Bridgewater, NJ, for Plaintiff.

Charles Carson Eblen, Shook Hardy & Bacon LLP, Kansas City, MO, Erin Patricia Loucks, Joanna Terese Vassallo, Shook Hardy & Bacon LLP, Philadelphia, PA, for Defendants.

**MEMORANDUM OPINION**

MARY L. COOPER, United States District Judge

*\*1* This matter originates from a 2015 heist at Hillsborough Rare Coins, a business engaged in the selling of rare coins, where three burglars broke in and stole merchandise. Plaintiff Hillsborough Rare Coins sued Defendant ADT in New Jersey Superior Court, Somerset County, alleging causes of action related to ADT's provision of an alarm system and alarm monitoring service. (Dkt. 1-2.)[1] Defendant removed the matter to the United States District Court for the District of New Jersey. (Dkt. 1.)

Plaintiff filed an Amended Complaint. (Dkt. 30). Defendant filed this motion to dismiss the Amended Complaint. (Dkt. 32.) Plaintiff filed a brief in opposition (dkt. 33), and Defendant filed a reply brief (dkt. 35). We have considered these filings, and will resolve the matter without oral argument. See L.Civ.R. 78.1(b).[2]

For the following reasons, we will grant the motion to dismiss in part, dismissing with prejudice as to Count Two, Count

Three, and Count Five, and dismissing without prejudice as to Count Four, Count Six, Count Seven, and Count Eight, and deny the motion to dismiss in part as to Count One.

**BACKGROUND**

We glean the following background from the allegations in HRC's Amended Complaint, which we accept as true at this stage in the pleadings. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff Hillsborough Rare Coins, LLC ("HRC") is a business located in Green Brook, New Jersey, and is engaged in the collection and sale of rare coins. (Dkt. 30 at 2.) In approximately 2001, HRC contracted with Defendant ADT Security Services, Inc. ("ADT")[3] to install an alarm system at the store. (Id. at 3.) HRC has had an ADT burglary alarm system since then. (Id.)

HRC alleges that a 2006 Sales Proposal/Agreement from ADT contains a signature dated May 7, 2006, purporting to be from Victor Fabricatore, HRC's Managing Member/owner, but was forged by ADT. (Dkt. 30 at 3.)

*\*2* On September 26, 2014, HRC and ADT entered into a separate contract to upgrade and convert the burglary system to ADT's "Pulse" system. (Id. at 3-4; dkt. 32-3 at 2, 4.) The contract covered "Alarm Monitoring and Notification Services" for burglary at a monthly service charge of $63. (Dkt. 30 at 3; dkt. 32-3 at 4.) HRC contracted for the upgraded system because ADT informed HRC that ADT would immediately contact the police and HRC if the alarm was triggered so that law enforcement could attempt to intervene and stop a possible burglary. (Dkt. 30 at 4.) ADT made this representation to HRC on the day that the contract was signed. (Id.)

The contract contained the following relevant provision:

**B. Services**

**2. Signal Receiving and Notification Service.** Signal Receiving and Notification Service shall be provided by ADT if this Contract includes a charge for Service. If an alarm signal registers at ADT's CMC, ADT shall endeavor to notify the appropriate Police or Fire Department and the designated representative of Customer. If a burglar alarm signal or fire signal registers at ADT's CMC, ADT

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 39 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 239 of 302 PageID: 247
Hillsborough Rare Coins, LLC v. ADT LLC, Not Reported in Fed. Supp. (2017)

at its sole discretion may endeavor to contact Customer's premises by telephone (or, in the case of a burglar alarm signal only, by Two-Way Voice if such monitoring service has been elected by Customer) to verify that the alarm is not false. Failing to contact Customer promptly or questioning the nature of the response received upon such contact, ADT shall endeavor to notify the appropriate Police Department or Fire Department. Customer agrees that ADT shall have no liability pertaining to any Two-Way Voice communication or its publication. If a supervisory signal or trouble signal registers at ADT's CMC, ADT shall endeavor to notify the designated representative of Customer.

(Dkt. 32-3 at 7.)[4]

On June 1, 2015, at approximately 10:30 p.m., three burglars broke into HRC to steal merchandise from the store. (Dkt. 30 at 4.) The burglars remained in HRC for about three hours. (Id. at 5.) ADT's monitoring station was alerted to the break-in. (Id. at 6-7.) The burglars stole "numerous valuable rare coins" and "other merchandise." (Id. at 5.) They also caused "extensive physical damage" to the HRC store. (Id.)

The burglars cut through the wall of the adjoining business next to HRC to access the rear room in the store. (Id.) They used power tools, such as a cutting wheel and hammer drill, to attempt to cut through the lining to the store's main safe. (Id.) They also cut, or attempted to cut, the ADT alarm panels' cables, before ultimately ripping the alarm system boxes and panels from the wall. (Id.)

Upon the burglars' entry into the store, the ADT alarm system was triggered and the ADT monitoring station was alerted to the entry. (Id.) ADT sent a computer-generated email to HRC stating that the alarm system's "silent panic alarm" had been triggered at 10:36 p.m. because sensors in the front and rear areas of the store alerted. (Id.) HRC did not learn of the email until after the burglary was over because the email was marked as spam and went into HRC's spam folder. (Id. at 5-6.) HRC alleges that pursuant to ADT's contractual promises, HRC had an additional obligation at that time to call both the police and Fabricatore's cell phone. (Id. at 6.) ADT called neither Fabricatore nor the police. (Id.)

*3 An ADT employee called Fabricatore at 11:20 p.m. to alert him that there had been a power outage at the store and that the alarm system was still functioning on a backup battery, and that ADT would inform him if it stopped working. (Id.) According to HRC, these statements were false. (Id.)

No power outage occurred at the HRC store, and at the time of the phone call, the burglars had already ripped the alarm system out of the walls. (Id.) At the time, however, HRC believed ADT's representations that there was a power outage but the alarm system was still functioning on a backup battery, that "nothing was wrong," and that ADT would call back if anything else happened. (Id. at 7.)

HRC discovered that its store was burglarized the following morning. (Id.) ADT assigned an investigator who inspected the store and spoke with Fabricatore. (Id.) ADT has not furnished any report or findings to HRC resulting from the investigation. (Id.)

HRC filed suit against ADT in New Jersey Superior Court, Somerset County on December 2, 2015. (Dkt. 1-2.) On February 19, 2016, ADT filed a Notice of Removal to the United States District Court for the District of New Jersey, 28 U.S.C. § 1441, on the basis of diversity jurisdiction, 28 U.S.C. § 1332(a). (Dkt. 1.)

ADT moved to dismiss the Complaint. (Dkt. 11.) We denied the motion without prejudice, and directed HRC to move for leave to file an Amended Complaint. (Dkt. 22.) HRC thereafter filed an Amended Complaint. (Dkt. 30.)

The Amended Complaint alleges: 1) breach of contract; 2) promissory estoppel; 3) equitable estoppel; 4) breach of the implied covenant of good faith and fair dealing; 5) breach of warranty; 6) violation of the New Jersey Consumer Fraud Act; 7) products liability; and 8) theft/civil conspiracy to commit theft. (Id. at 7-17.) ADT filed this motion to dismiss the Amended Complaint. (Dkt. 32.)

## DISCUSSION

### I. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted. When evaluating a motion to dismiss, a court must accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). In other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to

relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In evaluating the sufficiency of a plaintiff's factual pleadings, a court must take three steps:

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (citations and quotation marks omitted). However, "a court need not credit a plaintiff's 'bald assertions' or 'legal conclusions'" when deciding a motion to dismiss." *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) (quotation omitted).

## II. Analysis

### A. Breach of Contract (Count One)

HRC alleges that ADT breached the contract between them by promising to immediately notify HRC and the police if the alarm system triggered at the store, and then failing to do so on June 1, 2015, the night of the burglary. (Dkt. 30 at 8.)

**\*4** ADT asks that we enforce the insurer provision of the contract, through which, according to ADT, HRC acknowledged that ADT was not its insurer and HRC would look exclusively to its insurance provider to recover for any loss, such as a burglary. (Dkt. 32-2 at 17-18; dkt. 35 at 8-10.) Alternatively, if we were to deny the motion to dismiss and allow Count One to proceed, ADT argues that we should enforce the contract provision limiting recoverable damages to $1,000 and dismiss with prejudice Count One to the extent that it seeks damages in excess of that limit. (Dkt. 32-2 at 20-21 (citing dkt. 32-3 at 3); dkt. 35 at 10-11.)

HRC argues that the insurer provision and damages limitation clauses of the contract are unenforceable because the print was so small and inconspicuous as to be effectively hidden from a reader and that the clauses are void as unconscionable because they would effectively eliminate any liability for the services ADT agreed to provide. (Dkt. 33 at 13-17.) According to HRC, the insurer clause is further inapplicable because by its language, it would only apply if HRC had insurance, which it did not. (Id. at 17-18.) HRC argues that the

claims are not against ADT as insurer or guarantor to protect it from burglary, but rather for failing to call HRC or law enforcement after the alarm was triggered as contracted to.[5] (Dkt. 33 at 17.) HRC also argues that the damage limitation clause violates New Jersey law because it is a "reverse liquated damages" provision. (Id. at 18-19.)

The contract provisions at issue state:

**E. LIMITATIONS ON LIABILITY.**

**1. ADT IS NOT AN INSURER. THE AMOUNTS ADT CHARGES CUSTOMER ARE NOT INSURANCE PREMIUMS. SUCH CHARGES ARE BASED UPON THE VALUE OF THE SERVICES, SYSTEM AND EQUIPMENT ADT PROVIDES AND ARE UNRELATED TO THE VALUE OF CUSTOMER'S PROPERTY, ANY PROPERTY OF OTHERS LOCATED IN CUSTOMER'S PREMISES OR ANY RISK OF LOSS ON CUSTOMER'S PREMISES.**

**2. ADT'S SERVICES, SYSTEMS AND EQUIPMENT DO NOT CAUSE AND CANNOT ELIMINATE OCCURRENCES OF THE EVENTS THEY ARE INTENDED TO DETECT OR AVERT. ADT MAKES NO GUARANTY OR WARRANTY, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, THAT THE SERVICES, SYSTEM OR EQUIPMENT SUPPLIED WILL DETECT OR AVERT SUCH EVENTS OR THE CONSEQUENCES THEREFROM. ACCORDINGLY, ADT DOES NOT UNDERTAKE ANY RISK THAT CUSTOMER'S PERSON OR PROPERTY, OR THE PERSON OR PROPERTY OF OTHERS, MAY BE SUBJECT TO INJURY OR LOSS IF SUCH AN EVENT OCCURS. THE ALLOCATION OF SUCH RISK REMAINS WITH CUSTOMER, NOT ADT. INSURANCE, IF ANY, COVERING SUCH RISK SHALL BE OBTAINED BY CUSTOMER. ADT SHALL HAVE NO LIABILITY FOR LOSS, DAMAGE OR INJURY DUE DIRECTLY OR INDIRECTLY TO EVENTS, OR THE CONSEQUENCES THEREFROM, WHICH THE SYSTEM OR SERVICES ARE INTENDED TO DETECT OR AVERT. CUSTOMER SHALL LOOK EXCLUSIVELY TO ITS INSURER AND NOT TO ADT TO PAY CUSTOMER IN THE EVENT OF ANY SUCH LOSS, DAMAGE OR INJURY. CUSTOMER RELEASES AND WAIVES FOR ITSELF AND**

**ITS INSURER ALL SUBROGATION AND OTHER RIGHTS TO RECOVER FROM ADT ARISING AS A RESULT OF PAYING ANY CLAIM FOR LOSS, DAMAGE OR INJURY OF CUSTOMER OR ANOTHER PERSON.**

**3. IF NOTWITHSTANDING THE PROVISIONS OF THIS PARAGRAPH E, ADT IS FOUND LIABLE FOR LOSS, DAMAGE OR INJURY UNDER ANY LEGAL THEORY DUE TO A FAILURE OF THE SERVICES, SYSTEM OR EQUIPMENT IN ANY RESPECT, ITS LIABILITY SHALL BE LIMITED TO A SUM EQUAL TO 10% OF THE ANNUAL SERVICE CHARGE OR $1,000, WHICHEVER IS GREATER, AS AGREED UPON DAMAGES AND NOT AS A PENALTY, AS CUSTOMER'S SOLE REMEDY. THIS WILL BE THE SOLE REMEDY BECAUSE IT IS IMPRACTICAL AND EXTREMELY DIFFICULT TO DETERMINE THE ACTUAL DAMAGES, IF ANY, WHICH MAY RESULT FROM ADT'S FAILURE TO PERFORM ANY OF ITS OBLIGATIONS UNDER THIS CONTRACT. IF CUSTOMER REQUESTS, ADT MAY ASSUME GREATER LIABILITY BY ATTACHING A RIDER TO THIS CONTRACT STATING THE EXTENT OF ADT'S ADDITIONAL LIABILITY AND THE ADDITIONAL CHARGES CUSTOMER WILL PAY FOR ADTS ASSUMPTION OF SUCH GREATER LIABILITY. HOWEVER, SUCH ADDITIONAL CHARGES ARE NOT INSURANCE PREMIUMS, AND ADT IS NOT AN INSURER EVEN IF IT ENTERS INTO SUCH A RIDER.**

**\*5**  (Dkt. 32-3 at 3; dkt. 33-3 at 4.)

We find that HRC has stated a plausible claim of breach of contract that would not be subject to the insurer provision. HRC has stated that under the contract, ADT had an obligation to immediately call Fabricatore and the police if the alarm was triggered. HRC is not seeking coverage from ADT for the store's losses. Rather, according to HRC, the alarm was triggered but no phone call followed. Therefore, ADT broke their contractual obligation. These allegations are sufficient to survive a motion to dismiss. See Iqbal, 556 U.S. at 678. ADT remains free to raise the allocation of risk provision as an affirmative defense in the Answer, and HRC can challenge the provision's enforceability.

To the extent that ADT argues that we should dismiss HRC's claims that seek damages over $1,000, we decline to do so at this time. ADT cites no case within our jurisdiction

where such a provision was enforced at the Rule 12(b)(6) motion to dismiss stage. In fact, in numerous cases cited by ADT, the court explicitly declined to resolve questions surrounding a damages limitation provision at such an early stage in the litigation. See, e.g., *Adler Engineers, Inc. v. Dranoff Properties, Inc.*, No. 14-921, 2014 WL 5475189, at *9-10 (D.N.J. Oct. 29, 2014) ("[T]his Court's determination concerning whether the stipulated damages provision will apply requires the consideration and weighing of evidence outside the record, which is improper on a motion to dismiss under Rule 12(b)(6)."); *Berman v. ADT LLC*, No. 12-7705, 2013 WL 6916891, at *8 (D.N.J. Dec. 13, 2013) (declining to consider defendant ADT's argument to limit any award damages to the amount set forth in the contract because "[i]t is inappropriate for the Court to wade into factual issues, such as the measure of Plaintiffs' damages, on a motion to dismiss"). We will not consider the provision now nor decide whether the provision is an unenforceable reverse liquidated damages clause, as HRC claims, and ADT may raise this provision in its Answer.[6]

For these reasons, we will deny ADT's motion to dismiss HRC's breach of contract claim.

## B. Promissory Estoppel (Count Two) and Equitable Estoppel (Count Three)

HRC alleges that it reasonably relied upon ADT's "clear and definite" promises that ADT would promptly call law enforcement and Fabricatore to its own substantial detriment, and therefore, ADT is liable for breaking these promises under the doctrine of promissory estoppel (Count Two). (Dkt. 30 at 8-9.) HRC also alleges that ADT is liable under the doctrine of equitable estoppel because HRC, to its detriment, reasonably relied upon ADT's conduct, including their acts, omissions, and/or silence, which indicated that ADT promised and represented it would call law enforcement and Fabricatore in the event that the alarm was triggered at the store (Count Three). (Id. at 9-10.)

**\*6**  ADT has moved to dismiss both claims. We will address both of these claims together because of their similarity.

ADT argues that it cannot be held liable under either a "quasi-contract" theory of promissory estoppel or equitable estoppel because under New Jersey law, these two equitable claims are unavailable when a written contract exists. (Dkt. 32-2 at 22-23; dkt. 35 at 11-13.) ADT further contends that the

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 42 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 242 of 302
PageID: 250
Hillsborough Rare Coins, LLC v. ADT LLC, Not Reported in Fed. Supp. (2017)

contract is valid and it controls, and we should apply the agreed-upon terms. (Dkt. 35 at 7-10.)

HRC contends that it has satisfied the liberal notice-pleading standard required by Rule 12(b)(6) for its promissory estoppel and equitable estoppel claims. (Dkt. 33 at 20-21.) It disputes that promissory estoppel and equitable estoppel are "quasi-contract" theories of liability, but instead argues they constitute implied contracts. (Id. at 21.)

We will dismiss with prejudice Count Two (promissory estoppel) and Count Three (equitable estoppel) because HRC cannot bring these claims as a matter of law when a valid, enforceable contract exists.

The "essential justification" for the doctrine of promissory estoppel is "to avoid the substantial hardship or injustice which would result" if a promise was made, and reasonably relied upon, but not enforced. *Pop's Cones, Inc. v. Resorts Int'l Hotel, Inc.,* 704 A.2d 1321, 1324 (N.J. Super. Ct. App. Div. 1998). "[P]romissory estoppel generally serves as a stop-gap where no valid contract exists to enforce a party's promise." *Kiss Elec., LLC v. Waterworld Fiberglass Pools, N.E., Inc.,* No. 14-3281, 2015 WL 1346240, at *5 (D.N.J. Mar. 25, 2015).

The doctrine of equitable estoppel applies when "conduct, either express or implied, which reasonably misleads another to his prejudice so that a repudiation of such conduct would be unjust in the eyes of the law." *D'Agostino v. Maldonado,* 78 A.3d 527, 546 (N.J. 2013) (quotation omitted). "Equitable estoppel is designed to prevent disavowal of prior conduct if a change of course would be unjust." *In re Johnson,* 73 A.3d 440, 448 (N.J. 2013).

"[U]nder New Jersey law, liability based on quasi-contractual principles cannot be imposed 'if an express contract exists concerning the identical matter.'" *Freightmaster USA, LLC v. Fedex, Inc.,* No. 14-3229, 2015 WL 1472665, at *6 (D.N.J. Mar. 31, 2015) (quoting *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.,* 716 F.2d 220, 226-27 (3d Cir. 1983)).

Promissory estoppel is a quasi-contract theory and "cannot be maintained where a valid contract fully defines the parties' respective rights and obligations." *Jones v. Marin,* No. 07-738, 2009 WL 2595619, at *6 (D.N.J. Aug. 20, 2009); see also *Hill v. Commerce Bancorp, Inc.,* No. 09-3685, 2012 WL 694639, at *14 (D.N.J. Mar. 1, 2012) (holding that party "cannot prevail on both a breach of contract and promissory

estoppel theory for the same conduct, since promissory estoppel by its definition assumes that a contract supported by consideration has not been formed" (citing *Friedman v. Tappan Development Corp.,* 126 A.2d 646, 652-53 (1956)), aff'd, 586 Fed.Appx. 874 (3d Cir. 2014).

HRC attempts to distinguish implied contracts and quasi-contracts, arguing that unjust enrichment is a quasi-contract theory, but promissory and equitable estoppel are not because they are implied contracts instead. (Dkt. 33 at 21.) We, however, have rejected this distinction and have repeatedly equated and applied both unjust enrichment and promissory estoppel as quasi-contract theories that are unavailable when a valid contract exists. See, e.g., *Smith v. CitiMortgage, Inc.,* No. 15-7629, 2016 WL 8673066, at *6 (D.N.J. Aug. 5, 2016); *Kinney Bldg. Assocs., L.L.C. v. 7-Eleven, Inc.,* No. 15-7917, 2016 WL 2855063, at *5 (D.N.J. May 16, 2016).

**\*7** It does not appear that either a federal or state court has ruled on whether equitable estoppel creates a quasi-contract in New Jersey. The cases cited by ADT, (dkt. 32-2 at 22-23; dkt. 35 at 11-12), refer to either promissory estoppel or unjust enrichment, but not to equitable estoppel. We, however, do not see a justifiable reason that the rule for equitable estoppel should be different than for promissory estoppel. Both HRC's promissory estoppel and equitable estoppel claims rely on the creation of a duty for ADT through a promise or representation, then the subsequent breach of that promise. (Dkt. 30 at 8-10.) Applying HRC's theory of equitable estoppel here would thus also involve an implied contract. Indeed, HRC acknowledges that "equitable estoppel is based on implied contract." (Dkt. 33 at 21.) For the same reasons that a promissory estoppel claim cannot imply a contract when a valid contract exists, neither should a claim of equitable estoppel. As New Jersey law makes clear, "an express contract excludes an implied one. An implied contract cannot exist when there is an existing express contract about the identical subject." See Moser, 78 A.2d at 394. Although New Jersey has not referred to equitable estoppel as a quasi-contract theory, the cases demonstrate that when an express contract exists, it controls, and courts should not create an implied contract governing the same agreement.

Because there is a valid contract here between HRC and ADT, that contract must be enforced and HRC cannot proceed on alternate theories of quasi-contract. Although a party may plead in the alternative, claims cannot proceed on quasi-contract theories absent a claim that the contract is invalid. Freightmaster USA, 2015 WL 1472665, at *6.

Case 2-23-cv-03372-BRM-CLW    Document 1-2    Filed 06/20/23    Page 243 of 302
PageID: 251

BER-L-006176-22    04/12/2023 6:03:28 PM    Pg 43 of 101    Trans ID: LCV20231258369
Hillsborough Rare Coins, LLC v. ADT LLC, Not Reported in Fed. Supp. (2017)

We will grant ADT's motion to dismiss Count Two and Count Three. We must dismiss these claims with prejudice because New Jersey law prohibits a party from recovering on these quasi-contract theories when a valid contract exists. See, e.g., Adler Engineers, 2014 WL 5475189, at *12 (dismissing with prejudice promissory estoppel claim, under Rule 12(b)(6), because it was a quasi-contract claim that cannot be raised as a matter of law when a valid express contract existed).

**C. Breach of Implied Covenant of Good Faith and Fair Dealing (Count Four)**
HRC alleges that ADT violated the implied covenant of good faith and fair dealing by making contractual promises to HRC and then breaking those promises. (Dkt. 30 at 10-11.)

ADT moved to dismiss Count Four, arguing that HRC cannot maintain a separate cause of action for breach of the covenant of good faith and fair dealing that is based on the same conduct alleged in a breach of contract claim. (Dkt. 32-2 at 23-24; dkt. 35 at 12-13.)[7]

HRC contends that it has sufficiently pleaded a claim for breach of the implied covenant of good faith and fair dealing. (Dkt. 33 at 20, 22.) According to HRC, in New Jersey, the covenant of good faith and fair dealing is implied in every contract, and therefore, by definition, the implied covenant is based on the existence of an express contract. (Id. at 21-22.)

In New Jersey, implied into every contract is a covenant of good faith and fair dealing. *Atlantic City Racing Assoc. v. Sonic Fin. Corp.*, 90 F. Supp. 2d 497, 510 (D.N.J. 2000). " '[I]mplied covenants are as effective components of an agreement as those covenants that are express,' and 'a party's performance under a contract may breach [an] implied covenant even though that performance does not violate a pertinent express term.' " *Fields v. Thompson Printing Co.*, 363 F.3d 259, 271 (3d Cir. 2004) (quoting *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126 (N.J. 2001)). The implied covenant may fill in the gaps to give efficacy to a contract as written when some terms of the contract are not specific, but "where the terms of the parties' contract are clear, the implied covenant of good faith and fair dealing will not override the contract's express language." Id. at 271-72.

**\*8** Thus, we have repeatedly explained that a plaintiff "may not sustain a separate cause of action for breach of the covenant of good faith and fair dealing based on the

same conduct that has given rise to their breach of contract claims and where the terms of their contract are clear." *TBI Unlimited, LLC v. Clear Cut Lawn Decisions, LLC*, No. 12-3355, 2013 WL 6048720, at *3 (D.N.J. Nov. 14, 2013); see also *Elite Pers., Inc. v. PeopleLink, LLC*, No. 15-1173, 2015 WL 3409475, at *3 (D.N.J. May 27, 2015) ("[A] plaintiff cannot maintain a claim for breach of the implied covenant of good faith and fair dealing when the conduct at issue is governed by the terms of an express contract or the cause of action arises out of the same conduct underlying the alleged breach of contract." (quotation omitted)).

We find that HRC has not made sufficient factual allegations of a breach of the implied covenant beyond the breach of the contract. HRC has provided no specific claims indicating how ADT breached its "obligation to perform in good faith" by doing something that "interfere[d] with or destroy[ed] [HRC's] reasonable expectations under the contract." See Atlantic City Racing Assoc., 90 F. Supp. 2d at 510. HRC merely states that promises were made by ADT and ADT's conduct violated the implied covenant of good faith and fair dealing, without providing factual support for the allegation. (Dkt. 30 at 10-11.) The conduct HRC refers to is the same allegations that give rise to the breach of contract claim. We must therefore dismiss HRC's breach of implied covenant of good faith and fair dealing claim against ADT.

We will dismiss the claim without prejudice. HRC may seek leave to amend its First Amended Complaint in accordance with the FRCP and our local rules. If successful, ADT will be given the opportunity to respond to the new allegations and file a motion to dismiss.

**D. Breach of Warranty (Count Five)**
HRC alleges that ADT made both express and implied warranties for the alarm system and services provided, including for example, that "the alarm system and services were fit for the particular purposes" that HRC would use them for, and that "ADT's monitoring services were capable of receiving alert signals and implementing notifications to the customer as well as local law enforcement." (Dkt. 30 at 11-12.) HRC claims that ADT breached those warranties. (Id.)

ADT argues that the contract controls, and that a warranty disclaimer provision precludes HRC from bringing this claim. (Dkt. 32-2 at 17-19 (citing dkt. 32-3 at 7); dkt. 35 at 13.) ADT argues that this provision is conspicuously disclaimed, and is thus enforceable against HRC, because the clause is written

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 44 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 244 of 302
PageID: 252
Hillsborough Rare Coins, LLC v. ADT LLC, Not Reported in Fed. Supp. (2017)

in all bold and capital-letter, offset from the lowercase, non-bolded letters in the rest of the contract. (Dkt. 32-2 at 18.)

HRC argues that the warranty disclaimer provision is unenforceable because New Jersey requires a warranty disclaimer to be conspicuous, but the provision in the contract is set forth in tiny, unreadable print. (Dkt. 33 at 22-23.)

The contract provides a warranty for defective material or workmanship in the alarm system installed within ninety days of the installation. (Dkt. 32-3 at 7; dkt. 33-3 at 2.) The warranty disclaimer provision in the contract states:

> **THE FOREGOING WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER'S EXCLUSIVE REMEDY WITH RESPECT TO ANY AND ALL LOSSES OR DAMAGES RESULTING FROM ANY CAUSE WHATSOEVER, INCLUDING ADT'S NEGLIGENCE, SHALL BE REPAIR OR REPLACEMENT AS SPECIFIED ABOVE. ADT SHALL IN NO EVENT BE LIABLE FOR ANY CONSEQUENTIAL OR INCIDENTAL DAMAGES OF ANY NATURE, INCLUDING WITHOUT LIMIATION, DAMAGES FOR PERSONAL INJURY OR DAMAGES TO PROPERTY, AND HOWEVER OCCASIONED, WHETHER ALLEGED AS RESULTING FROM BREACH OF WARRANTY OR CONTRACT BY ADT OR NEGLICENCE OF ADT OR OTHERWISE.**

**\*9**  (Id.)

In New Jersey, "to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous." N.J.S.A. 12A:2-316 ("Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.' ") The parties agree that disclaimers of warranties are valid provided that they are "conspicuous," but the parties disagree as to whether the warranty disclaimer provision in the contract meets that standard.

The New Jersey Legislature has explained that " 'Conspicuous,' with reference to a term, means so written,

displayed, or presented that a reasonable person against which it is to operate ought to have noticed it." N.J.S.A. 12A:1-201(10).

Conspicuous terms include the following:

(a) a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and

(b) language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

Id.

Deciding whether a term meets this definition of conspicuous is a question for the court. Id. We thus have routinely resolved this question at the motion to dismiss stage. See, e.g., *Rapid Models & Prototypes, Inc. v. Innovated Solutions*, No. 14-277, 2015 WL 4914477, at \*7-8 (D.N.J. Aug. 18, 2015); *T.J. McDermott Transp. Co. v. Cummins, Inc.*, No. 14-04209, 2015 WL 1119475, at \*12 (D.N.J. Mar. 11, 2015).

The warranty disclaimer in the contract is on the first page of the contractual terms, set off by a bullet point, and emphasized in bolded, capital letters. (Dkt. 32-3 at 7; dkt. 33-3 at 2.)[8] This creates a contrast to the surrounding paragraphs which are not bulleted, and in standard lower-case, unbolded letters. See id. The warranty explicitly mentions merchantability and fitness for a particular purpose. Id.

We find that the disclaimer is clear and unambiguous, and therefore, conspicuous within the meaning of the statute. The warranty disclaimer is thus enforceable against HRC. We will grant ADT's motion to dismiss Count Five. Because the warranty disclaimer provision is valid, we will dismiss the claim with prejudice because amending the claim would be futile. See *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) (holding that dismissal with prejudice is appropriate when an amendment to the complaint would be inequitable or futile). See, e.g., Rapid Models & Prototypes, 2015 WL 4914477, at \*7-8 (dismissing with prejudice breach of warranty claim after finding that the warranty disclaimer provision was valid and enforceable); *Advanced Drainage Sys., Inc. v. SiteCo Materials, Inc.*, No. 13-1349, 2014 WL 1092809, at \*2-4 (D.N.J. Mar. 18, 2014) (same).

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 45 of 302   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 245 of 302
PageID: 253
Hillsborough Rare Coins, LLC v. ADT LLC, Not Reported in Fed. Supp. (2017)

### E. New Jersey Consumer Fraud Act (Count Six)

**\*10** HRC alleges that ADT violated the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., (the "CFA"), when selling the alarm system and services "through the use of employment of unconscionable commercial practices, deceptions, fraud, false pretenses, false promises, misrepresentations, and/or the knowing concealment, suppression or admission of material facts in connection with the services then performed." (Dkt. 30 at 12-13.) Specifically, HRC claims that ADT represented to HRC that the alarm monitoring system involved immediately notifying HRC and law enforcement if the alarm were triggered. (Id. at 13.) But, according to HRC, ADT insulated themselves from any liability by placing exculpatory clauses, damage-limitation clauses, and other waivers into the contract with "print so tiny as to be illegible and effectively hidden from view," amounting to an "unconscionable trade practice." (Id. at 13-14.) HRC also alleges that ADT forged an HRC signature on a 2006 Sales Proposal/Agreement. (Id. at 14.)

ADT has moved to dismiss HRC's CFA claim. ADT argues that New Jersey law bars CFA claims for contractual disputes. (Dkt. 32-2 at 27.) ADT contends that HRC only alleges a failure to properly perform contractual obligations, which does not give rise to a CFA claim. (Id. at 27-30; dkt. 35 at 14.) ADT further argues that the contract, including the exculpatory clauses, are enforceable. (Dkt. 32-2 at 30-32.) Lastly, ADT argues that HRC has not alleged an ascertainable loss with respect to the alleged 2006 forged signature, as required by the CFA, and that HRC's CFA claim regarding the 2006 contract must therefore be dismissed. (Id. at 32-33.) Moreover, ADT notes that the 2006 contract was not in effect at the time of the 2015 burglary at HRC's store. (Id. at 33; dkt. 35 at 14 n.6.)

In response, HRC argues that ADT's objections go to the weight of the evidence and are more appropriate at the summary judgment stage, rather than at the motion to dismiss stage. (Dkt. 33 at 24.) HRC submits that it has sufficiently pleaded the elements of a CFA violation. (Id.) HRC acknowledges that, under New Jersey law, a breach of contract claim alone cannot constitute a CFA violation, but HRC contends that it has made allegations apart from the breach of contract that would establish unconscionable practices, including that ADT forged a HRC signature in 2006. (Id. at 24-26.)

The New Jersey Consumer Fraud Act was "designed to promote the disclosure of relevant information to enable [ ] consumer[s] to make intelligent decisions in the selection of products and services." *Belmont Condo. Ass'n v. Geibel*, 74 A.3d 10, 27 (N.J. Super. Ct. App. Div.), certif. denied, 80 A.3d 747 (N.J. 2013). The CFA thus imposes liability on a person who uses "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission." N.J.S.A. 56:8-2.

"The standard of conduct that the term 'unconscionable' implies is lack of good faith, honesty in fact and observance of fair dealing." *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) (quotation omitted). A breach of contract or breach of warranty, however, is not per se unconscionable. Id. To demonstrate unconscionable acts in connection with a breach of contract, "substantial aggravating circumstances" must be present in addition to the alleged breach of contract. Id. Substantial aggravating circumstances include, "the existence of bad faith or lack of fair dealing, sufficient to constitute an 'unconscionable business practice.' " *Petri Paint Co. v. Omg Ams., Inc.*, 595 F. Supp. 2d 416, 421 (D.N.J. 2008) (quoting Cox, 647 A.2d at 462).

To state a claim, an individual must allege sufficient facts to demonstrate: "(1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 97 (D.N.J. 2011) (citing *International Union of Operating Engineers Local No. 68 Welfare Fund ("IUOEL 68") v. Merck & Co.*, 929 A.2d 1076, 1086 (2007)). Three types of unlawful conduct are recognized under the CFA: affirmative misrepresentations, knowing omissions, and regulation violations. *Mladenov v. Wegmans Food Markets, Inc.*, 124 F. Supp. 3d 360, 373 (D.N.J. 2015). We construe the CFA liberally because it is remedial legislation. Smajlaj, 782 F. Supp. 2d at 98 (citing IUOEL 68, 929 A.2d at 1079 n.1).

**\*11** HRC has made allegations of unlawful conduct beyond a mere breach of contract, which otherwise would be insufficient to state a claim. HRC's allegation of a forged signature on a contract, even if not the operative contract at the time of burglary, is a specific allegation beyond a mere contract dispute. Forging a signature on a contract "stand[s] outside the norm of reasonable business practice in that it

BER-L-006176-22    04/12/2023 6:03:28 PM    Pg 46 of 101    Trans ID: LCV20231258369

Case 2:23-cv-03372-BRM-CLW    Document 1-2    Filed 06/20/23    Page 246 of 302
PageID: 254

Hillsborough Rare Coins, LLC v. ADT LLC, Not Reported in Fed. Supp. (2017)

will victimize the average consumer." See *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 655 A.2d 417, 430 (N.J. 1995). This one act of forgery—assuming it is true, as we must at this stage—is sufficiently unconscionable that it is a substantial aggravating circumstance on its own. We conclude that the allegation of forgery is a sufficient allegation of aggravating circumstances at this initial pleading stage. See, e.g., *Naporano Iron & Metal Co. v. American Crane Corp.*, 79 F. Supp. 2d 494, 507 (D.N.J. 1999) (distinguishing between burden of proving an unconscionable practice at trial and alleging substantial aggravating circumstances at the initial pleading stage to survive a motion to dismiss). HRC, however, has made no allegations in its Amended Complaint regarding an ascertainable loss steaming from the alleged unconscionable practices beyond that resulting from a breach of contract. Nor has HRC alleged how a 2006 forged signature on a non-operative contract led to that loss. Therefore, we find that HRC has not sufficiently alleged facts to support all elements of a CFA claim in the pleadings. See *Smajlaj*, 782 F. Supp. 2d at 98.

We will dismiss without prejudice Count Six, the Consumer Fraud Act claim. HRC may seek leave to amend its First Amended Complaint in accordance with the FRCP and our local rules. If HRC is granted leave to amend, ADT will be given the opportunity to respond to the new allegations.

**F. Products Liability (Count Seven)**

HRC alleges that ADT's alarm and alarm system "was not reasonably fit or suitable for its intended purpose," "failed to contain adequate warnings," or "was designed in a defective manner," in violation of the New Jersey Products Liability Act (the "PLA"), N.J.S.A. 2A:58C-1 et seq. (Dkt. 30 at 15.)

ADT contends that HRC has provided insufficient factual support for the claim, specifically that HRC only alleged a vague defect without identifying whether the alarm was defective at the time it left ADT's control and that HRC has not averred that ADT failed to act in a reasonable manner while manufacturing, designing, or marketing the alarm system. (Dkt. 32-2 at 35-37; dkt. 35 at 17-18.) ADT argues that if the claim were to proceed, all other counts must be dismissed because the Products Liability Act is the exclusive remedy for product defects available by New Jersey law. (Dkt. 32-2 at 33-35; dkt. 35 at 14-17.)

HRC argues that it has alleged sufficient facts at the pleading stage to state a claim against ADT for products liability. (Dkt. 33 at 27.) HRC also argues that its claims against ADT are

not subsumed by the PLA because the remaining claims do not arise from ADT's duty to provide a safe product. (Id. at 27-28.)

Under the PLA, a claimant must demonstrate that "the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner." N.J.S.A. 2A:58C-2.

We find that HRC does not allege specific facts for a defective product. HRC merely parallels the legal standard, N.J.S.A. 2A:58C-2, without providing any supporting factual allegations. (See dkt. 30 at 15.) The Amended Complaint does not cite any product failure or defect in the alarm or alarm system. Rather, the allegations indicate that the ADT alarm worked and was "triggered, alerting the ADT monitoring station to the break-in," but ADT chose not to call law enforcement or Fabricatore. (Dkt. 30 at 5-6.)

We find that these bare allegations are insufficient to state a claim upon which relief may be granted. See *Iqbal*, 556 U.S. at 678.[9] We will therefore grant without prejudice ADT's motion to dismiss Count Seven, the Products Liability Act claim. HRC may seek leave to amend its First Amended Complaint in accordance with the FRCP and Local Civil Rules. Should HRC's motion to amend its Amended Complaint be successful, ADT may move to dismiss an amended products liability claim from the Second Amended Complaint in accordance with the FRCP and Local Civil Rules.

**G. Theft/Civil Conspiracy to Commit Theft (Count Eight)**

**\*12** HRC alleges that the burglars acted with "inside knowledge" because ADT employees or agents were involved with or participated in the burglary and theft. (Dkt. 30 at 16.) HRC claims that ADT employees conspired with the burglars, or each other, to burglarize the store and steal merchandise. (Id.)

ADT has moved to dismiss HRC's civil conspiracy claim, arguing that HRC has failed to meet the heightened pleading standard required by Rule 9(b). (Dkt. 32-2 at 39-41; dkt. 35 at 19-20.) ADT also argues that it cannot be held vicariously liable for the actions of its employees taken outside the scope

Hillsborough Rare Coins, LLC v. ADT LLC, Not Reported in Fed. Supp. (2017)

of their employment, such as providing inside information to burglars. (Dkt. 32-2 at 39; dkt. 35 at 18-19.) ADT also argues that civil conspiracy in New Jersey requires a valid underlying tort claim and that if we were to dismiss HRC's other tort claims, we would have to dismiss the civil conspiracy claim as well. (Dkt. 32-2 at 37-38.) ADT disputes that theft as alleged in the Amended Complaint qualifies as a substantive underlying tort claim to support a civil conspiracy claim. (Dkt. 35 at 20.)

HRC contends that it has sufficiently pleaded a count of civil conspiracy by ADT. (Dkt. 33 at 29-30.) HRC argues that the theft allegation (traditionally referred to as a claim for trover or conversion) qualifies as an underlying tort claim for the civil conspiracy claim. (Id. at 30.) HRC also argues ADT can be held liable under New Jersey law for any employee involvement in the burglary. (Id. at 29-30.)

ADT argues that the heightened pleading standard of Rule 9(b) applies to this claim, and HRC does not dispute this. We do not agree though that a heightened pleading standard applies here to a civil conspiracy claim that does not allege fraud.

Federal Rule of Civil Procedure 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

In determining whether the heightened pleading standard of Rule 9(b) applies, "the test is whether the particular claim alleged in this matter sounds in fraud. If so, the pleading is subject to 9(b)." *Gray v. Bayer Corp.*, No. 08-4716, 2009 WL 1617930, at *2 (D.N.J. June 9, 2009). When no fraud is involved, the general Rule 8 pleading standard applies to a claim of civil conspiracy. See, e.g., *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 184-85 (3d Cir. 2009) (applying Iqbal to civil conspiracy claim); *Wiatt v. Winston & Strawn LLP*, 838 F. Supp. 2d 296, 316-18 (D.N.J. 2012) (applying heightened Rule 9(b) pleading standard to fraud claims, but not civil conspiracy claim); *Warren v. Fisher*, No. 10-5343, 2011 WL 4073753, at *3-4 (D.N.J. Sept. 12, 2011) (applying Twombly to civil conspiracy claim). See also *Sawl v. The Borough of W. Kittanning*, No. 10-008, 2010 WL 1444868, at *6 (W.D. Pa. Apr. 9, 2010) ("Since Twombly and Iqbal, the United States Court of Appeals for the Third Circuit has applied their holdings in the context of civil conspiracy claims.").[10]

**\*13** We are not convinced that the allegations of theft are based in fraud. HRC accuses ADT employees of using force, not fraud or deception, to break into the store and steal merchandise. Therefore, we will not apply the heightened pleading standard of Rule 9(b).

In New Jersey, to state a claim of civil conspiracy, an individual must allege "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Banco Popular North America v. Gandi*, 876 A.2d 253, 263 (N.J. 2005) (quotation omitted); *Am. Corporate Soc'y v. Valley Forge Ins. Co.*, 424 Fed.Appx. 86, 90 (3d Cir. 2011). " 'The gravamen of a conspiracy action is not the conspiracy itself but the underlying wrong which, absent the conspiracy, would give a right of action.' " *Ewing v. Cumberland Cnty.*, 152 F. Supp. 3d 269, 301 (D.N.J. 2015) (quoting *Bd. of Educ. v. Hoek*, 183 A.2d 633, 646 (N.J. 1962)).

HRC alleges that at least one ADT employee or agent entered into an agreement with the burglars to commit the unlawful act.[11] According to HRC, the burglars acted with inside knowledge of the store and ADT alarm system, believed to be provided by ADT. (Dkt. 30 at 16.) HRC states that the silent panic alarm was triggered, but at that time ADT did not call HRC or law enforcement. (Id. at 5.) HRC alleges that an ADT employee later falsely told Fabricatore that there was a power outage and that the alarm system was still functioning on a backup battery. (Id. at 6-7.) HRC claims that this allowed the burglars to stay in the store for three hours because Fabricatore was led to believe that "nothing was wrong" and he would be notified if anything did go wrong. (Id. at 5, 7.) HRC also states that ADT claimed to conduct an investigation into the burglary, but would not release its findings to HRC. (Id. at 7.) Assuming what HRC states as true, a plausible claim of conspiracy to commit theft has been averred. See *Wiatt*, 838 F. Supp. 2d at 317 ("In order to survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a civil conspiracy claim must allege 'at least some facts which could, if proven, permit a reasonable inference of a conspiracy to be drawn.' " (quoting *Durham v. City and County of Erie*, 171 Fed.Appx. 412, 415 (3d Cir. 2006)).

ADT, however, argues that it cannot be held liable for the actions of its employees or agents that were done outside the course and scope of their employment. An employer

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 48 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 248 of 302 PageID: 256
Hillsborough Rare Coins, LLC v. ADT LLC, Not Reported in Fed. Supp. (2017)

is liable, under the doctrine of respondeat superior, for the tortious conduct of its employees performed within the scope of employment. *Brijall v. Harrah's Atl. City*, 905 F. Supp. 2d 617, 622 (D.N.J. 2012). Generally, intentional torts fall outside the scope of employment. Id.

HRC has made no allegations in the Amended Complaint of how an employee was working within the scope of employment to hold ADT vicariously liable. There are not sufficient facts in the pleadings to state a claim against ADT for the conduct of its employees under the doctrine of respondeat superior. See Iqbal, 556 U.S. at 678

**\*14** We must therefore grant ADT's motion to dismiss HRC's civil conspiracy claim against ADT. We will dismiss the claim without prejudice. HRC can seek leave to amend

the claim in accordance with the FRCP and the local rules. If successful, ADT will be given the opportunity to respond.

## CONCLUSION

For the reasons stated above we: deny the motion to dismiss as to Count One; grant the motion and dismiss with prejudice Count Two, Count Three, and Count Five; and grant the motion and dismiss without prejudice Count Four, Count Six, Count Seven, and Count Eight.

We will enter an appropriate order and judgment.

## All Citations

Not Reported in Fed. Supp., 2017 WL 1731695

## Footnotes

1    The Court will cite to the documents filed on the Electronic Case Filing System ("ECF") by the designation of "dkt." Pincites reference ECF pagination.

2    HRC attached an affidavit from the store's Managing Member/owner, Victor Fabricatore, and exhibits to its brief in opposition to the motion to dismiss. (Dkt. 33-1.) Generally, when considering a motion to dismiss filed pursuant to Rule 12(b)(6), we may not "consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). A complaint may not be amended by the briefs in opposition to a motion to dismiss. See *Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988). We therefore have constrained ourselves to evaluating the allegations in the Amended Complaint, and we have not considered the affidavit provided by HRC in its brief opposing the motion to dismiss. If HRC wishes us to consider these allegations and supporting documents, then HRC must seek leave to file an amended complaint in accordance with the Federal Rules of Civil Procedure and our local court rules.

3    Now known as ADT LLC. (Dkt. 30 at 2; dkt. 32-2 at 8.)

4    Although we generally limit our review to the pleadings when evaluating a motion to dismiss, we "may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document," such as the contract here. See *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

5    We note that ADT and HRC also make the same arguments regarding the insurer provision with respect to Counts Two, Three, Four, and Five. Because we resolve those claims on different grounds, we only discuss the insurer provision as it relates to the breach of contract claim.

6    ADT also raises the damages limitation provision as grounds to dismiss HRC's claims of promissory estoppel (Count Two), equitable estoppel (Count Three), breach of implied covenant of good faith and fair dealing (Count Four), and breach of warranty (Count Five). For the reasons given here, we likewise will not consider this provision in evaluating whether to dismiss those claims.

7    In its reply brief, ADT argues for the first time that the claim must also be dismissed because HRC has failed to specify any acts done in bad faith. (Dkt. 35 at 13 n.5.) HRC had no opportunity to respond to this argument. We have not considered this alternate ground for dismissal because it was not raised in the initial brief. See *Ballas v. Tedesco*, 41 F. Supp. 2d 531, 533 (D.N.J. 1999) ("A moving party may not raise new issues and present new factual materials in a reply brief

**Hillsborough Rare Coins, LLC v. ADT LLC, Not Reported in Fed. Supp. (2017)**

that it should have raised in its initial brief."); *Boisvert v. State Farm Fire & Cas. Co.*, No. 14-5760, 2015 WL 5771797, at *5 (D.N.J. Sept. 29, 2015).

8    In analyzing the provision, we have looked at both the version of the contract supplied by HRC and that supplied by ADT. (Dkt. 32-3; dkt. 33-3.) The language is the same in both versions, but the size of the printed text is different.

9    Because we find that HRC has failed to state a claim, we need not address ADT's argument that the PLA subsumes the remainder of HRC's claims and would be the exclusive remedy available to HRC.

10    *Spitz v. Medco Health Sols., Inc.*, No. 10-01159, 2010 WL 4615233, at *4 (D.N.J. Nov. 3, 2010), relied on by ADT (dkt. 32-2 at 39-40), appears to be the only case within the District to apply the heightened pleading standard to a civil conspiracy claim, absent allegations of fraud. The case <u>Spitz</u> relies on to apply a heightened pleading standard, *Sawl v. Borough of West Kittanning*, notes that the Third Circuit applies the <u>Twombly</u> and <u>Iqbal</u> standard to civil conspiracy claims. 2010 WL 1444868, at *6. We decline to follow <u>Spitz</u>, and instead follow the majority of other cases that have not applied a heightened pleading standard for a civil conspiracy claim without allegations of fraud.

11    HRC relies on a certification by Fabricatore to supplement its allegations of a civil conspiracy claim. (Dkt. 33 at 24.) As discussed above, we have only considered the allegations made in the Amended Complaint and have not reviewed any additional materials attached to the opposition brief that HRC has used in attempt to bolster its claims.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

TAB 6

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 51 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 251 of 302 PageID: 259
Center for Special Procedures v. Connecticut General Life, Not Reported in...

2010 WL 5068164
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

CENTER FOR SPECIAL
PROCEDURES, individually and as
assignee of Patients 1–50, Plaintiff,

v.

CONNECTICUT GENERAL
LIFE INSURANCE COMPANY,
d/b/a Cigna, et al., Defendants.

Civil Action No. 09–6566 (MLC).
|
Dec. 6, 2010.

**Attorneys and Law Firms**

Andrew Joseph Karcich, Joanne Eskin Sutkin, Lynch, Karcich & Yellin, Voorhees, NJ, for Plaintiff.

Eric Evans Wohlforth, Jennifer Marino Thibodaux, Gibbons, P.C., Newark, NJ, for Defendants.

**MEMORANDUM OPINION**

COOPER, District Judge.

**\*1** Plaintiff, Center for Special Procedures ("Plaintiff"), commenced this action against Connecticut General Life Insurance Company, d/b/a Cigna, Cigna Healthcare of Southern New Jersey, and Cigna Healthplan of New Jersey, Inc. (collectively, "Defendants"), both on its own behalf and, alternatively, as assignee of patients ("Patients 1–50") insured by Defendants to whom Plaintiff rendered surgical services. (Dkt. entry no. 20, 2d Am. Compl.) Defendants removed the action pursuant to 28 U.S.C. § 1441, on the basis that the Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims challenge the denial of benefits under health benefits plans governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq. (Dkt. entry no. 1, Rmv. Not. at 2.)[1]

Defendants now move to dismiss Count 1 through Count 9 and Count 11 of the Second Amended Complaint for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). (Dkt. entry no. 22, Mot. to Dismiss.) Defendants contend, *inter alia,* that the state law claims are preempted by ERISA. (Dkt. entry no. 22, Defs. Br. at 5–14.) The Court decides the motion on the papers, pursuant to Rule 78(b). For the reasons set forth below, the Court will grant Defendants' motion to dismiss Count 1 through Count 9 and 11.

**BACKGROUND**

Plaintiff is an ambulatory surgery center that provided surgical services to Patients 1–50 on an "out-of-network" basis as a "non-participating provider." (2d Am. Compl. at ¶¶ 9, 14.) Plaintiff has identified 38 insurance plans as governing the services rendered to Patients 1–50. (*Id.* at ¶ 11.) Of these 38 plans, it appears that three are exempt from the provisions of ERISA ("non-ERISA plans"), and 35 are ERISA plans. (*Id.* at ¶¶ 12–13.)

Plaintiff alleges that it called Defendants to confirm that Patients 1–50 each had out-of-network benefits that would cover services rendered by Plaintiff, and Defendants confirmed that such coverage existed. (*Id.* at ¶ 15.) Plaintiff received an assignment of benefits from Patients 1–50 assigning "all medical and/or surgical benefits" to Plaintiff. (*Id.* at ¶¶ 19–20.) Although Defendants had allegedly made payments for services rendered prior to February 16, 2009, after that date, when Plaintiff submitted claims for payment to Defendants, "individually as a service provider and alternatively as assignee of the patients," Defendants denied the claims and refused to pay. (*Id.* at ¶¶ 22–28.) The apparent basis for this refusal is that Plaintiff "is not licensed [with the New Jersey Department of Health] as an ambulatory care facility." (*Id.* at ¶ 29.)

Plaintiff contends that Defendants' refusal to pay is in violation of state and federal law. The Second Amended Complaint contains eleven counts, listed here as they appear in the pleading:

| | |
|---|---|
| Count 1: | Breach of Contract |
| Count 2: | Unjust Enrichment & Quantum Meruit |

BER-L-006176-22    04/12/2023 6:03:28 PM   Pg 52 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW    Document 1-2    Filed 06/20/23   Page 252 of 302
PageID: 260
Center for Special Procedures v. Connecticut General Life..., Not Reported in...

| Count 3: | Third Party Beneficiary |
|---|---|
| Count 4: | Implied Contract, Contract by Custom or Dealing, Implied Covenant of Good Faith and Fair Dealing |
| Count 5: | Reasonable Reliance, Arbitrary and Disparate Treatment |
| Count 6: | Tortious Interference |
| Count 7: | Negligent Misrepresentation |
| Count 8: | Arbitrary and Capricious |
| Count 9: | Promissory Estoppel |
| Count 10: | ERISA—Payment of Benefits Due—Violation of ERISA [§ ] 502(a)(1) |
| Count 11: | ERISA—Violation of Fiduciary Duty and $110 Per Day Penalty |

**\*2**  (2d Am. Compl. at 11–37.) With the exception of Count 10, each count is asserted as to both the ERISA plans and the non-ERISA plans at issue, "to the extent allowable at law." Plaintiff asserts Count 10 as to the ERISA plans only, and solely in the capacity of the assignee of Patients 1–50. (2d Am. Compl. at ¶¶ 172–173, 179–180.) The remaining claims are asserted alternatively in Plaintiff's own right and as assignee of Patients 1–50, designated by Plaintiff as "non-derivative claims" and "derivative claims," respectively. (Pl. Br. at 2.)[2]

Defendants contend that Count 1 through Count 9, as state law claims, are preempted by ERISA as to the ERISA plans, and further contends that Count 1 through Count 9 and Count 11 should be dismissed as to all plans for failure to conform to the pleading standard articulated in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). (Defs. Br. at 2–3.) Plaintiff opposes the motion. (Dkt. entry no. 23, Pl. Br.)

The Court determines the motion on the papers, pursuant to Rule 78(b). For the foregoing reasons, the Court will grant the motion.

## DISCUSSION

### I. 12(b)(6) Motion to Dismiss Standard

In addressing a motion to dismiss a complaint under Rule 12(b) (6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine, whether under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008). At this stage, a "complaint must contain sufficient factual matter, accepted as true to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'—that the 'pleader is entitled to relief.' " *Iqbal,* 129 S.Ct. at 1950 (quoting Rule 8(a)(2)).

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court may consider the complaint, exhibits attached thereto, matters of public record, and undisputedly authentic documents if the claimant's claims are based upon those documents. *See Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993).

### II. ERISA Preemption

#### A. Express Preemption

ERISA contains a broad preemption clause providing that ERISA shall "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S.

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 53 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 253 of 302
PageID: 261
Center for Special Procedures v. Connecticut General Life., Not Reported in...

41, 44–45, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). With this provision, Congress intended:

> to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government ..., and to prevent the potential for conflict in substantive law ... requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.

**\*3** *N.Y. Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 656–57, 115 S.Ct. 1671, 131 L.Ed.2d 695 (internal citations and quotations omitted); *see Kollman v. Hewitt Assocs., LLC,* 487 F.3d 139, 148 (3d Cir.2007).

The express preemption clause is not limited to "state laws specifically designed to affect employee benefit plans." *Pilot Life,* 481 U.S. at 47–48 (quoting *Shaw v. Delta Airlines,* 463 U.S. 85, 98, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). The term "relate to" has been construed broadly to preempt a broad range of state law claims. *See Ingersoll–Rand Corp. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (state law tort and breach of contract theories preempted by ERISA); *Pilot Life,* 481 U.S. at 43–44, 47 (breach of contract, breach of duty, and fraud claims preempted by ERISA); *Pryzbowski v. U.S. Healthcare,* 245 F.3d 266, 278 (3d Cir.2001) (negligence claim preempted by ERISA); *Pane v. RCA Corp.,* 868 F.2d 631 (3d Cir.1989) (breach of contract and bad-faith insurance practices claims preempted by ERISA); *Schmelzle v. Unum Life Ins. Co. of Am.,* No. 08–0734, 2008 U.S. Dist. LEXIS 63627, at *8–9, 2008 WL 2966688 (D.N.J. July 31, 2008) (breach of contract, breach of fiduciary duty, fraud, and negligence claims preempted by ERISA); *Wayne Surgical Ctr., LLC v. Concentra Preferred Sys., Inc.,* No. 06–928, 2007 WL 2416428, at *7 (D.N.J. Aug.20, 2007) (claims by out-of-network provider assignee for unjust enrichment, tortious interference, and fraud expressly preempted by ERISA); *Majka v. Prudential Ins. Co. of Am.,* 171 F.Supp.2d 410, 413 (D.N.J.2001) (breach of contract and breach of the implied duty of good faith and fair dealing preempted by ERISA); *Alston v. Atl. Elec. Co.,* 962 F.Supp. 616, 624 (D.N.J.1997) (breach of contract, negligent misrepresentation, and fraud claims preempted by ERISA).

To decide whether a plaintiff's state law claims are expressly preempted, a court must first determine whether the plan at issue is an ERISA benefit plan. *See Pane v. RCA Corp.,*

667 F.Supp. 168, 170 (D.N.J.1987), *aff'd,* 868 F.2d 631 (3d Cir.1989). A court must then analyze whether the state law claims "relate to" that plan. *Id.*

The parties do not dispute that 35 of the 38 plans at issue here are ERISA plans. *See* 29 U.S.C. § 1002(1) ("any plan, fund, or program ... established or maintained by an employer or by an employee organization, or by both, ... for the purpose of providing for its participants or their beneficiaries ... medical, surgical, or hospital care of benefits....").[3] Defendants do not argue that Count 1 through Count 9 are preempted by ERISA as to the three non-ERISA plans. (Defs. Br. at 2.)

We find that Count 1 through Count 9 of the Second Amended Complaint, insofar as they are asserted as to the ERISA plans, are expressly preempted by ERISA because they "relate to" Defendants' administration of the ERISA plans. Each of these state law causes of action clearly "relate to," in that they have a "connection with or reference to," the ERISA plans, because they are all rooted in the premise that Defendants should have remitted payment to Plaintiff for services Plaintiff rendered to persons covered by the plans. *Pane,* 667 F.Supp. at 171; *see Pryzbowski,* 245 F.3d at 278 (noting that "suits against ... insurance companies for denial of benefits, even when the claim is couched in terms of common law negligence or breach of contract, have been held to be preempted by" 29 U.S.C. § 1144(a)). Reference to the plans is necessary because no contract existed as between Defendants and Plaintiff as a non-participating, out-of-network provider to govern the parties' obligations. Accordingly, Count 1 through Count 9 will be dismissed as to the ERISA plans.

### B. Complete Preemption

**\*4** ERISA's civil enforcement provision, 29 U.S.C. § 1132(a), has been found to evince Congressional intent to completely preempt state law remedies and make the ERISA civil enforcement remedy exclusive as to plans governed by ERISA. *See Pilot Life,* 481 U.S. at 54–57. The statute provides that a civil action to enforce ERISA may be brought by, *inter alia,* "a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).[4]

Insofar as Plaintiff asserts that it pleads various state law claims in a "non-derivative" capacity, *i.e.,* on its own behalf rather than as assignee of Patients 1–50, such claims are preempted by ERISA's exclusive civil enforcement remedy

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 54 of 101   Trans ID: LCV20231258369

Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 254 of 302
PageID: 262

Center for Special Procedures v. Connecticut General Life..., Not Reported in...

because they amount to claims for unpaid benefits, and Plaintiff in its "non-derivative" capacity is neither a plan participant nor a beneficiary. (*See* Pl. Br. at 1–2.) *Aetna Health Inc. v. Davila,* 542 U.S. 200, 209, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004) ("[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted."). Thus, the claims insofar as they are asserted in Plaintiff's "non-derivative" capacity shall be dismissed.

### III. Rule 8(a)

Defendants contend that the Court should dismiss Count 1 through Count 9 and Count 11 because the Second Amended Complaint does not set forth sufficient facts showing that Plaintiff is entitled to relief. (Defs. Br. at 15 (citing *Twombly* ); dkt. entry no. 26, Def. Reply Br. at 5.) The Court considers each Count in turn.

#### A. Count 1—Breach of Contract

Count 1 of the Second Amended Complaint alleges that "Defendants are in breach of the applicable insurance agreements and plans with Plaintiff's Patients 1–50"; Plaintiff has demanded payment of the claims due and owing to it under the insurance agreements and plans individually as a services provider or, alternatively, as assignee of Patients 1– 50; and Defendants have denied payment. (2d Am. Compl. at ¶¶ 61–64.) It further alleges that Defendants denied payment on the basis Plaintiff is not licensed as an ambulatory care facility, and that this denial is contrary to "summary plan descriptions" ("SPDs") and Defendants' past practices. (*Id.* at ¶¶ 66–70.)

Defendants contend that Count 1 must be dismissed because Plaintiff failed to identify the contractual provisions at issue. The Court agrees. Plaintiff's factual allegations regarding the provisions of the SPDs are vague and stated in the alternative: "The SPDs do not prohibit payment of Services at 'unlicensed' ambulatory care facilities.... Alternatively, the SPDs are ambiguous regarding licensure." (2d Am. Compl. at ¶¶ 71–72.) The Second Amended Complaint does not state the actual terms or provisions Defendants have allegedly breached, but merely concludes that "Defendants' refusal to pay" is "contrary to the SPDs." (2d Am. Compl. at ¶¶ 67–69; *see also id.* at ¶ 70 ("The SPDs do not prohibit payment to Plaintiff under the circumstances herein and to the contrary, the SPD summaries *and/or* schedules of benefits indicate coverage exists.") (emphasis added).)

**\*5** "It is axiomatic that contract-based claims that do not adequately identify the contract at issue fail to 'set forth fair notice' of a claim and the 'grounds upon which it rests' and do not 'raise a right to relief above the speculative level.' " *In re Samsung DLP Television Class Action Litig.,* No. 07–2141, 2009 WL 3584352, at *6 (D.N.J. Oct.27, 2009) (quoting *Twombly,* 550 U.S. at 555). Insofar as Count 1 asserts a breach of contract based on Patients 1–50's insurance plans, it must be dismissed for failure to state a claim.[5]

#### B. Count 2—Unjust Enrichment and Quantum Meruit

Count 2 seeks recovery of the reasonable value of services provided by Plaintiff to Patients 1–50, based on Defendants' alleged "direct verbal confirmation that each patient had out of network benefits" for such services, inducing Plaintiff to provide those services. (2d Am. Compl. at ¶¶ 80–84.) Plaintiff contends that Defendant has therefore been unjustly enriched by retaining funds that otherwise should have been paid to Plaintiff for "covered out of network Services rendered to Patients 1–50." (*Id.* at ¶ 86.)

This claim, like Count 1, is based primarily on the written insurance plan contracts between Patients 1–50 and Defendants. Plaintiff has alleged that it is the assignee of the benefits engendered by Patients 1–50 by reason of their insurance plans. (2d Am. Compl. at ¶¶ 19–20, 81 (asserting Count 2, in the alternative, in the capacity as assignee of the Patients).) Recovery under an unjust enrichment or a quantum meruit theory is unavailable where an express agreement exists, and therefore Plaintiff's claim as assignee of benefits takes precedence over its "non-derivative" basis for the claim, which is not predicated on an express contract. (*Cf.* Pl. Br. at 15.) Because Defendants apparently do not challenge the validity of the Patients' assignments of benefits to Plaintiff, nor do Defendants dispute the existence of the insurance plans, this theory of recovery is unavailable to Plaintiff. *See Van Orman v. Am. Ins. Co.,* 680 F.2d 301, 310 (3d Cir.1982) ("[R]ecovery under unjust enrichment may not be had when a valid, unrescinded contract governs the rights of the parties."); *Moser v. Milner Hotels, Inc.,* 6 N.J. 278, 78 A.2d 393, 394 (N.J.1951) (holding that a plaintiff pleading existence of an express contract cannot recover in quasi-contract without showing a rescission, because an express contract excludes an implied one). Defendants' motion to dismiss will be granted as to Count 2.

#### C. Count 3—Third Party Beneficiary

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 55 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 255 of 302 PageID: 263
Center for Special Procedures v. Connecticut General Life..., Not Reported in...

Count 3 alleges that Plaintiff was a third party beneficiary of the insurance plan contracts between Patients 1–50 and Defendants, and contends that as the third party beneficiary, Plaintiff was "entitled to pursue and receive payment for Services rendered to Patients 1–50 from Defendants." (2d Am. Compl. at ¶¶ 91–94.) Defendant contends that this claim is redundant to Plaintiff's breach of contract claim, and should be dismissed, like Count 1, for insufficient factual allegations regarding the alleged contractual provisions. (Defs. Br. at 17.) Plaintiff responds that Count 3 is not redundant because "Plaintiff is a third party beneficiary by assignment and statute." (Pl. Br. at 16 (citing provisions of ERISA and *McGoldrick v. Trueposition, Inc.*, 623 F.Supp.2d 619, 634–36 (E.D.Pa.2009) (discussing standing of alleged beneficiary of ERISA plan to recover statutory penalty provided at 29 U.S.C. § 1132(c)(1))).)

**\*6** As discussed above, this claim is preempted as to the ERISA plans. With regard to the non-ERISA plans, Count 3 suffers the same infirmity as Count 1 in that the pertinent contractual provisions alleged to have been breached are not sufficiently set forth. Moreover, Count 3 is redundant to Count 1 in the sense that Plaintiff's breach of contract claim arises from its status as a third party beneficiary, which Plaintiff has standing to pursue by virtue of the assignments from Patients 1–50. *See Zahl v. Cigna Corp.*, No. 09–1527, 2010 WL 1372318, at \*1–2 (D.N.J. Mar.31, 2010). Accordingly, Count 3 will be dismissed.

### D. Count 4—Implied Contract, Contract by Custom or Dealing, Implied Covenant of Good Faith and Fair Dealing

Count 4 asserts that Plaintiff and Defendants had a course of dealing from August 2008 to February 16, 2009, during which Defendants paid Plaintiff for services it provided to various patients who were Defendants' insureds or plan members. (2d Am. Compl. at ¶ 99.) Plaintiff contends that this course of conduct "constituted an implied promise to continue payment" for such services, and that Defendants breached this promise by refusing to pay "without good cause and in bad faith." (*Id.* at ¶¶ 101–02.)

Defendants argue that the claims in Count 4 "are just reiterations of its breach of contract claim," noting that, "as with the breach of contract claim, no specific contract term is identified, even one that might have been established by a course of dealing." (Defs. Br. at 17–18.)

The Second Amended Complaint does not set forth any facts that would allow the Court, or Defendants, to discern the alleged terms of Defendants' "promise and/or contract to pay." (2d Am. Compl. at ¶ 102.) Instead, Count 4 consists of the type of "the-defendant-unlawfully-harmed-me" accusations the Supreme Court stated would not pass muster on a motion to dismiss in *Iqbal*, 129 S.Ct. at 1949. Accordingly, the Court will dismiss Count 4.

### E. Count 5—Reasonable Reliance, Arbitrary and Disparate Treatment

Plaintiff contends in Count 5 that Defendant violated the "implied contract between the parties" by refusing to pay for services rendered after February 16, 2009, and allege that this conduct was contrary to Defendants' course of conduct with other similarly situated medical providers, in that Defendants did not stop paying for services rendered by those other providers on the basis that the providers' facilities were not licensed. (2d Am. Compl. at ¶¶ 114–19.)

The Court has already noted that Plaintiff has not stated a cause of action for breach of contract, implied or otherwise. Insofar as Count 5 purports to assert causes of action for "reasonable reliance" and "arbitrary and disparate treatment," they are derivative of Plaintiff's breach of contract claims, and accordingly will also be dismissed for failure to state a claim.

### F. Count 6—Tortious Interference

Count 6 alleges that Defendants interfered with Plaintiff's right to engage in prospective economic relationships with patients, by "refusing intentionally and maliciously to pay for Services rendered by Plaintiff to Defendants' insureds or plan members, Patients 1–50." (2d Am. Compl. at ¶¶ 133–35.) Plaintiff contends that Defendants' refusal "to pay for Plaintiff's Services to Patients caused the loss to Plaintiff of the anticipated economic benefits of the relationship, thus causing injury and damage to Plaintiff." (*Id.* at ¶ 137.)

**\*7** To plead a cause of action for tortious interference with prospective economic advantage, a plaintiff must set forth facts alleging (1) "some protectable right—a prospective economic or contractual relationship," (2) the interference was done intentionally and with malice, (3) the interference caused the loss of the prospective gain, and (4) the injury caused damage. *Printing Mart–Morristown v. Sharp Elec. Corp.*, 116 N.J. 739, 563 A.2d 31, 37 (N.J.1989). It is " 'fundamental' to a cause of action for tortious interference with a prospective economic relationship that

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 56 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 256 of 302
PageID: 264
Center for Special Procedures v. Connecticut General Life..., Not Reported in...

the claim be directed against defendants who are not parties to the relationship.... Where a person interferes with the performance of his or her own contract, the liability is governed by principles of contract law." *Id.* at 37–38.

Because Defendants are party to the contractual relationship giving rise to the claims hereinamely, the insurance plans-Defendants are not subject to a claim for tortious interference with prospective economic advantage. Count 6 will therefore be dismissed as to all plans.

### G. Count 7—Negligent Misrepresentation

Plaintiff alleges in Count 7 that "Defendants negligently misrepresented to Plaintiff that Plaintiff would be paid for Services rendered to Patients 1–50." (2d Am. Compl. at ¶ 142.) Specifically, Plaintiff contends that in "telephone conversations between Plaintiff's representatives and Defendants' representatives," Defendants' representatives advised that "facility fees for outpatient pain management injections performed at an ambulatory surgical center were covered Services and that there was out of network coverage for same as to each of Plaintiffs 1–50." (*Id.* at ¶ 143, 563 A.2d 31.)

To state a claim for negligent misrepresentation, a plaintiff must show "[a]n incorrect statement, negligently made and justifiably relied on," proximately causing an economic loss. *Konover Constr. Corp. v. E. Coast Constr. Servs. Corp.,* 420 F.Supp.2d 366, 370 (D.N.J.2006). The misrepresentation must be made by a person with a duty to the plaintiff. *Roll v. Singh,* No. 07–4136, 2008 WL 3413863, at *20 (D.N.J. June 26, 2008). Even where a plaintiff properly pleads these elements, however, a negligent misrepresentation claim must fail if it is "not the type of case where a negligent misrepresentation claim is appropriate," *i.e.,* "tort claims by innocent third parties who suffered purely economic losses at the hands of negligent defendants with whom no direct relationship existed," *not* cases involving a breach of contract claim between parties in privity. *Id.* (quoting *People Express Airlines v. Consol. Rail Corp.,* 100 N.J. 246, 495 A.2d 107, 112 (N.J.1985)).

Plaintiff has not alleged in Count 7 that Defendants owed it a duty of care. (*See* 2d Am. Compl. at ¶¶ 140–48.) Beyond this deficiency, however, we find that this is not the type of case in which a claim for negligent misrepresentation is appropriate. Plaintiff's injury stems from the alleged breach of the contracts between Patients 1–50 and Defendants, which were negotiated between the employers of Patients 1–50

and Defendants. Although Plaintiff attempts to distance itself from these contracts in Count 7 by claiming it is asserting Count 7 "non-derivatively," the fact remains that Patients 1–50 have assigned Plaintiff their benefits under the contracts. (Pl. Br. at 20.) The contractual relationship at issue forecloses Plaintiff's tort claim. The Court will dismiss Count 7 as to all plans.

### H. Count 8—Arbitrary and Capricious

**\*8** Count 8 alleges that Defendants were obligated to act in accordance with the SPDs, but have not administered the plans "in a consistent, reasonable, or fair manner, and to the contrary" are administering the plans "arbitrarily and capriciously." (2d Am. Compl. at ¶¶ 152–54.) Plaintiff contends that it is being treated arbitrarily and capriciously because Defendants have made payments to "other similarly situated providers" who also do not technically meet the licensing standard imposed on Plaintiff by Defendants. (*Id.* at ¶ 156, 495 A.2d 107.)

Defendants state that they are unaware of the existence of an "arbitrary and capricious" cause of action under federal or state law. (Defs. Br. at 22.) Plaintiff responds that the "claim for arbitrary and capricious action by Defendant [sic] is ... properly stated under ERISA" and makes clear that Count 8 seeks benefits under ERISA. (Pl. Br. at 20–21; *see* 2d Am. Compl. at 30, "Wherefore" clause (demanding a judgment "[d]eclaring that Defendants are precluded from denying payment of claims by Plaintiff individually and as assignee for Services provided to its patients which are Defendants' insureds or plan members")).) However, Plaintiff does not cite to any statutory provision of ERISA, and it is clear that any cause of action Plaintiff is attempting to assert in Count 8 is preempted by ERISA's civil enforcement provision, 29 U.S.C. § 1132(a). *See Aetna Health Inc.,* 542 U.S. at 209. "Arbitrary and capricious" is a legal standard that can applied by a court in determining whether a plan administrator improperly denied benefits under an ERISA plan, not an independent cause of action. *See Doroshow v. Hartford Life & Acc. Ins. Co.,* 574 F.3d 230, 233 (3d Cir.2009) ("[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.... When the administrator has discretionary authority to determine eligibility for benefits ... the decision must be reviewed under an arbitrary and capricious standard.") (internal quotation and citation omitted); *see also Saltzman v. Independence Blue Cross,* 384 Fed.Appx. 107, 111 (3d

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 57 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 257 of 302
PageID: 265
Center for Special Procedures v. Connecticut General Life..., Not Reported in...

Cir.2010). Because Plaintiff separately pleads its cause of action to recover payment of claims for the services provided to Patients 1–50 in Count 10, which is based on 29 U.S.C. § 1132(a) and not at issue in the current motion, we will dismiss Count 8 for failure to state a claim.

### I. Count 9—Promissory Estoppel

Plaintiff asserts in Count 9 that, prior to rendering services to Patients 1–50, it called Defendants to confirm that each of Patients 1–50 "had out of network benefits for facility fees ... under their respective insurance agreements or plans with Defendants, and Defendants confirmed that there was such coverage as to each patient." (2d Am. Compl. at ¶ 163.) Plaintiff alleges that the confirmation of coverage "constituted a promise to pay" and caused Plaintiff to rely on the representations of coverage in deciding to render services to Patients 1–50. (*Id.* at ¶¶ 164–65.) Additionally, Plaintiff alleges that "Defendants' practice and pattern of behavior in paying ... benefits ... from August 2008 to February 2009 further induced Plaintiff's reasonable reliance on the promise to pay and confirmation of coverage" as to the patients. (*Id.* at ¶ 166.)

**\*9** To state a claim for promissory estoppel, a plaintiff must establish that "(1) there was a clear and definite promise; (2) the promise was made with the expectation that the promisee would rely upon it; (3) the promisee reasonably did rely on the promise; and (4) incurred a detriment in said reliance." *Martin v. Port Auth. Transit Corp.,* No. 09–3165, 2010 WL 1257730, at *5 (D.N.J. Mar.25, 2010). Defendants contend that Count 9 does not satisfy the pleading standard enunciated by *Twombly* because "the Second Amended Complaint is devoid of any allegations regarding a 'clear and definite promise.'" (Defs. Br. at 23.) Plaintiff responds that it has pleaded all of the elements required by *Martin, supra.*

"[G]enerally, an equitable claim cannot lie where a contract governs the relationship between the parties that gives rise to the equitable claim." *Ready & Motivated Minds, LLC v. Ceridian Corp.,* No. 10–1654, 2010 WL 2989986, at *7 (D.N.J. July 26, 2010). Although Plaintiff is permitted to plead in the alternative, it appears from the Second Amended Complaint that an express contract, namely, the non-ERISA plans, governs Plaintiff's claims, as assignee of the patients insured by the non-ERISA plans.[6] Count 9 does not allege facts distinguishing it from the breach of contract claim; it states only that Defendant told Plaintiff that Patients 1–50 had out of network benefits. Because we have held that

Plaintiff's pleading of its breach of contract claim did not satisfy *Twombly,* Plaintiff will be permitted to file an amended pleading setting forth facts supporting a claim for breach of contract as to the non-ERISA plans. Count 9 will be dismissed for failure to state a claim under *Twombly,* but with leave to Plaintiff to amend this claim as an alternative to its breach of contract claim as to the non-ERISA plans insofar as Plaintiff can set forth a "clear and definite promise" independent of the alleged breach of contract.

### J. Count 11–ERISA—Violation of Fiduciary Duty and $110 Per Day Penalty

Count 11, asserted by Plaintiff in its capacity as assignee of Patients 1–50 and therefore a "beneficiary" under ERISA, seeks payment of a penalty provided by 29 U.S.C. § 1132(c), based on Defendants' alleged failure to provide Plaintiff copies of the relevant plan documents until 200 days after such demand was made. (2d Am. Compl. at ¶¶ 198–204.) The relevant statutory provision provides that

> [a]ny administrator ... who fails or refuses to comply with a request for such information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

**\*10** 29 U.S.C. § 1132(c)(1)(B).[7] Plaintiff alleges that it requested the plan documents from Defendants on or about August 31, 2009, and confirmed this request through counsel and in writing on or about September 16, 2009. (2d Am. Compl. at ¶¶ 199, 201.) The Summary Plan Descriptions for the relevant plans were provided to Plaintiff on March 19, 2010. (*Id.* at ¶ 208.)

Defendants contend that Count 11 "fails to plausibly explain what Plaintiff means by 'ERISA—violation of fiduciary duty.'" (Defs. Br. at 24.) The Court agrees. The Second Amended Complaint does not indicate that Patients 1–50 assigned a claim for violation of fiduciary duty as opposed to a claim for benefits under the plans. Moreover, Plaintiff's brief opposes dismissal of Count 11 only on the ground that Count 11 "adequately pleads an ERISA claim for penalties." (Pl. Br. at 22–25.) Because a breach of fiduciary duty claim

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 58 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 258 of 302
PageID: 266
Center for Special Procedures v. Connecticut General Life..., Not Reported in...

would be duplicative of Plaintiff's claims for the alleged wrongful denial of benefits and for disclosure penalties, in that the Second Amended Complaint alleges no facts either specifically regarding a breach of fiduciary duty or that would entitle Plaintiff to relief beyond the benefits and disclosure penalties sought, Count 11 will be dismissed insofar as it asserts a claim for breach of fiduciary duty. *See Morley v. Avaya, Inc. Long Term Disability Plan,* No. 04–409, 2006 WL 22263336, at *23–24 (D.N.J. Aug. 3, 2006).

Defendants contend that the disclosure penalty provision cannot be enforced against them because they are not the *plan* administrator implicated in 29 U.S.C. § 1132(c)(1)(B), but rather the *claims* administrator for the plans at issue. (Defs. Br. at 29.) To state a claim for relief under 29 U.S.C. § 1132(c)(1)(B), a plaintiff must allege "(1) that he is a plan participant or beneficiary; (2) that he has made a written request to a plan administrator for information that falls within the purview of ERISA's disclosure requirements; and (3) that the plan administrator failed to provide the requested documents within thirty days of the written request." *Wargotz v. NetJets, Inc.,* No. 09–4789, 2010 WL 1931247, at *3 (D.N.J. May 13, 2010).

Plaintiff has alleged that it is a plan beneficiary by means of the assignments of benefits from Patients 1–50. (2d Am. Compl. at ¶ 198.) Thus, the first element is satisfied.

The second element requires a showing that a demand was made of a "plan administrator." Plaintiff alleges in Count 11 that the ERISA plans at issue "are administered, managed and operated by Defendants ... under ERISA" and further states that "the claims administrator with regard to the applicable plans ... is 'CIGNA Corporation.' " (*Id.* at ¶¶ 200, 207.) Plaintiff thus contends that because "Defendant [sic] is the claims administrator with regard to the applicable plans and also at all material times acted as the plan administrator as well," the second element set forth in *Wargotz* is met. (Pl. Br. at 23.)

 **\*11**  The Second Amended Complaint indicates only that Defendants, doing business as Cigna Corporation, act as claims administrators and not plan administrators under ERISA. "A plan administrator is ... either expressly designated in the plan documents or is the plan sponsor 'if an administrator is not so designated.' " *Wargotz,* 2010 WL 1931247, at *5 (citing 29 U.S.C. § 1002(16)(A) (i-ii)). A plan sponsor is

(i) the employer in the case of an employee benefit plan established or maintained by a single employer, (ii) the employee organization in the case of a plan established or maintained by an employee organization, or (iii) in the case of a plan established or maintained by two or more employers jointly by one or more employers and one or more employee organizations, the association, committee, joint board of trustees, or other similar group of representatives of the parties who establish or maintain the plan.

29 U.S.C. § 1002(16)(B).

Plaintiff's allegation that the relevant SPDs expressly designate "CIGNA Corporation" as the "claims administrator" does not suffice to indicate that Defendants are the plan administrator for the plans at issue. Thus, the potentially liable party under 29 U.S.C. § 1132(c)(1)(B) would be the plan sponsor of each ERISA plan, not Defendants. *See Campo v. Oxford Health Plans, Inc.,* No. 06–4332, 2007 WL 1827220, at *4–5 (D.N.J. June 26, 2007) (holding that employer, not insurer, was "plan administrator," and rejecting notion that insurer was *"de facto* plan administrator" for purposes of 29 U.S.C. § 1132(c)(1)(B)); *see also Erbe v. Billeter,* No. 06–113, 2007 WL 2905890, at *7–8 (W.D.Pa. Sept.28, 2007) (dismissing § 1132(c)(1)(B) claim against Connecticut General Life Insurance Company because it was "not vested with the responsibility for plan administration" and noting with approval case law cited by defendant "for the proposition that courts have consistently held an insurance company cannot be held liable for ERISA civil penalties when the plaintiff incorrectly directs a request for plan documents to the insurance company responsible for claim processing instead of to the plan administrator").

Plaintiff alleges no facts that could plausibly support a claim against Defendants for liability for failure to disclose documents under 29 U.S.C. § 1132(c)(1)(B). Accordingly, Count 11 will be dismissed in its entirety.

**CONCLUSION**

For the reasons discussed *supra,* the Court will dismiss Count 1 through Count 9 and Count 11 of the Second Amended Complaint. Plaintiff will be granted leave to file an amended pleading setting forth claims for (1) payment of benefits due, in its capacity as assignee of Patients 1–50, under ERISA's civil enforcement provision, 29 U.S.C. § 1132(a)

Center for Special Procedures v. Connecticut General Life, Not Reported in...

(1), as to the ERISA plans only (*i.e.,* Count 10 of the Second Amended Complaint), (2) breach of contract as to the non-ERISA plans only, and (3) promissory estoppel as to the non-ERISA plans only. Count 2 through Count 8 will be dismissed with prejudice because it appears that amendment would be futile. Fed.R.Civ.P. 15(a)(2); *Grayson v. Mayview*

*State Hosp.,* 293 F.3d 103, 110 (3d Cir.2002). The Court will issue an appropriate order.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5068164

Footnotes

1   Defendants also alleged the existence of jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000. (Rmv. Not. at 2.)

2   Only Count 1, Count 2, and Count 5 expressly state that the cause of action is based on, alternatively, Plaintiff's assignee status and on its own behalf as a provider of services. (2d Am. Compl. at ¶¶ 62–63, 80–81, 112–113.)

3   Plaintiff states that it "believes that there may be more than three (3) non-ERISA plans" and requests that any order of the Court dismissing Plaintiff's claims as preempted by ERISA "reflect that all plans ultimately determined to be non-ERISA plans are not preempted." (Pl. Br. at 8.) Given that Defendants provided the cover page for the summary plan descriptions for each of the 38 plans at issue to Plaintiff and included them as an exhibit to the motion to dismiss, we find no basis for Plaintiff's "belief" that some of the plans beyond the three specified non-ERISA plans are exempt from ERISA. (*Id.;* Defs. Br., Ex. A; 2d Am. Compl. at ¶¶ 11–13.) *See* 29 U.S.C. § 1003(b) (listing plans exempt from ERISA coverage).

4   The remaining provisions, 29 U.S.C. § 1132(a)(2)-(10), are not relevant here.

5   Plaintiff's opposition to dismissal of Count 1 on the basis that it is also asserting breach of "unwritten" contracts, in the form of Defendants' discontinuation of a previous course of dealing with Plaintiff, is misplaced, as Plaintiff separately pleaded causes of action relating to that theory. (Pl. Br. at 14–15.)

6   As discussed above, ERISA preempts all of Plaintiff's state law causes of action as to the ERISA plans because the claims "relate to" the ERISA plans. 29 U.S.C. § 1144.

7   The $100 per day penalty was increased to $110 per day for violations occurring after June 29, 1997. 29 C.F.R. § 2575.502c–1.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

TAB 7

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 61 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 261 of 302
PageID: 269
Kiss Elec., LLC v. Waterworld Fiberglass Pools, N.E., Inc., Not Reported in F.Supp.3d...

2015 WL 1346240
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

KISS ELECTRIC, LLC, Plaintiff,

v.

WATERWORLD FIBERGLASS
POOLS, N.E., INC., Defendant.

Civil No. 14–3281 (RBK/AMD).
|
Signed March 25, 2015.

**Attorneys and Law Firms**

Vincent Anthony Guarna, Trevose, PA, for Plaintiff.

**OPINION**

KUGLER, District Judge.

**\*1** Plaintiff Kiss Electric, LLC ("Plaintiff") brings this uncontested Motion for Default Judgment pursuant Fed.R.Civ.P. 55(b)(2) against Defendant Waterworld Fiberglass Pools, N.E., Inc. ("Defendant"). (Doc. No. 11.) This action arises under state statutory and common law, and includes claims for breach of contract, unjust enrichment, promissory estoppel, misrepresentation, and a violation of New Jersey's Payment Act, and requests both monetary damages and equitable relief. For the reasons stated herein, the Motion will be **GRANTED,** with further instructions for Plaintiff to file additional materials in order to satisfy the Court concerning the various damage amounts due.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Prior to April 29, 2014, Plaintiff and Defendant had several ongoing contractual dealings related to the installation of swimming pools and the provision of the necessary electric work at Defendant's customers' homes. (Amended Complaint ("Compl.") ¶¶ 9–10.) Typically, Defendant would enter into a contract with a homeowner to manufacture and install a swimming pool and Defendant would, through invoice or purchase order, subcontract the related electrical work to Plaintiff. (*Id.* ¶ 10.)

Up and until April 29, 2014, Plaintiff provided labor, materials, and services under contract with Defendant at five properties (the "Performed Jobs"), for which Defendant has not paid. (*Id.* ¶ 11.) The amount due to Plaintiff for its work on the Performed Jobs is equal to $21,425.00. (*Id.;* Ex. 1 to Compl., Performed Jobs Invoices ("Invoices").).[1]

During and prior to this time, Defendant also asked Plaintiff to purchase or rent equipment and supplies for an additional nine projects (the "Pending Jobs"). (*Id.* ¶ 12; *see also* Ex. 2 to Compl., Defendant's Pending Job Invoices ("Defendant's Invoices").) As a result of Defendant's representations to Plaintiff concerning the Pending Jobs, Plaintiff incurred expenses in the amount of $22,500.00 in material and equipment purchased, and $11,500.00 for the rental and purchase of ditch diggers, all of which were job-specific expenses and could not be used for any other projects. (*Id.* ¶ 13.) Plaintiff would not have purchased or rented the aforementioned materials and equipment, but for Defendant's promise that Plaintiff would perform the Pending Jobs. (*Id.* ¶ 14.) However, Defendant would not allow Plaintiff to perform the Pending jobs, despite the fact that Plaintiff was ready, willing, and able to complete the jobs. (*Id.* ¶ 12.) In addition to the loss of the expenses occurred in anticipation of the Pending Jobs, Plaintiff also suffered lost profit related to the Pending jobs. (*Id.* ¶ 15.) The Pending Jobs were each priced at $5,356.25, for a total of $48,206.25, and this price included Plaintiff's overhead and profit. (*Id.*)

During a meeting on May 5, 2014, between representatives of Plaintiff and Defendant concerning payment for the Performed Jobs, Defendant's owner orally agreed with Plaintiff that Plaintiff would be guaranteed at least 136 work orders throughout the season (the "Promised Jobs"). (*Id.* ¶ 16.) Prior to that meeting, two members of Defendant's operations department orally agreed that Plaintiff would perform between 150–200 jobs over the course of the season. (*Id.*) As a result of these representations, Plaintiff forbore from taking other projects that would interfere with the agreements and promises for jobs made by Defendant. (*Id.*) Perhaps not surprisingly, the Promised Jobs never materialized. (*Id.* ¶ 18.) Plaintiff claims that it has also loft profit related to the Promised Jobs. (*Id.* ¶ 19.)

**\*2** Finally, in light of Defendants misrepresentations which Plaintiff relied upon, Plaintiff used its electrician's stamp (the "Stamp") for permitting purposes on the Pending Jobs and the Promised Jobs. (*Id.* ¶ 20.) But for Defendant's

misrepresentations, Plaintiff would not have used its Stamp in order that Defendant could obtain permits. (*Id.* ¶ 21.) Plaintiff believes that Defendant never had the intention of compensating Plaintiff for the Performed Jobs, or having Plaintiff perform the Pending Jobs or Promised Jobs. (*Id.* ¶ 22.) Instead, it is Plaintiff's belief that Defendant intend to mislead Plaintiff for the purposes of obtaining Plaintiff's Stamp in order to obtain permits and perform the Pending Jobs and Promised jobs on its own, or with a different, less reputable electrical contractor. (*Id.* ¶ 23.)

As a result of Defendant's actions, Plaintiff has lost control of its Stamp and drawings the Stamp has been placed upon, ordered and rented material and equipment for the purposes of completing the Pending Jobs, suffered lost profits related to the Pending Jobs and Promised Jobs, and suffered damages related to the Performed Jobs. (*See id.* ¶¶ 11, 25.)

Plaintiff filed its original Complaint in this matter on May 22, 2014. (Doc. No. 1.) Summons was issued as to Defendant, and was returned executed on May 29, 2014. (Doc. No. 6.) The Court subsequently ordered that Plaintiff amend its Complaint, in order to properly allege diversity of citizenship (Doc. No. 7), which prompted Plaintiff to file its Amended Complaint on June 10, 2014. (Doc. No. 8). On July 10, 2014, after receiving no response from Defendant, who had neither filed a responsive pleading nor entered an appearance in this matter, Plaintiff sought and received the Clerk of Court's entry of Default under Rule 55(a) on July 11, 2012. (Doc. No. 9.)[2] Three months later, Plaintiff filed the instant Motion for Default Judgment on October 14, 2014. (Doc. No. 11.)

## II. DISCUSSION AND ANALYSIS

Rule 55(b)(2) allows the Court, upon a plaintiff's motion, to enter default judgment against a defendant that has failed to plead or otherwise defend a claim for affirmative relief. While the decision to enter default judgment is left principally to the discretion of the district court, there is a well-established preference in this Circuit that cases be decided on the merits rather than by default whenever practicable. *Hritz v. Woma Corp.,* 732 F.2d 1178, 1180–81 (3d Cir.1984). Consequently, the Court must address a number of issues before deciding whether a default judgment is warranted in the instant case. If it finds default judgment to be appropriate, the Court's next step is to determine a proper award of damages.

### A. Appropriateness of Default Judgment

### 1. *The Court's Jurisdiction*

First, the Court must determine whether it has both subject matter jurisdiction over Plaintiff's cause of action and personal jurisdiction over Defendant. *U.S. Life Ins. Co. in City of New York v. Romash,* Civ. No. 09–3510, 2010 WL 2400163, at *1 (D.N.J. June 9, 2010). Verifying the Court's jurisdiction is of particular concern where, as here, the defaulting party has failed to make any sort of appearance or submit any responsive communication to the Court.

**\*3** In this case, Plaintiff appears to assert state law claims for breach of contract, unjust enrichment, promissory estoppel, misrepresentation, and a violation of New Jersey's Payment Act, and requests both monetary damages and equitable relief. However, the Amended Complaint properly alleges the citizenship of every party and that diversity of citizenship exists between the parties. (Compl.¶¶ 1, 3, 6.) Consequently, the Court has diversity subject matter jurisdiction over Plaintiff's claims pursuant to 28 U .S.C. § 1332.

In addition, the Court must consider whether it may exercise personal jurisdiction over Defendant. Because Defendant is alleged to be a citizen of New Jersey, this Court has jurisdiction over Defendant pursuant to Fed.R.Civ.P. 4(k)(1) (A).

### 2. *Entry of Default*

Second, the Court must ensure that the entry of default under Rule 55(a) was proper. Rule 55(a) directs the Clerk of Court to enter a party's default when that party "against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." In this case, Defendant was properly served with a summons and the original Complaint on May 29, 2014. (Doc. No. 6.) Defendant failed to respond to the original Complaint within twenty-one days of service as required under Rule 12(a). Thereafter, the Court ordered that Defendant amend the Complaint to properly allege the citizenship of the parties, which it did on June 10, 2014. (Doc. No. 8.) Though Defendant certified that it served the Amended Complaint by first class mail to the same address at which original Complaint and summons were served and executed, Defendant again failed to respond to the Amended Complaint within twenty-one days of service as required under Rule 12(a). Plaintiff attested to these facts in a certification attached to its request for default. (Doc. No. 11.) Accordingly, the Clerk's entry of default under Rule 55(a) was appropriate.

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 63 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 263 of 302
PageID: 271

Kiss Elec., LLC v. Waterworld Fiberglass Pools, N.E., Inc., Not Reported in F.Supp.3d...

3. *Plaintiff's Causes of Action*

Third, the Court must determine whether Plaintiff's Amended Complaint states a proper cause of action against Defendant. In conducting this inquiry, the Court accepts as true a plaintiff's well-pleaded factual allegations while disregarding its mere legal conclusions. *See Directv, Inc. v. Asher,* Civ. No. 03–1969, 2006 WL 680533, at *1 (D.N.J. Mar.14, 2006) (citing 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2688, at 63 (3d ed.1998)). As stated above, Plaintiff alleges several causes of action: (1) breach of contract; (2) violation of New Jersey's Prompt Payment Act; (3) unjust enrichment; (4) promissory estoppel; and (5) intentional misrepresentation.[3] After a thorough review of Plaintiff's Amended Complaint and the applicable law, the Court finds that Plaintiff has alleged causes of action for breach of contract, promissory estoppel, and intentional misrepresentation, and has sufficiently alleged that it is entitled to the damages available under the New Jersey Prompt Payment Act.

a) *Breach of Contract*

**\*4** To maintain a claim for breach of contract under New Jersey law, Plaintiff must allege: (1) the existence of a contract; (2) that Defendant breached the contract; (3) damages flowing Defendant's breach, and; (4) that Plaintiff performed its own contractual duties. *See Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.,* 210 F.Supp.2d 552, 561 (D.N.J.2002).

"A contract arises from offer and acceptance, and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.' " *Weichert Co. Realtors v. Ryan,* 128 N.J. 427, 435, 608 A.2d 280 (1992) (quoting *West Caldwell v. Caldwell,* 26 N.J. 9, 24–25, 138 A.2d 402 (1958)). "Thus, if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." *Weichert,* 128 N.J. at 435, 608 A.2d 280.

Concerning the Performed Jobs and the Pending Jobs, Plaintiff has sufficiently stated a cause of action for breach of contract. Regarding the Performed Jobs, Plaintiff has alleged that it was "under contract" with Defendant for the Performed Jobs, (Compl.¶ 11), which Plaintiff completed. Defendant breached these contracts by failing to pay the amount due to Plaintiff when it completed the Performed Jobs.

Though Plaintiff does not specifically allege the existence of a contract for the Pending Jobs, the circumstances pled by Plaintiff give rise to an enforceable obligation and a valid breach of contract claim. First, Defendant promised that Plaintiff could perform those jobs and Plaintiff agreed. In addition, Defendant asked that Plaintiff purchase and rent the equipment and supplies for the Pending Jobs, which Plaintiff did.[4] Not only did Plaintiff rent and purchase certain materials and equipment, it used its Stamp to approve certain electrical plans and was "ready, willing, and able" to complete the Pending Jobs. (Compl.¶ 12.) Then, when Defendant refused to allow Plaintiff to perform the Pending Jobs, Plaintiff suffered damages from the expenses already incurred and the profits lost from those jobs.

However, with respect to the Promised Jobs, Plaintiff has failed to plead enough information to establish the existence of an enforceable contract. Though Defendant made a promise to Plaintiff when it guaranteed the Promised Jobs, this alone is insufficient to allege a valid contract. A unilateral promise, without consideration, is no contract at all. *See Friedman v. Tappan Dev. Corp.,* 22 N.J. 523, 533, 126 A.2d 646 (1956); *see also Oscar v. Simeonidis,* 352 N.J.Super. 476, 485, 800 A.2d 271 (App.Div.2002) (noting that while all valid contracts require consideration, this may involve only a "very slight advantage to one party, or a trifling inconvenience to the other"). Plaintiff has not pled any advantage given to Defendant, or inconvenience taken on in exchange for Defendant's promise. In the Amended Complaint, Plaintiff does not allege that it vowed in return to perform the Promised Jobs. Nor is it clear that Plaintiff's *reliance* on Defendant's promise—forbearing from taking other projects that would interfere with the Promised Jobs—was consideration for Defendant's promise. Plaintiff's own allegations state that Plaintiff forbore from taking other projects "as a result" of Defendant's promise, not in exchange for that promise. (Comp.¶ 16.) It is much the same with Plaintiff's use of its Stamp, which Plaintiff never alleges was used in exchange for Defendant's promise. Based on Plaintiff's allegations, there does not appear to be any "price bargained for" Defendant's guarantee of the Promised Jobs. *See Oscar,* 352 N.J.Super. at 485, 800 A.2d 271. Accordingly, though Plaintiff was ready and willing to perform the Promised Jobs when Defendant refused to allow Plaintiff to perform those jobs, the Court finds that there was no enforceable contract for Defendant to breach.

b) *Violation of New Jersey's Prompt Payment Act*

BER-L-006176-22  04/12/2023 6:03:28 PM  Pg 64 of 101  Trans ID: LCV20231258369

Kiss Elec., LLC v. Waterworld Fiberglass Pools, N.I., Inc., Not Reported in F.Supp.3d...

**\*5** The New Jersey Prompt Payment Act ("NJPPA"), N.J. Stat. § 2A:30A–2, provides that:

> If a subcontractor or subsubcontractor has performed on its contract with the prime contractor or subcontractor and the work has been accepted by the owner ... the prime contractor shall pay to its subcontractor and the subcontractor shall pay to its subsubcontractor within 10 calendar days of the receipt of each periodic payment, final payment or receipt of retainage monies, the full amount received for the work of the subcontractor or subsubcontractor based on the work completed or the amount due under the applicable contract.

§ 2A:30A–2(b). "If a payment due pursuant to the provisions of this section is not made in a timely manner, the delinquent party shall be liable for the amount of money owed under the contract, plus interest at a rate equal to the prime rate plus 1%." § 2A:30A–2(c). Additionally, "the prevailing party shall be awarded reasonable costs and attorney fees." § 2A:30A–2(f).

Because the Court has already found that Defendant is liable to Plaintiff for breach of contract with respect to the Performed Jobs, the Court also finds that Plaintiff is entitled to the outstanding amount due to Plaintiff for the Performed Jobs, as well as interest and attorney's fees and costs, pursuant to the NJPPA.

### c) *Unjust Enrichment/Quantum Meruit*

Plaintiff also seeks to recover the amount paid for the Performed Jobs based on a quasi-contract theory, i.e., a claim for unjust enrichment or quantum meruit. However, it is axiomatic that, where an express agreement is enforced, Plaintiff may not pursue damages outside that contract by alleging that Defendant has been unjustly enriched. *See Moser v. Milner Hotels, Inc.,* 6 N.J. 278, 280, 78 A.2d 393 (1951); *Kas Oriental Rugs, Inc. v. Ellman,* 394 N.J.Super. 278, 286, 926 A.2d 387 (App.Div.), *certif. denied,* 192 N.J. 74, 926 A.2d 858 (2007); *see also Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.,* 716 F.2d 220, 226–27 (3d Cir.1983) (finding that, under New Jersey law, constructive or quasi-contractual remedy "to prevent unjust enrichment or unconscionable benefit ... will not be imposed ... if an express contract exists concerning the identical subject matter.") Because it has already found that Defendant is liable to Plaintiff for the amount due for the Performed Jobs based on a breach of contract, the Court finds that Plaintiff cannot simultaneously prevail on a claim for unjust enrichment or quantum meruit.

### d) *Promissory Estoppel*

To establish liability based on promissory estoppel a plaintiff must show "(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." *Segal v. Lynch,* 211 N.J. 230, 253 (2012). Consistent with the other two quasi-contract claims mentioned above, promissory estoppel generally serves as a stop-gap where no valid contract exists to enforce a party's promise. "It is only when the parties do not agree that the law interposes and raises a promise. When an express contract exists, there must be a rescission of it before the parties will be remitted to the contract which the law implies, in the absence of that agreement which they made for themselves." *Moser,* 6 N.J. at 280–81, 78 A.2d 393 (quoting *Voorhees v. Executors of Woodhull,* 33 N.J.L. 494, 496–497 (E. & A. 1869)); *see also Carlson v. Arnot–Ogden Mem. Hosp.,* 918 F.2d 411, 416 (3d Cir.1990) (noting that promissory estoppel is generally invoked "in situations where the formal requirements of contract formation have not been satisfied and where justice would be served by enforcing a promise.") As the Court has already found that the parties formed an enforceable contract as to the Performed Jobs and the Pending Jobs, Plaintiff's promissory estoppel claim is superfluous with respect to those jobs. However, because Plaintiff's allegations do not give rise to an enforceable contract with respect to the Promised Jobs, the Court finds that Plaintiff's claim for promissory estoppel may still provide a basis for relief.

**\*6** Regarding the Promised Jobs, Plaintiff successfully states a claim for promissory estoppel. First, Plaintiff has alleged that a promise was made. According to the Amended Complaint, Defendant agreed with Plaintiff and guaranteed at least 136 work orders through the remainder of the season on May 5, 2014. Second, it is alleged that Defendant's promise was meant to induce Plaintiff's reliance. (Compl.¶ 45.) Plaintiff has also sufficiently pled that its reliance on Defendant's promise was detrimental. For instance, Plaintiff claims that it "forbore from taking other projects that would interfere with the agreements and promises made by [Defendant]." (*Id.* ¶ 16.) Additionally, Plaintiff provided its Stamp for permitting purposes on the Pending Jobs and the Promised Jobs. As a result of its reliance, Plaintiff claims that it lost profits on all 136 jobs, and lost the exclusive control of its Stamp.

Finally, the Court finds that Plaintiff reasonably relied upon Defendant's promise, to a point. While it would be reasonable

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 65 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 265 of 302
PageID: 273
Kiss Elec., LLC v. Waterworld Fiberglass Pools, N.J., Inc., Not Reported in F.Supp.3d...

for Plaintiff to forgo accepting new work from other general contractors or customers that might reasonably interfere with the jobs promised by Defendant at or around the time Defendant made that promise, it is clear Plaintiff could not reasonably rely on Defendant's promise for those 136 jobs indefinitely. This is evident from the fact that Plaintiff filed this lawsuit a mere seventeen days after Defendant guaranteed Plaintiff the Promised Jobs. Such an action indicates that Plaintiff had reason to believe Defendant's promise was suspect. *Cf. E.A. Coronis Assoc. v. M. Gordon Const. Co.,* 90 N.J.Super. 69, 80, 216 A.2d 246 (App.Div.1966) (noting that where a bid made by the defendant subcontractor was "so low as to put [the plaintiff] on notice that it was erroneous," the Plaintiff could not claim reasonable reliance on the defendant's promise). Therefore, the Court finds that Plaintiff has pled reasonable reliance up and until the date of the filing of this action.

As discussed below in its analysis of the damages sought by Plaintiff, the Court will award compensatory damages commensurate with the expected profit from the Promised Jobs which supplanted those jobs Plaintiff forbore from taking as a result of the aforementioned period of reasonable reliance. Additionally, the Court will apply the same principles regarding mitigation and avoidance of those damages as it does with respect to the other contract-related damages.

### e) *Intentional Misrepresentation*

Plaintiff's intentional misrepresentation claim sounds in fraud. To state a claim for fraud under New Jersey law, a plaintiff must allege "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 610, 691 A.2d 350 (1997). However, in order to sustain a claim for equitable fraud, Plaintiff need not prove the element of scienter, i.e., that Defendant had knowledge of the falsity and intended to obtain an undue advantage from that knowledge. *See Jewish Ctr. of Sussex Cnty. v. Whale,* 86 N.J. 619, 625, 432 A.2d 521 (1981).

**\*7** First, the Court notes that Plaintiff has sufficiently pled the elements of a legal fraud claim. Plaintiff has alleged that Defendant intentionally made false representations to induce Plaintiff to perform certain actions, order material and equipment, and obtain its Stamp, when Defendant had no intention of allowing Plaintiff to perform the Pending Jobs

or Promised Jobs. (Compl.¶ 47.) Further, the Court finds that Plaintiff has alleged facts which support its fraud claim, even in light of the heightened pleading requirements for fraud claims under *Fed.R.Civ.P. 9(b). See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir.1997) (noting that "[w]hile state of mind may be averred generally, plaintiffs must still allege facts that show the court their basis for inferring that the defendants acted with 'scienter.' ") Specifically, Plaintiff has pled that Defendants induced Plaintiff to complete the Performed Jobs, and promised Plaintiff the Pending Jobs and Promised jobs in order to obtain Plaintiff's Stamp and get unpaid work from Plaintiff for the Performed Jobs. The series of events described in Plaintiff's factual allegations, including Defendant's attempt to assuage Plaintiff's concerns over its failure to pay for the performed jobs by promising an additional 136 jobs in the future, and the allegation that Defendant defrauded Plaintiff to secure its Stamp in order that it might use the Stamp to obtain permits for work it did not actually intend Plaintiff to complete, support its position.

Second, because the only new relief Plaintiff may obtain pursuant to its misrepresentation claim is equitable relief, the Court finds that it has easily satisfied the lesser requirements for sustaining a claim for equitable fraud.[5] Plaintiff contends that, but for Defendant's promise that Plaintiff would perform the Pending Jobs and the Promised Jobs, it would not have applied its Stamp in order that Defendant could obtain electrical permits for the Pending Jobs. (Compl.¶ 21.) Because the Court finds that Defendant engaged in a misrepresentation amounting to fraud, Plaintiff is entitled to the equitable relief it seeks, which the Court discusses *infra* at Part II.B.4., in its analysis of the applicable damages.

### 4. *Emcasco Factors*

Fourth, and lastly, the Court must consider the so-called *Emcasco* factors when determining whether to enter default judgment. The Court considers: (1) whether the defaulting party has a meritorious defense; (2) the prejudice suffered by the plaintiff seeking default; (3) the defaulting party's culpability in bringing about default. *Bridges Fin. Grp., Inc. v. Beech Hill Co., Inc.,* Civ. No. 09–2686, 2011 WL 1485435, at *3 (D.N.J. Apr.18, 2011) (citing *Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds,* 250 F.R.D. 171, 177 (D.N.J.2008) (citing *Emcasco Ins. Co. v. Sambrick,* 834 F.2d 71, 74 (3d Cir.1987)). In this case, all three of these factors weigh in favor of granting a default judgment. First, there is no indication that Defendant has a cognizable defense to

Kiss Elec., LLC v. Waterworld Fiberglass Pools, N.E., Inc., Not Reported in F.Supp.3d...

Plaintiff's allegations. *See Hill v. Williamsport Police Dept.,* 69 Fed. App'x 49, 52 (3d Cir.2003) ("Because the defendants had not yet filed an answer, the District Court was unable to evaluate whether they had a litigable defense, [rendering this first] factor ... inconclusive."). Second, because Defendant has wholly failed to answer the Amended Complaint or otherwise appear, Plaintiff suffers prejudice if it does not receive a default judgment because it has no alternative means of vindicating its claim against the defaulting party. *See Directv,* 2006 WL 680533, at *2. Third, the Defendant's failure to respond permits the Court to draw an inference of culpability on its part. *See Surdi v. Prudential Ins. Co. of Am.,* Civ. No. 08–225, 2008 WL 4280081, at *2 (D.N.J. Sept.8, 2008). Thus, the *Emcasco* factors weigh in favor of entering default judgment.

### 5. *Conclusion*

**\*8** In light of the foregoing analysis, the Court finds that Plaintiff is entitled to a default judgment against Defendant.

### B. Damages

Although a plaintiff's allegations pertaining to the amount of damages it seeks are not treated as true upon the entry of a default judgment, *Comdyne I, Inc. v. Corbin,* 908 F.2d 1142, 1149 (3d Cir.1990), if the damages are for a "sum certain or for a sum which can by computation be made certain, a further evidentiary inquiry is not necessary and a district court may enter final judgment," *Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Moskowitz Motor Transp., Inc.,* Civ. No. 05–5605, 2007 WL 608436, at *3 (D.N.J. Feb.23, 2007) (citing Fed.R.Civ.P. 55(b)(1)). "A claim for damages is not a sum certain unless there is no doubt as to the amount to which a plaintiff is entitled as a result of the defendant's default. Such situations include actions on money judgments, negotiable instruments, or similar actions where the damages sought can be determined without resort to extrinsic proof." *Id.* (internal quotation marks and citation omitted). Here, only the damages for the amount due for the Performed Jobs are ascertainable. Because the Court requires further documentation to support many of the damages sought by Plaintiff, the Court will permit Plaintiff to submit additional documentation within twenty-one days of this Opinion and the accompanying Order and Judgment, in accordance with the applicable case law and Rules of Court.

### 1. *Compensatory Damages*

Plaintiff seeks actual damages of $288,421.88. (Pl.'s Cert. of Amt. Due of Keith Truskin ("Truskin Cert.") ¶¶ 6, 11, 12, 14.) In support of this allegation, Plaintiff submits the certification of Keith Truskin, the Chief Financial Officer of Plaintiff. Mr. Truskin affirms that the actual damages resulting from Defendant's actions are $288,421.88. (*See id.*) Those damages include: (a) $21,425.00 due for the Performed Jobs, (b) $34,000 for expenses incurred by Plaintiff for the rental and purchase of materials and equipment for the Pending Jobs, (c) $14,461.88 for lost profits from the Pending Jobs, and (d) $218,535.00 for lost profits from the Promised Jobs. (*Id.*)

For breach of contract, Defendant is liable to Plaintiff for "all the natural and probable consequences of the breach of that contract." *Pickett v. Lloyd's,* 131 N.J. 457, 474, 621 A.2d 445 (1993). Often, courts in New Jersey award compensatory damages, i.e., damages which put the innocent party in the position he or she would have achieved had the contract been completed, in breach of contract actions. *Totaro, Duffy, Cannova and Co., LLC. v. Lane, Middleton & Co., LLC,* 191 N.J. 1, 13, 921 A.2d 1100 (2007) (citing *Donovan v. Bachstadt,* 91 N.J. 434, 443–44, 453 A.2d 160 (1982)). Those damages may include lost profits, so far as they can be determined with a "reasonable degree of certainty." *Stanley Co. of Am. V. Hercules Powder Co.,* 16 N.J. 295, 314, 108 A.2d 616 (1954). For promissory estoppel, Plaintiff is entitled to the damages flowing from the loss due to its detrimental reliance on Defendant's promise regarding the Promised Jobs. *Pop's Cones, Inc. v. Resorts Int'l Hotel, Inc.,* 307 N.J.Super. 461, 472, 704 A.2d 1321 (App.Div.1998) (citing *Peck v. Imedia, Inc.,* 293 N.J.Super. 151, 168, 679 A.2d 745 (App.Div.) *certif. denied,* 147 N.J. 262 (1996)).

**\*9** The Court finds that only $21,425.00 of the amount sought by Defendant are ascertainable damages at this time. The Invoices attached as Exhibit 1 to the Amended Complaint confirm this amount owed for the Performed Jobs, and the Court need not inquire further concerning the damages incurred by Defendant's failure to pay Plaintiff for the work done on these jobs. *See, e.g., JPMorgan Chase Bank, N.A. v. Candor Constr. Grp., Inc.,* Civ. No. 08–3836, 2010 WL 3210521, at *2–3 (D.N.J. Aug. 12, 2010) (Director of Construction for plaintiff testified and showed invoice spreadsheets displaying unpaid balances and payments plaintiff made on behalf of defendant); *Imperial Constr. Grp., Inc. v. Jocanz Inc.,* Civ. No. 06–709, 2008 WL 2966794, at *4–6 (D.N.J. July 31, 2008) (plaintiff showed

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 67 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 267 of 302
PageID: 275

Kiss Elec., LLC v. Waterworld Fiberglass Pools, N.J., Inc., Not Reported in F.Supp.3d...

evidence of damages by submitting checks plaintiff paid on behalf of defendant and unpaid invoices sent to defendant).

The damages from the Pending Jobs and the Promised jobs, however, are not ascertainable without further evidentiary inquiry. Plaintiff has not submitted any of its own receipts or invoices to support the expenses it apparently incurred in anticipation of the Pending Jobs.[6] Nor do Defendant's Invoices, attached as Exhibit 2 to the Amended Complaint, indicate what work Plaintiff was contracted to perform for the Pending Jobs, or how much it was to be paid for that work. Further, there is no documentation anywhere in the record suggesting what type of work was to be performed by either Defendant or Plaintiff as part of the Promised Jobs, let alone what Plaintiff's amount due would be. The Court is left with only the certified statements of Mr. Truskin, which is particularly concerning where the amounts sought for the Pending Jobs ($48,461.88) and the Promised Jobs ($218,535.00) are significantly more than the amount Plaintiff is entitled to recover for the Performed Jobs.

Without more, there is simply no way of determining what the Plaintiff is due for the amounts expended in anticipation of the Pending Jobs, what profits Plaintiff would have received from the Pending Jobs, and what amount Plaintiff would be entitled to recover for its reliance on the Promised Jobs, without the submission of additional evidence. At this time it is unclear what the Pending Jobs and Promised Jobs were actually worth, what the profits would have been on those jobs, whether Defendant could reasonably foresee that these damages would flow from breaching its promise, and whether Plaintiff could or did mitigate any of these damages. *See Sommer v. Kridel,* 74 N.J. 446, 454 n. 3, 378 A.2d 767 (1977) ("It is well settled that a party claiming damages for a breach of contract has a duty to mitigate his loss.") (citing *Frank Stamato & Co. v. Borough of Lodi,* 4 N.J. 14, 71 A.2d 336 (1950); *Sandler v. Lawn–A–Mat Chem. & Equip. Corp.,* 141 N.J.Super. 437, 358 A.2d 805 (App.Div.1976); *Wolf v. Marlton Corp.,* 57 N.J.Super. 278, 154 A.2d 625 (App.Div.1956); 5 Corbin on Contracts (1964 ed.), § 1039 at 241 et seq.; McCormick, Damages, § 33 at 127 (1935)).

**\*10** Accordingly, Plaintiff must submit documentation supporting the amount paid for purchase and rental of materials and equipment in anticipation of the Pending Jobs, the value of the Pending Jobs, and the expected profit to be received from each of the Pending Jobs, including how that profit is calculated. Plaintiff must also submit evidence concerning any attempts it made to mitigate the damages

caused by Defendant's failure to fulfill its promise to allow Plaintiff to perform the Pending Jobs, including any other jobs it performed during that time which were taken in lieu of the Pending Jobs and the profits it earned from those jobs. In the absence of any mitigating steps, Defendant should document any reasons for its failure to take such steps. Moreover, in light of the Court's discussion of the scope of Plaintiff's reasonable reliance on Defendant's promise for the Promised Jobs, Plaintiff should submit affidavits or documentation supporting any work that was reasonably turned down in anticipation of those jobs prior to the filing of this action, and the value of the Promised Jobs that would have been performed in lieu of the rejected jobs, including the anticipated profits, and any other relevant information, such as attempts made by Plaintiff to mitigate its damages.

Plaintiff shall submit the appropriate documentation within twenty-one days of this Opinion and the accompanying Order and Judgment, in accordance with the applicable case law and Rules of Court.

### 2. *Interest*

As noted *supra* at Part II.A.3.(b), Plaintiff is entitled to interest on the amount due for the Performed Jobs at the prime rate plus 1%, pursuant to the NJPPA. § 2A:30A–2(c). When the prime rate is "easily ascertainable from financial publications," the Court may "take judicial notice of the applicable rate." *Rankin v. DeSarno,* 89 F.3d 1123, 1134 n. 11 (3d Cir.1996), *overruled on other grounds.* " 'Prime rate' means the average predominant prime rate, as determined by the Board of Governors of the Federal Reserve System, quoted by commercial banks to large businesses...." N.J. Stat. § 54:48–2.

While Plaintiff has not submitted evidence regarding what the prime rate during the applicable time period was, the Court notes that the Board of Governors of the Federal Reserve System set the prime rate at 3.25% in January 2009, and it has remained at that rate through the present date.[7] Therefore the applicable interest rate under the NJPPA is 4.25%.

That, however, is not the end of the Court's inquiry when calculating the interest due. The interest provision of the NJPPA requires a calculation of interest "beginning on the day after the required payment date and ending on the day on which the check for payment has been drawn." § 2A:30A–2(c). Though Mr. Truskin's Certification indicates that the amounts due on the Invoices for the Performed Jobs

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 68 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 268 of 302
PageID: 276

Kiss Elec., LLC v. Waterworld Fiberglass Pools, N.E., Inc., Not Reported in F.Supp.3d...

were due "upon receipt" of said invoices, it is not clear on what date Defendant received those invoices. Therefore, in order to calculate the interest due, Plaintiff must submit evidence demonstrating to the Court what the applicable interest accruing period under the NJPPA is.

**\*11** Plaintiff may submit the appropriate documentation within twenty-one days of this Opinion and the accompanying Order and Judgment, in accordance with the applicable case law and Rules of Court.

### 3. *Attorney's Fees*

Plaintiff is also entitled to "reasonable costs and attorney fees" under the NJPPA. § 2A:30A–2(f). The Court has the discretion to determine whether an amount of requested attorneys' fees is reasonable. *Spectrum Produce Distrib., Inc. v. Fresh Mktg., Inc.,* Civ. No. 11–06368, 2012 WL 2369367, at *3 (D.N.J. June 20, 2012). Plaintiff, however, has not submitted an affidavit or evidence setting forth its attorneys' fees and actual expenses which relate to the work expended in furtherance of this matter. *See Teamsters Health & Welfare Fund of Phila. and Vicinity v. Dubin Paper Co.,* Civ. No. 11–7137, 2012 WL 3018062, at *5 (D.N.J. July 24, 2012)* ("A request for fees must be accompanied by 'fairly definite information as to hours devoted to various general activities, e.g., partial discovery, settlement negotiations, and the hours spent by various classes of attorneys.' ") (quoting *Evans v. Port Auth.,* 273 F.3d 346, 361 (3d Cir.2001)); *see also Spectrum Produce,* 2012 WL 2369367, at *3 (noting that the "lodestar amount," which means the " 'number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate,' " is the appropriate method for determining whether a requested amount of attorney's fees is reasonable) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)); *Blum v. Stenson,* 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (holding that the party seeking damages must provide evidence of a reasonable hourly rate "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."); *Spectrum Produce,* 2012 WL 2369367, at *5. (further holding that the party seeking damages must provide evidence that the amount of time spent on the matter was reasonable). Accordingly, the Court cannot determine what attorneys' fees should be awarded at this time.

Plaintiff may submit an application for attorneys' fees within twenty-one days of the date of this Opinion and the

accompanying Order and Judgment, in accordance with the applicable case law and Rules of Court.

### 4. *Equitable Relief*

With respect to the equitable relief it seeks, apparently Plaintiff desires the return or destruction of any materials in Defendant's possession bearing its Stamp. In support of its request, Plaintiff claims it "lost control" of its Stamp when it approved the drawings for the Pending Jobs, (*id.* ¶ 24), and Plaintiff is the only entity with a right to possess or use its Stamp. (*Id.* ¶ 55.) That Plaintiff faces administrative penalties or sanctions for improper or unauthorized use of its Stamp only reinforces Plaintiff's position. *See* N.J. Admin. Code § 13:31–3.3(b). Because any drawing containing Plaintiff's Stamp is the sole property of Plaintiff, and may not be used by Defendant or any other electrician where Plaintiff will not be supervising the work, Plaintiff requests that Defendant cease using any drawing containing Plaintiff's Stamp, and destroy or return any documents containing Plaintiff's Stamp. (Compl.¶ 58.) Because it appears Plaintiff's position is supported by its allegations and the certification of Mr. Truskin, the Court finds that Plaintiff is entitled to equitable relief pursuant to its intentional misrepresentation claim.[8]

**\*12** In accordance with the accompanying Order and Judgment, Defendant shall cease and desist from using any and all documents containing Plaintiff's Stamp, and shall destroy or return all of said documents to Plaintiff within seven days of the entry of that Order.

### III. CONCLUSION

For the reasons stated above, the Court will grant Plaintiff's Motion for Default Judgment. Partial Judgment in the amount of $21,425.00 shall be entered for Plaintiff. Plaintiff shall submit the required additional documentation to the Court, in accordance with the terms of this Opinion and the accompanying Order and Judgment, within twenty-one days of the entry of the Order and Judgment. Further, Defendant shall be enjoined from any continued use of any materials bearing Plaintiff's Stamp, and Defendant shall be ordered to destroy or return any documents containing Plaintiff's Stamp. An appropriate Order shall issue today.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 1346240

Kiss Elec., LLC v. Waterworld Fiberglass Pools, N.C., Inc., Not Reported in F.Supp.3d...

## Footnotes

1   The Court notes that Plaintiff only included invoices for four of the five Performed Jobs, but the amount due quoted by Plaintiff in its Amended Complaint matches the amount due when the four invoices are added together. Accordingly, the Court accepts for purposes of this Motion that Plaintiff is owed $21,425.00 for the work done on the Performed Jobs.

2   As a consequence of the Clerk of Court's entry of default against Defendant on July 11, 2014, and for purposes of deciding the instant Motion for Default Judgment, the Court accepts as true the factual allegations in Plaintiff's Amended Complaint, save those relating to the amount of damages. *United States v. Pinsky,* Civ. No. 10–2280, 2011 WL 1326031, at *2 (D.N.J. Mar.31, 2011) (citing *Comdyne I, Inc. v. Corbin,* 908 F.2d 1142, 1149 (3d Cir.1990)).

3   Plaintiff also alleges a "Demand for Equitable, Injunctive, and Declaratory Judgment" in Count VI of the Amended Complaint. The Court, however, construes this Count as a prayer for relief, rather than an independent cause of action, and it discusses the propriety of equitable relief *infra* at Part II.B.4.

4   The Court finds that Plaintiff's purchase and rental of the equipment and materials for the Pending Jobs was sufficient partial performance of the Pending Jobs that it rendered Defendant's promise to allow Plaintiff to perform those jobs enforceable. *See* 2–6 Corbin on Contracts § 6.1 (noting that where "part performance is so rendered as to justify the implication of a promise to render the entire performance proposed in the offer," the entire unilateral contract may become binding). Because of the significant and specific nature of the expenses undertaken by Plaintiff at Defendant's behest, the Court finds that the agreement for the Pending Jobs was a binding obligation, even if it were to find Plaintiff did not offer consideration for Defendant's promise that Plaintiff could perform those jobs.

5   Based on Plaintiff's submissions with its Motion for Default Judgment, it appears Plaintiff only seeks the money damages owed to it under the breached agreements, injunctive relief with respect to the Stamp, and attorneys' fees for all of its claims. Plaintiff apparently no longer seeks "penalties [and] punitive damages" for its intentional misrepresentation claim. (*See* Compl., Count V.) Because Plaintiff is entitled to the compensatory damages and the attorneys' fees pursuant to its breach of contract claims, the Court finds the only relief remaining is the equitable relief Plaintiff seeks in Count VI.

6   The Court does, however, accept the allegation that the materials and equipment purchased and rented were job specific, not suitable for any other projects, and would not have been purchased by Plaintiff but for Defendant's promise that Plaintiff would perform the Pending Jobs. (*See* Compl. ¶¶ 12–14.)

7   The weekly current prime rate is listed on the Board of Governors of the Federal Reserve System's website athttp:// www.federalreserve.gov/releases/h15/current/default.htm (last accessed March 23, 2015). Historical charts for the daily, weekly, monthly, and yearly rates are available athttp:// www.federalreserve.gov/releases/h15/data.htm (last accessed March 23, 2015.) Additionally, the Wall Street Journal publishes the daily prime rates, along with the prime rate ranges from the prior 52 weeks, athttp:// onl ine.wsj.com/mdc/public/page/2_3020–moneyrate.html (last accessed March 23, 2015). During the period covered by the events giving rise the present litigation until the date of this Opinion, the prime rate has remained at 3.25%.

8   As noted *supra* at note 3, Plaintiff attempts to assert a separate "Demand for Equitable Relief, Injunctive, and Declaratory Judgment" in Count VI, (Compl. at 11–13), but does not explain what cause of action entitles it to the equitable relief it seeks. Whether Plaintiff intended to state a cause of action for conversion or some other common law claim, the Court finds that Plaintiff's successful intentional misrepresentation claim entitles it to the equitable relief it now seeks.

---

**End of Document**                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

TAB 8

2009 WL 2595619

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court, D. New Jersey.

Paul JONES, Plaintiff,

v.

Luis MARIN and Anthony Lahanis,
Defendants and Third Party Plaintiffs,

v.

Derrec Jones, Walter Leasing and Walter
Brokerage, Third Party Defendants.

Civ. No. 07–0738 (WHW).

|

Aug. 20, 2009.

**Attorneys and Law Firms**

Barry S. Guaglardi, Esq., Englewood Cliffs, NJ, for
Defendant Anthony Lahanis.

Ryan Mulin, Esq., Killian & Salisbury, P.C., Clark, NJ, for
Plaintiff Paul Jones and Third Party Defendants Derrec Jones
and Walter Leasing and Walter Brokerage.

**OPINION**

WALLS, Senior District Judge.

 **\*1** This action arises out of a sale of a shipping and
freight company from plaintiff Paul Jones to defendants Luis
Marin[1] and Anthony Lahanis. Plaintiff alleges breach of
contract claims against defendants. Defendants assert breach
of contract, bad faith, unfair competition, tortious interference
and breach of the duty of loyalty claims against plaintiff and
third party defendants. Plaintiff and third party defendants
now move for summary judgment. Pursuant to Fed.R.Civ.P.
78, the Court decides the motion without oral argument. The
motion is granted.

**FACTS AND PROCEDURAL BACKGROUND**[2]

On August 7, 2006, defendants Marin and Lahanis agreed
to purchase Bulldog Lines, Inc., a New Jersey corporation
engaged in the business of shipping containers and freight,
from Paul Jones for $550,000. (Affidavit of Ryan Milun in
Support of Motion for Summary Judgment ("Milun Aff.")
Ex. B.) The contract of sale, drafted by Jones' counsel, called
for defendants to pay $200,000 immediately to plaintiff, the
remaining $350,000 by a promissory note held by Paul Jones.
(*Id.;* Pl.'s Statement of Undisputed Facts ("Pl.Facts") ¶ 8.) The
note was payable over three years by monthly payments of
approximately $10,000, with first payment due on February 1,
2007. (Milun Aff. Ex. B.) Under the promissory note's default
clause, the entire outstanding amount of the note would
come due at plaintiff's option if the defendants defaulted
on their payments. (*Id.*) Defendant Lahanis provided the
initial payment of $200,000 but took no part in the running
of Bulldog. (Pl. Facts ¶¶ 11, 12.) Defendant Marin was
responsible for the day-to-day operations. (*Id.* ¶ 12.)

The contract of sale required Jones to "provide the services
of the dispatcher for six months or until the dispatcher is
released from employment by the Buyers, whichever comes
first or, in the alternative, Paul Jones will continue to provide
his ordinary services to [Bulldog] for six months." (Milun
Aff. Ex. B.) The dispatcher at time of sale was Derrec Jones,
Jones' son. (Milun Aff. Ex. L at 44:15–17.) Derrec Jones
worked for Bulldog for six months following the sale. (*Id.*)
Paul Jones also stayed at Bulldog to help the new owners with
the transition. (Affidavit of Paul Jones ("Jones Aff.") ¶ 5.) In
October 2006, he gave notice to Marin and left the company.
(*Id.* ¶ 12.)

In November 2006, Jones started a new business called Walter
Leasing. (*Id.* ¶ 13.) Jones began doing work for previous
or current customers of Bulldog although he claims that he
was careful to avoid competing with Bulldog and took on
jobs which did not compete with Bulldog. (*Id.* ¶¶ 14–17.)
Bulldog, in the meantime, began experiencing cash flow
problems and eventually ceased operations. (Defs.' Counter–
Statement of Facts ("Def.Facts") ¶¶ 99–100.) Defendants
principally blame plaintiff for the failure of Bulldog alleging
that Jones failed to deliver Bulldog free and clear of liens
and encumbrances and that he "illegally" solicited Bulldog's
customers. (*Id.* ¶¶ 45, 85–86, 99.)

 **\*2** On February 13, 2007, Paul Jones filed suit against
Marin and Lahanis. Paul Jones alleges that defendants missed
their first promissory note payment, which had been due
on February 1, 2007. Invoking the default clause, he seeks

Jones v. Marin, Not Reported in F.Supp.2d (2009)

$350,000.00 in damages and interest. In response, Marin and Lahanis asserted counterclaims against Paul Jones and a third party complaint against Derrec Jones, plaintiff's son and Jones' new company, Walter Leasing and Walter Brokerage. They make trade name infringement, unfair competition, breach of contract, tortious interference, fraud, breach of implied covenant of good faith and fair dealing, unjust enrichment, promissory estoppel, and interference with proprietary information claims against Paul Jones. They also make tortious interference, breach of duty of loyalty, and interference with proprietary information claims against third party defendant Derrec Jones. Paul Jones and third party defendants now move for summary judgment. Defendant Lahanis opposes the motion.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is material if, under the substantive law, it would affect the outcome of the suit, and it is genuine if a reasonable jury could return a verdict for the non-moving party. *See Anderson,* 477 U.S. at 248. The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" in question. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To survive a motion for summary judgment, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. County of Lawrence,* 396 F.3d 314, 319 (3d Cir.2005). The non-moving party must go beyond the pleadings and, by affidavits or other evidence, designate specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex,* 477

U.S. at 323–24. "Conclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment." *Olympic Junior, Inc. v. David Crystal, Inc.,* 463 F.2d 1141, 1146 (3d Cir.1972).

**\*3** At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson,* 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See id.* at 255; *Curley v. Klem,* 298 F.3d 271, 276–77 (3d Cir.2002).

**DISCUSSION**

Paul Jones and third party defendants move for summary judgment contending that there is no factual dispute regarding the validity of the contract of sale or the promissory note and that there has been no material breach of the contract by Jones that would excuse defendants' performance under the promissory note. Defendant Lahanis does not dispute the movants' first point but argues that Jones' breach and his tortious acts excuse his obligation to repay the promissory note. Lahanis first claims that Jones committed fraud by representing that he was going to retire from the trucking industry. He also contends that Jones breached the contract by failing to stay at Bulldog for six months as agreed in the sale agreement and by failing to deliver Bulldog free and clear of debt and liens. Finally, he accuses Paul Jones and Derrec Jones of improperly using the Bulldog name to solicit business from Bulldog's customers. These acts allegedly violated the express and implied terms of the sales agreement to which the parties had agreed. The Court takes up each contention in turn.

**I. Fraud in the Inducement**

Lahanis first accuses Jones of fraud for representing that he was going to retire from the trucking industry. A contract that was induced by fraud may be deemed invalid and unenforceable under the law. *See Nolan v. Lee Ho,* 120 N.J. 465, 472, 577 A.2d 143 (1990). The elements of fraud in the inducement are a misrepresentation of material fact, knowledge or belief by the defendant of its falsity, intent that the other party rely on the misrepresentation, and reasonable reliance thereon by the other party. *See Nolan,* 120 N.J. at 472, 577 A.2d 143 (citing *Jewish Center of Sussex County v. Whale,* 86 N.J. 619, 625, 432 A.2d 521 (1981)).

Jones v. Marin, Not Reported in F.Supp.2d (2009)

Lahanis claims that both Marin and he relied on Jones' representation that he would retire from the trucking industry following the sale in deciding to purchase the company. That assertion is belied by Marin's statement at his deposition that he and Lahanis had relied on the strong revenues of Bulldog and nothing else in deciding to purchase the company. (Milun Aff. Ex. L at 45:22–46:12). Even if Marin and Lahanis had detrimentally relied on Jones' representation, Lahanis has presented no evidence for a jury to infer that Jones had made that representation with knowledge or belief of its falsity. It follows then that the defense of fraud in the inducement fails.

## II. Breach of Contract

Lahanis next complains that Jones materially breached the contract of sale by failing to deliver a debt-free company as warranted, continuing to commit Bulldog to financial obligations after the sale without the new owners' authorization, and failing to fulfill his obligation to serve as a consultant to the new owners following the sale.

**\*4** The parties do not dispute that New Jersey law governs this dispute. Under New Jersey law, if the terms of a contract are clear and unambiguous, the courts must enforce those terms as written. *See Driscoll Const. Co., Inc. v. Empire Mortgage Svcs., Inc.,* 341 N.J.Super. 216, 224, 775 A.2d 174 (App.Div.2001) (citing *Kampf v. Franklin Life Ins. Co.,* 33 N.J. 36, 43, 161 A.2d 717 (1960)); *Levison v. Weintraub,* 215 N.J.Super. 273, 276, 521 A.2d 909 (App.Div.1987), *cert. denied,* 107 N.J. 650, 527 A.2d 470 (1987)). Whether a contract provision or term is clear or ambiguous is a question of law and therefore suitable for a decision on a motion for summary judgment. *See Driscoll Const. Co., Inc. v. State, Dept. of Transportation,* 371 N.J.Super. 304, 313–14, 853 A.2d 270, 276 (App.Div.2004). "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations." *M.J. Paquet, Inc. v. New Jersey Dep't of Transp.,* 171 N.J. 378, 396, 794 A.2d 141, 152 (2002) (citation omitted).

A material breach by either party to a bilateral contract will excuse the other party from rendering any further performance. *See Magnet Resources, Inc. v. Summit MRI, Inc.,* 318 N.J.Super. 275, 285–86, 723 A.2d 976 (App.Div.1998). However, even a material breach will not excuse performance if the party continues to take advantage of the contract's benefits. *See S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 376 (3d Cir.1992). When one party to a contract believes that the other contracting party has breached

the agreement, the proper course of action is for "the non-breaching party to either stop performance and assume the contract is avoided, or continue its performance and sue for damages ." *Id.*

Defendant contends that Paul Jones materially breached the sale agreement by failing to pay various invoices and continuing to commit Bulldog into financial obligations without authorization. Defendant takes issue with three leased trailers that Jones returned after the close of the sale. (Def. Br. at 19–20.) Jones states, and defendant does not dispute, that he paid the invoice related to the lease trailers in full. (Jones Aff. ¶ 20.) Defendant next raises a litany of complaints, that Jones opened an E–Z pass account in Bulldog's name without authorization and failed to pay $29.90 owing on the account, and that he let fines and penalties in the amount of $188.84 levied by the Internal Revenue Service upon Bulldog to go unpaid. (Def.'s Counter–Statement of Facts ("Def.Facts") ¶¶ 80–81, 83, 93, 95.) Jones asserts that defendants never presented these bills to him for payment. (Jones Supp. Aff. ¶ 2.) Defendant also accuses Jones of registering a trailer with the New Jersey Division of Motor Vehicles ("DMV") without transferring the title of that trailer to the new owners. The only evidence of this claim is a renewal of registration notice from the DMV. (Marin Aff. Ex. N.) According to Jones, the trailer was sold to White Arrow Freight before the sale of Bulldog but White Arrow never re-registered the trailer which explains why Bulldog received the renewal notice. (Jones Aff. ¶¶ 25–26.) Lahanis does not dispute this. Lahanis also does not state how or if these alleged act or omissions by Jones interfered with the operation of Bulldog. He merely states, conclusorily, that Jones' actions "have made it impossible for Defendants to receive the benefit of purchasing the Company, i.e., the operation of the Company in a profitable and successful manner free from pre-existing debts and liens." (Def. Facts ¶ 97.)

**\*5** Even assuming that these acts or omissions violated the term in the sale agreement which represented that "[t]he sale is free and clear of any debts, mortgages, security interest, or other liens or encumbrances" (Milun Aff. Ex. B), the breach was not material. The total amount of the remaining invoices or bills that Jones allegedly owed was approximately $3,961. (Def. Facts ¶¶ 90, 94–95.) Although materiality of a breach is ordinarily a jury question, *see Magnet Resources,* 318 N.J.Super. at 286, 723 A.2d 976, there is no genuine issue for trial because no reasonable jury could find that Jones' failure to pay these amounts excuses defendant's obligation to satisfy the $350,000 promissory note. Defendant, however, may be

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 74 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 274 of 302
PageID: 282
Jones v. Marin, Not Reported in F.Supp.2d (2009)

entitled to a setoff for the amount that Jones owed to him and Marin.

Likewise, there is no genuine dispute of material fact regarding Jones' alleged failure to serve as an unpaid consultant to Bulldog for six months. The contract of sale obligated Jones to "provide the services of the dispatcher for six months or until the dispatcher is released from employment by the Buyers, whichever comes first or, in the alternative, Paul Jones will continue to provide his ordinary services to [Bulldog] for six months." (Milun Aff. Ex. B.) The dispatcher at time of sale was Derrec Jones. (Milun Aff. Ex. L (Marin Dep.) at 44:15–17.) Derrec Jones worked as a dispatcher for Bulldog for six months following the sale. Paul Jones, therefore, upheld his end of the bargain by providing the services of the dispatcher for six months. Paul Jones' service, in addition to Derrec's, was not required because the provision regarding his services was stated clearly as an alternative to providing the services of dispatcher. Summary judgment is granted to plaintiff on this breach of contract claim.

### III. Breach of the Implied Covenant of Good Faith and Fair Dealing, Breach of the Duty of Loyalty and Other Tort Claims

Lahanis accuses Paul Jones and Derrec Jones of improperly using the Bulldog name to solicit business from Bulldog's customers. This, defendant, alleges breached the implied covenant of good faith and fair dealing.

New Jersey law implies in every contract a covenant of good faith and fair dealing obliging parties to a contract to do nothing "which will have the effect of destroying or injuring the right of the other party to receive the fruits of that contract." *See Wade v. Kessler Inst.,* 172 N.J. 327, 340, 798 A.2d 1251 (2002). The implied covenant of good faith and fair dealing, however, cannot override express terms of a contract, *see Sons of Thunder, Inc. v. Borden,* 148 N.J. 396, 419, 690 A.2d 575 (1997), and may not "impose a condition in direct contravention of an unequivocal provision in a contract covering the identical subject." *Borbely v. Nationwide Mut. Ins. Co.,* 547 F.Supp. 959, 975 (D.N.J.1981). As a threshold requirement, a party bringing a bad faith claim must show that the other party acted in bad faith or with improper motive. *See Bruswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Assoc.,* 182 N.J. 210, 231, 864 A.2d 387 (2005) ("an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent an improper motive"); *Wilson v. Amerada Hess Corp.,* 168

N.J. 236, 251, 773 A.2d 1121 (2001) ("Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance.").

**\*6** The contract did not contain a covenant not to compete. (Milun Aff. Ex. B.) Even if the Court were to accept defendant's argument that solicitation of Bulldog's customers is a breach of the implied covenant, defendant has not presented any admissible evidence to show that Paul Jones or his son committed such a breach. Lahanis, as a "silent partner" in the business, had no knowledge of day-to-day operations of Bulldog. Marin's knowledge that Jones was doing work for a customer of Bulldog is based entirely on hearsay or double hearsay and therefore his testimony is inadmissible. The testimony of Robert Stillwell, another dispatcher at Bulldog, regarding Paul Jones' use of Bulldog's name is also based on hearsay. It follows then that Jones' statement that he was careful to avoid competing with Bulldog stands undisputed. Because defendant has no admissible evidence of wrongful conduct by Paul Jones let alone evidence of his bad faith motive, the breach of the implied covenant of good faith and fair dealing claim is dismissed.

Defendant's tortious interference with prospective economic advantage, interference with proprietary information, unfair competition and trade name infringement claims must also be dismissed as defendant has not produced any admissible evidence that Paul Jones misappropriated protected trade name or information or that Paul Jones competed unfairly. Finally, defendant has no evidence to support his breach of the duty of loyalty against Derrec Jones.[3] Defendant nitpicks at Derrec Jones' performance of his job but none show that Derrec Jones disregarded the interests of Bulldog, or that he helped his father compete with Bulldog. Although Robert Stillwell states that Derrec Jones acted suspiciously, the basis of his suspicion was merely that Derrec Jones took a service call on his cell phone so that he could not be overheard. No reasonable jury can infer based on this fact, alone or in combination with other acts, that Derrec Jones breached his duty of loyalty to his employer. Summary judgment on these claims is granted.

### IV. Quasi–Contract Claims

Defendant has pled two more causes of action, unjust enrichment and promissory estoppel which sound in quasi-contract. Claims in quasi-contract cannot be maintained where a valid contract fully defines the parties' respective

BER-L-006176-22  04/12/2023 6:03:28 PM  Pg 75 of 101  Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW  Document 1-2  Filed 06/20/23  Page 275 of 302
PageID: 283
Jones v. Marin, Not Reported in F.Supp.2d (2009)

rights and obligations. *See St. Matthew's Baptist Church v. Wachovia Bank Nat'l Assoc.,* No. 04–4540, 2005 WL 1199045, *7 (D.N.J. May 18, 2005) ("[w]here there is an express contract covering the identical subject matter of [an unjust enrichment] claim, [a] plaintiff cannot pursue a quasi-contractual claim for unjust enrichment"); *Winslow v. Corporate Express, Inc.,* 364 N.J.Super. 128, 143, 834 A.2d 1037 (App.Div.2003) (same). Defendant does not dispute that the contract for sale and the promissory note are valid contracts. Unjust enrichment and promissory estoppel claims are dismissed.

## CONCLUSION

The motion for summary judgment is granted in its entirety. In the absence of defenses to enforcement of the contract, Paul Jones is entitled to the amounts due under the promissory note. Lahanis may be entitled to a setoff for the amount that Jones owed to him and Marin if he offers proper proof of the invoices.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2595619

## Footnotes

1    Marin's counsel advised the Court that Marin filed a petition for bankruptcy in the Eastern District of New York on September 11, 2007. (Dkt. Entry No. 23.) The Court administratively dismissed Marin from this case without prejudice on October 1, 2007. (Dkt Entry No. 24.) Marin has not made a motion to re-enter the case. Although the Court may refer to Marin and his affidavit, this Opinion only resolves the motion as it relates to Defendant Lahanis.

2    Defendant Lahanis did not respond to plaintiff's Rule 56.1 Statement of Undisputed Facts. Instead, he included a "statement of disput'ed material facts" consisting of mostly irrelevant facts in his opposition brief. Pursuant to L. Civ. R. 56.1, the Court accepts as true all material facts contained in plaintiff's Rule 56.1 statement if they are supported by evidence and not contradicted in defendant's opposing evidence. *See Hill v. Algor,* 85 F.Supp.2d 394, 408 n. 26 (D.N.J.2000).

3    Even if defendant had a viable claim against Derrec Jones, it would not excuse Lahanis' obligation owed to Paul Jones under the contract of sale and promissory note.

---

**End of Document**                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

TAB 9

Fustok v. UnitedHealth Group, Inc., Not Reported in Fed. Supp. (2012)

2012 WL 12937486
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Abdel K. FUSTOK, M.D. et al., Plaintiffs,

v.

UNITEDHEALTH GROUP,

INC. et al., Defendants.

CIVIL ACTION NO. 12-cv-787
|
Signed 09/06/2012

**Attorneys and Law Firms**

Muhammad S. Aziz, Abraham, Watkins, Nichols, Sorrels, Agosto & Friend, Houston, TX, for Plaintiffs.

Andrew G. Jubinsky, Timothy A. Daniels, Figari Davenport et al., Dallas, TX, Dimitri Portnoi, Matthew W. Close, O'Melveny & Myers LLP, Los Angeles, CA, Patricia Hair, Phelps Dunbar LLP, Houston, TX, Shannon M. Barrett, O'Melveny Myers LLP, Washington, DC, for Defendants.

**MEMORANDUM AND ORDER**

KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE

*\*1* Pending before the Court is the Motion to Dismiss First Amended Class Action Complaint (Doc. No. 23) filed by Defendants UnitedHealth Group, Inc., Spectera, Inc., United HealthCare Services, Inc., and UnitedHealthcare Insurance Co. (collectively "United").

After considering the motion, all responses thereto, and the applicable law, the Court finds that United's Motion to Dismiss First Amended Class Action Complaint must be granted in part and denied in part.

**I. BACKGROUND**

This case is brought by Plaintiff Abdel K. Fustok, M.D. and Abdel K. Fustok, M.D., P.A. on behalf of themselves and all others similarly situated (collectively "Fustok") against United. United's motion, however, as well as this memorandum are limited to Fustok's claims without regard to the ostensible class.

On May 7, 2012, Fustok filed the First Amended Complaint (the "Complaint") (Doc. No. 20) alleging negligent misrepresentation, breach of implied-in-fact contract, liability in quantum meruit, promissory estoppel, and violations of the Texas Deceptive Trade Practices Act ("DTPA"). (Compl. ¶¶ 30-49.)

Fustok is licensed to practice medicine in Texas and regularly provided medical services to United's insured patients. Fustok served as an in-network health care provider for United before 2007. Beginning in 2007, Fustok switched to be an out-of-network health care provider for United. (Compl. ¶ 21.)

United has a certain set of procedures to reimburse out-of-network services. For some insurance plans, United requires that the insured patient or the out-of-network provider notify United prior to performing the medical services. Even if notification is not required, patients or providers may contact United to obtain information regarding potential coverage. Once United is contacted, it sends the insured patient and the out-of-network provider a letter confirming that notification has been given and that the procedure, based on limited information, is eligible to be covered. (Doc. No. 23 p. 5.) It was Fustok's practice to contact United for purposes of verifying and preauthorizing coverage before performing any medical services for United's insured patients. Fustok alleges that his office would call United as well as submit pre-authorization forms to United for review and approval. (Compl. ¶ 22.) Fustok claims that United expressly represented that Fustok would be compensated for his medical services. After receiving the pre-authorization, Fustok would then perform the medical services. (Compl. ¶ 22.) Fustok's practice of submitting services for pre-approval, performing the requested medical services once he received pre-approval, and then receiving reimbursement remained the same from 2007 until 2009. (Compl. ¶ 23.)

Beginning in October 2009, United denied a number of claims submitted by Fustok in which United had issued pre-authorization approval. (Compl. ¶ 22.) These claims were denied on the grounds that Fustok did not provide certain documents. The allegedly omitted documents included previous medical records related to the procedure; preoperative history and physical; anesthesia record and pre-op anesthesia evaluation form; intraoperative/perioperative nursing record; recovery room record; pathology reports; admission and discharge nurses' notes; laboratory and X-ray

Fustok v. UnitedHealth Group, Inc., Not Reported in Fed. Supp. (2012)

reports; and itemized facility statement. Fustok claims he did not have access to these records. (Compl. ¶ 24.)

## II. LEGAL STANDARD

### A. Failure to State a Claim
**\*2** Federal Rule of Civil Procedure 8(a) requires that a plaintiff's pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). If a plaintiff fails to satisfy Rule 8(a), a defendant may file a motion to dismiss the plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see also Bank of Abbeville & Trust Co. v. Commonwealth Land Title Ins. Co.,* 2006 WL 2870972, at \*2 (5th Cir. Oct. 9, 2006) (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1203 (3d ed. 2004)).

"To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' " *Cuvillier v. Taylor,* 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). That is, a complaint must contain sufficient factual matter that, if it were accepted as true, would "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). A claim need not give rise to "probability," but need only plead sufficient facts to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). A pleading also need not contain detailed factual allegations, but it must go beyond mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citation omitted).

While the court must accept well-pleaded facts as true, *Iqbal,* 556 U.S. at 678, it should neither "strain to find inferences favorable to the plaintiffs" nor "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.' " *R2 Investments LDC v. Phillips,* 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.,* 365 F.3d 353, 362 (5th Cir. 2004)). A court should not evaluate the merits of the allegations, but must satisfy itself only that plaintiff has adequately pled a legally cognizable

claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 376 (5th Cir. 2004).

### B. Rule 9(b) Fraud
Fustok's DTPA and negligent misrepresentation claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). In *Flowserve Corp. v. Hallmark Pump Co.,* the court noted that claims alleging violation of the DTPA are subject to the requirements of Rule 9(b). No. 09-cv-0675, 2010 WL 2232285, at \*6 (S.D. Tex. Feb. 3, 2010) (citing *Krames v. Bohannon Holman, LLC,* 2009 WL 762205, at \*10 (N.D. Tex. March 24, 2009)). The Fifth Circuit has also stated that Rule 9(b) applies to negligent misrepresentation claims if that claim and a DTPA claim are based on the same set of alleged misconduct. *Benchmark Elecs., Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 723 (5th Cir. 2003).

Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." In the Fifth Circuit, the Rule 9(b) standard requires "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they were fraudulent." *Plotkin v. IP Axess, Inc.,* 407 F.3d 690, 696 (5th Cir. 2005); *see also Southland Sees. Corp. v. Inspire Ins. Solutions, Inc.,* 365 F.3d 353, 362 (5th Cir. 2004). Essentially, the standard requires the complaint to allege answers to "newspaper questions" ("who, what, when, where, and how") of the alleged fraud. *Melder v. Morris,* 27 F.3d 1097, 1100 n. 5 (5th Cir. 1994).

## III. ANALYSIS
**\*3** United argues that the Complaint fails to state a claim pursuant to Rule 12(b)(6) or Rule 9(b) under theories of negligent misrepresentation, breach of an implied-in-fact contract, quantum meruit, and promissory estoppel. Additionally, United argues that Fustok fails to state a claim under the DTPA. Even if Fustok succeeds in stating a claim, United argues that all state law claims are preempted insofar as they seek insurance payments for patients who are covered by an employee benefit plan regulated by the Employee Retirement Income Security Act of 1974 ("ERISA"). Fustok contests all these arguments. They will be considered in turn.

### A. Preemption by ERISA
United argues that all of Fustok's claims relate to ERISA plans, and ERISA "preempts all state laws insofar as they 'relate to any employee benefit plan covered by the Act.' "

*Transitional Hospitals Corp. v. Blue Cross & Blue Shield of Texas, Inc.,* 164 F.3d 952, 954 (5th Cir. 1999) (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96-97 (1983)).

ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a). The Supreme Court has "observed repeatedly that this broadly worded provision is 'clearly expansive.' " *Egelhoff v. Egelhoff ex rel. Breiner,* 532 U.S. 141, 146 (2001) (quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655 (1995)). However, the Supreme Court also recognized that the phrase "relate to" would encompass virtually all state law if given its broadest reading. *Egelhoff,* 532 U.S. at 146. The text of § 1144(a) is not helpful in restricting the provision. Therefore the Court must "look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Travelers,* 514 U.S. at 656.

In the Fifth Circuit, a defendant pleading preemption under 29 U.S.C. § 1144(a) must prove that: "the state law claims address an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claims directly affect the relationships among traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries." *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236, 245 (5th Cir. 1990). The Fifth Circuit further held that, even if the plans in issue are ERISA plans, "ERISA does not preempt state law when the state-law claim is brought by an independent, third-party health care provider (such as a hospital) against an insurer for its negligent misrepresentation regarding the existence of health care coverage." *Transitional,* 164 F.3d at 954.

The merits of Fustok's state law claims do not depend on whether his services were or were not fully covered under the patients' plans, but rather on misrepresentation of reimbursement. Fustok alleges that United represented that Fustok would be compensated for his medical services. (Compl. ¶ 23.) If the plans did not cover the medical services, Fustok may go on to prove that he was reasonable to rely on United's statements regarding reimbursements. Even if the plans do cover the medical services, Fustok may have a misrepresentation claim to the effect that United omitted to inform Fustok that he would not be reimbursed. Fustok's alleged right to reimbursement does not depend on the terms of the ERISA plans, and therefore does not directly affect the relationships among traditional entities.

Not all third party providers escape preemption. The Fifth Circuit has stated that state law claims are preempted by ERISA when the third party "seeks to recover benefits owed under the plan to a plan participant who has assigned her right to benefits to the hospital." *Transitional,* 164 F.3d at 954. In this case, Fustok alleges that he is not acting as an assignee asserting patients' claim for ERISA benefits. (Doc. No. 24 ¶ 68.) Whether a medical provider is an assignee asserting a derivative claim for ERISA benefits is a "fact-sensitive inquiry" that need not be determined at this stage. *Cypress Fairbanks Med. Center, Inc. v. Pan-American Life Ins. Co.,* 110 F.3d 280 (5th Cir. 1997), *cert. denied,* 522 U.S. 862 (1997).

**\*4** Therefore United's motion to dismiss state law claims because of preemption by ERISA is denied.

## B. State Law Claims

### 1. Negligent misrepresentation

United moves to dismiss Fustok's negligent misrepresentation for failure to state a claim. However, the Court need not determine whether Fustok stated a claim because the claim would be barred by the statute of limitations.

In Texas, negligent misrepresentation claims have a two-year statute of limitations. *Newby v. Enron Corp.,* 542 F.3d 463, 468 (5th Cir. 2008); *Kansa Reinsurance Co. v. Cong. Mortg. Corp.,* 20 F.3d 1362, 1371-72 (5th Cir. 1994). The general rule in Texas is that a cause of action accrues and the statute of limitations begins to run when "a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *Murphy v. Campbell,* 964 S.W.2d 265, 270 (Tex. 1997) (quoting *S.V. v. R. V.,* 933 S.W.2d 1, 4 (Tex. 1996)); *Roberts v. Lain,* 32 S.W.3d 264, 269 (Tex.App.-San Antonio 2000, no pet). Fustok states that "false, material representations were made in pre-approval letters in the Fall of 2009." (Doc. No. 24 ¶ 24.) The two-year statute of limitations would have run in 2011. However, Fustok first pleaded a claim for negligent misrepresentation on May 7, 2012, months after the statute of limitations had run. (Compl. ¶ 30-33.)

Because the two-year statute of limitations has run, United's motion to dismiss this claim must be granted.

## 2. Implied-in-Fact Contract

United moves to dismiss Fustok's claim for breach of an implied-in-fact contract. The elements of a breach of contract claim are the same whether the alleged contract is express or implied. *See Plotkin v. Joekel,* 304 S.W.3d 455, 476 (Tex.App.-Houston [1st Dist.] 2009, review denied). In order to state a breach of contract claim based on an "implied-in-fact" contract, a plaintiff must allege the existence of a contract, the performance or tender of performance by the plaintiff, a breach by the defendant, and damages resulting from that breach. *Bridgmon v. Array Sys. Corp.,* 325 F.3d 572, 577 (5th Cir. 2003) (citing *Frost Nat'l Bank v. Burge,* 29 S.W.3d 580, 593 (Tex.App.Houston [14th Dist.] 2000, no pet.)).

Fustok alleges that United represented that it would compensate Fustok for providing medical services. (Compl. ¶ 22.) If these allegations are proven, it would establish the existence of a contract. Fustok also alleges that he performed his contractual obligations by rendering the medical services (Compl. ¶ 22), and that United breached its contractual obligation to pay for those services. (Compl. ¶ 24.) Fustok further alleges that he suffered damages as a result of United's breach. (Compl. ¶ 28.) These factual allegations satisfy the pleading requirements for a breach of contract claim based on an implied-in-fact contract.

The Court notes that United has not invoked the statute of frauds or any similar doctrine relating to parol evidence. Accordingly, and because Fustok has satisfied the pleading requirements, United's motion to dismiss this claim is denied.

## 3. Promissory Estoppel

**\*5** United argues that Fustok fails to state a claim for promissory estoppel. "The elements of promissory estoppel are: (1) a promise, (2) foreseeability of reliance by the promisor, (3) substantial and reasonable reliance by the promisee to its detriment, and (4) enforcing the promise is necessary to avoid injustice." *Collins v. Walker,* 341 S.W.3d 570, 573-74 (Tex.App.-Houston [14th Dist.] 2011, no pet.) *(citing English v. Fischer,* 660 S.W.2d at 524).

Fustok alleges that United promised to reimburse him for medical services performed (Compl. ¶ 43), and that reliance was foreseeable because United had issued pre-approvals

and had reimbursed dozens of surgeries according to this procedure prior to October 2009. (Compl. ¶ 42.) However, it does not follow that previous reimbursements necessarily lead to foreseeability of reliance by the promisor. All medical services claims are submitted on a case-by-case basis and previous payment does not guarantee future payment. Fustok alleges that he received pre-approval for these medical services. This pre-approval did not waive United's right to evaluate the claim when it was submitted for reimbursement. *Provident Am. Ins. Co. v. Castaneda,* 988 S.W.2d 189 (Tex. 1998) (holding that pre-authorization letters do not waive right to evaluate and deny claims). Fustok continued to submit pre-authorization and reimbursement claims for medical services, indicating that reimbursement was granted on a case-by-case basis. Therefore it was not reasonable for Fustok to assume that payment was guaranteed.

Fustok has failed to plead the second and third elements of a promissory estoppel claim. Therefore United's motion to dismiss this claim is granted. Fustok may amend his claim.

## 4. Quantum Meruit

United argues that Fustok does not have a claim for quantum meruit because services were provided to insured patients and not for United. To recover under quantum meruit, a claimant must prove that: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged. *Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc.,* 787 S.W.2d 942, 944 (Tex. 1990) (quoting *City of Ingleside v. Stewart,* 554 S.W.2d 939, 943 (Tex. Civ. App. 1977)). Quantum meruit "is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted." *Id.* Further, "[t]o recover in quantum meruit, the plaintiff must show that his efforts were undertaken for the person sought to be charged; it is not enough to merely show that his efforts benefitted the defendant." *Truly v. Austin,* 744 S.W.2d 934, 937 (Tex. 1988).

United argues that the medical services were not provided for United, but rather for the insured patients. In Fustok's complaint, he does acknowledge that the procedures were performed for United's insured patients. (Compl. ¶ 22.) However, Fustok claims that the procedures benefited United

Fustok v. UnitedHealth Group, Inc., Not Reported in Fed. Supp. (2012)

because it "discharged [United's] contractual obligation to facilitate health care for [United's] insured." (Compl. ¶ 40.) Whether United had a contractual obligation is a legal conclusion that Fustok has not supported with any factual allegations. Therefore United's motion to dismiss this claim is granted, but Fustok may amend his claim.

## 5. DTPA

 **\*6** United moves to dismiss Fustok's DTPA claim for failure to state a claim. Under the DTPA, only a consumer may seek relief. A consumer is defined as one "who seeks or acquires by purchase or lease, any goods or services." Tex. Bus. & Com. Code §§ 17.45(4). *See also Sherman Simon Enterprises, Inc. v. Lorac Service Corp.,* 724 S.W.2d 13 (Tex. 1987) (recognizing the two requirements to qualify as a consumer under the DTPA as (1) seeking or acquiring by purchase or lease (2) any goods or services). Fustok fails to meet this definition of a consumer.

First, Fustok did not "purchase or lease." The Texas Supreme Court has stated that third parties negotiating a settlement with an insurer do not seek to purchase or lease any of the services of the insurer. They seek the proceeds of the policy. A party whose only relation to an insurance policy is to seek policy proceeds is not a "consumer." *Transp. Ins. Co. v. Fair cloth,* 898 S.W.2d 269, 274 (Tex. 1995) (citing *English v. Fischer,* 660 S.W.2d 521, 524 (Tex. 1983)). Fustok sought to be reimbursed pursuant to his patients' insurance policies for medical services he performed. Since this was Fustok's only interaction with United, he was only seeking the proceeds of the insurance policy and cannot be said to have purchased or leased.

Second, Fustok did not acquire goods or services, but only money. Under Texas law, "money is not a 'tangible chattel,' or 'goods' as defined by the DTPA. Tex. Bus. & Com. Code § 17.45(1); *Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 174 (Tex. 1980).

Because Fustok was not a consumer as defined by the DTPA, he cannot seek relief under this law. Therefore, United's motion to dismiss this claim must be granted, but Fustok may amend his claim.

## IV. CONCLUSION

For the reasons discussed above, United's Motion to Dismiss First Amended Class Action Complaint is granted in part and denied in part.

United's Motion to Dismiss Amended Class Action Complaint is **DENIED** as to the ERISA preemption argument, **GRANTED** as to negligent misrepresentation, promissory estoppel, quantum meruit, and DTPA, and **DENIED** as to implied-in-fact contract.

Fustok is granted leave to file a Second Amended Complaint, consistent with this Memorandum and Order, by September 14, 2012.

## IT IS SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2012 WL 12937486

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

TAB 10

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 83 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 283 of 302 PageID: 291
Yapak, LLC v. Massachusetts Bay Ins. Co., Not Reported in F.Supp.2d (2009)

2009 WL 3366464
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

YAPAK, LLC d/b/a Klassi Kids, Plaintiff,

v.

MASSACHUSETTS BAY INSURANCE
COMPANY, The Hanover Insurance
Group, and John Does 1–10, Defendants.

Civ. No. 3:09–cv–3370.
|
Oct. 16, 2009.

**Attorneys and Law Firms**

Mauro Carlo Casci, Law Offices of Mauro C. Casci, Leonardo, NJ, for Plaintiff.

John Peter Malloy, Robinson & Cole LLP, Hartford, CT, for Defendants.

OPINION & ORDER

*INTRODUCTION*

THOMPSON, District Judge.

*\*1* This matter comes before the Court upon Defendants' Motion to Dismiss Plaintiffs' Amended Complaint [12]. This matter has been decided on the papers without oral argument. For the reasons stated below, Defendants' motion is GRANTED.

*BACKGROUND*

This dispute arises out of an insurance coverage dispute between Plaintiff and Defendants. On June 1, 2009, Plaintiff filed this lawsuit in the Superior Court of New Jersey. Defendants removed the action to federal court on July 9. Plaintiffs filed an Amended Complaint with the Court on September 4, and the Defendants have now moved to dismiss that complaint for failure to state a claim upon which relief may be granted under Fed.R.Civ.P. 12(b)(6).

*ANALYSIS*

I. *Standard of Review*

To survive a motion to dismiss, a plaintiff must plead sufficient factual matter to enable a court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal,* — U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). As the Third Circuit has explained, this requires the Court to undertake a two-step analysis:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief."

*Fowler v. UPMC Shadyside,* 578 F.3d 203, 210–211 (3d Cir.2009) (citing *Iqbal,* 129 S.Ct. at 1949–50). For purposes of resolving a motion to dismiss, "plausible" does not mean "probable," but it requires more than "sheer possibility." *Iqbal,* 129 S.Ct. at 1949; *see also Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In other words, if the factual allegations are more likely explained by lawful behavior than illegal activity, then the complaint should be dismissed. *Id.* at 1950.

II. *Application to Plaintiff's Complaint*

Plaintiff's complaint makes out two claims against Defendants: breach of contract and breach of the duty of good faith and fair dealing. The Court examines each in turn.

A. *Breach of Contract*

The classic elements of a breach of contract claim are (1) the existence of a valid contract, (2) defective performance, and (3) damages. *Coyle v. Englander's,* 199 N.J.Super. 212, 223, 488 A.2d 1083 (App.Div.1985). To survive a motion to dismiss, Plaintiff must allege facts sufficient to satisfy these elements, but a mere recital of the elements themselves will not suffice. *Iqbal,* 129 S.Ct. at 1949. In this case, the complaint is insufficient because it fails to allege defective performance adequately. Plaintiffs' allegations essentially amount to the following: Plaintiff sustained losses; Plaintiff submitted claims to Defendants; Defendants did not pay Plaintiff's claims; Defendants thereby breached their

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 84 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 284 of 302
PageID: 292
Yapak, LLC v. Massachusetts Bay Ins. Co., Not Reported in F.Supp.2d (2009)

contract with Plaintiff. (Am.Compl.1.) The last of these four allegations, that Defendants breached their contract, is a legal conclusion rather than a factual allegation, and therefore the Court must disregard it. The remaining, factual allegations simply amount to the proposition that Plaintiff had its insurance claim denied. While such a denial might be a breach of contract, it might equally well be perfectly legal under the terms of the agreement. In other words, Plaintiff's allegations do not rise beyond the "sheer possibility" threshold. *See Iqbal,* 129 S.Ct. at 1949. To make out a "plausible claim for relief," Plaintiff must allege factual matter sufficient to warrant the inference that when Defendants refused to pay, they violated their contractual obligations. Since Plaintiff has not alleged any facts concerning the terms of the contract or the losses at issue, this Court cannot infer whether the breach of contract claim is plausible. Consequentially, that claim must be dismissed.

B. *Breach of the Duty of Good Faith and Fair Dealing*

 **\*2**  There is no universally-accepted test for establishing a breach of the duty of good faith and fair dealing, but two elements appear to recur with some frequency: (1) the defendant acts in bad faith or with a malicious motive, (2) to deny the plaintiff some benefit of the bargain originally intended by the parties, even if that benefit was not an express provision of the contract. *See, e.g., Brunswick Hills Racquet Club, Inc. v. Route 18 Shoppint Ctr. Assocs.,* 182 N.J. 210, 225, 864 A.2d 387 (2005); *Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 251, 773 A.2d 1121 (2001). New Jersey law also recognizes a tort specific to the insurance contract context— that it is unlawful for an insurer to deny an insurance claim without any "fairly debatable" justification. *See Pickett v. Lloyd's,* 131 N.J. 457, 621 A.2d 445 (1993).

It is not clear which of these two causes of action is the basis for the second count of the complaint, but in either event, the claim fails. The second count is full of allegations that are, in essence, legal conclusions. Plaintiff alleges that Defendants' conduct was "willful, wanton, and malicious," that Defendants "breached the common law duty of good faith and fair dealing," and that "there was no 'fairly debatable' reason for the Defendants to not make payments.' " (Am.Compl.2.) These allegations simply allege the elements of a claim of bad faith, which make them legal rather than factual allegations. Another allegation simply states that Defendants violated a host of New Jersey statutes. (*Id.*) This is also a legal conclusion. Since all these allegations are legal rather than factual, the Court disregards them in considering the motion to dismiss. *Fowler,* 578 F.3d at 210–211. The only factual allegations in the second count of the Complaint are the facts incorporated from the first count, which simply amount to the proposition that Plaintiff made an insurance claim that was denied. This simple allegation does not support an inference that Plaintiff's claim for breach of the duty of good faith and fair dealing is a plausible one. Therefore, that claim must be dismissed as well.

*CONCLUSION*

Plaintiff has failed to state a claim upon which relief may be granted. It is therefore ORDERED that, on this 16th day of October, 2009, Defendants' Motion to Dismiss [12] is GRANTED.

It is further ORDERED that Plaintiff's Amended Complaint is DISMISSED without prejudice.

It is further ORDERED that Plaintiff is given 30 days to move for leave to file a second amended complaint. If Plaintiff does not so move, this case will be closed.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3366464

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

TAB 11

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 86 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 286 of 302
PageID: 294
Bijeau-Seitz v. Atlantic Coast Mortg. Services, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 3285979
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Joanne BIJEAU–SEITZ, et al., Plaintiffs,

v.

ATLANTIC COAST MORTGAGE

SERVICES, INC. et al., Defendants.

Civil No. 12–6372 (RBK/AMD).
|
June 28, 2013.

**Attorneys and Law Firms**

Harry Draudins, pro se.

Duane Kenneth Thompson, U.S. Securities & Excange Commission, Washington, DC, John Andrew Ruymann, Office of the U.S. Attorney, Trenton, NJ, for Plaintiff.

**OPINION**

KUGLER, District Judge.

**\*1** This matter comes before the Court on the motion of Bank of America, N.A. ("BOA") to dismiss the complaint of Joanne Bijeau–Seitz and Robert Seitz ("Plaintiffs"). Plaintiffs allege that BOA fraudulently delayed review of a loan modification application, made numerous fraudulent misrepresentations, breached their loan modification contract and the implied covenant of good faith and fair dealing, and also negligently processed Plaintiffs' loan modification request. Plaintiffs also assert claims based on alleged violations of the Federal Fair Debt Collection Practices Act ("FDCPA") and the New Jersey Consumer Fraud Act ("NJCFA"). BOA argues that Plaintiffs were not entitled to a loan modification and that none of the claims are properly pled. For the reasons expressed below, BOA's motion is **GRANTED IN PART, DENIED IN PART.** Because Plaintiffs failed to submit a proposed amended complaint to their motion to amend, Plaintiffs' motion to amend is **DENIED.**

**I. BACKGROUND**

On January 22, 2008, Plaintiffs entered into a loan agreement with Atlantic Coast Mortgage Services, Inc. ("Atlantic") after refinancing their home mortgage several times. Compl. ¶ 4. Under the terms of the thirty-year loan, which was secured by a mortgage on Plaintiffs' home, Plaintiffs owed principal in the amount of $243,397.00 with a 6% interest rate to be assessed annually. *Id.* at ¶ 4–5. At some point thereafter, Plaintiff Robert Seitz lost his job and Plaintiffs began having trouble making their mortgage payments. *Id.* at ¶ 6. On July 21, 2009, Plaintiffs contacted BOA to determine whether they were eligible for modification of their loan. *Id.* at ¶ 7–8. Plaintiffs submitted the relevant documentation to be considered for the Federal Home Affordable Modification Program ("HAMP"). *Id.* at ¶ 9. As time progressed, Plaintiffs' financial condition became so dire that they began receiving food stamps and Medicaid. *Id.* at ¶ 9. On October 26, 2009, Plaintiffs again contacted the bank to ascertain the status of the modification review process. *Id.* at ¶ 10. The representative with whom Plaintiffs spoke advised that the lender would need a "financial hardship letter" in order to complete the review. *Id.* at ¶ 11. Plaintiffs allege that Mr. Seitz sent the letter the same day. *Id.*

Within weeks, Plaintiffs hired Global Client Solutions to help expedite the process. *Id.* at ¶ 12. Plaintiffs allege that they paid a $1,700.00 fee and that Global Client Solutions began corresponding with BOA on their behalf. *Id.* On December 1, 2009, Plaintiffs again called BOA and were informed that the bank would need a new hardship letter and further documentation. *Id.* at ¶ 13. Although Plaintiffs insisted that they had already provided the information, the representative informed them that they would need to re-send it and that BOA would take up to 45 days to review their file. On February 10, 2010, a BOA representative informed Plaintiffs that they had never received the requested documentation, despite Plaintiffs' alleged delivery confirmation receipt.

**\*2** This back and forth continued for several months. *See Id.* at ¶¶ 16–24. On September 30, 2010, a BOA representative informed Plaintiffs that they were reviewed for a "special forbearance program" because they did not qualify for HAMP. *Id.* at ¶ 24. Plaintiffs allege that BOA violated HAMP requirements and protocols when it failed to notify them of their HAMP denial. *Id.* at ¶ 25. On December 7, 2010, a BOA representative informed Plaintiffs that they were approved for a modification at 4.87% fixed for 30 years and that their new monthly payment would be $1,907.00. *Id.* at ¶ 27. The representative allegedly told Plaintiffs that the paperwork would be sent out "shortly." *Id.* On January 4,

Bijeau-Seitz v. Atlantic Coast Mortg. Services, Inc., Not Reported in F.Supp.2d (2013)

2011, a BOA representative informed Plaintiffs that their file was closed because the bank determined that they were not actually qualified for the modification offered. *Id.* at ¶ 30.

On May 26, 2011, Plaintiffs contacted BOA and were told to submit additional documentation. *Id.* at ¶ 33. After submitting the information and having several conversations with BOA representatives, on June 20, 2012, Plaintiffs' attorney was informed that Plaintiffs did not qualify for modification because of their more than twelve month arrearage. *Id.* at ¶ 68. Plaintiffs' attorney was further informed that Plaintiffs' only options were to surrender their home via deed in lieu of foreclosure, or pay BOA over $10,000 by the end of the month and submit new information for a new review for modification. *Id.* at ¶ 69. Plaintiffs allege that BOA has since referred their file to foreclosure counsel. *Id.* at ¶ 70.

Plaintiffs now contend that BOA fraudulently refused to accept monthly payments when the outstanding balance was manageable and intentionally delayed the review process. *Id.* at ¶¶ 72–75. Plaintiffs further argue that BOA misrepresented that they were eligible for modification and that they had been approved for modification. *Id.* at ¶¶ 77–81. Plaintiffs also accuse BOA of negligently processed their loan modification request. *Id.* at ¶¶ 92–94. Plaintiffs additionally assert claims for breach of contract and for breach of the implied covenant of good faith and fair dealing based on BOA's failure to perform the loan modification after advising Plaintiffs that they qualified. *Id.* at ¶¶ 82–91. Finally, Plaintiffs allege that BOA violated the NJCFA by engaging in "unconscionable commercial practices" and the FDCPA by contacting Plaintiffs directly after being notified that they were represented by counsel. *Id.* at ¶¶ 95–101. BOA has moved to dismiss Plaintiffs' complaint in its entirety, arguing that Plaintiffs' allegations do not amount to cognizable legal claims.

## II. LEGAL STANDARD

*Federal Rule of Civil Procedure 12(b)(6)* allows a court to dismiss an action for failure to state a claim upon which relief can be granted. When evaluating a motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009) (quoting *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008)). In other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a

claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

**\*3** To make this determination, a court conducts a three-part analysis. *Santiago v. Warminster Twp.,* 629 F.3d 121, 130 (3d Cir.2010). First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Iqbal,* 556 U.S. at 675). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 131 (quoting *Iqbal,* 556 U.S. at 680). Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* (quoting *Iqbal,* 556 U.S. at 680). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679. A complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible. *Id.*

## III. DISCUSSION

Plaintiff alleges that BOA violated both state and federal law during their loan modification review process. The Court will address each count of the Complaint in turn, granting BOA's motion to dismiss as to some claims and denying the motion as to others. The Court will then address Plaintiffs' Motion to Amend.

### *1. Counts 1 and 2: Fraudulent Inducement and Fraudulent Misrepresentation*

Plaintiffs first assert claims against BOA for fraudulent inducement and fraudulent misrepresentation. The law governing each of these claims is the same as that of common-law fraud. *Kare Distribution, Inc. v. Jam Labels & Cards LLC,* No. 09–00969, 2009 WL 3297555, at \*4 (D.N.J. Oct.9, 2009). In New Jersey, the elements of a common law fraud claim are (1) a material misrepresentation of a presently existing or past fact, (2) knowledge or belief by the defendant of its falsity, (3) intent that the other person rely on it, (4) reasonable reliance thereon by the other person, and (5) resulting damages. *Banco Popular N. Am. v. Gandi,* 184 N.J. 161, 876 A.2d 253, 260 (N.J.2005). A common law fraud claim must be plead with particularity under *Federal Rule of Civil Procedure 9(b)*. *Fredericko v. Home Depot,* 507 F.3d 188, 200 (3d Cir.2007). Thus, a party claiming fraud must "plead or allege the date, time, and place of the alleged fraud or otherwise

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

inject precision or some measure of substantiation into a fraud allegation." *Id.*

BOA challenges the plausibility of Plaintiffs' fraud-related claims because "Plaintiffs fail to plead, at minimum, the fifth element, resulting damages." BOA's Br. at 6. BOA argues that Plaintiffs' allegations merely establish that Plaintiffs were in the same economic position prior to the bank's alleged misrepresentations as they were after the purported fraud. *Id.* at 7. BOA notes that Plaintiffs have not pled that they were assessed any late fees or other penalties and consequently cannot maintain an action for fraud against the bank. *Id.* Plaintiffs counter that they specifically pled that they paid Global Client Solutions $1700.00 fee and that BOA induced them into such debt that they were unable to re-pay the large lump sum owed.[1]

**\*4**  The Court finds that Plaintiffs fail to adequately allege damages for their fraud claims. To the extent that Plaintiffs argue that BOA induced them to accrue debt, Plaintiffs have not stated how this alleged inducement actually damaged them. As BOA notes, "[i]f Plaintiffs chose not to save the payments that were deferred during the modification review process, that decision is attributable to them, not BOA." BOA Br. at 7. As to the Global Client Solutions payment, the Court remains skeptical that such a fee would constitute damages. Although Plaintiffs did not detail Global Client Solutions' exact role in the modification review process, Plaintiffs state that the company corresponded with BOA on their behalf and faxed documentation upon request. *See* Compl. ¶¶ 12, 15. This voluntary expenditure on representational services seems more akin to an attorney's fee than to a compensatory damage and would consequently not suffice to save Plaintiffs' fraud claims. *See Baker v. National State Bank,* 353 N.J.Super. 145, 801 A.2d 1158 (N.J.Super.Ct.App.Div.2002) ("Traditionally, an award of attorney fees is not considered to be compensatory, but provided as a policy mater in specific types of cases, to remedy problem of unequal access to courts."); *See also Rendine v. Pantzer,* 141 N.J. 292, 661 A.2d 1202, 1219 (1995) ("Under the so-called 'American Rule,' adhered to by the federal courts and by the courts of this state, 'the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser.''). However, the Court declines to resolve this question because Plaintiffs allege other damages in their opposition brief that are sufficient. Therefore, the Court will grant BOA's motion to dismiss without prejudice, providing Plaintiffs the opportunity to properly seek leave to amend.

### 2. Count 3: Breach of Contract

Plaintiffs also assert a breach of contract claim against BOA based on the bank's failure to perform the loan modification after informing Plaintiffs that they were approved. Plaintiffs allege that "in consideration" for their performance of each of the lender's requests, BOA offered to modify their loan, which Plaintiffs assert they immediately accepted. *See* Compl. ¶¶ 83–84. Thus, Plaintiffs contend that they had an enforceable contract, which BOA breached by placing Plaintiffs' loan back in default status. *Id.* at ¶ 85, 661 A.2d 1202. BOA argues that any alleged contract is invalid because the modification "agreement" lacked consideration. BOA Br. at 8.

The law is well-settled that even where there has been offer and acceptance, a contract is unenforceable "without the flow of consideration-both sides must 'get something' out of the exchange." *Continental Bank of Pennsylvania v. Barclay Riding Academy, Inc.,* 93 N.J. 153, 459 A.2d 1163, (N.J.1983),* 1171, *cert. denied,* 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 684 (1983). This premise applies equally to agreements to modify existing contracts as to new contracts. *Oscar v. Simeonidis,* 352 N.J.Super. 476, 800 A.2d 271, 276 (N.J.Super.Ct.App.Div.2002) (citing *County of Morris v. Fauver,* 707 A.2d 958, 100 (1998)). Although a contract requires consideration, "the value given or received as consideration need not be monetary or substantial." *Id.* at 276. Thus, even a "very slight advantage to one party, or a trifling inconvenience to the other, is a sufficient consideration to support a contract." *Id. quoting Joseph Lande & Son v. Wellsco Realty,* 131 N.J.L. 191, 34 A.2d 418, 423 (N.J.1943).

**\*5**  Plaintiffs' allegations surely meet this low threshold. Plaintiffs allege that for almost two years, they remained in purgatory, uncertain of the status of their loan modification. Plaintiffs contacted BOA numerous times, only to be instructed to submit further documentation and additional hardship letters. After a convoluted back and forth, Plaintiffs were offered a modification over the telephone, which Plaintiffs allege that they immediately accepted. In their opposition brief, Plaintiffs argue that modifying the loan provided a benefit to BOA by allowing the bank to avoid the drawn-out and costly process of foreclosure. Pl.'s Opp'n at 6. Given these allegations and arguments, Plaintiffs have adequately alleged consideration.[2] In their reply brief, BOA attempts to frame the dispositive inquiry as whether Plaintiffs were entitled to modification by virtue of submitting an application and then answers this question in the negative.

BER-L-006176-22 04/12/2023 6:03:28 PM Pg 89 of 101 Trans ID: LCV20231258369

Case 2:23-cv-03372-BRM-CLW Document 1-2 Filed 06/20/23 Page 289 of 302 PageID: 297

Bijeau-Seitz v. Atlantic Coast Mortg. Services, Inc., Not Reported in F.Supp.2d (2013)

BOA Reply at 9. However, this question is immaterial to whether the modification agreement, allegedly brought about by BOA's own actions and not merely Plaintiffs' submission of the modification application, was supported by consideration. BOA also urges the Court to ignore Plaintiffs' "self-serving statement that 'foreclosure is not favorable to the lender' " because not foreclosing following a borrower default "is clearly a detriment to a secured creditor." *Id.* at 10, 34 A.2d 418. The "self-serving" nature of Plaintiffs' consideration argument is not dispositive of whether BOA received a "very slight advantage" or whether Plaintiffs incurred "a trifling inconvenience." Plaintiffs have pled that BOA's alleged offer was supported by consideration. As this is the only element of the breach of contract claim challenged by BOA, the Court will deny the motion to dismiss this claim.

### 3. Count 4: Breach of Covenant of Good Faith and Fair Dealing

Although Plaintiffs have alleged an enforceable contract, the Court will grant BOA's motion as to the breach of the implied covenant claim. Plaintiffs cannot maintain the action for breach of contract and breach of the implied covenant simultaneously. In New Jersey, every contract contains an implied covenant of good faith and fair dealing. *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assoc.,* 182 N.J. 210, 864 A.2d 387, 395 (N.J.2005); *Sons of Thunder, Inc. v. Borden, Inc.,* 148 N.J. 396, 690 A.2d 575, 587 (N.J.1997). In order to succeed on a claim for breach of the implied covenant, a plaintiff must prove that: (1) a contract exists between the plaintiff and the defendant; (2) the plaintiff performed under the terms of the contract [unless excused]; (3) the defendant engaged in conduct, apart from its contractual obligations, without good faith and for the purpose of depriving the plaintiff of the rights and benefits under the contract; and (4) the defendant's conduct caused the plaintiff to suffer injury, damage, loss or harm. *Wade v. Kessler.* Inst., 343 N.J.Super. 338, 778 A.2d 580, 586 (N.J.Super.Ct.App.Div.2001) *aff 'd as modified Wade v. Kessler Inst.,* 172 N.J. 327, 798 A.2d 1251 (N.J.2002). Generally, the implied covenant has been applied in three ways: 1) the covenant permits the inclusion of terms and conditions not expressly set forth in the written contract, 2) the covenant has been used to allow redress for bad faith performance of an agreement even where the defendant has not breached any express term, and 3) the covenant permits inquiry into a party's exercise of discretion expressly granted by the contract's terms. *Seidenberg v. Summit Bank,* 348 N.J.Super. 243, 791 A.2d 1068, 1076 (N.J.Super.Ct.App.Div.2002).

**\*6** Plaintiffs concede that under New Jersey law a plaintiff cannot maintain both breach claims based on the same conduct, but attempt to hurdle this obstacle by reframing their breach of the implied covenant claim. Plaintiffs argue that "Bank of America acted in a manner that had the 'effect of destroying or injuring the right of the other party to receive the fruits of the contract,' which directly violates the covenant." Pl. Opp'n at 7 (*citing Hahn v. OnBoard,* No. 09–3639, 2009 WL 4508580 (Nov. 16, 2009)). Even under this formulation, Plaintiffs' implied covenant claim is duplicative. Plaintiffs are not asserting that BOA complied with the express terms of the modification agreement, but did so in a manner that inhibited them from receiving the fruits of the contract. Plaintiffs are instead arguing that BOA deprived them of the benefits of the contract by not honoring the modification. Plaintiffs merely seek an additional path to recovery for BOA's alleged breach of contract. This is impermissible under New Jersey law and the Court will grant BOA's motion to dismiss this claim.

### 4. Count 5: Negligence

Plaintiffs have also asserted a negligence claim against BOA based on the bank's alleged negligent processing of Plaintiffs' loan modification application. This claim has been flatly rejected by several courts. *See Beals v. Bank of America, N.A.,* No. 10–5427, 2011 WL 5415174 at \* 16 (D.N.J. November 4, 2011) (finding that bank had no duty imposed by law as predicate for negligent processing claim); *See also Stolba v. Wells Fargo,* No. 10–6014, 2011 WL 3444078 (D.N.J. Aug.8, 2011). To state a viable negligence claim, a plaintiff must demonstrate a(1) that there was a duty of care, (2) the duty was breached, (3) and the breach was 146 the proximate cause of (4) actual damages. *Polzo v. Cnty. of Essex,* 196 N.J. 569, 960 A.2d 375, 384 (N.J.2008). However, courts have repeatedly held that creditors do not owe a duty of care to borrowers. *See Stolba,* 2011 WL 3444078 at \*5; *United Jersey Bank v. Kensey,* 306 N.J.Super. 540, 704 A.2d 38, 45 (N.J.Super.Ct.App.Div.1997).

In order to circumvent this established principle, Plaintiffs argue that BOA voluntarily undertook a fiduciary duty to Plaintiffs when it began providing Plaintiffs with "financial advice" and "direction." *See* Pl.'s Opp'n at 8. Plaintiffs then invoke precedent affirming the fiduciary duties of financial advisors. This argument is unconvincing. Plaintiffs cite no relevant precedent supporting the proposition that a self-interested bank can suddenly assume a fiduciary duty to consumers by providing "inconsistent and unsound advice, [failing] to return the phone calls and response to letters,

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 90 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 290 of 302
PageID: 298

Bijeau-Seitz v. Atlantic Coast Mortg. Services, Inc., Not Reported in F.Supp.2d (2013)

[failing] to comply with HAMP protocol and requirements, and [promising] to provide certain services which they may have never had the intention of providing." Compl. ¶¶ 93–94. Regardless of how Plaintiffs attempt to frame BOA's actions, they cannot establish that BOA owed a duty of care. Consequently, the Court must dismiss Plaintiffs' negligence claim with prejudice.

### 5. Count 6: FDCPA

**\*7** In addition to their state law claims, Plaintiffs allege that BOA violated the FDCPA when the bank engaged in prohibited debt collection practices such as contacting Plaintiffs directly after being informed that Plaintiffs were represented by counsel. *See* Compl. ¶ 96. The FDCPA's primary goal is to protect consumers from abusive, deceptive, and unfair debt collection practices. *F.T.C. v. Check Investors, Inc.,* 502 F.3d 159, 165 (3d Cir.2007). In essence, the legislation prohibits "debt collectors" from using certain enumerated collection methods to collect from consumers. *Id.* A "debt collector" is broadly defined by the statute as "any person who uses any instrumentality of interstate commerce or the mails in any business the principle purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). The FDCPA also includes enforcement provisions, which allow consumers to sue an offending debt collector for actual damages, attorney's fees and costs, and statutory damages up to $1,000. *F.T.C. v. Check Investors,* 502 F.3d at166.

The FDCPA's coverage does not generally extend to "creditors," as opposed to "debt collectors." *Police v. National Tax Funding, L.P.,* 225 F.3d 379, 404 (3d Cir.2000). A "creditor" is "any person who offers or extends credit creating a debt or to whom a debt is owed." 15 U.S.C. § 1692a(4). Excluded from this definition is one who "receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another." *Id.* In determining whether an entity is a "creditor" or "debt collector," courts focus on the status of the debt when it is acquired. *F.T.C. v. Check Investors,* 502 F.3d at 173. Thus, one is a "debt collector" under the FDCPA if the debt in question was in default when acquired. *Id.*

BOA argues that Plaintiffs have failed to plead a cognizable FDCPA claim because they have not alleged that BOA is a debt collector subject to the act. BOA argues that Plaintiffs' own allegations establish that BOA is not a debt collector because BOA began servicing the loan *before* Plaintiffs

defaulted. BOA further alleges that even if the bank was assigned Plaintiffs' mortgage after the default, BOA cannot be liable for the period following assignment because Plaintiffs have failed to allege "that such assignment was solely for the purpose of facilitating collection of such debt for another." Def.'s Br. at 1 citing 15 U.S .C. § 1692a(4). Plaintiffs protest that it is unclear "without the opportunity to conduct discovery, when the Defendant began servicing the subject loan" and that BOA is a debt collector under the statute. Pl.'s Br. at 9. However, BOA is correct that Plaintiffs' pleading does not meet the threshold requirements for an FDCPA claim. Plaintiffs have not pled that BOA is a debt collector subject to the FDCPA. As with Plaintiffs' fraud claims, the Court cannot rely upon assertions in Plaintiffs' moving papers to decide the motion. Accordingly, the Court will dismiss Plaintiffs' FDCPA without prejudice.

### 6. Count 7: NJCFA

**\*8** Finally, BOA moves to dismiss Plaintiffs' NJCFA claim.[3] BOA argues that because Plaintiffs' CFA claim is based on the same underlying conduct as the fraud claims, the Court should similarly dismiss that claim.[4] The Court agrees. Because Plaintiffs assert that the unlawful conduct was BOA's purported fraud and the Court has dismissed the fraud claims, the Court will dismiss the NJCFA claim without prejudice. *See Stolba,* 2011 WL 3444078 at *5 (dismissing NJCFA claim because fraud claim dismissed).

### 7. Motion To Amend

Plaintiffs alternatively argue that if their complaint is in any way deficient, the Court should grant Plaintiffs' leave to amend. Plaintiffs cite Federal Rule of Civil Procedure 15(a), which states that the Court should freely give leave to amend "when justice so requires." Fed.R.Civ.P. 15(a). Plaintiffs argue that they have set forth a sufficient basis in their moving papers for the Court to grant leave. Pl.'s Opp'n at 11. However, Local Rule 7.1 states that "upon filing a motion for leave to file an amended complaint or answer ... the moving party *shall attach to the motion a copy of the proposed pleading* or amendments and retain the original until the Court has ruled." (emphasis added) NJ L. Civ. R. 7.1(f). Plaintiffs failed to comply with this rule and did not provide the Court a copy of their proposed amendment. Accordingly, the Court will deny the motion to amend. If Plaintiffs wish to seek leave of the Court to file an amended complaint, they are advised to consult with the Local Rules for the District of New Jersey.

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 91 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 291 of 302
PageID: 299
Bijeau-Seitz v. Atlantic Coast Mortg. Services, Inc., Not Reported in F.Supp.2d (2013)

## IV. CONCLUSION

Plaintiffs have asserted the following claims against the defendants: fraudulent inducement, fraudulent misrepresentation, breach of contract, breach of the covenant of good faith and fair dealing, negligence, and claims for violations of the FDCPA and NJCFA. For the reasons previously stated, the Court will grant BOA's motion in part and dismiss the negligence claim with prejudice. The Court will deny BOA's motion to dismiss the breach of contract claim. Because Plaintiffs can potentially cure the deficiencies of their complaint by amending, the Court will dismiss the remainder of Plaintiffs' claims without prejudice. The Court will also deny Plaintiffs' motion to amend for failure to comply with the Local Rules. An accompanying Order shall issue today.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3285979

---

Footnotes

1   In their opposition, Plaintiffs allege that "they expended substantial time, incurred legal fees, etc. and while not specifically pled in so many words, late fees, interest, 'property inspection fees,' Bank of America's counsel fees, 'property reservation fees,' and other 'miscellaneous fees' *were* added to the Seitzes' loan account." (emphasis in original) Pl. Opp'n at 5. However, the Court cannot consider these additional allegations that were never set forth in Plaintiffs' pleadings. *See Schneider v. California Dept. of Corrections,* 151 F.3d 1194, 1197 n. 1 (9th Cir.1998) (The "new allegations contained in the [plaintiff's] opposition motion, however, are irrelevant for Rule 12(b)(6) purposes. In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss"); *See also Harrell v. United States,* 13 F.3d 232, 236 (7th Cir.1993) ("If a complaint fails to state a claim even under the liberal requirements of the federal rules, the plaintiff cannot cure the deficiency by inserting the missing allegations in a document that is not either a complaint or an amendment to a complaint.")

2   In the motion to dismiss, BOA argues that "Plaintiffs' Opposition relies on *Cave* for the principle that consideration for a loan modification can be found even in the slightest detriment to a borrower—in that case the borrowers' undergoing credit counseling." Def.'s Reply at 8. BOA continues on to distinguish the facts of *Cave v. Saxon Mortg. Services, Inc.* from Plaintiff's case. No. 11–4586 2012, WL 1957588 (May 30, 2012). Ultimately, BOA argues that "Cave's holding is inapplicable to the facts of this case, and Plaintiffs still fail to plead consideration to support a contract." Def.'s Reply at 8. BOA's distinction of Cave does not rebut Plaintiffs' consideration argument. Cave is relevant, not because it is factually analogous, but rather because the case recites well-established contract law on the minimal threshold for consideration.

3   To state a claim under the NJCFA, a plaintiff must show: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss. *Deutsche Bank Nat. Trust Co. v. Lacapria,* No. 08–2174, 2010 WL 715617, at *5 (D.N.J.Mar.1, 2010); *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.,* 192 N.J. 372, 929 A.2d 1076, 1086 (N.J.2007).

4   Plaintiffs did not address this argument in their opposition and instead argued that they had adequately pled damages to support both the NJCFA and common law fraud claims.

---

**End of Document**                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   6

TAB 12

BER-L-006176-22   04/12/2023 6:03:28 PM   Pg 93 of 101   Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 293 of 302
PageID: 301
Donnelly v. Option One Mortg. Corp., Not Reported in F.Supp.2d (2012)

2012 WL 4490642
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Christine DONNELLY and

Kevin J. Donnelly, Plaintiffs,

v.

OPTION ONE MORTGAGE

CORPORATION, et. al., Defendants.

Civil Action No. 11–7019 (ES).
|
Sept. 26, 2012.

**Attorneys and Law Firms**

David H. Kaplan, Law Office of David H. Kaplan, LLC, Stanhope, NJ, for Plaintiffs.

Anthony J. Laura, Patton Boggs LLP, Newark, NJ, Debora A. O'Neill, Matthew Lucius Miller, Meyerson & O'Neill, Philadelphia, PA, for Defendants.

**OPINION**

SALAS, District Judge.

**I. Introduction**

**\*1** Pending before this Court is a motion filed by Option One Mortgage Corporation, n/k/a Sand Canyon Corporation, ("Option One" or "Defendant") to dismiss Christine and Kevin J. Donnelly's (collectively, "Plaintiffs") Complaint, (D.E.1)[1], pursuant to Fed.R.Civ.P. 8(a), 9(b), and 12(b)(6). (D.E.18). The Court has jurisdiction under 28 U.S.C. § 1332(a). The Court has considered the parties' submissions in support of and in opposition to the instant motion, and decides the matter without argument pursuant to Fed.R.Civ.P. 78(b). For the reasons set forth below, the Court grants Defendant's motion.

**II. Background**

Plaintiffs allege that in 2006, Defendant Mortgage Tree Lending Corporation ("MTLC") approached them to refinance their mortgage on a residential property located at 690 Devon Street, Kearny, New Jersey. (Compl.¶¶ 1,

11). Despite being up-to-date on their mortgage payments, Plaintiffs entered into negotiations with MTLC. (*Id.* ¶¶ 12–13). Plaintiffs requested a loan with a fixed interest rate and monthly payments not exceeding $2,300. (*Id.* ¶ 14). MTLC, "in conjunction with" Option One, offered an adjustable interest rate loan with monthly payments of "more than $2,700." (*Id.* ¶ 16). MTLC explained that the loan would pay off the previous mortgage, that Plaintiffs would default if they failed to refinance, and that the loan could be further refinanced six months after execution. (*Id.* ¶¶ 17–18).

On October 25, 2006, the parties met in Plaintiffs' home to close on a mortgage to secure a $323,000 note payable to MTLC. (*Id.* ¶¶ 19, 23). Plaintiffs were "not advised to retain an attorney for the transaction." (*Id.* ¶ 23). Plaintiffs allege that the refinanced mortgage did not meet any of their stated specifications, nor was it necessary to stave off default or foreclosure on any existing mortgage. (*Id.* ¶¶ 24–26, 31). Plaintiffs aver that their consent was secured because Defendant NETCO, the settlement agent, did not furnish complete copies of the loan or closing papers. (*See id.* ¶ 29).

On November 2, 2006, MTLC assigned the mortgage note to Option One. (*Id.* ¶ 32). Thereafter, "plaintiffs made the[ir] first two mortgage payments to ... Option One in accordance with the mortgage note." (*Id.* ¶ 34). Option One placed the first payment into an escrow account rather than crediting it to the mortgage. (*Id.* ¶ 35). In other words, Option One "failed to properly credit [Plaintiffs'] payment." (*Id.*). The failure to properly credit that payment- and future payments-led "defendants Option One, GRP [Financial Services Corporation ("GRP") ] [the broker for the loan], and/or John Doe" to conclude that Plaintiffs had defaulted on their mortgage. (*Id.* ¶ 37). Consequently, Defendants commenced with foreclosure proceedings in April 2007. (*Id.*). Plaintiffs claim that they received no notice of default until the foreclosure action commenced. (*Id.* ¶¶ 36–37).

**\*2** In 2007, Plaintiffs contacted "Option One, GRP, and/or MTLC" and began negotiations on a Forbearance Agreement to prevent continuation of the foreclosure. (*Id.* ¶ 38). "Defendants Option One and GRP told the plaintiffs that they did not have to defend the foreclosure action." (*Id.* ¶ 39). As a result, "plaintiffs continued to make regular mortgage payments, as well as supplemental payment[s] to get current." (*Id.*).

In April 2008, Plaintiffs entered a Forbearance Agreement with Option One and GRP. (*Id.* ¶ 40). The Forbearance Agreement was to govern the parties' relationship until February 2009. (*Id.* ¶ 41). The Agreement required an initial payment of $21,000 with monthly payments of $3,000. (*Id.*). Plaintiffs allege that they "made all [of the] payments" as required by the Agreement. (*Id.* ¶ 45). The "Forbearance Agreement [also] placed the Foreclosure Action in abeyance and prohibited ... Option One from [pursuing foreclosure] during the pendency of the agreement." (*Id.* ¶ 42).

Notwithstanding the terms of the Forbearance Agreement, Option One entered final judgment in the foreclosure proceeding on July 15, 2008. (*Id.* ¶ 47). Plaintiffs allege that Option One also "obtained a Writ of Execution against the plaintiff['s'] property ...." (*Id.* ¶ 48). Plaintiffs aver that Option One failed to serve them with either the Writ of Execution or a copy of the final judgment. (*Id.* ¶¶ 48–49).

"At the conclusion of the Forbearance Agreement, the plaintiffs were prepared to resume making their regular monthly payments under the mortgage note .... [when] Defendants Option One and GRP again breached the Forbearance Agreement by informing the plaintiffs that ... [they] were required to make a balloon payment of $21,000." (*Id.* ¶¶ 52, 53). According to Plaintiffs, "[n]o such ... payment is stated in the Forbearance Agreement." (*Id.* ¶ 54). Furthermore, Plaintiffs "were financially unable to make [the $21,000 balloon] payment."[2] (*Id.* ¶ 56). As a result, on September 8, 2009, Option One and GRP commenced with sheriff's sale proceedings against Plaintiff's property and, on September 24, 2009, the Hudson County Sheriff issued a sheriff's deed to GRP. (*Id.* ¶¶ 59, 60).

In light of the preceding facts, Plaintiffs filed suit in New Jersey Superior Court on October 11, 2011 against Option One, MTLC, GRP, W.J. Bradley Mortgage Capital Corporation, NETCO, Inc., John Does No. 1–12, and ABC Corporations No. 1–10. On December 1, 2011, the suit was removed to this Court. Option One filed the instant motion to dismiss on February 16, 2012. (D.E.18). The matter is now ripe for this Court's adjudication.

## III. Legal Standards

### A. Motion to Dismiss for Failure to Comply with Rule 9(b)

Option One seeks dismissal of Counts One and Two of Plaintiffs' Complaint on the basis that they fail to meet the heightened pleading requirement of Fed.R.Civ.P. 9(b). Rule 9(b) imposes a heightened pleading requirement concerning allegations of fraud, including New Jersey Consumer Fraud Act claims, over and above that required by Rule 8(a). *Hughes v. Panasonic Consumer Elecs. Co.,* No. 10–846, 2011 U.S. Dist. LEXIS 79504, at *29, 2011 WL 2976839 (D.N.J. July 21, 2011).

**\*3** Rule 9(b) requires that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). The intended purpose of the heightened pleading standard is to require the plaintiff to "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir.2007) (internal quotations omitted); *see also Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984). "To satisfy this standard, the plaintiff must plead or allege the date, time, and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico,* 507 F.3d at 200. "Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation." *Lum v. Bank of Am.,* 361 F.3d 217, 224 (3d Cir.2004) (internal citation omitted); *Wiatt v. Winston & Strawn, LLP,* No. 10–6608, 2011 U.S. Dist. LEXIS 68827, at *53 (D.N.J. Jan. 27, 2011) ("The plaintiff must also allege who made the purported misrepresentations and what specific misrepresentations were made.") (internal quotations omitted).

### B. Motion to Dismiss for Failure to State a Claim: Rule 12(b)(6)

Option One seeks dismissal of Counts Three through Eight of Plaintiffs' Complaint on the basis that they fail to state a claim under Fed.R.Civ.P. 12(b)(6). On a motion to dismiss pursuant to Rule 12(b)(6), "[c]ourts are required to accept all well-pleaded allegations in the complaint as true and to draw all reasonable inferences in favor of the non-moving party." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008); *Burrell v. DFS Servs., LLC,* 753 F.Supp.2d 438, 440 n. 1 (D.N.J. Dec.6, 2010) (ruling that contradictory factual assertions on the part of defendants must be ignored). Courts must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 374 n. 7 (3d Cir.2002). "Factual allegations must be enough to raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Donnelly v. Option One Mortg. Corp., Not Reported in F.Supp.2d (2012)

929 (2007), and the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

**IV. Discussion**

**A. Count I—Violation of the New Jersey Consumer Fraud Act**

In Count One, Plaintiffs allege that Option One, jointly with other Defendants, violated the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8–1 *et seq.* ("NJCFA"), by making (1) "false promises and misrepresentations ... concerning the material terms of the subject mortgage note .... [which] include, but are not limited to, false promises and misrepresentations about the amount of the monthly payments, interest rate, type of mortgage, and the cost of financing," and by making (2) "false representations about the terms and conditions of the Forbearance Agreement ...." (Compl.¶¶ 78, 79). Option One argues that Plaintiffs' allegations do not satisfy the pleadings requirements of Rule 9(b) because they fail to "allege acts specifically attributable to Option One," or "specify the content of the false promises and misrepresentations...." (D.E. 18–3 ("Def. Moving Br.") at 8–9). In opposition, Plaintiffs explain that the Complaint specifically attributes the "forbearance agreement scam" to Option One; and restate that "Option One provided defendant MTLC with incentives to obtain the refinancing ...." (D.E. 31 ("Pl.Opp.Br.") at 8, 10).

**\*4** In order to establish a claim under the NJCFA, Plaintiffs must plead "(1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal relationship between the unlawful conduct and the loss." *Prof'l Cleaning & Innovative Bldg. Servs. v. Kennedy Funding, Inc.,* 245 F. App'x 161, 165 (3d Cir.2007); *Glass v. BMW of N. Am.,* No. 10–5259, 2011 U.S. Dist. LEXIS 149199, at *11, 2011 WL 6887721 (D.N.J. Dec. 29, 2011) (same). The Supreme Court of New Jersey has held that "the Act should be construed liberally in favor of consumers." *Cox v. Sears Roebuck & Co.,* 138 N.J. 2, 647 A.2d 454, 461 (N.J.1994). However, "breach of contract ... is not per se unfair or unconscionable ..." and "alone does not violate a consumer protection statute." *Id.* at 462 (citing *D'Ercole Sales v. Fruehauf Corp.,* 206 N.J.Super. 11, 501 A.2d 990, 998 (N.J.Supp.Ct.App.Div.1985)).

Claims brought under the NJCFA "are subject to the particularity requirements of Federal Rule of Civil Procedure 9(b)." *Parker v. Howmedica Osteonics Corp.,* No. 07–2400, 2008 WL 141628, at *2 (D.N.J. Jan.14, 2008). Accordingly, Plaintiffs must plead each NJCFA claim with the requisite specificity to "place the defendant on notice of the [unlawful] conduct for which it is charged." *Frederico,* 507 F.3d at 200.

Plaintiffs' claims under the NJCFA fail because (1) the allegations chronologically attributable to Option One sound only in breach of contract; and (2) the Complaint fails to ascribe particular fraudulent behavior to Option One.[3]

Plaintiffs claim that Option One made "false promises and misrepresentations" with regard to a variety of matters that occurred before the mortgage was executed on October 25, 2006. (*See* Compl. ¶¶ 19, 78). However, Plaintiffs concede that Option One did not become the assignee of the mortgage note until November 2, 2006. (*Id.* ¶ 32). Therefore, the sufficiency of Plaintiffs' pleading with regard to the initial mortgage transaction turns on the degree to which Option One was involved in that transaction. The Complaint describes the negotiation of the mortgage as between Plaintiffs and MTLC. (*Id.* ¶¶ 11–15). Plaintiffs then introduce Option One into the mortgage transaction in a conclusory manner, providing no explanation as to its specific role. (*See id.* ¶ 16 ("At the closing, defendant MTLC in conjunction with defendant Option One, presented an adjustable rate loan....")). Indeed, Plaintiffs attribute the coercive statements that were purportedly made during the mortgage negotiation to MTLC alone. (*See id.* ¶¶ 15, 17, 18). Plaintiffs then assign those statements to Option One, claiming that Option One provided MTLC with "incentives" in order to "obtain ... plaintiff's refinance and other mortgage notes...." (*Id.* ¶ 33). However, the Court is unable to ascertain the factual basis upon which Plaintiffs allege that Option One was giving direction to MTLC. To that end, Plaintiffs fail to sufficiently explain Option One's involvement in the initial transaction. For that reason, the Court grants Option One's motion for dismissal under Rule 9(b) for Plaintiffs' NJCFA claims pertaining to events prior to November 2, 2006.

**\*5** The Court next must determine whether Plaintiffs' NJCFA claim, with respect to the Forbearance Agreement, has been pleaded in conformance with the heightened pleading requirements of Rule 9(b). Plaintiffs allege that Option One entered final judgment in the foreclosure action despite Plaintiffs' timely payments, in contravention of the Agreement. (*Id.* ¶¶ 42, 47, 50). Plaintiffs further allege that

BER-L-006176-22 04/12/2023 6:03:28 PM Pg 96 of 101 Trans ID: LCV20231258369
Case 2:23-cv-03372-BRM-CLW Document 1-2 Filed 06/20/23 Page 296 of 302
PageID: 304
Donnelly v. Option One Mortg. Corp., Not Reported in F.Supp.2d (2012)

Option One demanded a balloon payment of $21,000, a term not contained in the Agreement. (*Id.* ¶¶ 53, 54). Defendant argues that the claim fails on two grounds: (1) the claim fails to satisfy Rule 9(b) because "[Plaintiffs] lump together Option One and GRP ... with no specificity as to when defendant did what, and when." (Def. Moving Br. at 10 n. 6); and (2) Plaintiffs' claims "are not fraud allegations at all, but rather breach of contract allegations...." (*Id.* at 11).

The Court finds that Plaintiffs fail to plead a NJCFA claim with the requisite specificity imposed by Rule 9(b) for the following reasons. First, Plaintiffs do not attribute any "unlawful conduct" with regard to the Forbearance Agreement to Option One, *i.e.,* Plaintiffs' allegations sound in breach of contract. (*See, e.g.,* Compl. ¶ 47 ("Surreptitiously and in breach of the Forbearance Agreement, defendant Option One entered final judgment against the plaintiffs ....")). Second, for allegations that could conceivably sound in fraud, Plaintiffs fail to state what acts, if any, Option One committed. Defendants correctly note that Plaintiffs do not plead circumstances "with sufficient particularity to give *each* defendant notice of the specific conduct for which Plaintiffs bring their claims." (Def. Moving Br. at 8) (citing *Naparano Iron & Metal Co. v. Am. Crane Corp.,* 79 F.Supp.2d 494, 511 (D.N.J.1999)). For example, Plaintiffs allege that Option One and Defendant GRP share responsibility for deceitful practices under the Agreement, but do not explain which party is responsible for what acts. (*See, e.g.,* Compl. ¶ 55 ("Defendant GRP and Option One told the plaintiffs that they must make the balloon payment before they could resume the normal monthly payments ....")). Plaintiffs' Complaint does not identify factual matter "injecting precision and some measure of substantiation into the fraud allegations" against Option One. *See Lum,* 361 F.3d at 224. Therefore, the Court dismisses Plaintiffs' NJCFA claims with regard to the Forbearance Agreement for failure to comply with the heightened pleading requirements of Rule 9(b).

**B. Count II—Common Law Fraud**

Plaintiffs next allege that Option One, jointly with all other Defendants, engaged in common law fraud through "misrepresentations ... [that] caused plaintiffs to enter into the mortgage transactions." (Compl.¶ 84).

Defendant argues that this claim is "conclusory" and does not "identify any specific misrepresentations by Option One," and therefore "fails to satisfy Rule 9(b)." (Def. Moving. Br. at 9). Conversely, Plaintiffs contend that Option One

"intentionally misrepresented its loan product for the purpose of inducing the plaintiffs to accept something they did not want ...." (Pl. Opp. Br. at 11). Plaintiffs further contend that Option One "misrepresented the terms of the [forbearance] agreement to the plaintiff ... knowing that its statement was false, intending for the plaintiff's to rely on them ...." (*Id.*).

**\*6** The elements of common law fraud are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 691 A.2d 350, 367 (N.J.1997). Claims of common law fraud are subject to the pleadings standards of Rule 9(b), so at minimum, the "circumstances constituting fraud" must be plead with sufficient particularity. Fed.R.Civ.P. 9(b).

The Court concludes that Plaintiffs have failed to comply with the stringent pleadings requirements of Rule 9(b) for the following two reasons. First, Plaintiffs' Complaint does not allege misrepresentation by Option One with any specificity. For example, Plaintiffs generally contend that Option One "provided incentives" to the original lender to "obtain the plaintiff's reliance" in disregard of "established lending criteria." (Compl.¶ 33). Thus, Plaintiffs offer no verification that Option One had a hand in the initial transaction.

Second, the Complaint does not identify the individual source of misrepresentation with any particularity. In order to survive dismissal under Rule 9(b), Plaintiffs must identify the "who, what, when, where, and how" of the alleged misrepresentation. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1422; *see also DiMare v. Metlife Ins. Co.,* 369 F. App'x 324, 330 (3d Cir.2010) (finding that a fraud claim fails under Rule 9(b) because it "fails to disclose the identity of the person who made the allegedly fraudulent misrepresentations"); *Klein v. Gen. Nutrition Co., Inc. .,* 186 F.3d 338, 345 (3d Cir.1999) ("The complaint fails to attribute the statement to any specific member of GNC management. [Rule 9(b) ] requires, at a minimum, that the plaintiff identify the speaker of allegedly fraudulent statements."). The particularity standards may be relaxed in circumstances where a plaintiff cannot know the identity of the fraudulent actor. *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 645 (3d. Cir.1989). In such circumstances, however, plaintiffs must "allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of facts upon which the allegations are based."

Case 2:23-cv-03372-BRM-CLW   Document 1-2   Filed 06/20/23   Page 297 of 302
PageID: 305

Donnelly v. Option One Mortg. Corp., Not Reported in F.Supp.2d (2012)

*Id.* In this case, Plaintiffs neither detail any interactions that might otherwise form the basis of a fraud claim, *see In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1422; *DiMare,* 369 F. App'x at 330, nor do they allege that the information necessary to plead a claim for fraud is solely within Option One's control. *See Craftmatic Sec. Litig.,* 890 F.2d at 645. Therefore, the Court finds that Plaintiffs fail to adequately plead a claim for common law fraud.

### C. Count III—Unconscionability

Next, Plaintiffs claim unconscionability, jointly against all Defendants, for "excessive fees and costs and overly onerous loan terms. This includes but is not limited to the additional interest payments ... and the closing costs to enter loans that these consumers did not understand and were defrauded into." (Compl.¶ 88).

**\*7** In seeking dismissal, Defendant argues that unconscionability "is not a recognized independent affirmative cause of action in the State of New Jersey." (Def. Moving Br. at 11). In opposition, Plaintiffs contend that they have alleged a valid unconscionability claim because the terms of the mortgage note and Forbearance Agreement were "dictate[d]" by Option One, leaving Plaintiffs "no options regarding terms and conditions." (Pl. Opp. Br. at 12).

"[C]ourts may refuse to enforce contracts that are unconscionable .... " *Saxon Constr. & Mgmt. Corp. v. Masterclean of North Carolina, Inc.,* 273 N.J.Super. 231, 641 A.2d 1056, 1058 (N.J.Super.Ct.App.Div.1994). A claim for unconscionability requires two elements: "(1) unfairness in the formation of the contract, and (2) excessively disproportionate terms." *Sitogum Holdings, Inc. v. Ropes,* 352 N.J.Super. 555, 800 A.2d 915, 920 (N.J.Super.Ct. Ch. Div.2002). To survive a 12(b)(6) motion, Plaintiffs must plausibly demonstrate "some overreaching or imposition resulting from a bargaining disparity between the parties, or such patent unfairness in the contract that no reasonable person not acting under compulsion or out of necessity would accept its terms." *Howard v. Diolosa,* 241 N.J.Super. 222, 574 A.2d 995, 999–1000 (N.J.Super.Ct.App.Div.1990).

The Court finds that this claim fails on two grounds. First, in New Jersey, unconscionability exists as an independent cause of action only insofar as it "shield[s] against [the] enforcement of an unreasonable contract." *Lind v. New Hope Prop., LLC.,* No. 09–3757, 2010 U.S. Dist. Lexis 36672, at \*25, 2010 WL 1493003 (D.N.J. Apr. 13, 2010) (quoting *Sitogum Holdings, Inc.,* 800 A.2d at 922 n. 14).

Here, instead of using unconscionability as a shield from an unreasonable contract-and requesting rescission alone-Plaintiffs assert unconscionability as an affirmative claim for relief by requesting money damages *beyond and in addition to* rescission. (Compl.¶ 91) (emphasis added). Thus, Plaintiffs' claim of unconscionability fails as a matter of law. Second, insofar as the Plaintiffs do seek rescission, the Complaint does not plead factual allegations sufficient to "raise a right to relief above the speculative level," *see Bell Atlantic Corp.,* 550 U.S. at 555, with regard to the Forbearance Agreement. Plaintiffs allege that they were "defrauded" into the Agreement, but provide no factual assertions concerning improper formation of the Agreement. (Compl.¶ 88). Nor do Plaintiffs indicate which specific terms within the Agreement are excessively disproportionate. Accordingly, Plaintiffs have failed to state a claim upon which relief can be granted. Consequently, Plaintiffs' claim for unconscionability is dismissed.

### D. Count IV—Unjust Enrichment

In Count Four, Plaintiffs allege that Option One, jointly with all other Defendants, was "unjustly enriched." (Compl.¶ 93). Plaintiffs apparently base this claim on overpayments on the various mortgage instruments they allege were improperly secured and administered by Option One. (*See id.* ¶¶ 19, 21, 22, 53, 54, 57, 58). Option One argues that this claim fails as a matter of law because such a claim is inapplicable where parties have a contractual arrangement. (Def. Moving Br. at 12). Plaintiffs posit that "all payments" were made under contractual obligations for which Option One "had no intention of abiding ...." (Pl. Opp. Br. at 12, 13). A contract secured under such circumstances cannot be held to govern the arrangement. (*Id.*).

**\*8** In order to state a claim for unjust enrichment, Plaintiffs must show that (1) the defendant received a benefit from the plaintiff; and (2) the defendant's retention of that benefit without payment would be unjust. *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 641 A.2d 519, 526 (N.J.1994). Further, the Plaintiffs must show that they "expected remuneration from the defendant at the time [Plaintiffs] performed or conferred a benefit on [the] defendant and that the failure of remuneration enriched [the] defendant beyond its contractual rights." *Id.* Plaintiffs must plead that the defendant was enriched in a manner not governed by any enforceable contract. *See, e.g., Estate of Gleiberman v. Hartford Life Ins. Co. ..,* 94 F. App'x 944, 947 (3d Cir.2004) ("Claims for unjust enrichment and the corresponding remedy, restitution, are only supportable when the parties' rights are not governed by a valid, enforceable contract."); *see also Minuto v.*

Donnelly v. Option One Mortg. Corp., Not Reported in F.Supp.2d (2012)

*Genesis Advisory Servs.,* No. 11–3391, 2012 U.S. Dist. Lexis 44882, at \*33, 2012 WL 1085807 (Mar. 29, 2012) (showing that the existence of a contractual relationship is antecedent to asserting enrichment beyond the bounds of such a relationship).

The Court finds that Plaintiffs have failed to state a claim upon which relief can be granted because they provide insufficient factual matter as to the content of their contractual relationship with Option One. Specifically, Plaintiffs' assertions of overpayments are conclusory, and this Court cannot interpret the rights of the parties under either the mortgage note or the Forbearance Agreement from the face of the Complaint.[4] Therefore, the Court cannot determine which, if any, transactions were not governed by the contracts. Accordingly, the Court dismisses this claim under Rule 12(b)(6) for failure to properly allege that the asserted enrichment is beyond the scope of the contracts.

### E. Count V—Breach of Fiduciary Duty

Plaintiffs next claim that Option One, jointly with other Defendants, owed a fiduciary duty to Plaintiffs and breached that duty through the "acts and omissions" set forth in the Complaint. (Compl.¶¶ 96, 97). The Court reads the Complaint to allege that Option One breached a fiduciary duty with regard to the Forbearance Agreement. Defendants argue that Plaintiffs have failed to state a cognizable claim because "a lender does not owe a fiduciary duty to a borrower, absent limited circumstances that are not present here." (Def. Moving Br. at 12) (citations omitted). Plaintiffs do not address this argument in their Opposition Brief, which Defendants cite as cause for "dismiss[al] for waiver ...." (D.E. 32 ("Def. Reply Br.") at 4).

A party cannot generally "state a claim for breach of fiduciary duty based solely on the allegations ... which reflect nothing more than a debtor-creditor relationship ...." *Abulkhair v. Citibank & Assocs.,* 434 F. App'x 58, 63 (3d Cir.2011). Presuming a fiduciary duty between creditors and debtors is counterintuitive to the necessarily oppositional nature of the transaction. *See Paradise Hotel Corp. v. Bank of Nova Scotia,* 842 F.2d 47, 53 (3d Cir.1988) ("It ordinarily would be anomalous to require a lender to act as a fiduciary for interests on the opposite side of the negotiating table.") (internal quotations omitted). Only limited "special circumstances" where the creditor "knows or has reason to know that the customer is placing his trust and confidence in the [creditor] and relying on the [creditor] so to counsel and

inform him" may give rise to a fiduciary duty. *United Jersey Bank v. Kensey,* 306 N.J.Super. 540, 704 A.2d 38, 45 (N.J.Super.Ct.App.Div.1997). Such a circumstance may be present when "the lender encouraged the borrower to repose special trust or confidence in its advice, thereby inducing the borrower's reliance .... and concealed its self-interest in promoting the transaction involved." *Id.* at 45–46. A special relationship is not implied for "less egregious circumstances" to create a duty to "disclose information [lenders] may have concerning the financial viability of the transactions the borrowers were about to enter." *Id.* at 46. For the purposes of assigning a fiduciary duty, a mortgage lender is treated the same as any bank creditor. *See, e.g., Margulies v. Chase Manhattan Mortg. Corp.,* 2005 N.J.Super. LEXIS 383, at \*6, 2005 WL 2923580 (N.J.Super.Ct.App.Div. Nov. 7, 2005) ("[A]s a general rule there is no fiduciary relationship between a debtor and a creditor, *i.e.,* also a mortgagee and a mortgagor....").

**\*9** The Court grants Defendant's motion to dismiss because Plaintiffs do not plausibly plead the existence of a fiduciary duty. According to the Complaint, the Forbearance Agreement included a clause that placed a stay on all foreclosure action. (Compl.¶ 42). Option One then "told the plaintiffs not to defend the foreclosure complaint while the forbearance agreement was in effect." (*Id.* ¶ 44). Option One breached the terms of the Agreement and entered Final Judgment in the foreclosure action roughly six months before the Agreement was set to conclude. (*Id.* ¶ 47). Accepting the factual allegations as true, the Complaint pleads a claim for breach of contract, not breach of a fiduciary duty. Plaintiffs argue that they relied upon Option One's counsel and ceased defending against foreclosure, and that this is an acceptable source of a fiduciary duty. Plaintiffs' argument is misplaced. In an adversarial debtor-creditor relationship, Option One should have no reason to believe that Plaintiffs were relying upon their legal counsel. Plaintiffs' allegations are insufficient to state a claim that Option One had a special relationship with the Plaintiffs from which the Court should read-in a fiduciary duty. Therefore, the Court grants the Defendant's motion to dismiss Count Five.

### F. Count VI—Breach of Good Faith and Fair Dealing

Plaintiffs next claim that Option One, jointly with all other Defendants, violated a covenant of good faith and fair dealing. (Compl.¶¶ 100, 101). Defendants argue that the claim should be dismissed because the Complaint fails to allege the "essential element ... that Option One (or any other defendant for that matter) acted maliciously, in bad faith, or

Donnelly v. Option One Mortg. Corp., Not Reported in F.Supp.2d (2012)

with improper motive." (Def. Moving Br. at 14). Plaintiffs do not address this argument in their Opposition Brief, which Defendants cite as a reason for the dismissal of this Count. (*See* Def. Reply Br. at 4.)

Every contract entered into under the laws of New Jersey contains an implied covenant of good faith and fair dealing. *Kalogeras v. 239 Broad Ave., L.L. C.,* 202 N.J. 349, 997 A.2d 943, 953 (N.J.2010). "The party claiming a breach of the covenant of good faith and fair dealing must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.,* 182 N.J. 210, 864 A.2d 387, 396 (N.J.2005) (quotations omitted). A plaintiff may be entitled to relief in an action under the covenant if the defendant acts with ill motives and without any legitimate purpose to destroy the plaintiff's reasonable expectations. *Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 773 A.2d 1121, 1130 (N.J.2001). However, "bad motive or intention" is essential, and "an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent improper motive." *Id.*

**\*10** In light of this precedent, the Court concludes that Plaintiffs have failed to adequately state a claim for breach of the implied covenant of good faith and fair dealing. In this case, the Court finds Plaintiffs' allegations concerning Option One's motives to be nothing more than conclusory statements devoid of factual support. For example, Plaintiffs allege that Option One acted "[s]urreptitiously" in entering final judgment in the foreclosure action. (Compl.¶ 47). Plaintiffs do not, however, provide facts explaining *how* or *why* Option One's actions should be viewed in that light. Plaintiffs further allege "[u]pon information and belief," that Option One had constructive knowledge of misleading behavior, from which improper motives should be inferred. (*Id.* ¶¶ 62, 64). This allegation is similarly flawed because it is devoid of factual matter demonstrating how Option One had such knowledge. Therefore, the Court finds that Plaintiffs have failed to proffer "plausible grounds to infer" bad faith, *Twombly,* 550 U.S. at 556, and this Court will not permit "an allegation of bad faith or unfair dealing ... to be advanced in the abstract." *Wilson,* 773 A.2d at 1130. Accordingly, the Court dismisses Plaintiffs' claim for breach of good faith and fair dealing.

**G. Count VII—Violations of the New Jersey Home Ownership Security Act ("NJ HOSA")**

In Count Seven, Plaintiffs claim that Option One, jointly with all other Defendants, violated the NJ HOSA "by regularly participating in abusing predatory lending practices, such as the making of loans that are equity-based rather than income-based, and the financing of high points and fees that causes the loss of equity with each refinancing." (Compl.¶ 106).

Defendants argue that dismissal is warranted because: (1) "[i]nstead of alleging actual facts as to how Option One violated HOSA, Plaintiffs merely make allegations that parrot the language of the statute ...;" (2) Plaintiffs do not specify what portions of the Act were violated; and (3) the "Complaint fails to show that their mortgage loan is within HOSA's purview in the first place." (Def. Moving Br. at 15–17). Plaintiffs counter that their Complaint does, in fact, specifically allege that NJ HOSA applies to their loan. (Pl. Opp. Br. at 11). Plaintiffs cite to ¶ 20 of their Complaint, which they claim sufficiently alleges that the loan exceeds certain thresholds as set by the Act. (*See id.*). Defendants respond by explaining that ¶ 20 of Plaintiffs' Complaint makes no mention of NJ HOSA, but instead raises violations of the Federal Home Ownership and Equity Protection Act. (Def. Reply Br. at 2).

The Court concludes that dismissal is warranted for the following reasons. First, Plaintiffs' allegations amount to nothing more than " 'a formulaic recitation of the elements of a cause of action[, which] will not do.' " *See Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555); *compare* N.J.S.A. § 46:10B–23(a) ("One of the most common forms of abusive lending is the *making of loans that are equity-based, rather than income-based.* The financing of points and fees in these loans provides immediate income to the originator and encourages the repeated refinancing of home loans.... *[T]he financing of high points and fees causes the loss of precious equity in each refinancing and often leads to foreclosure."*), *with* (Compl.¶ 106) ("The defendants ... violated the NJ HOSA by regularly participating in abusing predatory lending practices, *such as the making of loans that are equity-based rather than income-based,* and the *financing of high points and fees that causes the loss of equity with each refinancing .*" ) (emphasis added). Therefore, the Court finds Plaintiffs' NJ HOSA claim to be facially insufficient. Consequently, the Court dismisses this Count of Plaintiffs' Complaint.

**H. Count VIII–Predatory Lending**

**\*11** Finally, Plaintiffs seek relief for "predatory lending" by Option One, jointly with all other Defendants. (Compl.¶¶ 110–117). Plaintiffs claim that Option One (1) introduced

Donnelly v. Option One Mortg. Corp., Not Reported in F.Supp.2d (2012)

"onerous" loan terms that Plaintiffs had little "capability to repay;" (2) "targeted the plaintiffs" because of their geographic and economic position; (3) "targeted the plaintiffs and others, including the elderly, minorities, and residents of neighborhoods that do not have ready access to credit;" and (4) took "advantage of the plaintiffs due to their lack of sophistication in the lending market." (*Id.*¶¶ 111–116). Defendant seek dismissal of this Count on three independent grounds: (1) predatory lending "is not an independent cause of action under state law;" (2) any cause of action for "activities associated with predatory lending" are included in claims plead under NJ HOSA; or (3) "Plaintiffs have not made any factual allegations sufficient to support such a claim." (Def. Moving Br. at 17–19). Plaintiffs counter that the claim should not be dismissed because they "should have the opportunity to establish the existence of a legally cognizable claim" under the umbrella of predatory lending. (Pl. Opp. Br. at 14). Defendant contends, in its Reply Brief, that the Plaintiffs' Opposition Brief does "not dispute that New Jersey does not recognize predatory lending as a cause of action," so the claim remains deficient. (Def. Reply Br. at 6).

The Court finds that Option One has the better of the argument. In New Jersey, claims for "predatory lending" are tied to some underlying statute or provision that reflects the conduct charged. *See, e.g.,* N.J. Admin. Code § 3:30–1.1 (2012) ("The purpose of this chapter [entitled "Predatory Lending"] is to implement the New Jersey Home Ownership Security Act of 2002;) *Gutierrez v. TD Bank,* No. 11–5533, 2012 U.S. Dist. LEXIS 10724, at *38, 2012 WL 272807 (D.N.J. Jan. 27, 2012) (construing a claim for predatory lending as interchangeable with claims under the Truth in Lending Act and NJCFA); *Lawrence v. Emigrant Mortg. Co.,*

No. 11–3569, 2011 U.S. Dist. LEXIS 47020, at *51, 2012 WL 1108532 (D.N.J. Mar. 30, 2012) (construing a claim for predatory lending as an allegation of common law fraud); *Cleveland v. O'Brien,* No. 10–3169, 2010 U.S. Dist. LEXIS 120220, at *35, 2010 WL 4703781 (D.N.J. Nov. 12, 2010) (inferring that a claim under the "NJ Predatory Lending Statute" is actually claim under the NJHOSA). Plaintiffs attempt to assert a " 'colorable claim' of predatory lending" based upon *Associates Home Equity Services v. Troup,* 343 N.J.Super. 254, 778 A.2d 529 (N.J.Super.Ct.App.Div.2001). (Pl. Opp. Br. at 13–14). In that case, however, the Court interpreted the predatory lending claim as cumulative of a variety of other statutory claims, not as an independent cause of action. *See Assocs. Home Equity Servs.,* 778 A.2d at 536. Based upon the allegations contained in Plaintiffs' Complaint, the Court cannot discern whether this claim uses predatory lending to raise additional claims, or merely offers redundancies of claims alleged elsewhere in the Complaint. For that reason, the Court will dismiss this Count without prejudice and allow the Plaintiffs to cure the deficiency in an amended pleading.

## V. Conclusion

**\*12** For the foregoing reasons, the Court GRANTS Defendant's motion as to all counts. The Court dismisses all counts without prejudice and grants Plaintiffs leave to file an amended complaint-consistent with this Opinion—within 30 days. An accompanying Order shall follow. s/Esther Salas

## All Citations

Not Reported in F.Supp.2d, 2012 WL 4490642

## Footnotes

1   As requested by the Court, Plaintiffs re-filed their complaint to correct an inadvertent docketing error. (*See* D.E. No. 37). Although the re-filed version appears as an "Amended Complaint" on this Court's docket, (*see* D.E. No. 41), there is, in fact, only one operative complaint. (*See* D.E. No. 1–1, Ex. 1; D.E. No. 18–2).

2   The Court notes that "[by] March 2009, the plaintiffs had paid Option One approximately $70,000 toward[s] the mortgage note." (*Id.* ¶ 57, 778 A.2d 529).

3   Plaintiffs attempt to cure these deficiencies in their Opposition Brief, claiming that Option One "deceived the plaintiffs into a forbearance agreement it did not intend to honor," which it then failed to honor, (Pl. Opp. Br. at 8), and that GRP and Option One are properly associated because "GRP was the broker and servicer for Option One." (*Id.*). When considering a motion to dismiss, the Court "may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997). Consequently, Plaintiff's attempt to supplement his Complaint, or cure the deficiencies contained therein, by proffering additional allegations in his Opposition Brief, is futile. *See Commonwealth*

Donnelly v. Option One Mortg. Corp., Not Reported in F.Supp.2d (2012)

*of Pa ex. Rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 181 (3d Cir.1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (internal quotations omitted).

4   The Court notes that Plaintiffs did not attach either the mortgage note or the Forbearance Agreement to their Complaint.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.